**IN THE COURT OF COMMON PLEAS**
**MONTGOMERY COUNTY, OHIO**

| | | |
|---|---|---|
| JACQUELYN MARES, M.D. | ) | Case No. 2019 CV 02921 |
| | ) | |
| Plaintiff, | ) | Judge E. Gerald Parker |
| | ) | |
| v. | ) | |
| | ) | |
| MIAMI VALLEY HOSPITAL, et al. | ) | |
| | ) | |
| Defendants. | ) | |

---

**AFFIDAVIT TERESA ZRYD, M.D.**

---

| | |
|---|---|
| STATE OF OHIO | ) |
| | ) ss: |
| COUNTY OF MONTGOMERY | ) |

Now comes the Affiant, Teresa Zryd, M.D., having been duly cautioned and sworn, and hereby states as follows:

1. I affirm that I am of full legal age and am competent to make the following statements.

2. I have personal knowledge of the facts and matters contained herein and believe this information to be true.

3. I am the Vice President of Academic Affairs and Research and Chief Academic Officer at Miami Valley Hospital ("MVH"). In this position, the Chief Executive Officer of MVH has delegated to me decisions regarding resident physicians who are assigned to work at MVH.

4. MVH entered into an agreement with Wright State University (WSU) regarding the medical residency program at WSU's Boonshoft School of Medicine ("BSOM") and the assignment of residents to work and be trained at MVH. Attached as **Exhibit A** is a true and

accurate copy that agreement (referred to as the "Medical Education Agreement"), of which I am familiar. The Medical Education Agreement outlines the roles and responsibilities of WSU/BSOM and MVH in providing medical education to medical residents. The Medical Education Agreement specifically provides that WSU retains final responsibility for medical student education and academic training of BSOM resident physicians.

5. All BSOM resident physicians who are assigned to receive medical training at MVH enter into a Resident-Fellow Agreement with both MVH and WSU/BSOM ("Resident Agreement"). I am familiar with the Resident Agreement signed by most resident physicians assigned to MVH, including the one signed by Jacquelyn Mares, M.D.

6. All resident physicians assigned to work at MVH are considered to be "at will."

7. A resident physician may be dismissed from his or her assignment at MVH within the discretion of the BSOM residency program. Termination of a BSOM resident physician from her assignment at MVH is appropriate if she fails to meet any of the program requirements set forth by the BSOM or if she is terminated by the BSOM residency program.

8. I have also been the Program Director of the Family Medicine Residency Program at WSU/BSOM. I am familiar with the WSU/BSOM, Resident Manual, including Item 504 – Academic and Professional Standards / Due Process.

9. I learned in October 2018, that Jacquelyn Mares, M.D., a resident physician in the Obstetrics & Gynecology Residency Program at WSU/BSOM had been recommended for dismissal from the program by Theodore Talbot, M.D., the Residency Director of the Obstetrics & Gynecology Program at WSU/BSOM and the Clinical Competency Committee. Attached as **Exhibit B** is a true and accurate copy of the recommendation of the Clinical Competency Committee that I received in the normal course of business and reviewed.

10. Consistent with Item 504, Dr. Mares appealed the recommendation of the Clinical Competency Committee and a panel of three members conducted a hearing on November 7, 2018, concerning Dr. Mares's dismissal from the program.

11. I received the hearing panel's recommendation dated November 14, 2018. The panel recommended that Dr. Mares remain on probation and meet a variety of other conditions in order to remain in the program.

12. After receiving the hearing panel's recommendation, I reviewed the transcript from the hearing, as well as a multitude of exhibits submitted at the hearing. The hearing panel testimony revealed concerns regarding repeated instances of unprofessional, rude, and insubordinate conduct and difficulties with interpersonal communications. It also revealed that Dr. Mares had not met expected standards regarding critical communications regarding patients and had entered incorrect information in a patient safety report. The hearing exhibits consisted of over 130 pages and included, but were not limited to, evaluations of Dr. Mares by the Directors of WSU/BSOM OB/GYN Residency Program, evaluations by medical interns who worked with Dr. Mares, complaints by medical students, feedback from attending physicians, notes from Clinical Competency Committee meetings, patient complaints, documents relating to Dr. Mares's probation, feedback from Dr. Mares's rotation at the Wright-Patterson Medical Center, and letters in support of Dr. Mares.

