**ELECTRONICALLY FILED
COURT OF COMMON PLEAS
Friday, June 21, 2019 4:04:34 PM
CASE NUMBER: 2019 CV 02921 Docket ID: 33542919
MIKE FOLEY
CLERK OF COURTS MONTGOMERY COUNTY OHIO**

## COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| **JACQUELYN MARES, M.D.** | : | Case No. |
| 37 Green Street | : | |
| Dayton, Ohio 45402 | : | Judge |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **MIAMI VALLEY HOSPITAL** | : | |
| One Wyoming Street | : | |
| Dayton, Ohio 45409 | : | |
| | : | |
| and | : | |
| | : | |
| **PREMIER HEALTH PARTNERS** | : | |
| One Wyoming Street | : | |
| Dayton, Ohio 45409 | : | |
| | : | |
| and | : | |
| | : | |
| **WRIGHT STATE PHYSICIANS** | : | |
| 725 University Blvd | : | |
| Dayton, Ohio 45435 | : | |
| | : | |
| and | : | |
| | : | |
| **JEROME L. YAKLIC, M.D.** | : | |
| 400 Sugar Camp Circle, Suite 101 | : | |
| Dayton, Ohio 45409 | : | |
| | : | |
| and | : | |
| | : | |
| **G. THEODORE TALBOT, M.D.** | : | |
| 400 Sugar Camp Circle, Suite 101 | : | |
| Dayton, Ohio 45409 | : | |
| | : | |
| and | : | |
| | : | |
| **TERESA W. ZRYD, M.D.** | : | |
| 2261 Philadelphia Drive | : | |
| Dayton, Ohio 45406 | : | |
| | : | |
| and | : | |

| | |
|---|---|
| **MARGARET M. DUNN, M.D.** | : |
| **2300 Miami Valley Dr., Suite 350** | : |
| **Centerville, Ohio 45459** | : |
| | : |
| **Defendants.** | : |
| | : |
| | : |

_____

### COMPLAINT AND JURY DEMAND
_____

Plaintiff, Jacquelyn Mares, M.D. ("Dr. Mares"), for her complaint against Miami Valley Hospital ("MVH"), Premier Health Partners ("PHP"), Wright State Physicians ("WSP"), Jerome L. Yaklic, M.D. ("Dr. Yaklic"), G. Theodore Talbot, M.D. ("Dr. Talbot"), Teresa W. Zryd, M.D. ("Dr. Zryd"), and Margaret M. Dunn, M.D. ("Dr. Dunn"), states as follows:

### I. Introduction

1. Pursuant to the terms of an express written contract, Dr. Mares was enrolled in and employed as a resident physician in the Wright State University Obstetrics and Gynecology Program ("Program") hosted and operated by MVH, PHP and WSP.

2. On or about October 5, 2018, Dr. Mares was terminated from the Program without good or just cause and in breach of the terms of her contract.

3. In effectuating Dr. Mares' termination, Defendants also conspired to tortiously interfere with her contract because she refused to accede to their insistence that she take a board examination in order to maintain the Program's status as an accredited residency program. In doing so, Defendants not only deprived Dr. Mares of the benefit of her contract, they also damaged her professional reputation and jeopardized her ability to practice medicine in her chosen area of medical specialization.

2

4. Dr. Mares seeks relief in the form of reinstatement into the Program, compensation for her economic and non-economic damages, punitive damages, and an award of her reasonable attorney fees in prosecuting this action.

## II. Jurisdiction and Venue

5. This Court has original subject-matter jurisdiction of this complaint pursuant to RC § 2305.01.

6. Venue is appropriate in this jurisdiction because Defendants either reside, conduct business, maintain facilities, or conduct activities that gave rise to this claim for relief in Montgomery County, Ohio.

## III. Parties

7. Dr. Mares is a United States citizen who, at all times relevant hereto, was employed as a resident physician in the Program.

8. Defendant MVH is a private, for-profit corporation which owns and operates an acute care hospital in Montgomery County, Ohio. MVH hosts the Program and uses residents to provide patient care. MVH is paid by the federal government to train residents and, in turn, employs and pays residents.

9. Defendant PHP is a private, not-for-profit corporation with its principal place of business in Montgomery County, Ohio. PHP is the parent corporation of MVH and, jointly with MVH, operates the Program in which Dr. Mares was enrolled.

