ELECTRONICALLY FILED
COURT OF COMMON PLEAS
Wednesday, September 11, 2019 2:52:11 PM
CASE NUMBER: 2019 CV 02921 Docket ID: 33809379
MIKE FOLEY
CLERK OF COURTS MONTGOMERY COUNTY OHIO

# IN THE COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| JACQUELYN MARES, M.D. | ) | Case No. 2019 CV 02921 |
| | ) | |
| Plaintiff, | ) | Judge E. Gerald Parker |
| | ) | |
| v. | ) | |
| | ) | |
| MIAMI VALLEY HOSPITAL, et al. | ) | |
| | ) | |
| Defendants. | ) | |

---

## MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS MIAMI VALLEY HOSPITAL, PREMIER HEALTH PARTNERS, AND TERESA ZRYD, M.D.

---

Now come the Defendants Miami Valley Hospital ("MVH"), Premier Health Partners ("PHP"), and Teresa Zryd, M.D. ("Dr. Zryd") (collectively the "MVH Defendants") and by and through counsel, and hereby move this Court, pursuant to Ohio R. Civ. P. 56(C) for entry of summary judgment on each of Plaintiff's claims against them. The grounds for this Motion are detailed in the attached Memorandum.

Respectfully submitted,

*/s/ Karen T. Dunlevey*
Karen T. Dunlevey (0067056)
JACKSON LEWIS PC
8534 Yankee Street, Suite E
Dayton, Ohio 45458
(937) 949-3846
(513) 898-0051 | Fax
karen.dunlevey@jacksonlewis.com

*Counsel for Defendants Miami Valley Hospital, Premier Health Partners, and Teresa Zryd, M.D.*

<u>**MEMORANDUM**</u>

## I.    <u>INTRODUCTION</u>

Plaintiff Jacquelyn Mares, M.D.  ("Dr. Mares") asserts four claims in this action: breach of contract (Count 1); tortious interference with contractual relations (Count 2); tortious interference with prospective economic advantage (Count 3); and civil conspiracy (Count 4)[1]. Dr. Zryd is exempted from the first claim (breach of contract), and MVH and PHP are exempted from the second claims (tortious interference with contractual relations), but all three of the MVH Defendants are subject to the third and fourth claims.  All of Dr. Mares's claims arise out of her dismissal from a medical residency program.  The undisputed facts demonstrate that Dr. Mares cannot establish the requisite elements of any of her claims, and such claims therefore fail as a matter of law.  Accordingly, the MVH Defendants are entitled to summary judgment in their favor, and Dr. Mares's claims against them must be dismissed, with prejudice.

## II.    <u>RELEVANT BACKGROUND FACTS</u>

Dr. Mares was a resident physician in the Wright State University Obstetrics and Gynecology Residency Program ("Program") through the Wright State University Boonshoft School of Medicine ("BSOM").  (Compl. ¶ 1).  BSOM assigns physicians in its residency program to work at various area hospitals, including MVH.  Wright State University ("WSU") (including BSOM) and MVH have an Agreement governing the respective roles that WSU and MVH play in providing medical education to medical residents ("Medical Education Agreement").  (Affidavit of Teresa Zryd, M.D., "Zryd Aff.", at Ex. A).   That Agreement states that "both parties recognize that the University [WSU] retains final responsibility for the academic programs of medical

---

[1] Dr. Mares also asserts claims against Defendants Wright State Physicians, Dr. Yaklic, Dr. Talbot, and Dr. Dunn. The claims against Dr. Talbot, Dr. Yaklic, and Dr. Dunn are currently subject to a Motion to Dismiss on jurisdictional grounds since they are state employees who are statutorily immune from Dr. Mares's claims.

student education and the academic training of resident physicians in its sponsored residencies." (*Id.* at p.2). The Medical Education Agreement also states: "The University faculty, students, and resident physicians who are participating in this association will be under the governance of the University." (*Id.* at Sec. 2.4). Thus, "[r]esident physicians, who provide patient care under this agreement, are responsible to, and under the supervisions of, the University's clinical, volunteer and fully affiliated faculty." (*Id.* at Sec. 3.1).

When BSOM residents are assigned to MVH, they enter into a Resident-Fellow Agreement ("Resident Agreement") with both MVH and BSOM. (See Ex. A to Compl.). The Resident Agreement specifically states that the resident's employment by MVH is on an "employment at will" basis. (*Id.* at Section I). Under the Resident Agreement, Dr. Mares was obligated to meet a number of performance standards, including, but not limited to the following:

- "Perform satisfactorily to the best of his/her ability, the customary services of a(n) Obstetrics/Gynecology Resident/Fellow in each progressive year of the residency program"; and
- "Participate fully in any process directed to the Joint Commission Accreditation or the certification of accreditation of the Hospital and/or Program by any other agency."

(*Id*. at Section II(A) and (I)). The Resident Agreement also states that "this employment agreement shall abide by the laws of the State of Ohio laws [sic] concerning 'employment at will'. Accordingly, either party may terminate this agreement by giving notice to the other at any time for time [sic] for any reason that does not contradict the law or due process procedures (Section F below) for residents." (*Id*. at Section IV). Additionally, "[t]his contract may be terminated by Hospital immediately, at any time prior to its expiration, for the following reasons: . . . If in the Program's opinion the resident/fellow substantially fails to meet any of the general requirements of the Program or is terminated by the Program." (*Id*. at Section IV(F)). The Resident Agreement further states: "Academic Progress and completion of residency is the sole discretion of the

residency program director and relevant academic department clinical competency committee." (*Id*. at Section V).

Termination from the Program is governed by Item 504 - Academic and Professional Standards / Due Process of the BSOM Resident Manual ("Item 504"). (*See Id*.; Ex. B to Compl.). According to Item 504, "among the academic standards a resident must meet, "[t]he resident must acquire cognitive medical knowledge." (*Id.*). Item 504 also includes professional standards a resident must meet, including, "[t]he resident must perform all responsibilities as a resident competently, efficiently, and maturely," and that "[t]he resident must refrain from obstructing or disrupting medical care and hospital activities." (*Id*.) "Residents are also subject to additional standards of conduct and performance adopted by hospitals participating in the educational program." (*Id*.) If the resident does not meet the Program's academic and professional standards, "the program may act to demote, not promote, not renew, or terminate the resident's appointment." (*Id*.) The due process provisions of Item 504 allow for a resident who is subject to termination from the Program to request a review of the action by a three-member hearing panel. (*Id*.) After a hearing, the panel must make a recommendation to the dean of the BSOM and the hospital's chief executive officer. (*Id*.) After receiving the panel's recommendation, the dean of the BSOM and the hospital's chief executive officer must jointly decide to (1) affirm the Program's intended action; (2) take revised action against the resident; or (3) not affirm the program's intended action. (*Id*.) The dean of the BSOM and the hospital's chief executive officer are not required to accept the panel's recommendation. (*Id*.) The resident may then appeal the decision within ten working days to the provost of Wright State University. (*Id*.) The provost shall then decide to either affirm or not affirm the decision. (*Id*.)