13. After reviewing all of the evidence submitted, I consulted with Margaret Dunn, M.D., M.B.A., the Dean of BSOM. Dr. Dunn agreed with the Clinical Competency Committee that Dr. Mares should be dismissed from the program, and I agreed. We did not make this decision lightly. Dr. Mares demonstrated persistent unprofessional and insubordinate conduct involving patients, faculty, supervisors, and learners. She had previously been counseled about her

deficiencies in professionalism and interpersonal communications and had been placed on probation for such deficiencies. Despite this fact, her behavior did not improve and only worsened.

14. On December 3, 2018, Dr. Dunn and I wrote a letter to Dr. Mares informing her of our decision to affirm the recommendation of the Clinical Competency Committee to dismiss her from the residency program. Attached as **Exhibit C** is a true and accurate copy of that letter. In that letter, we informed Dr. Mares that she could appeal the recommendation to the Provost of WSU, Dr. Susan Edwards.

15. Dr. Mares appealed the dismissal recommendation made by me and Dr. Dunn to the Provost of WSU.

16. Dr. Susan Edwards, the Provost of WSU, decided to dismiss Dr. Mares from the program. Attached as **Exhibit D** is a true and accurate copy of a letter from Dr. Edwards dated January 9, 2019, that I received.

FURTHER AFFIANT SAYETH NAUGHT

_____
Teresa Zryd, M.D.

Sworn to and subscribed before me by Teresa Zryd, M.D. on this _11_ day of September, 2019.

_____
Notary Public

4846-4461-6354, v. 1

THERESA M CORY, Notary Public
In and for the State of Ohio
My Commission Expires Sept. 2, 2020

# EXHIBIT A

AGREEMENT BETWEEN THE
WRIGHT STATE UNIVERSITY BOONSHOFT SCHOOL OF MEDICINE AND
MIAMI VALLEY HOSPITAL

This agreement, between the Wright State University, including the Boonshoft School of Medicine, Dayton, Ohio, hereinafter referred to as the "University," and the Miami Valley Hospital, Dayton, Ohio, hereinafter referred to as the "Hospital," is entered into for the mutual benefit of both.

PREAMBLE

The primary concern of the hospital is to provide quality care for patients. This quality can be enhanced when a quality teaching program for medical students, resident physicians, and other learners is incorporated as a basic policy of the hospital. We are convinced that the continued affiliation of the Hospital with the University will strengthen further that teaching program and will contribute thereby to the maintenance of quality patient care.

The primary mission of the University's School of Medicine is the education of its medical students, resident physicians, and other learners. The University is convinced that a quality clinical educational program for its students and resident physicians can be obtained when quality patient care is demonstrated as part of the educational process.

WITNESSETH

Whereas, the University has established a School of Medicine and students of said School need supervised clinical experience and the use of clinical facilities, and

Whereas, the University has developed programs of medical education in a number of affiliated community facilities and is desirous of continuing to include the Hospital among these facilities, and

Whereas, the Hospital has the facilities for furnishing clinical training, and

Whereas, the Hospital desires continued enrichment of its medical education program by direct association with the University, and

Whereas, it is to the mutual benefit of the parties that students of the University are assigned in the Hospital facilities for clinical training and experience, and resident physicians of the Hospital are assisted by the resources of the University for orderly progress of their education, and

Whereas, it is to the mutual benefit of the parties that qualified members of the University may be appointed to the staff of the Hospital, and

Whereas, it is to the mutual benefit of the parties that qualified members of the Hospital Staff may be appointed to the faculty of the University, and

Whereas, both parties recognize that the Hospital retains final authority for patient care, and

Whereas, both parties recognize that the University retains final responsibility for the academic programs of medical student education and the academic training of resident physicians in its sponsored residencies, and