10. Defendant WSP is a private, not-for-profit corporation with its principal place of business in Montgomery County, Ohio. WSP provides staffing and administrative support for the Program and is responsible for its functions on a daily basis.

11. Defendant Dr. Yaklic is and, at all times relevant hereto, was an employee, agent and official of MVH, PHP and/or WSP who exercised supervisory authority over the Program.

12. Defendant Dr. Talbot is and, at all times relevant hereto, was an employee, agent and official of MVH, PHP and/or WSP who exercised supervisory authority over the Program.

13. Defendant Dr. Zryd is and, at all times relevant hereto, was an employee, agent and official of MVH, PHP and/or WSP who exercised supervisory authority over the Program.

14. Defendant Dr. Dunn is and at, all times relevant hereto, was an employee, agent and official of MVH, PHP and/or WSP who exercised supervisory authority over the Program.

## IV.  Statement of the Case

15. Dr. Mares was employed by MVH as a resident / fellow in the Program pursuant to the terms and conditions of a Resident-Fellow Agreement ("Agreement"), effective January 1, 2016. A copy of the Agreement is marked Exhibit A, attached hereto and incorporated herein.

16. Included in and made a part of the Agreement is Item 504 of the Wright State University Boonshoft School of Medicine Resident Program Manual ("Item 504"). A copy of Item 504 is marked Exhibit B, attached hereto and incorporated herein.

17. On or about October 5, 2018, Defendants, by means of a letter from Dr. Talbot authorized by Dr. Yaklic, informed Dr. Mares that she was being dismissed and placed on paid administrative leave effective immediately from the Program.

18. The decision to terminate Dr. Mares from the Program was not motivated by just or good cause or by any legitimate academic or institutional reason. Rather, the decision to dismiss Dr. Mares was the product of a scheme or plan by Defendants to terminate Dr. Mares' enrollment in the Program because she had refused to agree to sit for a certification board examination in Obstetrics and Gynecology ("OBGYN"). By doing so, Defendants artificially enhanced the Program's performance under a certain institutional standard established and enforced by the Accreditation Council for Graduate Medical Education ("ACGME"). That standard required at least eighty percent of the Program's graduating class to take the certification boards in OBGYN. Defendants feared that Dr. Mares' choice not to sit for the board examination jeopardized the Program's ability to meet the statistical threshold ("the take rate"), and thus its ability to maintain accreditation; hence, the incentive to prevent Dr. Mares from graduating from the Program.

19. To mask Defendants' motivation for their decision to dismiss Dr. Mares and to serve as a pretext for their tortious conduct, Defendants concocted a false narrative that Dr. Mares had failed to demonstrate satisfactory progress throughout her residency, primarily in the areas of professionalism and interpersonal communication skills with staff, residents, and attending physicians. In fact, and contrary to the official grounds offered by Defendants for her termination, Dr. Mares had met or exceeded official standards governing her continued enrollment in and entitlement to complete the Program.

20. In addition, Defendants regarded Dr. Mares as an individual suffering from "physician burnout." Physician burnout constitutes a physical and emotional condition that substantially limits the major life activities of mental acuity and mood lability.

5

According to the Resident Program Manual and the ACGME, the symptoms of fatigue and/or stress associated with physician burnout include mood swings, interpersonal conflict, and malaise of the exact nature witnessed and objected to by Defendants. Despite Defendants' contractual obligation to address and to attempt to ameliorate Dr. Mares' "burnout," Defendants used Dr. Mares' burnout as an excuse to terminate her, fictitiously claiming that, on account of her condition, she engaged in conduct that evidenced her deficiencies in professionalism and interpersonal communication.

21. Dr. Mares then challenged the decision that she be dismissed by availing herself of her contractual right to due process under the provisions of Item 504. Accordingly, Dr. Mares' appeal of the decision to dismiss her was held before a panel consisting of neutral physicians who, following an evidentiary hearing, determined that dismissal was not supported by substantial evidence and recommended to Defendants that Dr. Mares remain in the program until her graduation, subject to conditions detailed by the panel. Dr. Dunn and Dr. Zryd, however, without any explanation, rejected the panel's recommendation and proceeded to dismiss Dr. Mares.