On October 5, 2018, Dr. Talbot, as the chair of BSOM's Clinical Competency Committee, informed Dr. Mares in writing that she was being dismissed from the Program and placed on paid administrative leave effective immediately. (Compl. ¶ 17). The Clinical Competency Committee advised Dr. Mares:

> Despite formal probation March 8, 2018, mentoring, and repeated feedback sessions both written and verbal, you have continued to have lapses in professionalism and communication with patients, faculty, and other residents/medical students. While you have demonstrated competency with medical knowledge and surgical skills, your progress with medical knowledge and surgical skills, your progress with other required tasks pertaining to professionalism and communication have been unsatisfactory.

(Zryd Aff. at ¶ 9, Ex. B). Dr. Mares appealed the termination decision to a hearing panel pursuant to Item 504. (Compl. ¶ 21). Although the hearing panel recommended that Dr. Mares be permitted to remain in the Program until graduation, subject to certain conditions, Dr. Dunn, the Dean of the BSOM, and Dr. Zryd, the Vice President of Academic Affairs and Research at MVH, agreed with the Clinical Competency Committee's determination that Dr. Mares should be dismissed from the Program. (*Id.*) Dr. Zryd's rationale for supporting Dr. Mares's dismissal from the Program was Dr. Mares's repeated instances of unprofessional and insubordinate conduct and her difficulties with both interpersonal communications and critical communications about patient health. (Zryd. Aff. at ¶¶ 12-13).

Dr. Mares then appealed the decision to the Provost of WSU, Dr. Susan Edwards. (Zryd Aff. at ¶ 15). The Provost ultimately decided that Dr. Mares should be dismissed from the Program. (*Id.* at ¶ 16, Ex. D).

## III.  STANDARD OF REVIEW

Under Civ. R. 56(C), summary judgment is appropriate if the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." Civ. R. 56(C). Accordingly, summary judgment is appropriate where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the non-moving party. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 375 N.E.2d 46. Because summary judgment is a procedural device to terminate litigation, courts should award it cautiously after resolving all doubts in favor of the non-moving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358-359, 1992 Ohio 95, 604 N.E.2d 138. Here, the undisputed facts demonstrate that Plaintiff's claims against the MVH Defendants fail as a matter of law.

**IV.    LAW AND ARGUMENT**

**A.    Reasonable Minds Can Only Conclude that Plaintiff Cannot Establish a Claim for Breach of Contract Against MVH and PHP (Count 1)**

Dr. Mares's breach of contract claim purportedly arises out of her dismissal from the Program, although her Complaint is devoid of specific allegations regarding the provisions of the contract she alleges were breached by MVH and PHP. When a complaint sounds in contract, as in the instant case, the promise(s) claimed to have been broken must be set forth with sufficient detail so that it can be identified. *Schoonover v. Van Leunen's Inc.*, 1st Dist. No. C-780035, 1979 Ohio App. LEXIS 9863 (citing Civ. R. 8(A)). Viewing the evidence in favor of Dr. Mares, she cannot establish a claim for breach of contract. The elements of a claim for breach of contract are the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, ¶18, 878 N.E.2d 66.

Although Plaintiff's Complaint references the Resident Agreement, it fails to allege any of the specific terms of the agreement that have allegedly been breached, and it specifically fails to

identify any restrictions on the parties' ability to terminate the contract. For this reason alone, Plaintiff has failed to state a claim upon which relief can be granted under Civ. R. 12(B)(6). *See, e.g.*, *RotoSolutions, Inc. v. Crane Plastics Siding, LLC*, 2013-Ohio-4343, ¶16 (10th Dist.) (a plaintiff must plead all of the elements of a claim); *Varee v. Holzinger*, 2007-Ohio-1924, ¶ 24 (11th Dist.) (where the allegations in a complaint are not sufficient to state a contract claim a "material point" is missing, and the complaint is properly dismissed). Regardless, under Civ. R. 56(C), Plaintiff also cannot establish that either MVH or PHP breached the Resident Agreement.

The Resident Agreement makes clear that Dr. Mares's employment with MVH was "at will." Thus, she could be terminated with or without cause or notice. *See Daup v. Tower Cellular, Inc.*, 136 Ohio App.3d 555, 561 (2000). Under the unambiguous language of the Resident Agreement, Dr. Mares was aware that the Resident Agreement could be terminated and that "completion of Residency is the *sole discretion* of the residency program director and relevant academic department competency committee." (Ex. A to Compl.) (emphasis added). Because Dr. Mares could be and was dismissed from the Program in the sole discretion of the aforementioned individual and committee, MVH and PHP cannot be held liable for Dr. Mares's dismissal from the Program. Once Dr. Mares was dismissed from the Program, MVH had an absolute right to immediately terminate the Resident Agreement with Dr. Mares. (*Id.* at Section IV(F)).

To the extent that Dr. Mares may argue that she was denied the due process promised in the Resident Agreement, this argument fails as a matter of law. By her own admission, she was provided with the promised due process. The Clinical Competency Committee recommended that Dr. Mares be dismissed from the Program and informed Dr. Mares of her right to appeal the decision. (Zryd Aff. at Ex. B). Dr. Mares appealed that decision and a hearing panel was assigned. (Zryd Aff. at ¶ 10). A panel hearing was held pursuant to Item 504. (Compl. ¶ 21). The panel

made a recommendation. (*Id.*) Consistent with the due process provisions of Item 504, Dr. Dunn and Dr. Zryd rejected the panel's recommendation and affirmed the Clinical Competency Committee's recommendation that Dr. Mares should be dismissed from the Program. (*Id.*; Ex. B. to Compl.; Zryd Aff. at ¶¶ 11-14, Ex. C). Dr. Mares then appealed that decision to the Provost of WSU and the Provost made the final determination that Dr. Mares should be dismissed. (Zryd. Aff. at ¶¶ 15-16, Ex. D). Just because Dr. Mares did not like the ultimate decision does not mean she was not provided with due process. *See, e.g., Reed v. State Med Bd.*, 162 Ohio App.3d 429, 442, 2005-Ohio-4071, ¶ 35 (holding that the fact that a doctor disagreed with a medical board's finding that she violated the standards of the board did not mean that the board lacked sufficient evidence upon which to base its decision and the board's findings "did not deny [the doctor] due process of law."); *In re Da.R.*, 2019-Ohio-2270, ¶ 19 ("The fact that she disagrees with the decision reached by the trial court does not mean that she was denied due process."). Dr. Mares received all the due process outlined in Item 504. In fact, this is more than the due process to which she is otherwise entitled under the law.

In considering the quantum of due process owed by a university to a dismissed medical student, the U.S. Supreme Court distinguished between dismissals from education institutions (such as Dr. Mares's dismissal from the BSOM in the instant case) on the basis of an "academic" rationale and those that may be properly characterized as "disciplinary." *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 89-90, 98 S. Ct. 948 (1978). The Court noted that an academic dismissal is one that involves "a school's determination of whether a student will make a good doctor," and the school's consideration of a student's personal attributes may permissibly factor into this "academic" decision. *Id.* at 91 n.6. In the case of academic dismissals, due process only requires that a student is informed of the nature of the faculty's dissatisfaction

and that the ultimate decision to dismiss is "careful and deliberate" and does not require a hearing. *Id*. at 85; *Fenje v. Feld*, 398 F.3d 620, 626-627 (7th Cir. 2005). "Courts have consistently held that the dismissal of a resident for poor clinical performance is an academic decision." *Knapik v. Mary Hitchcock Mem'l Hosp.*, 90 F. Supp.3d 292, 300 (D. Vt. 2015) (citations omitted.). Such "[a]cademic decisions are entitled to substantial deference." *Id., citing Regents of Univ. of Michigan v. Ewing,* 474 U.S. 214, 225, 106 S. Ct. 507 (1985).