Whereas, the parties desire to memorialize their agreement with respect to medical education recognizing that the substance of this Agreement shall provide the basis for the working relationship and for decision making, and that the parties will not attempt to predetermine each decision but continue to permit growth and development of an effective inter-institutional relationship,

Now Therefore, in consideration of the mutual commitments herein contained, which are hereby incorporated to this Agreement, the parties hereby agree to the following:

1. JOINT RESPONSIBILITIES

    1.1. Joint Cooperation. The Hospital Chief Executive Officer and the Dean of the School of Medicine or their designees shall meet periodically and as needed to carry on the cooperative activities including but not limited to the financial responsibilities for medical student and residency education, as well as to periodically review changing requirements of the institutions, individually and collaboratively.

    1.2. Facilities and Resources. The Hospital and the University agree to the mutual use of the facilities and resources of the parties in accordance with the policies, bylaws, rules and regulations of each to more fully realize the substance of this association. Clinical resources of the Hospital shall be made available for teaching purposes for the students and resident physicians of the University subject to the policies, bylaws, rules and regulations of the Hospital. Under these guidelines, the Hospital will provide each medical student and resident physician, who is certified by the University and approved by the Hospital, the opportunity for clinical experience and will permit such students, resident physicians and members of the University Faculty access to appropriate hospital and outpatient department facilities. The Hospital will permit its Staff, and other personnel, to participate in the clinical experience and teaching of students and resident physicians.

    1.3. Accreditation. Both parties agree to work together towards the maintenance of appropriate accreditation status of each other.

    1.4. Non-Discrimination. Both parties agree to maintain a policy in which neither will discriminate against any employee, applicant for employment, student or resident physician because of age, gender, race, color, creed, national origin, disability, or veterans' status in accordance with applicable law.

1.5. **Appointment to Staff.** Where appropriate and consistent with the intent of this agreement and the regulations of each party, key leadership positions, such as a chair of a School of Medicine clinical department physically based at the Hospital, will be appointed by the University to the University Faculty, with advice provided by Hospital academic leadership, and by the Hospital to the Hospital medical staff so long as practitioner meets eligibility requirements under the Hospital's Medical Staff Bylaws. The Hospital Vice President of Academic Affairs, as the leadership person in medical education representing the Hospital, will be appointed by the Hospital with the advice of the University.

1.6. **Medical Staff.** It is agreed by both parties that this agreement is not intended to limit the Hospital's prerogative to appoint physicians to its medical staff. Hospital medical staff physicians are not required to participate in the medical student or residency education programs, nor does this agreement limit the admissions policy of the Hospital or patients of its medical staff physicians. Medical staff physicians of the Hospital may be selected and appointed by the University to the Faculty of the University. Physician faculty of the University may be selected and appointed to the Hospital medical staff by the usual credentialing procedures of the Hospital, in which case the physician shall support and abide by the Hospital's programs under the terms of the Hospital's Medical Staff Bylaws.

1.7. **Term and Termination.** The terms of this agreement shall commence upon the signing of this agreement and shall continue until terminated by either party. Such termination shall be preceded by written notification to the other party of the intention to terminate sent by registered mail one year prior to the proposed termination date. However, both parties may mutually agree to terminate this agreement at any time. This agreement is entered into with a spirit of mutual cooperation for the benefit of both parties, with the full realization that this agreement encompasses long-range planning and joint efforts to assure meaningful learning experiences for the students, resident physicians, staff, and faculty and to assure the quality of health care for the patients.

1.8. **Severability.** If any one or more of the provisions contained in this Agreement are held to be invalid, illegal, or unenforceable in any respect for any reason, then such invalidity, illegality, or unenforceability shall not affect other provisions hereof. It is the intention of the parties that, if any provision is held to be invalid, illegal, or unenforceable, there shall be added in lieu thereof a mutually agreeable valid and enforceable provision as similar in terms to such provision as is possible.