22. In terminating Dr. Mares in the manner and for the reasons previously stated, Defendants MVH, PHP, and WSP violated the terms and conditions of the Agreement, both express and implied, as follows:

    a. By dismissing Dr. Mares from the Program on the basis of a factor or consideration not relevant to her academic performance, skills, or professionalism (i.e., the take rate), and because she chose not to take the board certification examination, these Defendants violated the express or implied terms of Agreement which conditioned Dr. Mares' continued enrollment and advancement in the Program on her compliance with its official rules, policies, and standards.

6

    b.    By failing to inform Dr. Mares upon her enrollment that taking the board certification was a condition of her advancement and graduation from the program, Defendants violated the express or implied terms of the Agreement by denying Dr. Mares due process as required by the academic and performance standards set forth in Item 504.

    c.    By failing to advise Dr. Mares prior to her due process hearing that her appeal would consider, as a determining factor, the fact that she chose not to take the board certification examination, these Defendants violated the express or implied terms of the Agreement by denying her the institutional due process to which she was entitled under Item 504.

    d.    By refusing to accept the panel's recommendation that Dr. Mares not be dismissed, by refusing to abide by the panel's factual finding there was insufficient evidence supporting dismissal, and by failing to provide any rational substantive explanation for their rejection of that recommendation, these Defendants violated the express or implied terms of the Agreement by denying Dr. Mares the institutional due process to which she was entitled under Item 504.

    e.    By regarding Dr. Mares as an individual who suffered from "physician burnout" during the course of her residency, and then failing to provide her assistance and/or relief for such burnout, Defendants failed to satisfy the procedures required in Section 5 of the Resident Program Manual establishing standards and mandatory protocols with respect to perceived instances of stress or fatigue by resident physicians.

23.    For the purpose of effectuating Dr. Mares' termination, individual Defendants Dr. Yaklic, Dr. Talbot, Dr. Zryd, and Dr. Dunn entered into a civil conspiracy

to tortiously, intentionally, and maliciously interfere with her right under the Agreement to continue in and to graduate from the Program, notwithstanding her compliance with its official academic and professional standards. In furtherance of this civil conspiracy, these Defendants committed the following acts: placing Dr. Mares on a probationary status, downgrading her performance, failing to properly and meaningfully provide relief or accommodation for her physician burnout, denying her due process as provided in the Agreement, and, without good or just cause, altering the terms and conditions of her enrollment and employment.

24. As a direct and proximate result of Defendants' actions in the manner and for the reasons previously described, Dr. Mares has suffered and continues to suffer a lack of employment, damage to her professional reputation, economic damages for the loss of her salary and benefits, and non-economic damages in the form of emotional pain and suffering.

25. Dr. Mares seeks relief in the form of a preliminary and permanent injunction reinstating her into the Program, a judgment for compensatory damages for her economic and non-economic injuries, punitive damages, and an award of her costs and reasonable attorney fees.

## V. STATEMENT OF THE CLAIMS

### Count 1:

### Breach of Contract

26. Dr. Mares incorporates paragraphs 1 through 25 as if fully rewritten herein.

27. The actions of the institutional Defendants MVH, PHP, and WSP, in the manner and for the reasons previously described, constituted a breach of the Agreement with Dr. Mares.

**Count 2:**

**Tortious Interference with Contractual Relations**

28. Dr. Mares incorporates paragraphs 1 through 27 as if fully rewritten herein.

29. The actions of the individual Defendants Dr. Yaklic, Dr. Talbot, Dr. Zryd, and Dr. Dunn, in the manner and for the reasons previously described, constituted tortious interference with the Agreement between Dr. Mares and the institutional Defendants MVH, PHP, and WSP.

**Count 3:**

**Tortious Interference with Prospective Economic Advantage**

30. Dr. Mares incorporates paragraphs 1 through 29 as if fully rewritten herein.

31. The actions Defendants, in the manner and for the reasons previously described, constituted tortious interference with Dr. Mares' prospective economic advantage by hindering her ability to become a board-certified physician in her chosen area of medical specialization.

**Count 4:**

**Civil Conspiracy**

32. Dr. Mares incorporates paragraphs 1 through 31 as if fully rewritten herein.

33. The actions of the Defendants, in the manner and for the reasons previously described, constituted an unlawful civil conspiracy for the purpose of tortiously interfering with Dr. Mares' contractual relationships and prospective economic interests.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Jacquelyn Mares, M.D. demands judgment against Defendants Miami Valley Hospital, Premier Health Partners, Wright State Physicians, Jerome L. Yaklic, M.D., G. Theodore Talbot, M.D., Teresa W. Zryd, M.D., and Margaret M. Dunn, M.D. and each of them, jointly and severally, as follows:

a. A judgment for compensatory damages for her economic and non-economic injuries in an amount to be determined at trial;

b. A judgment for punitive damages against the individual Defendants in an amount to be determined at trial;

c. A judgment for an award of Plaintiff's reasonable attorney fees and costs;

d. A judgment for such other relief in law or in equity that is appropriate under the premises.