Concern about a medical student's lack of professionalism is an academic judgment. *See Al-Dabagh v. Case Western Reserve Univ.*, 777 F.3d 355, 356 (6th Cir. 2015). Likewise, a hospital's decision to dismiss a medical resident for poor performance – including lack of professionalism – is an academic, rather than an employment decision. *See, e.g., Gupta v. New Britain Gen. Hosp.* 239 Conn. 574, 687 A.2d 111, (Conn. 1996) ("[T]he hospital's decision to dismiss the plaintiff for poor clinical performance constituted an academic, rather than an employment, decision."); *David v. Mann,* 882 F.2d 967, 974 (5th Cir. 1989) ("The residency program is distinct from other types of employment in that the resident's 'work' is what is academically supervised and evaluated. It is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program."); *Ross v. Univ. of Minn.*, 439 N.W.2d 28, 32 (Minn. Ct. App. 1989) ("[A] resident is a student for the purpose of reviewing the decision to dismiss for academic reasons. To hold otherwise would be to threaten the autonomy of academic institutions to determine standards for the passing and failing of students.").

In this case, according to Dr. Mares's allegations, the BSOM informed Dr. Mares of its dissatisfaction and decision to dismiss her from the Program because "Dr. Mares had failed to demonstrate satisfactory progress throughout her residency, primarily in the areas of

professionalism and interpersonal communications skills with staff, residents, and attending physicians." (*See* Compl. at ¶¶ 17, 19; Zryd Aff. Ex. B). The BSOM provided Dr. Mares a hearing, after which the ultimate decision-maker upheld the dismissal. (*See* Compl. at ¶ 21; Zryd Aff. at ¶ 16). Under any circumstances, Dr. Mares cannot claim that she was denied due process, as MVH and PHP provided her with all of the due process they were required to provide under both Item 504 and the applicable law. Dr. Mares was afforded every opportunity to present reasons why she should not have been dismissed from the Program, and those reasons were ultimately rejected by WSU's Provost. WSU's Provost has no affiliation with MVH or PHP. Moreover, the Medical Education Agreement between WSU and MVH clearly provides that WSU retains final responsibility for the academic programs of medical student education and Item 504 provides that the Provost shall make the final decision regarding the termination of a resident from the Program. (Zryd Aff. at Ex. A; Compl. at Ex. B, Due Process ¶7). Consequently, MVH and PHP cannot be held responsible for the academic decision to dismiss Dr. Mares from the Program.

Courts throughout Ohio and elsewhere have rejected contractual and quasi-contractual claims against hospitals from medical residents who have been dismissed from their respective programs. *See, e.g., Rizvi v. St. Elizabeth Hosp. Med. Ctr.*, 2003-Ohio-7011, ¶ 25; *Rehman v. Cuyahoga Cnty. Hosp.*, 1991 Ohio App. LEXIS 2213 *6-9; *Mounla-Sakkal v. W. Reserve Care Sys.*, Case No. 4:98CV2251, 2000 U.S. Dist. LEXIS 22203 (N.D. Ohio May 18, 2000); Alvarez v. *Hosp. Episcopal San Lucas, Inc.*, Case No. 15-2413, 2019 U.S. Dist. LEXIS 5797 D. P.R. Jan. 10, 2019; *Hason v. Univ. of California Bd. of Regents*, 35 Fed. App'x 340, 341 (9th Cir. 2002); *Gupta*, 687 A.2d at 119; *Abdullah v. State,* 771 N.W. 2d 246, 255 (N.D. 2009). This Court should similarly reject Dr. Mares's claims.

In summary, Dr. Mares's breach of contract claims against MVH and PHP fail because: (1) she fails to identify any specific term(s) of the Resident Agreement that MVH and PHP allegedly breached; (2) the Resident Agreement unambiguously and specifically provides that her relationship with MVH was terminable "at will"; (3) MVH had an absolute right to immediately terminate the Resident Agreement once she was terminated by the Program; (4) the Resident Agreement specifically provides that her completion of the residency program is in the "sole discretion" of the residency program director and the relevant academic competency committee; (5) she was provided with due process; and (6) the decision to dismiss her from the Program was an academic one made by WSU, unrelated to her employment with MVH and PHP, and should be provided substantial deference. MVH and PHP are entitled to summary judgment on this claim.

**B.** **Reasonable Minds Can Only Conclude that Plaintiff Cannot Establish a Claim for Tortious Interference with Contractual Relations Against Dr. Zryd (Count 2)**

Dr. Mares's tortious interference with contract claim against Dr. Zryd is also devoid of any specific factual allegations in support of the claim, again relying upon the allegations in her Statement of the Case. (Compl. ¶¶ 28-29). The specific allegations against Dr. Zryd is that she (along with Dr. Dunn from Wright State Physicians) "rejected the panel's recommendation and proceeded to dismiss Dr. Mares" after the hearing panel recommended that she be permitted to stay in the Program until her graduation, subject to conditions. (Id. at ¶ 21). What Dr. Mares omits from her Complaint is that she was then afforded the opportunity to appeal the decision of Dr. Dunn and Dr. Zryd to WSU's Provost, which she did. It was WSU's provost who made the final determination regarding Dr. Mares's dismissal from the Program. (Zryd Aff. at ¶ 16, Ex. D).

In order to establish a claim for tortious interference with contractual relations, Dr. Mares must prove that: (1) a valid contract existed; (2) Dr. Zryd was aware of the existence of the contract; (3) Dr. Zryd intentionally procured a breach of the contract; (4) Dr. Zryd lacked justification for

11

her conduct; and (5) Dr. Mares suffered damages as a result of the Dr. Zryd's conduct. *Kenty v. Transamerica Premium Ins. Co*., 72 Ohio St.3d 415, 419, 1995 Ohio 61, 650 N.E.2d 863 (1995). The contract which allegedly forms the basis of Dr. Mares's tortious interference with contractual relations claim against Dr. Zryd is the Resident Agreement (Compl., Ex. A), which us also the subject of her breach of contract claim against MVH and PHP. (See Compl. at ¶¶ 15, 29). As set forth above, there was no breach of the Agreement. Because there was no breach, Dr. Zryd could not have intentionally procured such a breach. Moreover, Dr. Zryd's role was to review the evidence and determine whether there were grounds to dismiss Dr. Mares from the Program. (See Compl. at Ex. B; Zryd Aff. at ¶¶ 12-13). By doing so, she was following the terms of Item 504. Thus, her conduct in making a recommendation on the dismissal of Dr. Mares from the Program was entirely justified and, in fact, required under the contract. This justification is further emphasized by the ultimate and final decision of the WSU Provost to dismiss Dr. Mares.