1.9. **Relationship of Parties.** Nothing herein is intended to be construed as creating joint venture, partnership, tenancy-in-common, or joint tenancy relationship between the parties hereto and nothing herein contained shall be construed to authorize either party to act as agent for the other. In performing their respective obligations hereunder, the Hospital and the University shall be deemed independent contractors

and each shall assume full responsibility for their respective employees, agents, or subcontractors.

1.10. Indemnification. Each party shall agree to indemnify and hold the other harmless from any and all claims, actions and proceedings, judicial or otherwise, judgments, damages, costs, expenses, and attorneys' fees, arising from or in connection with its respective responsibilities under this agreement to the extent provided by Ohio law.

1.11. Entire Agreement. This agreement contains the entire Agreement of the parties hereto unless otherwise stated and supersedes all prior agreements and oral or otherwise amendment of this Agreement shall not be effective unless the same shall be in a writing duly executed by all parties hereto.

1.12. Binding Effect. This Agreement shall be binding upon the parties hereto and their respective heirs, legal representatives, successors, and assigns.

1.13. Governing Law. This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Ohio.

1.14. Confidentiality of Patient Information. University warrants and covenants that neither it nor its faculty employees nor its students and resident physicians will share or release, disclose or provide to third parties any of the confidential, private or otherwise sensitive information it may have or become aware of regarding the Hospital's' patients. University further agrees that the medical record of each patient that receives services pursuant to this Agreement is the property of the Hospital and shall be treated as confidential by University and its faculty, students and resident physicians pursuant to the policies of the Hospital and applicable law. University acknowledges that Hospital is bound by law to have written agreements with its business partners who may have access to patient information requiring compliance with the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the rules and regulations promulgated thereunder. Accordingly, University warrants and represents that it understands the privacy concerns of protecting patient health information and shall perform its services under this Agreement in compliance with HIPAA and all relevant federal statutes, rules, regulations and applicable interpretive rulings governing the confidentiality and privacy of protected health information. Failure by University or its faculty or students and resident physicians to comply with this provision shall result in immediate and automatic termination of such faculty, student or resident physician from participation in the educational program under this Agreement.

2. UNIVERSITY (SCHOOL OF MEDICINE) RESPONSIBILITIES

    2.1. Appointment to Hospital. Faculty members recommended by the University and approved by the Hospital medical staff may be appointed to the Hospital medical staff in accordance with the bylaws of the Hospital, to engage in health care delivery at the Hospital and in the education of medical students and resident physicians.

2.2. Accreditation. The University agrees to continue to operate and support accredited medical education programs.

2.3. Evaluation. The University understands the importance of timely evaluation of educational goals and programs. Prior to the activation of any significant changes in the University's academic programs implemented at the Hospital, these proposed changes and their impact on the Hospital will be discussed with the Hospital.

2.4. Governance. The University faculty, students, and resident physicians who are participating in this association will be under the governance of the University. The University will assure that its faculty, students, and resident physicians will comply with all applicable rules, regulations, policies, and requirements of the Hospital while performing in the Hospital. Notwithstanding this, University faculty members of the Hospital's Medical Staff will be bound by the Hospital's Medical Staff Bylaws.

2.5. Insurance. The University agrees to maintain appropriate liability and malpractice insurance for its employees and the University's medical students. Liability and malpractice insurance coverage for resident physicians will be provided by the employing institution. Air Force employed resident physicians shall be provided professional liability insurance coverage by Hospital, solely while providing patient care within Hospital's facility(ies).

3. HOSPITAL RESPONSIBILITIES

3.1. Supervision. The medical staff physicians are to comply with the Hospital's Bylaws. Resident physicians, who provide patient care under this agreement, are responsible to, and under the supervision of, the University's clinical, volunteer and fully affiliated faculty.

3.2. Program Changes. The Hospital understands that major changes in its programs may reflect on this agreement and also understands the importance of timely planning and coordination of its patient care programs with the University's academic programs. Any such proposed major changes will be reviewed by the Hospital with the Dean of the School of Medicine or the dean's designee. It is understood that the purpose of this information sharing is not to set patient care standards or initiate patient care programs, but rather to consider the effect of such changes on the educational programs under this agreement.