Respectfully submitted,

MEZIBOV BUTLER

/s/Marc D. Mezibov
Marc D. Mezibov (OH No. 0019316)
Brian J. Butler (OH No. 0082675)
Daniel J. Treadaway (OH No. 0098000)
615 Elsinore Place, Suite 105
Cincinnati, OH 45202
Phone: 513.621.8800
Fax: 513.621.8833
mmezibov@mezibov.com
bbutler@mezibov.com
dtreadaway@mezibov.com

*Attorneys for Plaintiff Jacquelyn Mares, M.D.*

**JURY DEMAND**

Plaintiff Jacquelyn Mares, M.D., demands a jury trial to resolve issues of fact related to her Complaint.

/s/Marc D. Mezibov
Marc D. Mezibov (Ohio No. 0019316)

# Exhibit A


**Premier Health**
Miami Valley Hospital

## RESIDENT-FELLOW AGREEMENT

Miami Valley Hospital (*Hospital*) agrees to employ **Jacquelyn Elizabeth Mares, M.D.** (*Resident/Fellow*), **R2**, Social Security # 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 in the **Wright State University Obstetrics/Gynecology Program** (*Program*), pursuant to the following terms and conditions. This Agreement is effective on **July 1, 2016**.

### I. OBLIGATIONS OF HOSPITAL

Hospital agrees to employ **Jacquelyn Elizabeth Mares, M.D.** (*Resident/Fellow*), pursuant to the terms of this contract on an "employment at will" basis, as a(n) **Obstetrics/Gynecology Resident/Fellow.** (See Position Description attached and incorporated herein as Exhibit A.)

Further, Hospital agrees through its affiliation with Wright State University to:
    A. Provide a suitable opportunity for medical education experience;
    B. Provide a training program that meets the standards of the Accreditation Council on Graduate Medical Education;
    C. Provide a duration and sequence of assignments which shall be in accordance with specialty board requirements with consideration given to the desires of the resident/fellow and to the schedule of the participating institutions;
    D. Provide compensation and benefits as further stated in this agreement, and as stated in the Hospital benefit policies applicable to residents/fellows.
    E. The Dayton Area Graduate Medical Education Community and Hospital maintain a drug-free and tobacco-free workplace. All new Hospital employees are required to undergo urine drug testing as a condition of employment. This test quantifies the presence of illicit drugs and nicotine metabolites. New and/or prospective employees who have levels above the threshold level will have their employment or offer of employment rescinded. All incoming interns/residents offered contracts through the NRMP will also undergo such drug testing to include nicotine, as part of the pre-employment examinations and will be subject to termination of employment or rescission of employment offer if said illicit drugs and/or nicotine metabolites levels are above such threshold level.

### II. OBLIGATIONS OF THE RESIDENT/FELLOW

The resident/fellow agrees to:

    A. Perform satisfactorily to the best of his/her ability, the customary services of a(n) **Obstetrics/Gynecology Resident/Fellow** in each progressive year of the residency program (see Position Description attached as Exhibit A);
    B. Perform only those medical procedures under such supervision as appropriate and as credentialed pursuant to the Program;
    C. Conform to and be governed by all Hospital and Program policies, procedures, and regulations governing residents/fellows which are not inconsistent with this contractual agreement;
    D. Be on time and attend all specifically designated conferences as requested, including Daily Check-In;