Additionally, where an employee is employed at-will, a claim of tortious interference with the contract of employment is not a valid cause of action. *Walter v. ADT Security Systems, Inc.*, 2007-Ohio-3324, ¶ 30, 2007 Ohio App. LEXIS 3051, citing *Mitchell v. Mid-Ohio Emergency Services, L.L.C.*, 2004- Ohio-5264, at ¶ 29; *see also, Hustler Cincinnati, Inc. v. Cambria*, 625 Fed. App'x. 712, 720 (6th Cir 2015). There is no evidence in this case that Dr. Mares was anything other than an at-will employee with respect to her work as a medical resident at MVH. (See Compl. at Ex. A). Thus, Dr. Mares's tortious interference with contractual relations claim fails as a matter of law.

**C.** **Reasonable Minds Can Only Conclude that Plaintiff Cannot Establish a Claim for Tortious Interference with Prospective Economic Advantage Against the MVH Defendants (Count 3)**

Dr. Mares next claims that the MVH Defendants tortiously interfered with her prospective economic advantage "by hindering her ability to become a board-certified physician in her chosen area of medical specialization." (Compl. ¶ 31). Dr. Mares admits that she refused to sit for the board certification examination. (Compl. ¶ 18). It is therefore her own actions that have "hindered her ability to become a board-certified physician in her chosen area of medical specialization," not the actions of the MVH Defendants. Consequently, this claim is completely unsupported by any facts warranting relief and must be dismissed.

Even if, for sake of argument, the elements of a tortious interference with prospective economic advantage are considered, Dr. Mares's claim still fails. Courts in Ohio use the terms "tortious interference with prospective economic advantage" (often also referred to as "tortious interference with business expectancy") and "tortious interference with a business relationship" interchangeably. *Syed v. Poulos*, 2016-Ohio-3168, ¶ 15 (8th Dist.), citing *Coventry Group, Inc. v. Gottlieb*, 2014-Ohio-213 ¶13 (8th Dist.). "Ohio does not recognize the tort of wrongful interference with a business expectancy [or prospective economic advantage] that is separate from tortious interference with a business relationship." *Id*. In order establish a claim for tortious interference, Dr. Mares must prove: (1) the existence of a valid business relationship between Dr. Mares and a third party; (2) the MVH Defendants' knowledge of the business relationship; (3) the MVH Defendants' intentional inducement of the third party to terminate the business relationship; (4) the absence of justification for MVH Defendants' conduct; and (5) damages resulting from the MVH Defendants' actions. *Connor Group v. Raney*, 2016-Ohio-2959, ¶ 27 (2nd Dist.)(citations omitted).

13

Dr. Mares has not alleged (and cannot establish) the first element of the claim, that is the existence of a relationship between her and a third party (other than the BSOM). She has not identified any such relationship. To the knowledge of the MVH Defendants, no such relationship currently exists, nor did one exist at the time she was dismissed from the Program. Without the existence of such a relationship, Dr. Mares also cannot meet the second and third elements of the claim. Additionally, as set forth above, Dr. Mares cannot demonstrate that her dismissal from the Program was unjustified. Furthermore, because it was her decision not to become a board-certified physician, Dr. Mares cannot claim she suffered damages as a result of Dr. Zryd's decision to recommend dismissal from the Program (which decision was ultimately upheld by the WSU Provost). This claim wholly fails.

Moreover, in the context of employment relationships "[t]he right of noninterference in an employment relationship is limited. There are those whose position vis-à-vis the employee and the employer entitle them to intrude upon the employment relationship." *Contadino v. Tilow*, 68 Ohio App.3d 463, 467 (1990) (citations omitted); *see also, Daup v. Tower Cellular, Inc.* 136 Ohio App.3d 555, 567 (2000); *DeVilbiss v. Schade*, 186 Ohio App.3d 441, 452, 2010-Ohio- 493, ¶ 44. "Thus, while actions for intentional interference with an employment [relationship] are cognizable against 'outsiders' to the employment relationship," such actions against supervisors and employers are not cognizable." *Daup*, 136 Ohio App.3d at 568. Hence, to the extent that the MVH Defendants were Dr. Mares's employer and she is claiming that they somehow interfered with that employment relationship by supporting the BSOM's decision to dismiss her from the Program, she cannot establish a tortious interference claim against them in connection with that relationship.

The MVH Defendants are entitled to summary judgment on Dr. Mares's tortious interference claim.

**D.** **Reasonable Minds Can Only Conclude that Plaintiff Cannot Establish a Claim for Civil Conspiracy Against the MVH Defendants (Count 4)**

Plaintiff's civil conspiracy claim is based upon the Defendants allegedly conspiring to tortiously interfere with Dr. Mares's contractual relationships and prospective economic interests as set forth in Counts 2 and 3 of her Complaint. (Compl. ¶ 33). To maintain a claim of civil conspiracy, Dr. Mares must allege: (1) a malicious combination of two or more persons, (2) causing injury to another person or property, and (3) the existence of an unlawful act independent from the conspiracy itself. *Kenty*, 72 Ohio St.3d at 419. "The malice involved in the tort is 'that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.'" *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475 (1998) (citation omitted). An underlying unlawful act must be committed in order to establish an action for civil conspiracy. *Gosden v. Louis*, 116 Ohio App.3d 195, 219 (1996). "[U]nless something is actually done by one or more of the conspirators which proximately results in damage, no civil action lies against anyone." 10 Ohio Jurisprudence 2d Conspiracy, Section 3, at 59 (1960). A civil conspiracy claim cannot stand alone; if there are no surviving claims, there can be no civil conspiracy. *Mender v. Vill. of Chauncey*, 2015-Ohio-4105, ¶ 30, 41 N.E.3d 1289, 1301. Because Dr. Zryd did not tortiously interfere with any contract and MVH and PHP did not tortiously interfere in Dr. Mares's prospective economic interests, they committed no unlawful act that could sustain a civil conspiracy claim. Accordingly, the MVH Defendants are entitled to summary judgment on this claim.

**V.**     <u>**CONCLUSION**</u>

For all of the foregoing reasons, the MVH Defendants respectfully request that this Court grant their motion for summary judgment and dismiss all claims against them.

Respectfully submitted,

<u>/s/ Karen T. Dunlevey</u>
Karen T. Dunlevey (0067056)
JACKSON LEWIS PC
8534 Yankee Street, Suite E
Dayton, Ohio 45458
(937) 949-3846
(513) 898-0051 | Fax
karen.dunlevey@jacksonlewis.com

*Counsel for Defendants Miami Valley*
*Hospital, Premier Health Partners, and*
*Teresa Zryd, M.D.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of September, 2019, the foregoing was electronically filed with the Clerk of Courts via the Court's electronic filing system and that such system will send electronic notice of the filing to the following:

Marc D. Mezibov, Esq.
Brian J. Butler, Esq.
Daniel J. Treadaway, Esq.
615 Elsinore Place, Suite 105
Cincinnati, OH 45202
mmezibov@mezibov.com
bbutler@mezibov.com
dtreadaway@mezibov.com
*Counsel for Plaintiff*

Jonathan Hollingsworth, Esq.
Hollingsworth & Washington, LLC
6494 Centerville Business Parkway
Centerville, Ohio 45459
jhollingsworth@jhallc.com
*Counsel for Defendant Wright State Physicians*