3.3. Patient Care Standards. The Hospital agrees to maintain medically accepted standards of patient care.

3.4. Exceptions to Patient Resources. The Hospital agrees to make its facilities and patient resources available for instructional purposes to fulfill the educational needs requested by the University. Exceptions to participation in educational programs can be made for specific patients on request of the attending physician, the patient's family, or by the patient.

Agreement Between the
Wright State University School of Medicine and
Miami Valley Hospital                                                                                          6

3.5. Emergency Care of Students. The Hospital will provide emergency first aid and emergency care for the University students and resident physicians should accident or illness occur while in the Hospital pursuant to this association agreement. Students and resident physicians are personally responsible for charges for such care, which will be at the Hospital's prevailing rates. The Hospital's determination of the duration and extent of the first aid or the emergency care shall be conclusive.

3.6. Insurance. The Hospital agrees to maintain appropriate insurance for its employees in such amounts determined at the Hospital's discretion.

3.7. Expenses. The Hospital agrees to work collaboratively with the University in establishing annual agreements between parties whereby the expenses of clinical faculty based at the Hospital as well as the supporting clerical and program expenses would be allocated between the University and the Hospital. The guideline for such allocation is that those expenses associated with the general operation of the medical school and those related to the education of medical students will be borne by the University; and, that portion of the expenses related to the conduct of the residency programs and those expenses related to the Hospital's clinical activities will be borne by the Hospital. Hospital financial support of research proposed by faculty or students will be considered on an individual-proposal basis in accordance with the rules of the Hospital and at the discretion of the Hospital.

The effective date of this agreement is as of the date of execution by both parties.

**MIAMI VALLEY HOSPITAL**                                      **WRIGHT STATE UNIVERSITY**

_____  8/15/15           _____  9/18/2015
Mark S. Shaker                    Date              Margaret Dunn, MD, MBA        Date
President/ Chief Executive Officer                  Dean, Boonshoft School of Medicine


Acknowledged by:

_____
Molly Hall, M.D.         Date
Vice President and Chief Academic Officer

# EXHIBIT B



**Boonshoft School of Medicine**
**WRIGHT STATE UNIVERSITY**

Department of Obstetrics and Gynecology
128 E. Apple Street, Suite 3800 • Dayton, OH 45409
Tel 937.208.2850 • Fax 937.222.7255
medicine.wright.edu

October 5, 2018

Subject: Dismissal from Residency, Jacquelyn Mares, MD

Dear Dr. Mares,

The Clinical Competency Committee met during a closed meeting October 3, 2018. The majority found that your lack of satisfactory progress throughout your residency with ACGME Competencies Professionalism, Communication/Interpersonal Skills, and overall patient care implications warrant termination and dismissal from the Wright State University Obstetrics & Gynecology Residency Program.

Despite formal probation March 8, 2018, mentoring, and repeated feedback sessions both written and verbal, you have continued to have lapses in professionalism and communication with patients, faculty, and other residents/medical students. While you have demonstrated competency with medical knowledge and surgical skills, your progress with other required tasks pertaining to professionalism and communication have been unsatisfactory. **Based upon the recommendations of the Clinical Competency Committee, you are being dismissed and placed on paid administrative leave effective immediately from this residency program.**

You have 5 business days for written appeal to this dismissal letter by writing to Dr. Albert Painter, DIO, at albert.painter@wright.edu. Dr. Painter can also be reached by phone at 513-827-1357. Failure to appeal will result in commencement of this dismissal. The due process available to you as a resident in the Wright State Obstetrics and Gynecology Residency is fully described in the Wright State University Resident Manual Item 504 Academic and Professional Standards/Due Process Policy available here: https://medicine.wright.edu/faculty-and-clinical-affairs/resident-manual/table-of-contents.

Please sign below to indicate receipt of this letter. Note: Signing this letter indicates receipt, not necessarily agreement with the content therein.

Sincerely,

*[signature]*

G. Theodore Talbot, MD
Program Director, Obstetrics and Gynecology

*[handwritten note: Dr Mares declined to sign this acknowledgment at this time after meeting with Dr Talbot and myself.]*

*[signature] Jeane L. Y-kh.i*
10/5/2018

I have received a copy of this letter.