Page 1

E.  Know and adhere to all medical records rules or regulations as stated in the medical staff bylaws and adhere to the medical staff and House Staff rules and regulations of Hospital. The resident/fellow shall participate in hospital-required educational courses in a timely manner. Failure to follow these and other Hospital policies may result in the suspension of privileges and possible termination, and the resultant withholding of certification. This contract specifically incorporates the disciplinary provisions of the Hospital section of the Resident Manual of Wright State University, School of Medicine. Furthermore, this contract specifically incorporates all Hospital, University, and Program policies regarding sexual and other forms of harassment.
F.  Refrain from disclosing to any unauthorized person any confidential information, including protected health information, received during the course of employment;
G.  Not engage in any remunerative work not authorized in writing by the Program Director;
H.  Provide to the Program proof of graduation from an approved medical school and, if applicable, provide to the Program a valid ECFMG certificate; proof of graduation and the ECFMG certificate must be provided to the Program before the execution of this Agreement;
I.  Participate fully in any process directed toward Joint Commission accreditation or the certification or accreditation of the Hospital and/or Program by any other agency.
J.  Comply with the rules and regulations of Hospital applicable to residents/fellows, as well as the rules and regulations applicable to Hospital employees in general which are not in conflict with the rules and regulations applicable to residents/fellows.

### III. COMPENSATION AND BENEFITS

In exchange for resident/fellow's fulfillment of the resident/fellow's obligations, Hospital agrees to the following:

A.  Salary: Hospital shall pay to resident/fellow $55944.96 per year gross salary beginning July 1, 2016; and such compensation shall be paid to resident/fellow bi-weekly, calculated by taking the annual salary divided by 26 pay periods (bi-weekly gross pay). The annual salary shall be recalculated each year; compensation increases shall be approved through Hospital's annual compensation plan for its employees as indicated, and applied to resident/fellow's annual salary. Any increase shall not be awarded until such time the resident/fellow is promoted to the next post-graduate year in the program.
B.  Professional Liability Insurance: Professional Liability Insurance Coverage is provided each resident/fellow by Hospital in the same amounts and subject to the same or substantially similar terms and conditions as all other employee-physicians of Hospital. Coverage is not provided for non-assignment duties.
C.  Other Benefits: Hospital shall provide to resident/fellow, during the term of this Agreement, those benefits listed in Exhibit B attached.

### IV. TERM AND TERMINATION

This contract begins **7/1/2016** and is expected to end **6/30/2019**. This agreement may be shortened or extended based on the written recommendation of the Program Director to reflect a change in the training period due to Family Medical Leave absence(s), delayed promotion, resignation of the resident/fellow, or other such events. The aforementioned events are examples only and are not to be considered an exhaustive list. All such written recommendations will constitute an amendment and hereby be incorporated to this agreement; shall be maintained by Hospital's Department of Medical Education in the employee's personnel file; and the term of this agreement shall be changed accordingly. In addition, this employment agreement shall abide by the laws of the State of Ohio laws concerning "employment at will". Accordingly, either party may terminate this agreement by giving written notice to the other at any time for time for any reason that does not contradict the law or due process procedures (Section F below) for residents. Notwithstanding the

forgoing, resident agrees whenever possible to provide the Program Director and Hospital a minimum of 60 days' advance written notice of resignation.

This contract may be terminated by Hospital immediately, any time prior to its expiration, for the following reasons:

- A. Resident/fellow's death or disability (as determined by the Hospital's employment policies);
- B. If resident/fellow's temporary or permanent certification to practice medicine in the State of Ohio is limited, suspended, or terminated for any reason;
- C. If resident/fellow is convicted of a felony and/or crime of moral turpitude (as determined in the Hospital's sole discretion); and/or
- D. Pursuant to the employment and corrective action policies of the Hospital applicable to Hospital employees in general and which policies are not in conflict with the rules and regulations applicable to resident/fellow.
- E. If the residency program is terminated, subject to the provision of reasonable notice by Hospital of such termination to resident/fellow and the exercise of best efforts by Hospital for resident/fellow to complete the education within the program or to help identify and facilitate resident/fellow's transfer to another program to complete the education;
- F. If in the Program's opinion the resident/fellow substantially fails to meet any of the general requirements of the Program or is terminated by the Program.
  - a. Consistent with the Wright State University Boonshoft School of Medicine, Resident Manual, Item 504 - Academic and Professional Standards / Due Process, and as such policy may be updated from time to time, written notice of intent to not promote or to terminate a resident's appointment must be provided to resident no later than 120 days (four months) prior to the end of their current academic year, if the primary reason occurred prior to the last 120 days of the academic year.

V. CONDITIONS FOR ADVANCEMENT

Conditions for advancement are those included in the Program's policies. Academic progress and completion of Residency is the sole discretion of the residency program director and relevant academic department clinical competency committee.