Mia Meucci Yaniko Esq.
Lizbeth M. Chavez, Esq.
Assistant Attorneys General
Education Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215-3400
Mia.yaniko@ohioattorneygeneral.gov
Lizbeth.chavez@ohioattorneygeneral.gov
*Counsel for Defendants Margaret M. Dunn, M.D.,*
*G. Theodore Talbot, M.D., and Jerome Yaklic, M.D.*

*/s/ Karen T. Dunlevey*
Karen T. Dunlevey (0067056)

4834-2941-9170, v. 2

17

**IN THE COURT OF COMMON PLEAS
MONTGOMERY COUNTY, OHIO**

| | | |
|---|---|---|
| JACQUELYN MARES, M.D. | ) | Case No. 2019 CV 02921 |
| | ) | |
| Plaintiff, | ) | Judge E. Gerald Parker |
| | ) | |
| v. | ) | |
| | ) | |
| MIAMI VALLEY HOSPITAL, et al. | ) | |
| | ) | |
| Defendants. | ) | |

_____

**AFFIDAVIT TERESA ZRYD, M.D.**
_____

STATE OF OHIO           )
                               ) ss:
COUNTY OF MONTGOMERY    )

Now comes the Affiant, Teresa Zryd, M.D., having been duly cautioned and sworn, and hereby states as follows:

1.     I affirm that I am of full legal age and am competent to make the following statements.

2.     I have personal knowledge of the facts and matters contained herein and believe this information to be true.

3.     I am the Vice President of Academic Affairs and Research and Chief Academic Officer at Miami Valley Hospital ("MVH"). In this position, the Chief Executive Officer of MVH has delegated to me decisions regarding resident physicians who are assigned to work at MVH.

4.     MVH entered into an agreement with Wright State University (WSU) regarding the medical residency program at WSU's Boonshoft School of Medicine ("BSOM") and the assignment of residents to work and be trained at MVH. Attached as **Exhibit A** is a true and

accurate copy that agreement (referred to as the "Medical Education Agreement"), of which I am familiar. The Medical Education Agreement outlines the roles and responsibilities of WSU/BSOM and MVH in providing medical education to medical residents. The Medical Education Agreement specifically provides that WSU retains final responsibility for medical student education and academic training of BSOM resident physicians.

5.      All BSOM resident physicians who are assigned to receive medical training at MVH enter into a Resident-Fellow Agreement with both MVH and WSU/BSOM ("Resident Agreement"). I am familiar with the Resident Agreement signed by most resident physicians assigned to MVH, including the one signed by Jacquelyn Mares, M.D.

6.      All resident physicians assigned to work at MVH are considered to be "at will."

7.      A resident physician may be dismissed from his or her assignment at MVH within the discretion of the BSOM residency program. Termination of a BSOM resident physician from her assignment at MVH is appropriate if she fails to meet any of the program requirements set forth by the BSOM or if she is terminated by the BSOM residency program.

8.       I have also been the Program Director of the Family Medicine Residency Program at WSU/BSOM. I am familiar with the WSU/BSOM, Resident Manual, including Item 504 – Academic and Professional Standards / Due Process.

9.      I learned in October 2018, that Jacquelyn Mares, M.D., a resident physician in the Obstetrics & Gynecology Residency Program at WSU/BSOM had been recommended for dismissal from the program by Theodore Talbot, M.D., the Residency Director of the Obstetrics & Gynecology Program at WSU/BSOM and the Clinical Competency Committee. Attached as **Exhibit B** is a true and accurate copy of the recommendation of the Clinical Competency Committee that I received in the normal course of business and reviewed.

10.     Consistent with Item 504, Dr. Mares appealed the recommendation of the Clinical Competency Committee and a panel of three members conducted a hearing on November 7, 2018, concerning Dr. Mares's dismissal from the program.

11.     I received the hearing panel's recommendation dated November 14, 2018.  The panel recommended that Dr. Mares remain on probation and meet a variety of other conditions in order to remain in the program.

12.     After receiving the hearing panel's recommendation, I reviewed the transcript from the hearing, as well as a multitude of exhibits submitted at the hearing.  The hearing panel testimony revealed concerns regarding repeated instances of unprofessional, rude, and insubordinate conduct and difficulties with interpersonal communications.  It also revealed that Dr. Mares had not met expected standards regarding critical communications regarding patients and had entered incorrect information in a patient safety report.  The hearing exhibits consisted of over 130 pages and included, but were not limited to, evaluations of Dr. Mares by the Directors of WSU/BSOM OB/GYN Residency Program, evaluations by medical interns who worked with Dr. Mares, complaints by medical students, feedback from attending physicians, notes from Clinical Competency Committee meetings, patient complaints, documents relating to Dr. Mares's probation, feedback from Dr. Mares's rotation at the Wright-Patterson Medical Center, and letters in support of Dr. Mares.

13.     After reviewing all of the evidence submitted, I consulted with Margaret Dunn, M.D., M.B.A., the Dean of BSOM.  Dr. Dunn agreed with the Clinical Competency Committee that Dr. Mares should be dismissed from the program, and I agreed.  We did not make this decision lightly.  Dr. Mares demonstrated persistent unprofessional and insubordinate conduct involving patients, faculty, supervisors, and learners.  She had previously been counseled about her

deficiencies in professionalism and interpersonal communications and had been placed on probation for such deficiencies. Despite this fact, her behavior did not improve and only worsened.

14.     On December 3, 2018, Dr. Dunn and I wrote a letter to Dr. Mares informing her of our decision to affirm the recommendation of the Clinical Competency Committee to dismiss her from the residency program. Attached as **Exhibit C** is a true and accurate copy of that letter. In that letter, we informed Dr. Mares that she could appeal the recommendation to the Provost of WSU, Dr. Susan Edwards.

15.     Dr. Mares appealed the dismissal recommendation made by me and Dr. Dunn to the Provost of WSU.

16.     Dr. Susan Edwards, the Provost of WSU, decided to dismiss Dr. Mares from the program. Attached as **Exhibit D** is a true and accurate copy of a letter from Dr. Edwards dated January 9, 2019, that I received.

FURTHER AFFIANT SAYETH NAUGHT

Teresa Zryd, M.D.

Sworn to and subscribed before me by Teresa Zryd, M.D. on this _11_ day of September, 2019.

Notary Public

4846-4461-6354, v. 1

THERESA M CORY, Notary Public
In and for the State of Ohio
My Commission Expires Sept. 2, 2020

# EXHIBIT A

AGREEMENT BETWEEN THE
WRIGHT STATE UNIVERSITY BOONSHOFT SCHOOL OF MEDICINE AND
MIAMI VALLEY HOSPITAL

This agreement, between the Wright State University, including the Boonshoft School of Medicine, Dayton, Ohio, hereinafter referred to as the "University," and the Miami Valley Hospital, Dayton, Ohio, hereinafter referred to as the "Hospital," is entered into for the mutual benefit of both.

PREAMBLE

The primary concern of the hospital is to provide quality care for patients. This quality can be enhanced when a quality teaching program for medical students, resident physicians, and other learners is incorporated as a basic policy of the hospital. We are convinced that the continued affiliation of the Hospital with the University will strengthen further that teaching program and will contribute thereby to the maintenance of quality patient care.

The primary mission of the University's School of Medicine is the education of its medical students, resident physicians, and other learners. The University is convinced that a quality clinical educational program for its students and resident physicians can be obtained when quality patient care is demonstrated as part of the educational process.