_____          _____
Jacquelyn Mares, MD                                          Date
(Indicates receipt, not necessarily agreement with content therein.)



Boonshoft
School of Medicine
WRIGHT STATE UNIVERSITY

Department of Obstetrics and Gynecology
128 E. Apple Street, Suite 3800 • Dayton, OH 45409
Tel 937.208.2850 • Fax 937.222.7255
medicine.wright.edu

# Clinical Competency Committee

## SUMMARY OF 10/3/18 MEETING

Dr. Mares was of immediate concern due to her active formal probationary status driven by concerns including professionalism, communication, patient care interactions, and overall performance abilities. It was noted that she has actively participated in discussion with her mentor, and in the area of interaction with medical students made the necessary improvements. However, evaluations and numerous recent incidents discussed at length posed serious concern for overall progress through probationary status. Finally, much debate centered the fact that she has verbalized on several occasions she does not intend to practice OBGYN after graduation, and will not commit to taking the OBOG qualifying exam at graduation. This raised concerns by Gyn Oncology attendings and WPAFB faculty that she is "going through the motions" to graduation and presents a patient safety issue. That she is not committed to continual improvement as a physician during the remainder of her training. Two instances were discussed where she refused to care for a surgical patient (one with Dr Yaklic, one with Dr Kindig). A formal movement to remove Dr. Mares from the residency program was posed and seconded. The official vote from the committee was 6-2, in favor of removal.

(Discussions concerning other residents that day are not included in this summary.)

# EXHIBIT C



Office of the Dean
3640 Col. Glenn Hwy. ▪ Dayton, OH 45435
medicine.wright.edu

December 3, 2018

Jacquelyn Mares, M.D.
37 Green Street
Dayton, Ohio 45402

Dear Dr. Mares:

We are in receipt of your November 7, 2018 review panel's recommendation, as attached. Our decision is to reject the recommendation of the review panel and to affirm the program's recommended action of termination from the program.

We have made this decision based upon your persistent demonstration of unprofessional and insubordinate conduct involving patients, faculty, supervisors, and learners. These additional documented incidents occurred subsequent to you having been placed on probation in March 2018 for deficiencies in Professionalism and Interpersonal Communication. Moreover, concerns have been raised regarding your deficiencies in critical communications obligations and entering incorrect information in a patient safety report.

Within ten working days of receipt of this decision, you may elect to appeal the decision in writing to the Provost of Wright State University, Dr. Susan Edwards. This appeal must contain the action that you are requesting and the reasons for that action. The Provost will have fifteen working days to respond to that appeal. Refer to policy 504 in the BSOM Resident manual that may be found at the following link
https://medicine.wright.edu/sites/medicine.wright.edu/files/page/attachments/2018%20Resident%20Manual%20-%20Revised.pdf

Sincerely,

Margaret M. Dunn, M.D., M.B.A
Dean
Boonshoft School of Medicine

Teresa W. Zryd, M.D.
Vice President
Academic Affairs /Research
Miami Valley Hospital

By certified mail and US mail

Cc:
Albert F. Painter, Psy.D.
Ted Talbot, M.D.
Jerome Yaklic, M.D., M.B.A.
Linda Barney, M.D.
Christopher S. Croom, M.D.
Stacey Poznanski, D.O., M.Ed.



Office of Faculty and Clinical Affairs
3640 Col. Glenn Hwy. ■ Dayton, OH 45435
Tel 937.245.7640 ■ Fax 937.775.7955, or 937.775.7956
medicine.wright.edu

| | |
|---|---|
| Date: | November 14, 2018 |
| To: | Teresa W. Zryd, M.D., M.P.H., Chief Academic Officer<br>Premier Health<br><br>Margaret M. Dunn, M.D., M.B.A., FACS<br>Dean, Wright State University Boonshoft School of Medicine |
| From: | Linda Barney, M.D.<br>Chair, OB/GYN Residency Due Process Hearing Panel |
| Subject: | Due Process Review Hearing re: Jackie Mares, M.D., PGY4 |