VI. OTHER TERMS

- A. Conflicts: Any conflicts between the Program and resident/fellow may be addressed through the grievance procedure outlined in the Residency Manual of Wright State University. Any employment matter between Hospital and resident/fellow may be addressed in accordance with Hospital's grievance procedure as stated in Hospital's Employee Handbook.
- B. Applicable Law: This Agreement shall be governed by the laws of the State of Ohio; Venue for any suit shall be proper only in Montgomery County, Ohio.
- C. Entire Agreement, Severability: This Agreement contains the entire agreement between the parties, and supersedes all prior and contemporaneous verbal and written agreements. If any portion of this agreement is held to be illegal, void or voidable by any court of competent jurisdiction or other governmental body, the remaining provisions shall remain in full force and effect.
- D. Excluded Provider: Resident/fellow agrees to enroll as a Medicare and Medicaid provider. Resident/fellow hereby represents and warrants that he/she is not and has at no time been excluded from participation in any federal or state funded healthcare program, including but not limited to, Medicare and Medicaid. Resident/fellow hereby agrees to notify Hospital immediately of any threatened, proposed, or actual exclusion of

Page 3

resident/fellow from any federal or state funded healthcare program, including but not limited to, Medicare and Medicaid. In the event that resident/fellow is excluded from participation in any federal or state funded healthcare program during the term of this Agreement, or if at any time after the effective date of this Agreement it is determined that resident/fellow is in breach of this Section, this Agreement shall, as of the effective date of such exclusion or breach, automatically terminate. Resident/fellow shall indemnify and hold harmless Hospital against any and all actions, claims, demands and liabilities, and against all loss, damages, cost and expenses, including reasonable attorney's fees, arising directly or indirectly, out of any violation of this section of this agreement by resident/fellow, or due to exclusion of the resident/fellow from a federally funded healthcare program including but not limited to, Medicare or Medicaid.

Wherefore, the parties enter into this Agreement effective as of the date and year first written above.

Wright State University Boonshoft School of Medicine

_____
Michael L. Galloway, M.D.
Residency Program Director

_____
Molly Hall, M.D.
Vice President of Academic Affairs & Chief Academic Officer

_____
Jacquelyn Elizabeth Mares, M.D.
Resident/Fellow

[Approved as to form: Cara W. Powers, Esq.]

Page 4

# Exhibit B

Item 504
Academic and Professional Standards / Due Process
Revised October 2013

## Purpose

The primary purpose of the Boonshoft School of Medicine (BSOM) residency and fellowship programs is to provide high quality graduate medical education, patient care, experience in teaching, and the opportunity to conduct research. The procedures contained in this document concerning the academic standards and the professional standards are intended to further these fundamental goals.

## Applicability

These procedures and standards are applicable to residents in all BSOM sponsored graduate medical education programs.

Residents are also subject to additional standards of conduct and performance adopted by hospitals participating in the educational program. To obtain a copy of a hospital's standards of conduct, contact the medical education office.

The Office of Faculty and Clinical Affairs and the Director of Medical Education for the employing institution shall be consulted before the implementation of any due process.

## Academic Standards

1. The resident must demonstrate the competence, efficiency, and maturity necessary to assume increasing responsibilities for teaching and supervising other residents, fellows, and students.
2. The resident must acquire appropriate cognitive medical knowledge.
3. The resident must competently obtain thorough medical histories, perform complete physical exams, develop rational differential diagnoses, and implement appropriate management plans for treatment of patients appropriate to his or her level of responsibility.
4. The resident must assume appropriate responsibility for patient.
5. The resident must demonstrate approved creativity in the advancement of patient care and medical knowledge appropriate to his or her level of responsibility.

Violations of one or more of the above academic standards constitute sufficient grounds for academic suspension, academic demotion, academic non-promotion, academic non-renewal or academic termination.

## Professional Standards

1. The resident must perform all responsibilities as a resident competently, efficiently, and maturely.
2. The resident must refrain from engaging in any conduct that is grounds for (a) refusal to grant or (b) revocation of a certificate to practice medicine in Ohio as provided by the Ohio Revised Code Section 4731.22.
3. The resident must refrain from habitual or excessive drug or alcohol use or any combination thereof.
4. The resident must refrain from obstructing or disrupting medical care and hospital activities.
5. The resident must obey all provisions of the American Medical Association Principles of Medical Ethics.

Violations of one or more of the above standards relating to professional conduct constitute sufficient grounds for disciplinary suspension, disciplinary termination, or disciplinary non-renewal of the resident's appointment.