WITNESSETH

Whereas, the University has established a School of Medicine and students of said School need supervised clinical experience and the use of clinical facilities, and

Whereas, the University has developed programs of medical education in a number of affiliated community facilities and is desirous of continuing to include the Hospital among these facilities, and

Whereas, the Hospital has the facilities for furnishing clinical training, and

Whereas, the Hospital desires continued enrichment of its medical education program by direct association with the University, and

Whereas, it is to the mutual benefit of the parties that students of the University are assigned in the Hospital facilities for clinical training and experience, and resident physicians of the Hospital are assisted by the resources of the University for orderly progress of their education, and

Whereas, it is to the mutual benefit of the parties that qualified members of the University may be appointed to the staff of the Hospital, and

Whereas, it is to the mutual benefit of the parties that qualified members of the Hospital Staff may be appointed to the faculty of the University, and

Agreement Between the
Wright State University School of Medicine and
Miami Valley Hospital                                                                                              2

Whereas, both parties recognize that the Hospital retains final authority for patient care, and

Whereas, both parties recognize that the University retains final responsibility for the academic programs of medical student education and the academic training of resident physicians in its sponsored residencies, and

Whereas, the parties desire to memorialize their agreement with respect to medical education recognizing that the substance of this Agreement shall provide the basis for the working relationship and for decision making, and that the parties will not attempt to predetermine each decision but continue to permit growth and development of an effective inter-institutional relationship,

Now Therefore, in consideration of the mutual commitments herein contained, which are hereby incorporated to this Agreement, the parties hereby agree to the following:

1. JOINT RESPONSIBILITIES

   1.1. Joint Cooperation. The Hospital Chief Executive Officer and the Dean of the School of Medicine or their designees shall meet periodically and as needed to carry on the cooperative activities including but not limited to the financial responsibilities for medical student and residency education, as well as to periodically review changing requirements of the institutions, individually and collaboratively.

   1.2. Facilities and Resources. The Hospital and the University agree to the mutual use of the facilities and resources of the parties in accordance with the policies, bylaws, rules and regulations of each to more fully realize the substance of this association. Clinical resources of the Hospital shall be made available for teaching purposes for the students and resident physicians of the University subject to the policies, bylaws, rules and regulations of the Hospital. Under these guidelines, the Hospital will provide each medical student and resident physician, who is certified by the University and approved by the Hospital, the opportunity for clinical experience and will permit such students, resident physicians and members of the University Faculty access to appropriate hospital and outpatient department facilities. The Hospital will permit its Staff, and other personnel, to participate in the clinical experience and teaching of students and resident physicians.

   1.3. Accreditation. Both parties agree to work together towards the maintenance of appropriate accreditation status of each other.

   1.4. Non-Discrimination. Both parties agree to maintain a policy in which neither will discriminate against any employee, applicant for employment, student or resident physician because of age, gender, race, color, creed, national origin, disability, or veterans' status in accordance with applicable law.

Agreement Between the
Wright State University School of Medicine and
Miami Valley Hospital                                                                                      3

1.5.    Appointment to Staff. Where appropriate and consistent with the intent of this agreement and the regulations of each party, key leadership positions, such as a chair of a School of Medicine clinical department physically based at the Hospital, will be appointed by the University to the University Faculty, with advice provided by Hospital academic leadership, and by the Hospital to the Hospital medical staff so long as practitioner meets eligibility requirements under the Hospital's Medical Staff Bylaws. The Hospital Vice President of Academic Affairs, as the leadership person in medical education representing the Hospital, will be appointed by the Hospital with the advice of the University.

1.6.    Medical Staff. It is agreed by both parties that this agreement is not intended to limit the Hospital's prerogative to appoint physicians to its medical staff. Hospital medical staff physicians are not required to participate in the medical student or residency education programs, nor does this agreement limit the admissions policy of the Hospital or patients of its medical staff physicians. Medical staff physicians of the Hospital may be selected and appointed by the University to the Faculty of the University. Physician faculty of the University may be selected and appointed to the Hospital medical staff by the usual credentialing procedures of the Hospital, in which case the physician shall support and abide by the Hospital's programs under the terms of the Hospital's Medical Staff Bylaws.

1.7.    Term and Termination. The terms of this agreement shall commence upon the signing of this agreement and shall continue until terminated by either party. Such termination shall be preceded by written notification to the other party of the intention to terminate sent by registered mail one year prior to the proposed termination date. However, both parties may mutually agree to terminate this agreement at any time. This agreement is entered into with a spirit of mutual cooperation for the benefit of both parties, with the full realization that this agreement encompasses long-range planning and joint efforts to assure meaningful learning experiences for the students, resident physicians, staff, and faculty and to assure the quality of health care for the patients.

1.8.    Severability. If any one or more of the provisions contained in this Agreement are held to be invalid, illegal, or unenforceable in any respect for any reason, then such invalidity, illegality, or unenforceability shall not affect other provisions hereof. It is the intention of the parties that, if any provision is held to be invalid, illegal, or unenforceable, there shall be added in lieu thereof a mutually agreeable valid and enforceable provision as similar in terms to such provision as is possible.

1.9.    Relationship of Parties. Nothing herein is intended to be construed as creating joint venture, partnership, tenancy-in-common, or joint tenancy relationship between the parties hereto and nothing herein contained shall be construed to authorize either party to act as agent for the other. In performing their respective obligations hereunder, the Hospital and the University shall be deemed independent contractors

Agreement Between the
Wright State University School of Medicine and
Miami Valley Hospital                                                                                          4

and each shall assume full responsibility for their respective employees, agents, or subcontractors.

1.10.   Indemnification. Each party shall agree to indemnify and hold the other harmless from any and all claims, actions and proceedings, judicial or otherwise, judgments, damages, costs, expenses, and attorneys' fees, arising from or in connection with its respective responsibilities under this agreement to the extent provided by Ohio law.

1.11.   Entire Agreement. This agreement contains the entire Agreement of the parties hereto unless otherwise stated and supersedes all prior agreements and oral or otherwise amendment of this Agreement shall not be effective unless the same shall be in a writing duly executed by all parties hereto.

1.12.   Binding Effect. This Agreement shall be binding upon the parties hereto and their respective heirs, legal representatives, successors, and assigns.

1.13.   Governing Law. This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Ohio.

1.14.   Confidentiality of Patient Information. University warrants and covenants that neither it nor its faculty employees nor its students and resident physicians will share or release, disclose or provide to third parties any of the confidential, private or otherwise sensitive information it may have or become aware of regarding the Hospital's' patients. University further agrees that the medical record of each patient that receives services pursuant to this Agreement is the property of the Hospital and shall be treated as confidential by University and its faculty, students and resident physicians pursuant to the policies of the Hospital and applicable law. University acknowledges that Hospital is bound by law to have written agreements with its business partners who may have access to patient information requiring compliance with the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the rules and regulations promulgated thereunder. Accordingly, University warrants and represents that it understands the privacy concerns of protecting patient health information and shall perform its services under this Agreement in compliance with HIPAA and all relevant federal statutes, rules, regulations and applicable interpretive rulings governing the confidentiality and privacy of protected health information. Failure by University or its faculty or students and resident physicians to comply with this provision shall result in immediate and automatic termination of such faculty, student or resident physician from participation in the educational program under this Agreement.