Jackie Mares M.D., a resident in her PGY4 year of Obstetrics and Gynecology residency training at Wright State University Boonshoft School of Medicine, requested a review panel hearing in appeal of the dismissal decision of the Program Director, Dr. Ted Talbot. The hearing was conducted on November 7, 2018 in order to determine if substantial evidence was present to support the program's intended action. Persons present were:

REVIEW PANEL

    Linda Barney, M.D., Associate Professor, WSU BSOM Department of Surgery

    Stacey Poznanski, D.O., M.Ed., Associate Professor, WSU BSOM Department of Emergency Medicine

    Christopher S. Croom, M.D., Clinical Professor, WSU BSOM Department of OB/GYN

PARTICIPANTS

    Ted Talbot, M.D. Program Director, Wright State University OB/GYN Residency

    Jackie Mares, M.D., PGY4, OB/GYN Residency program

    Jerome Yaklic, M.D., M.B.A., Chair, WSU BSOM Department of OB/GYN

    Albert F. Painter, Psy.D., Associate Dean and Designated Institutional Official to the ACGME, BSOM

    Melanie Glover, M.D., Clinical Assistant Professor, WSU BSOM Department of OB/GYN
    Lisa Boydston, M.A., Administrative Director of GME, WSU BSOM

Due Process Review Hearing re: Jackie Mares, M.D., PGY4
November 14, 2018
Page Two

Prior to the opening of the proceedings, the Review Panel chair reviewed the Due Process Policy from the Wright State University Boonshoft School of Medicine Sponsored Graduate Medical Education Programs Resident Manual (http://www.med.wright.edu/fca/gme/rm504.html). This policy was in effect during the events in question.

The panel then reviewed the evidence presented by both parties. The Review panel considered only evidence available before the program's decision of October 5, 2018.

Dr. Talbot, Program Director, presented to the panel a review of Dr. Mares's professional and clinical problems in the residency program leading to the decision to dismiss. Dr. Yaklic offered supporting details supporting the program's intended action to dismiss.

Dr. Mares then presented information describing her reasons for aforementioned problems in the program and attempts to remedy these issues in support of her appeal.

Dr. Glover presented information to support Dr. Mares' appeal related to aforementioned problems.

RECOMMEDATIONS
The panel recommends that the intended action to dismiss Dr. Mares be modified to the following elements:

1. Dr. Mares will remain on Probation until her graduation from the program.
2. Dr. Mares will be assigned a mentor and meet on a weekly basis to discuss her performance in the program including feedback from the Program Director and other faculty.
3. Dr. Mares will follow the Academic and Professional Standards contained in the WSU BSOM Policies and Procedures, BSOM Resident Manual, Item 504.
4. Dr. Mares will identify a course on professionalism and clinical practice in collaboration with her mentor and Program Director and complete this activity at the earliest possible date. She will write up a synopsis of learnings to be discussed with the Program Director and her mentor as it relates to changes she intends to incorporate in her doctoring.
5. Continue working with outside assistance regarding problems adversely effecting professionalism and interaction with others especially medical students in the OB/GYN clerkship.
6. Any additional infractions in violation to the Academic and Professional Standards will result in immediate termination from the WSU BSOM OB/GYN Program without the benefit of due process.

# EXHIBIT D



**Office of the Provost**
3640 Colonel Glenn Hwy.
Dayton, OH 45435-0001
(937) 775-3035
FAX (937) 775-2421

January 9, 2019

Jacquelyn Mares, M.D.
37 Green Street
Dayton, Ohio 45402

Dear Dr. Mares,

I have reviewed your letter dated December 14, 2018 and the associated documents you provided appealing your dismissal from the Obstetrics and Gynecology residency program at the Boonshoft School of Medicine. After careful review of these documents, and the additional materials from the hearing, I find that I must affirm the action that you be dismissed from the Boonshoft School of Medicine Obstetrics and Gynecology residency program.

Sincerely,

Susan Edwards, Ph.D.
Provost