## Continued Appointment / Promotion

The above academic and professional standards must be met for continued appointment and/or promotion.

## Adverse Actions

1. If the above academic standards or professional standards are not met, the program may act to demote, not promote, not renew, or terminate the resident's appointment. A written notice of the action shall be transmitted to the resident and shall include:
    - the program's intended action,

- a summary of the reason{ the intended action, and
- the right of appeal as described in this policy.

2. Written notice of intent to not renew, not promote or terminate a resident's appointment must be provided to residents no later than 120 days (four months) prior to the end of their current contract if the primary reason occurred prior to the last 120 days of the contract.

   When professional standards are not met, the program director may immediately suspend the resident with pay for a maximum of 60 days. Within five working days of taking this action, the program must notify the resident in writing stating the reasons for the action and the program's intention to reinstate or terminate the resident's appointment at the end of the suspension period.

3. The program director will meet with the resident to discuss the program's intended action and to attempt resolution of any disputed issues.

**Due Process**

1. Within five working days after receipt of the written notice or within five working days after the conference with the program director, whichever is later, the resident may request in writing a review of the program's intended action. The review will not be granted if requested after the five-day period has expired except under extenuating circumstances.
2. Within 60 calendar days after the receipt of the request for the review, the Designated Institutional Official (DIO) or designee must convene a hearing to review the intended action.
3. Review panel membership
   - Panel membership will consist of three faculty members, who are knowledgeable of the program's academic content. The panel members will be appointed jointly by the dean of the BSOM and the employing institution's chief executive officer/commander. One of the three members will also be appointed as chair.
   - One member of the three will be nominated by the resident. Within five working days of requesting the review, the resident may submit a list of three to five faculty nominees as a member. One nominee will be selected from the list by the dean and the chief executive officer/commander to serve on the panel.
   - If the resident is on active duty with the United States Air Force, at least one member of the review panel must be an active duty medical officer stationed at the Wright-Patterson Medical Center (see #6).
4. The purpose of the review is to determine if there is substantial evidence to support the program's intended action.
   1. The program or resident may have an attorney present as an observer but may not be represented by the attorney at the hearing.
   2. The hearing will be recorded by the Boonshoft School of Medicine, and a transcript made available to the resident upon request.
   3. If the resident fails to appear for the scheduled hearing, the program's decision shall be affirmed.
   4. The program director
      - will present the basis for the intended action,
      - may call witnesses if a 15 calendar day advanced written notice is provided to the resident, and
      - may question the resident or any witnesses called by the resident.
   5. The resident
      - may appear and speak on their own behalf,
      - has the opportunity to respond to the program director's presentation,
      - may question the evidence, the program director, or any witnesses that have been called by the program,
      - may present evidence including testimony of witness,
      - will be responsible for questioning any witnesses that the resident has asked to attend, and
      - may be assisted by a faculty advisor chosen by the resident. This advisor may give advice to the resident or may speak on the resident's behalf.
   6. The hearing panel
      - may question any witnesses that have been called by either the program director of the resident and
      - will not consider any information related to the resident's performance after the program's decision.
5. Within ten working days following the conclusion of the review, the panel must submit a written recommendation to the dean and the employing chief executive officer/commander. The panel must reach their decision by a majority vote based on the evidence presented. The recommendation can be to
   - affirm the program's intended action,
   - take revised action against the resident, or
   - not affirm the program's intended action.

6. Within 15 working days of the re___t of the review panel's recommendatio___ e dean of the BSOM and the employing institution's chief executive officer/commander must jointly decide and notify the resident in writing of the decision. The decision can be to
    - affirm the program's intended action,
    - take revised action against the resident, or
    - not affirm the program's intended action.
7. Within ten working days of receipt of the notice of the decision, the resident may appeal the decision to the provost of the university. The appeal must be made in writing and must contain the action the resident requests and reasons in support of that action. Within 15 working days of receipt of the appeal, the provost of the university must notify the resident in writing of the decision to affirm or not affirm the action.
8. In the case of military residents, once the recommendation of the review panel is finalized, Wright-Patterson Medical Center may conduct hearings according to USAF rules and regulations regarding the individual's military status. Final approval by HQ AFPC/DPAME is required.

The dean and the chief executive officer/commander at their discretion may modify time lines as may be appropriate to ensure fairness and realities of scheduling.