2.   UNIVERSITY (SCHOOL OF MEDICINE) RESPONSIBILITIES

2.1.    Appointment to Hospital. Faculty members recommended by the University and approved by the Hospital medical staff may be appointed to the Hospital medical staff in accordance with the bylaws of the Hospital, to engage in health care delivery at the Hospital and in the education of medical students and resident physicians.

2.2.   Accreditation. The University agrees to continue to operate and support accredited medical education programs.

2.3.   Evaluation. The University understands the importance of timely evaluation of educational goals and programs. Prior to the activation of any significant changes in the University's academic programs implemented at the Hospital, these proposed changes and their impact on the Hospital will be discussed with the Hospital.

2.4.   Governance. The University faculty, students, and resident physicians who are participating in this association will be under the governance of the University. The University will assure that its faculty, students, and resident physicians will comply with all applicable rules, regulations, policies, and requirements of the Hospital while performing in the Hospital. Notwithstanding this, University faculty members of the Hospital's Medical Staff will be bound by the Hospital's Medical Staff Bylaws.

2.5.   Insurance. The University agrees to maintain appropriate liability and malpractice insurance for its employees and the University's medical students. Liability and malpractice insurance coverage for resident physicians will be provided by the employing institution. Air Force employed resident physicians shall be provided professional liability insurance coverage by Hospital, solely while providing patient care within Hospital's facility(ies).

3.   HOSPITAL RESPONSIBILITIES

3.1.   Supervision. The medical staff physicians are to comply with the Hospital's Bylaws. Resident physicians, who provide patient care under this agreement, are responsible to, and under the supervision of, the University's clinical, volunteer and fully affiliated faculty.

3.2.   Program Changes. The Hospital understands that major changes in its programs may reflect on this agreement and also understands the importance of timely planning and coordination of its patient care programs with the University's academic programs. Any such proposed major changes will be reviewed by the Hospital with the Dean of the School of Medicine or the dean's designee. It is understood that the purpose of this information sharing is not to set patient care standards or initiate patient care programs, but rather to consider the effect of such changes on the educational programs under this agreement.

3.3.   Patient Care Standards. The Hospital agrees to maintain medically accepted standards of patient care.

3.4.   Exceptions to Patient Resources. The Hospital agrees to make its facilities and patient resources available for instructional purposes to fulfill the educational needs requested by the University. Exceptions to participation in educational programs can be made for specific patients on request of the attending physician, the patient's family, or by the patient.

Agreement Between the
Wright State University School of Medicine and
Miami Valley Hospital                                                                                    6

3.5.    Emergency Care of Students. The Hospital will provide emergency first aid and
        emergency care for the University students and resident physicians should accident or
        illness occur while in the Hospital pursuant to this association agreement. Students
        and resident physicians are personally responsible for charges for such care, which
        will be at the Hospital's prevailing rates. The Hospital's determination of the duration
        and extent of the first aid or the emergency care shall be conclusive.

3.6.    Insurance. The Hospital agrees to maintain appropriate insurance for its employees in
        such amounts determined at the Hospital's discretion.

3.7.    Expenses. The Hospital agrees to work collaboratively with the University in
        establishing annual agreements between parties whereby the expenses of clinical
        faculty based at the Hospital as well as the supporting clerical and program expenses
        would be allocated between the University and the Hospital. The guideline for such
        allocation is that those expenses associated with the general operation of the medical
        school and those related to the education of medical students will be borne by the
        University; and, that portion of the expenses related to the conduct of the residency
        programs and those expenses related to the Hospital's clinical activities will be borne
        by the Hospital. Hospital financial support of research proposed by faculty or students
        will be considered on an individual-proposal basis in accordance with the rules of the
        Hospital and at the discretion of the Hospital.

The effective date of this agreement is as of the date of execution by both parties.

**MIAMI VALLEY HOSPITAL**                              **WRIGHT STATE UNIVERSITY**

_____  8/15/15                       _____  9/18/2015
Mark S. Shaker          Date                           Margaret Dunn, MD, MBA    Date
President/ Chief Executive Officer                     Dean, Boonshoft School of Medicine

Acknowledged by:

_____
Molly Hall, M.D.      Date
Vice President and Chief Academic Officer

# EXHIBIT B



Boonshoft
**School of Medicine**
WRIGHT STATE UNIVERSITY

Department of Obstetrics and Gynecology
128 E. Apple Street, Suite 3800 ▪ Dayton, OH 45409
Tel 937.208.2850 ▪ Fax 937.222.7255
medicine.wright.edu

October 5, 2018

Subject: Dismissal from Residency, Jacquelyn Mares, MD

Dear Dr. Mares,

The Clinical Competency Committee met during a closed meeting October 3, 2018. The majority found that your lack of satisfactory progress throughout your residency with ACGME Competencies Professionalism, Communication/Interpersonal Skills, and overall patient care implications warrant termination and dismissal from the Wright State University Obstetrics & Gynecology Residency Program.

Despite formal probation March 8, 2018, mentoring, and repeated feedback sessions both written and verbal, you have continued to have lapses in professionalism and communication with patients, faculty, and other residents/medical students. While you have demonstrated competency with medical knowledge and surgical skills, your progress with other required tasks pertaining to professionalism and communication have been unsatisfactory. **Based upon the recommendations of the Clinical Competency Committee, you are being dismissed and placed on paid administrative leave effective immediately from this residency program.**

You have 5 business days for written appeal to this dismissal letter by writing to Dr. Albert Painter, DIO, at albert.painter@wright.edu. Dr. Painter can also be reached by phone at 513-827-1357. Failure to appeal will result in commencement of this dismissal. The due process available to you as a resident in the Wright State Obstetrics and Gynecology Residency is fully described in the Wright State University Resident Manual Item 504 Academic and Professional Standards/Due Process Policy available here: https://medicine.wright.edu/faculty-and-clinical-affairs/resident-manual/table-of-contents.

Please sign below to indicate receipt of this letter. Note: Signing this letter indicates receipt, not necessarily agreement with the content therein.

Sincerely,

*G. Theodore Talbot*

G. Theodore Talbot, MD
Program Director, Obstetrics and Gynecology

*Dr Mares declined to sign this acknowledgment at this time after meeting with Dr Talbot and myself.*

*Jason L. Yee-kc*
*10/5/2018*

I have received a copy of this letter.

_____        _____
Jacquelyn Mares, MD                              Date
(Indicates receipt, not necessarily agreement with content therein.)



Boonshoft
School of Medicine
WRIGHT STATE UNIVERSITY

Department of Obstetrics and Gynecology
128 E. Apple Street, Suite 3800 ▪ Dayton, OH 45409
Tel 937.208.2850 ▪ Fax 937.222.7255
medicine.wright.edu

# Clinical Competency Committee

## SUMMARY OF 10/3/18 MEETING

Dr. Mares was of immediate concern due to her active formal probationary status driven by concerns including professionalism, communication, patient care interactions, and overall performance abilities. It was noted that she has actively participated in discussion with her mentor, and in the area of interaction with medical students made the necessary improvements. However, evaluations and numerous recent incidents discussed at length posed serious concern for overall progress through probationary status. Finally, much debate centered the fact that she has verbalized on several occasions she does not intend to practice OBGYN after graduation, and will not commit to taking the OBOG qualifying exam at graduation. This raised concerns by Gyn Oncology attendings and WPAFB faculty that she is "going through the motions" to graduation and presents a patient safety issue. That she is not committed to continual improvement as a physician during the remainder of her training. Two instances were discussed where she refused to care for a surgical patient (one with Dr Yaklic, one with Dr Kindig). A formal movement to remove Dr. Mares from the residency program was posed and seconded. The official vote from the committee was 6-2, in favor of removal.

(Discussions concerning other residents that day are not included in this summary.)

# EXHIBIT C



Boonshoft
**School of Medicine**
WRIGHT STATE UNIVERSITY

**Office of the Dean**
3640 Col. Glenn Hwy. ■ Dayton, OH 45435
medicine.wright.edu

December 3, 2018

Jacquelyn Mares, M.D.
37 Green Street
Dayton, Ohio 45402

Dear Dr. Mares:

We are in receipt of your November 7, 2018 review panel's recommendation, as attached. Our decision is to reject the recommendation of the review panel and to affirm the program's recommended action of termination from the program.

We have made this decision based upon your persistent demonstration of unprofessional and insubordinate conduct involving patients, faculty, supervisors, and learners. These additional documented incidents occurred subsequent to you having been placed on probation in March 2018 for deficiencies in Professionalism and Interpersonal Communication. Moreover, concerns have been raised regarding your deficiencies in critical communications obligations and entering incorrect information in a patient safety report.

Within ten working days of receipt of this decision, you may elect to appeal the decision in writing to the Provost of Wright State University, Dr. Susan Edwards. This appeal must contain the action that you are requesting and the reasons for that action. The Provost will have fifteen working days to respond to that appeal. Refer to policy 504 in the BSOM Resident manual that may be found at the following link https://medicine.wright.edu/sites/medicine.wright.edu/files/page/attachments/2018%20Resident%20Manual%20-%20Revised.pdf

Sincerely,

Margaret M. Dunn, M.D., M.B.A
Dean
Boonshoft School of Medicine

By certified mail and US mail

Teresa W. Zryd, M.D.
Vice President
Academic Affairs /Research
Miami Valley Hospital

Cc:
Albert F. Painter, Psy.D.
Ted Talbot, M.D.
Jerome Yaklic, M.D., M.B.A.
Linda Barney, M.D.
Christopher S. Croom, M.D.
Stacey Poznanski, D.O., M.Ed.



Boonshoft
## School of Medicine
WRIGHT STATE UNIVERSITY

Office of Faculty and Clinical Affairs
3640 Col. Glenn Hwy. ▪ Dayton, OH 45435
**Tel** 937.245.7640 ▪ **Fax** 937.775.7955, or 937.775.7956
medicine.wright.edu

| | |
|---|---|
| Date: | November 14, 2018 |
| To: | Teresa W. Zryd, M.D., M.P.H., Chief Academic Officer<br>Premier Health |
| | Margaret M. Dunn, M.D., M.B.A., FACS<br>Dean, Wright State University Boonshoft School of Medicine |
| From: | Linda Barney, M.D.<br>Chair, OB/GYN Residency Due Process Hearing Panel |
| Subject: | Due Process Review Hearing re: Jackie Mares, M.D., PGY4 |

Jackie Mares M.D., a resident in her PGY4 year of Obstetrics and Gynecology residency training at Wright State University Boonshoft School of Medicine, requested a review panel hearing in appeal of the dismissal decision of the Program Director, Dr. Ted Talbot. The hearing was conducted on November 7, 2018 in order to determine if substantial evidence was present to support the program's intended action. Persons present were:

<u>REVIEW PANEL</u>

Linda Barney, M.D., Associate Professor, WSU BSOM Department of Surgery

Stacey Poznanski, D.O., M.Ed., Associate Professor, WSU BSOM Department of Emergency Medicine

Christopher S. Croom, M.D., Clinical Professor, WSU BSOM Department of OB/GYN

<u>PARTICIPANTS</u>

Ted Talbot, M.D. Program Director, Wright State University OB/GYN Residency

Jackie Mares, M.D., PGY4, OB/GYN Residency program

Jerome Yaklic, M.D., M.B.A., Chair, WSU BSOM Department of OB/GYN

Albert F. Painter, Psy.D., Associate Dean and Designated Institutional Official to the ACGME, BSOM

Melanie Glover, M.D., Clinical Assistant Professor, WSU BSOM Department of OB/GYN
Lisa Boydston, M.A., Administrative Director of GME, WSU BSOM

Due Process Review Hearing re: Jackie Mares, M.D., PGY4
November 14, 2018
Page Two

Prior to the opening of the proceedings, the Review Panel chair reviewed the Due Process
Policy from the Wright State University Boonshoft School of Medicine Sponsored
Graduate Medical Education Programs Resident Manual
(http://www.med.wright.edu/fca/gme/rm504.html). This policy was in effect during the
events in question.

The panel then reviewed the evidence presented by both parties. The Review panel
considered only evidence available before the program's decision of October 5, 2018.

Dr. Talbot, Program Director, presented to the panel a review of Dr. Mares's professional
and clinical problems in the residency program leading to the decision to dismiss. Dr.
Yaklic offered supporting details supporting the program's intended action to dismiss.

Dr. Mares then presented information describing her reasons for aforementioned
problems in the program and attempts to remedy these issues in support of her appeal.

Dr. Glover presented information to support Dr. Mares' appeal related to aforementioned
problems.

<u>RECOMMEDATIONS</u>
The panel recommends that the intended action to dismiss Dr. Mares be modified to the
following elements:

1. Dr. Mares will remain on Probation until her graduation from the program.
2. Dr. Mares will be assigned a mentor and meet on a weekly basis to discuss her
   performance in the program including feedback from the Program Director and
   other faculty.
3. Dr. Mares will follow the Academic and Professional Standards contained in the
   WSU BSOM Policies and Procedures, BSOM Resident Manual, Item 504.
4. Dr. Mares will identify a course on professionalism and clinical practice in
   collaboration with her mentor and Program Director and complete this activity at
   the earliest possible date. She will write up a synopsis of learnings to be discussed
   with the Program Director and her mentor as it relates to changes she intends to
   incorporate in her doctoring.
5. Continue working with outside assistance regarding problems adversely effecting
   professionalism and interaction with others especially medical students in the
   OB/GYN clerkship.
6. Any additional infractions in violation to the Academic and Professional
   Standards will result in immediate termination from the WSU BSOM OB/GYN
   Program without the benefit of due process.

# EXHIBIT D



**Office of the Provost**
3640 Colonel Glenn Hwy.
Dayton, OH 45435-0001
(937) 775-3035
FAX (937) 775-2421

January 9, 2019

Jacquelyn Mares, M.D.
37 Green Street
Dayton, Ohio 45402

Dear Dr. Mares,

I have reviewed your letter dated December 14, 2018 and the associated documents you provided appealing your dismissal from the Obstetrics and Gynecology residency program at the Boonshoft School of Medicine. After careful review of these documents, and the additional materials from the hearing, I find that I must affirm the action that you be dismissed from the Boonshoft School of Medicine Obstetrics and Gynecology residency program.

Sincerely,

Susan Edwards, Ph.D.
Provost