ELECTRONICALLY FILED
COURT OF COMMON PLEAS
Monday, September 23, 2019 2:15:21 PM
CASE NUMBER: 2019 CV 02921 Docket ID: 33844046
MIKE FOLEY
CLERK OF COURTS MONTGOMERY COUNTY OHIO

## IN THE COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| JACQUELYN MARES, M.D. | : | Case No. 2019 CV 02921 |
| | : | |
| | : | |
| Plaintiff, | : | Judge E. Gerald Parker |
| | : | |
| v. | : | |
| | : | |
| MIAMI VALLEY HOSPITAL, et al., | : | |
| | : | |
| Defendants. | : | |

_____

### PLAINTIFF'S MOTION TO CONTINUE DATE FOR RESPONSE TO DEFENDANTS' MIAMI VALLEY HOSPITAL, PREMIER HEALTH PARTNERS, AND TERESA ZRYD, M.D. MOTION FOR SUMMARY JUDGMENT (RULE 56(F))
_____

Pursuant to Ohio Civil Rule 56(F), Plaintiff, Jacquelyn Mares, M.D., hereby requests that the Court order a continuance to allow her to take discovery to establish facts necessary to respond to Defendants' Miami Valley Hospital ("MVH"), Premier Health Partners ("PHP"), and Teresa Zryd, M.D. ("Dr. Zryd") Motion for Summary Judgment. In support of this motion, Dr. Mares relies upon the accompanying memorandum of law and declaration of Marc D. Mezibov, attached hereto.

Respectfully submitted,

/s/ Marc D. Mezibov_____
Marc D. Mezibov (OH No. 0019316)
Brian J. Butler (OH No. 0082675)
Daniel J. Treadaway (OH No. 0098000)
MEZIBOV BUTLER
615 Elsinore Place, Suite 105
Cincinnati, OH 45202
Phone: 513.621.8800
Fax: 513.621.8833
mmezibov@mezibov.com

bbutler@mezibov.com
dtreadaway@mezibov.com

*Attorneys for Plaintiff Jacquelyn Mares, M.D.*

## MEMORANDUM

MVH Defendants' motion for summary judgment is premature and should be continued pending the completion of discovery, which has not yet been permitted or conducted in this case.

## I.    Legal Standard

This Court has not yet adopted any case management plan that permits the MVH Defendants to file a motion for summary judgment. Plaintiff Jacquelyn Mares, M.D. filed her Complaint in June 2019, and the MVH Defendants filed their Answer in July 2019. Under the local rules, this Court will now hold a pre-trial conference "to establish all filing and discovery deadlines" (Mont. Co. C.P.R. 2.01(B)(2)(b)(ii)), including "a discovery cut-off date" and "a date for the filing of . . . motions for summary judgment" (*id.*, 2.07(B)(2)(b) and (c)). The threshold step of adopting an orderly case management plan "will achieve the prompt and fair disposition of civil cases [and] provide the Court with an efficient means of controlling the flow of civil cases" (*id.*, 2.01(A).

This Court's local rules are consistent with the Ohio Rules of Civil Procedure. Rule 56(C) anticipates that discovery will precede any motion for summary judgment. Among other things, the specific categories of evidence admissible on such a motion include materials generated only in discovery ("pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact," emphasis added).

The precondition of discovery for summary judgment motions is well established in this District. *See, e.g., WAS, Inc. v. Alea London, Ltd.,* 2d Dist. Montgomery No. 20646, 161 Ohio App.3d 111, 2005-Ohio-2533, 829 N.E.2d 727, ¶ 8 (reversing summary judgment rooted in "speculation" because it was "premature until facts . . . are revealed"

in discovery); *Weinberg v. Weinberg*, 2d Dist. Montgomery No. 27834, 2018-Ohio-2862, 117 N.E.3d 907, ¶ 28 (reversing summary judgment rooted in a "relatively sparse" rather than "fully developed summary judgment record.")

A continuance under Rule 56(F) is the proper relief where, as here, a motion for summary judgment relies only on "an 'uncorroborated, self-serving affidavit [by defendant] . . . insufficient to establish the <u>absence</u> of any genuine issue of material fact where the opposing parties have not yet been afforded an opportunity to explore the underlying facts through discovery.'" *Farmer v. PNC Bank, N.A.,* 2d Dist. Montgomery No. 27149, 2017-Ohio-4203, 92 N.E.2d 218, ¶ 11 (emphasis in original).

## II. Disputed Issues of Fact

Discovery is likely to reveal evidence relevant to the following disputed issues of fact that is within the exclusive knowledge and control of the MVH Defendants and third parties. Because that evidence is not presently known, or accessible, to Dr. Mares or her counsel, they are unable to generate a full, accurate, and complete affidavit by Dr. Mares to oppose the MVH Defendants' summary judgment motion and instead request this continuance under Rule 56(F). (Affidavit of Marc D. Mezibov (attached hereto as Exh. A)).

### A. Reason for Dismissal

Dr. Mares alleges she was dismissed from her fourth year OBGYN residency position in order to pad the program's accreditation statistics. Compl. ¶ 18. The MVH Defendants dispute this allegation of fact. MVH Answer ¶ 18. However, their motion for summary judgment does not address it at all, either by argument or evidence.

The MVH Defendants contend Dr. Mares was dismissed for irritability. Dr. Zryd Affid., ¶ 13. Dr. Mares disputes this allegation of fact. Compl. ¶ 19.

Dr. Mares also alleges that any irritability was a symptom of "physician burnout," a workplace-related syndrome <u>caused</u> by Defendants. Compl. ¶ 20. The MVH Defendants dispute this allegation of fact. MVH Answer ¶ 18. However, their motion for summary judgment does not address it at all, either by argument or evidence.

### B. Contract Obligations and Breaches

Dr. Mares alleges that the MVH Defendants had a contractual obligation, which they breached, to dismiss her only for specified reasons that did not include padding the program's accreditation statistics. Compl. ¶ 20(a), (b), (c). The MVH Defendants' dispute these factual allegations of obligation and breach. MVH Answer ¶ 20(a), (b), (c). Their summary judgment motion contains a long legal argument about contractual obligations, but in terms of evidence refers only to the employment agreement attached to Dr. Mares's Complaint and Dr. Zryd's personal, conclusory, and untested interpretation that Dr. Mares was an "at will" employee. Dr. Zryd Aff. ¶ 6.

Dr. Mares also alleges that the MVH Defendants had a contractual obligation, which they breached, to identify and ameliorate the burnout caused by their residency program's working conditions, not contractual permission to dismiss her for its symptom of irritability. Compl. ¶ 22(e). The MVH Defendants' dispute these factual allegations of obligation and breach. MVH Answer ¶ 22(e). But once again, as evidence their summary judgment motion cites only the employment agreement attached to Dr. Mares's Complaint and Dr. Zryd's personal, conclusory, and untested interpretation that Dr. Mares was an "at will" employee. Dr. Zryd Aff. ¶ 6.

Dr. Mares also alleges that the MVH Defendants had a contractual obligation, which they breached, to honor the findings of her due process panel and not to dismiss her when the panel found, as they did, there was no basis for dismissal. Compl. ¶ 22(e).

The MVH Defendants' dispute these factual allegations of obligation and breach. MVH Answer ¶ 22(e). Their summary judgment motion presents evidence only in the form of Dr. Zryd's affidavit, which simply reflects her belief that the employment agreement obligated the MVH Defendants to <u>hold</u> a due process hearing, but not to <u>follow</u> it, which of course is not "due process" at all. Dr. Zryd Aff. ¶¶ 10-13.

### C. "Reasonable Minds" May Differ

The MVH Defendants' motion for summary judgment repeatedly contends that "reasonable minds can only conclude" the disputed facts and law in their favor. Def. Mo., *passim*.

The problem for the MVH Defendants, however, is that nearly a dozen highly educated, impartial, and reasonable minds with first-hand knowledge of the facts have <u>already</u> differed with the MVH Defendants' purported facts, interpretations and arguments. For example, far more faculty members of the OBGYN residency program opposed Dr. Mares dismissal than supported it, and eight of them wrote letters to the MVH Defendants expressing that support (attached hereto as Exh. B). Additionally, the full transcript of Dr. Mares's "due process" hearing demonstrates the basis on which the panel's three impartial faculty members sided with her (transcript attached hereto as Exh. C).

## III. Conclusion

Discovery has not yet been permitted in this case, and Dr. Mares needs discovery in order to obtain evidence supporting her claims. The MVH Defendants' motion for summary judgment is premature. Dr. Mares respectfully requests that it be continued pending the completion of discovery.

Respectfully submitted,

/s/ Marc D. Mezibov
Marc D. Mezibov (OH No. 0019316)
Brian J. Butler (OH No. 0082675)
Daniel J. Treadaway (OH No. 0098000)
MEZIBOV BUTLER
615 Elsinore Place, Suite 105
Cincinnati, OH 45202
Phone: 513.621.8800
Fax: 513.621.8833
mmezibov@mezibov.com
bbutler@mezibov.com
dtreadaway@mezibov.com

*Attorneys for Plaintiff Jacquelyn Mares, M.D.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2019, this document was eFiled via the

Court's eFile system which shall send notifications of this filing to the following:

Jonathan Hollingsworth
HOLLINGSWORTH & WASHINGTON, LLC
6494 Centerville Business Parkway
Centerville, Ohio 45459

Karen T. Dunlevey
JACKSON LEWIS P.C.
PNC Center, 26th Floor
201 E. Fifth Street
Cincinnati, Ohio 45202

Lizbeth M. Chavez
Mia Meucci Yaniko
Assistant Attorneys General
Education Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215-3400

/s/ Marc D. Mezibov
Marc D. Mezibov (OH No. 0019316)

**IN THE COURT OF COMMON PLEAS**
**MONTGOMERY COUNTY, OHIO**

| | | |
|---|---|---|
| JACQUELYN MARES, M.D. | : | Case No. 2019 CV 02921 |
| | : | |
| | : | |
| **Plaintiff,** | : | **Judge E. Gerald Parker** |
| | : | |
| v. | : | |
| | : | |
| MIAMI VALLEY HOSPITAL, et al., | : | |
| | : | |
| **Defendants.** | : | |

---

### AFFIDAVIT OF MARC D. MEZIBOV

---

I, Marc D. Mezibov, having been duly cautioned and sworn, state as follows:

1. I am counsel for Plaintiff in the above-captioned matter.

2. On September 11, 2019, Defendants' Miami Valley Hospital, Premier Health Partners, and Teresa Zryd, M.D. filed a motion for summary judgment asking that Dr. Mares's complaint against them be dismissed.

3. To date, neither Dr. Mares nor any other defendant has conducted any discovery. In fact, no case management or pretrial order has yet to be established.

4. It has been my practice and experience that, prior to conducting any discovery, a pretrial conference be held to establish, among other things, dates for the exchange of information and a discovery cutoff date. To the best of my knowledge and belief, this process is established by this Court by Local Rule 2.07 governing pretrial procedures in civil cases.

5. It is my professional opinion that in order to fairly and responsibly respond to the motion for summary judgment filed by Defendants, it is essential that I be

**EXHIBIT A**

permitted to conduct discovery, at a minimum, with respect to the following issues of fact:

a. Whether Defendants complied with the terms and conditions of the employment agreement between Dr. Mares and Miami Valley Hospital;

b. What are the nature, identity, and scope of the joint obligations and responsibilities of Wright State University and Miami Valley Hospital with respect to the operation of the Wright State University Obstetrics and Gynecology Residency Program;

c. The nature and quality of Dr. Zryd's assessment of the recommendations of the individual defendants that Dr. Mares be dismissed from the Residency Program;

d. What were the nature, frequency, and substance of any communications pertaining to Dr. Mares by and between Dr. Zryd and any of the individual defendants;

e. Whether Dr. Mares's termination was motivated, in whole or in part, by Defendants' consideration of her physician burnout;

f. Whether Defendants complied with their contractual obligations to mitigate the effects of Dr. Mares's physician burnout;

g. Whether Dr. Mares's termination was motivated in whole or in part by consideration of the program's need to maintain its accreditation.

h. Whether Dr. Mares was treated similarly to other residents by the individual defendants with respect to her continued participation in the Residency Program;

Further Affiant Sayeth Naught.

_____

Marc D. Mezibov

Sworn to and subscribed before me this 13 day of September, 2019:

BRIAN J. BUTLER
Attorney At Law
Notary Public, State of Ohio
My commission has no expiration date
Sec. 147.03 R.C.

Notary Public

3



One Wyoming St.
Dayton, Ohio 45409
mvh.org

To: Dr. Susan Edwards, Ph.D.
   Executive Vice President for Academic Affairs and Provost

From: Dr. Marc Belcastro, D.O.
   Chief Medical Officer and Vice President of Operations
   Premier Health, South Region
   mrbelcastr@premierhealth.com
   937-208-2712
   937-974-9314

Dear Dr. Edwards,

I am writing on behalf of Dr. Jackie Mares, the OB/Gyn resident that was recently released from her program with about 6 months remaining. While I am not intimately familiar with the specifics of her case, I have reviewed her appeal letter and have picked up a few themes. Her leaders and mentors often expressed disapproval of her decisions with silence or lack of clear and direct feedback. There seemed to be no attempt to coach her through situations where she felt unsafe or how to regain the trust of a patient. She appropriately apologized for one situation and had developed some degree self-awareness and self-reflection. Finally, a finding of untruthful documentation was added to the list of complaints to which she had no recollection or time to adequately respond.

Prior to the hearing and decision, I had been informed of her situation in general terms from the maternal fetal medicine physicians providing her support. This is a group that spends a significant amount of time teaching the residents, so her character would not be foreign to them. They reached out to me because of my considerable experience in coaching and mentoring physicians and nurses in relationship building, listening and communication skills, as well as emotional awareness. These are skills I have learned and used through Premier Health's engagement with a company out of Columbus called, "Business of People". I currently facilitate a physician/advance practitioner cohort. I expressed a willingness to meet with Dr. Mares up to weekly if necessary, for the remainder of her residency to ensure her success.

As a Chief Medical Officer, I understand the importance of our Bylaws, Rules and Regulations, and holding our providers accountable for professionalism and behavior. Healthcare is a sacred responsibility and patients deserve our best. I also believe that leaders must be very clear and direct about expectations when someone's life and career hang in the balance. Finally, as leaders, we need to extend grace and design a clear plan for improvement to help every individual be successful if possible. Dr. Mares was given only time, and her leaders acted after a number of events transpired, but I do not believe she was provided with the feedback, expectations, or resources to be as successful as I know she can be. This is a life, and leaders need to value and care for those they lead. I ask that you strongly consider a different path for Dr. Mare to complete her residency with clear guardrails.

Please feel free to contact me,

Sincerely,

Marc Belcastro, D.O.

**EXHIBIT B**



**Miami Valley Hospital**
Premier Health Partners

The Center For Maternal-Fetal Medicine,
Ultrasound and Genetics
One Wyoming St.
Dayton, Ohio 45409-2793
(937) 208-2516
(937) 208-6124 Fax

December 14, 2018

Susan Edwards, PhD
Executive VP for Academic Affairs & Provost
University Hall 256
3640 Colonel Glenn Hwy.
Dayton, Ohio 45435-0001

Re: Jacquelyn Mares, MD

Dear Dr. Edwards:

This letter is written on behalf of Dr. Jacqueline Mares. I am privileged to serve as her advisor during the appeal process addressing her termination from the Wright State University Boonshoft School of Medicine, Obstetrics and Gynecology Residency Program. To introduce myself, I am a product of this residency program, class of 2007. In my years here I have worked with over 110 residents in the WSU BSOM OB/GYN Program. In my honest opinion, Jackie is as human as the rest of us. She is young and under pressure, burned out and trying to cope with the immense stressors of our amazing profession. She is also competent, compassionate, skilled, hard-working, and dedicated to patient care. Jackie possesses immense potential.

Prior to her termination, Jackie and I had developed a solid working and interpersonal relationship. In my time as her formal advisor, she has confided in me a raw, detailed account of OB/GYN residency as viewed through her lens. Through my subsequent, objective investigations, I have come to understand that she has not committed a single grievance I have not witnessed before in this program. Some of her grievances I myself was guilty of in training, and others I have seen committed by attending physicians who are currently recommending her termination from this training program. My recognition that she has become a casualty of this dichotomy between expectations and reality is, quite frankly, one of the most sobering realizations in my experience as an attending physician to date.

I am openly fraught by worry for Jackie Mares and her future. She has dedicated her *entire* adult life to becoming a physician. Her identity has been permanently altered by the art and practice of medicine. She has suffered from burnout during the rigors of residency training, and despite moments of desperation she has developed a reinvigorated passion for obstetrics and gynecology. Jackie has pushed ahead with good work ethic and determination to develop a skill set that illustrates competency and great potential for future growth. I along with an overwhelming cohort of physicians and other medical personnel at Miami Valley Hospital are distressed by her termination because we have come to understand we *need her and what she brings to our profession.*

The collection of documents and letters presented to you is a representative portion of the narrative of the WSU BSOM OB/GYN Residency Program as experienced by one Dr. Jacqueline Mares. It is in part an historical account of the program's strengths and successes, as well as its struggles and shortcomings. Jackie's story also carries a cautionary message comparable to that of the canary in the coal mine. My exploration and dissection of her residency experience has manifested as my realization that the canary metaphor has evolved into real human experience within the WSU OB/GYN Residency Program. During her appeal hearing, Dr. Yaklic acknowledged that we failed Jackie. Yet here we are, bearing witness to an abominable sacrifice of the proverbial lamb.

As a physician educator, I ardently believe we must re-center our focus to the observation made by the program's chair. Furthermore, we should explore our failure in resident education lest we risk recurring future loss of physicians of great potential. As stewards of physicians in training, we must commit ourselves no only to the promotion of their academic success and technical skills, but also to fostering their emotional and mental well-being.

Dr. Edwards, please examine the transcript of the appeal hearing and all materials Jackie provided to Dr. Painter during that time. Study the details of the appeal committee's recommendations and action plan. Read each letter of support word-by-word. Consider what appears to be a breach of due process by Dean Margaret Dunn when she cited a patient safety report (PSR) as justification for overturning the appeal committee's recommendations although this PSR was never presented to the committee, and as a result Jackie was not able to address it prior to Dean's decision. I implore you to do the difficult but right thing by reinstating and supporting Dr. Jacqueline Mares as a PGY-4 in the WSU BSOM OB/GYN Residency Program.

You are very welcome to contact me if you wish to discuss this matter in person or by phone (cell: 937-477-7178; asst: 499-0122). Thank you for attention.

Sincerely,

Melanie M. Glover, MD
mmglover@premierhealth.com
Chair, MVH Department of OB/GYN
Chair, MVH Safety Committee
Chair, Morbidity and Mortality Improvement
Clinical Assistant Professor, Dept. of OBG, BSOM, WSU



Boonshoft
**School of Medicine**
WRIGHT STATE UNIVERSITY

Department of Obstetrics and Gynecology
128 E. Apple Street, Suite 3800 ᵉ Dayton, OH 45409
Tel 937.208.2850 ▪ Fax 937.222.7255
medicine.wright.edu

December 12, 2018

Susan Edwards Ph.D.

Provost

Wright State University

Dear Dr. Edwards,

I am writing in support of Dr. Jacqueline Mares' appeal to complete her residency in the Department of Obstetrics and Gynecology Boonshoft School of Medicine located at Miami Valley Hospital. I have trained her for over 2 years. The details behind her dismissal and inability to complete her 4th and final year of residency will no doubt be readily available to you. However, I support that she should be allowed to complete her residency.

I am the Women's Health Clerkship Director and an Associate Professor in the WSU-BSOM Department of Ob-Gyn. I manage 3rd year medical student education in a didactic fashion and by providing a good clinical learning environment. Dr. Mares is one of our preceptors, as are all the residents in our program. She was identified in several student evaluations to be a preceptor who provided a hostile working environment. This was through communication mistakes and poorly demonstrated attitudes toward student education. Because of multiple negative evaluations, the BSOM administration insisted on management. The Dept. Ob-Gyn Chair, Dr. Jerome Yaklic and Residency Director, Dr. Michael Galloway, responded by counseling of Dr. Mares and initiating her probation.

Dr. Mares made the changes that were asked of her and this was reflected in medical student evaluations that indicated a positive change. There were no negative evaluations of her in the 6 months subsequent to her probation. In addition, there were some commendations of her teaching. I was very pleased to see this change.

The decision that the Dept. Ob-Gyn made to not allow Dr. Mares to complete her residency was based on her negative communications with individuals on several levels including: subordinates, colleagues, attending physicians, and most recently a patient's family member. This collection of events over the last two years indicate that she has a problem with the management of her own stress leading to unprofessional communication.

As a member of the WSU Dept of Ob-Gyn Residency Education Committee, I originally voted that she be allowed to finish her residency despite repetitive infractions of professionalism because I weighed this communication problem against her ability to be an Ob-Gyn. Her knowledge and skills in my specialty are on par with her peers and she has demonstrated excellent communication skills. Her communication mistakes are inconsistent and unpredictable. It seems to be that during extreme stress, Dr. Mares' attention to this weakness



Department of Obstetrics and Gynecology
128 E. Apple Street, Suite 3800 • Dayton, OH 45409
Tel 937.208.2850 • Fax 937.222.7255
medicine.wright.edu

breaks down. Still her mistakes are not excusable and she needs dedicated help to have consistent and dependable good communication skills.

With all due respect to my Chair, Dr. Yaklic, my Dean, Dr. Dunn and Assistant Dean, Dr. Painter, and others who spent hours poring over this problem of how to handle Dr. Mares and her communication blunders, and made the decision that she is appealing now, I still stand by my feeling that she should be allowed to complete her residency. With the right help and with time she will manage her stress and she will consistently communicate effectively. I ask that you give her this chance.

Most sincerely,

Sheela Barhan M.D.

Associate Professor

Clerkship Director of Women's Health

WSU- Boonshoft School of Medicine

Sheela.barhan@wright.edu

Cell# 937-219-5741



**Miami Valley Hospital**
Premier Health Partners

The Center For Maternal-Fetal Medicine,
**Ultrasound and Genetics**
One Wyoming St.
Dayton, Ohio 45409-2793
(937) 208 2516
(937) 208 6124 Fax

December 13, 2018

Susan Edwards, PhD
Executive VP for Academic Affairs & Provost
University Hall 256
3640 Colonel Glenn Hwy.
Dayton, Ohio 45435-0001

Re: Jacquelyn Mares, MD

Dear Dr. Edwards:

I request you please read this letter carefully. You have an opportunity to right a wrong which is contrary to the University's core values, save a young physician's career, and prevent irreparable harm to Wright State University.

I am writing this letter on behalf of Jacquelyn Mares, MD, whom Dean Margaret Dunn has recommended be terminated from the WSU BSOM Obstetrics and Gynecology Program. My affiliation with this residency program began 1992, and I believe my judgement and experience are sound when I unequivocally say the Dean has made a grave mistake.

I am a member of the Department's Clinical Competency Committee and was present when the original recommendation was made on 10/3/18 to terminate Dr. Mares' employment. In retrospect, it is clear the information presented to this committee regarding Dr. Mares' conduct was hearsay, biased, and flawed. In truth she suffers from burnout, and despite this mental health condition has significantly improved her professionalism during her probationary period.

Per the University's due process, Dr. Mares' case was reviewed on 11/7/18 by a formal review panel. Comprised of three BSOM faculty, the panel's evaluation of the evidence took six hours. After hearing <u>all sides</u>, the panel recommended she continue on probation, and added elements to treat burnout, improve her professionalism, and succeed as a physician. These elements include professional counseling, a formal course on professionalism, oversight, and mentoring.

This recommendation was subsequently rejected by the Dean who cited two additional brand new allegations, neither of which Dr. Mares was ever made aware, nor given the opportunity to explain. As a faculty member, attending physician at Miami Valley Hospital, and member of the Clinical Competency Committee, I never heard about the new allegations. The Dean's action was capricious and arbitrary, and ignored the due process and work of three physicians who dedicated the better part of a day developing a solution to help Dr. Mares.

The crux of the issues with Dr. Mares relate to lapses in professional behavior, which she acknowledges and has objectively improved. She has never placed patients in danger, nor has her clinical care been an issue. She recognizes that she responds to stress unfavorably, and has been working on her reactions. Who among us does not have room to improve their response to stress?

The University and Medical School have an obligation to provide Dr. Mares the opportunity to be successful. The review panel's plan does just that. Termination will ruin her career. She will never be able to practice medicine. It will also damage the reputation of the Department of Obstetrics and Gynecology, the BSOM, and Wright State University. Residents, medical students, and medical school applicants will know that the program chooses to terminate residents rather than provide the resources needed to combat mental health conditions such as physician burnout. The damage to our reputation will have long lasting negative effects, something Wright State can hardly afford.

I hope from this appeal you clearly see Dr. Mares' termination is wrong, and that she is deserving of our program's help. I have tried to be brief, and I would be happy to discuss any of this content further with you in person, or you may call me on my cell phone, 937-478-9556. Thank you for your attention to this matter.

Sincerely,

David S. McKenna, MD
Clinical Associate Professor



**Miami Valley Hospital**
Premier Health Partners

One Wyoming St.
Dayton, Ohio 45409
(937) 208 8000
www.mvh.org

December 11, 2018

Susan Edwards, PhD
Executive VP for Academic Affairs & Provost
University Hall 256
3640 Colonel Glenn Hwy.
Dayton, Ohio 45435-0001

Re: Jacquelyn Mares, MD

Dear Dr. Edwards:

I am writing in support of Dr. Mares to continue in our OB/GYN residency program.

I am volunteer faculty and have worked with Dr. Mares on many occasions and have never witnessed performance or behavior that would warrant dismissing her. I also do attending call two to four times a month which has allowed me to work closely with her.

I have noted that at times she has seemed aloof and/or depressed. I am not sure what definitive action has been taken to help her. I serve on the Physician Effectiveness Committee at Miami Valley Hospital. When we identify a problem with a physician, there is a process by which that individual is referred for professional help and monitored. It is specific and defined, not recommended, not just a mentor, etc. That is what we do for a staff member. I would hope we could do as much or better with a resident we have committed to train.

I have asked around about this matter. Nurse managers, nurses, fellow residents, none of who supports her dismissal. My experience is when we truly have a bad egg, the good riddance sentiments are unanimous.

I suggest we implement a defined action plan to help this resident we committed to train. This is a person who has worked hard her whole life to get to this point. She will not be able to find an R4 position somewhere else. We need to be sure with have exhausted every effort. I'm not sure we have.

Sincerely,

J. Scott Bembry, MD



**Miami Valley Hospital**
Premier Health Partners

The Center For Maternal-Fetal Medicine,
Ultrasound and Genetics
One Wyoming St.
Dayton, Ohio 45409-2793
(937) 208-2516
(937) 208-6124 Fax

12 December, 2018

Susan Edwards, PhD
Executive VP for Academic Affairs & Provost
University Hall 256
3640 Colonol Glenn Hwy.
Dayton, Ohio 45435-0001

Re: Jacquelyn Mares, MD

Dear Provost Edwards:

I write this letter in strong support of Dr. Jacqueline Mares, to appeal for her reinstatement as a chief resident to complete her training. I would like this document to be submitted as a testament to her character, knowledge, and clinical skills as a provider of obstetrical care. I have personally known and worked with Jackie since she began her residency at Wright State University Department of OB/GYN in July, 2016. During this time I have been a witness to her exceptional knowledge base and growing personal/professional skills. I have seen her develop from a reserved new resident joining an already established class of interns just beginning their second year into a capable and intuitive physician who has integrated seamlessly into her class while continuing to evolve and grow in the difficult environment of an OB/GYN residency. She has a unique combination of natural intelligence combined with humility, empathy, kindness, and the quest for knowledge in order to provide her patients with the most accurate and appropriate care for their situations.

Jackie has always stood out to me; not just in her class of five residents, but in my fifteen years of teaching residents from multiple medical schools and in different hospitals throughout the U.S. She is clearly well-read, as she has a broad and impressive knowledge base. Whether I am rounding on the antepartum service, staffing the high risk obstetrical service, or giving a lecture - Dr. Mares often knows the answers to my questions or already has an evidence-based plan of care in place for her patients. Due to her solid fund of knowledge, she frequently has thoughtful questions about areas of controversy; the 'grey zones'. Together we have looked up the answers to questions that she raises. This curiosity serves her well when it comes to coming up with thoughtful solutions to clinical questions where there is no clear answer.

During her first year in our program, Dr. Mares and I took care of a very ill and difficult patient. 'Ms. Doe' had a long history of substance abuse and was being cared for in the inpatient setting for complications stemming from intravenous drug use. I witnessed Jackie take ownership of Ms. Doe and treat her with amazing kindness and empathy (and also her dry sense of humor). Several more patients with similar stories ensued, which inspired Dr. Mares to put together a case series

on these patients and to initiate a relationship with an attending cardiologist who co-managed them. The three of us worked together to put a paper together which Jackie submitted for publication.

In all of my encounters with Dr. Mares, she has exhibited a commitment to her patients and a desire to practice medicine which is current and evidence-based. I have known her to challenge information that she comes across; I have always seen this as an effort on her part to understand what the situation at hand is, and to ensure that the assessment and plan being executed for a patient is the correct one. I find this to be an essential character for physicians - the continued pursuit of knowledge in the endeavor of patient care.

In summary, Dr. Jacqueline Mares is an intelligent, caring, and competent OB/GYN resident who has exhibited strength, courage, and growth in the more than two years that I have known her. I am struck by her combination of natural intelligence, curiosity, hard work, humility, and kindness towards her patients and co-workers. I am more than happy to discuss her qualifications at any time and I strongly support her reinstatement into the residency program in order to allow her to complete her training.

Sincerely,

Samantha Wiegand, MD,
Clinical Assistant Professor, Dept. of OBG, BSOM, WSU
slwiegand@premierhealth.com



**Miami Valley Hospital**
Premier Health Partners

The Center For Maternal-Fetal Medicine,
Ultrasound and Genetics
One Wyoming St.
Dayton, Ohio 45409-2793
(937) 208-2516
(937) 208-6124 Fax

December 12, 2018

Susan Edwards, PhD
Executive VP for Academic Affairs & Provost
University Hall 256
3640 Colonel Glenn Hwy.
Dayton, Ohio 45435-0001

Re: Jacquelyn Mares, MD

Dear Dr. Edwards:

I have had the pleasure of working with Dr. Mares as an attending physician on the Maternal Fetal Medicine Service since her arrival at Miami Valley Hospital as a second-year resident. I find her to be a very competent, compassionate, and intelligent physician. I strongly support her appeal to be reinstated as a fourth-year resident in Obstetrics and Gynecology at Wright State University.

I am well aware of the events surrounding her firing and the events that led up to it, both from personal communications with Dr. Mares and communications with persons who were involved in her defense. I had the opportunity to review the transcripts from her hearing held in front of a three-person panel, which took place on November 7, 2018.

I think that the circumstances of Dr. Mares need to be reviewed very carefully. I am certain that you now do have in your possession all the pertinent documents. There are a number of problems that are easily extracted from the evidence available. However, there are two issues that are especially egregious.

First, in my view, the judgement that was passed by Dr. Dunn to overturn the recommendation of the panel is not supportable by the available facts. If there are other facts that support her firing but were not made available to Dr. Mares and the three-person panel at the time of the hearing, then the rules of due process were grievously breached.

Second, when you review the course of events that are pertinent to this case, you will find that there were some failings on the part of Dr. Mares. However, she did show evidence of continued improvement and was functioning at a level, which was appropriate to her level of training. Firing Dr. Mares on October 4, 2018, in her fourth year of residency and essentially only two months after she was told by her program director on August 29, 2018 that she was doing well

and would be off her probation by the end of the year, is unforgivable. The only circumstance that I can imagine doing this is if Dr. Mares presented danger to her patients. There is no evidence of this being the case. Even if such evidence exists, the fact that it was not shared with Dr. Mares prior to her firing is equally unforgivable.

In summary, from the available evidence of which I am aware, the due process has failed Dr. Mares and she should be reinstated. Purely from the human standpoint, it is hard to fathom how these decisions could have been made by a "compassionate" group of people.

Sincerely,

Jiri D. Sonek, MD, RDMS
Medical Director, Maternal Fetal Medicine, Ultrasound, and Genetics Center
Clinical Professor, Wright State University Boonshoft School of Medicine



**Miami Valley Hospital**
Premier Health Partners

The Center For Maternal-Fetal Medicine,
Ultrasound and Genetics
One Wyoming St.
Dayton, Ohio 45409-2793
(937) 208-2516
(937) 208-6124 Fax

December 11, 2018

Susan Edwards, PhD
Executive VP for Academic Affairs & Provost
University Hall 256
3640 Colonel Glenn Hwy.
Dayton, Ohio 45435-0001

Re: Jacquelyn Mares, MD

Dear Dr. Edwards:

I am writing in support of Dr. Jackie Mares' appeal to you, for reversal of the Dean's decision to reject the recommendations of the review panel. You truly have the opportunity to change the course of an individual's life in a very positive fashion.

I realize that you have been inundated with numerous documents discussing Dr. Mares' tenure as an OB/GYN resident. As a member of the review panel, I was afforded greater than 10 hours for intense evaluation of this material. One compelling topic which was discussed at length during the panel's briefing was the issue of burnout. Unless you have had the opportunity to review the transcript of the panel's hearing, you might not see much documentation of this subject.

Almost all of Dr. Mares' dysfunctional behaviors that warranted the disciplinary actions are components of the diagnostic criteria for resident burnout. This was never considered by the residency director, clinical competency committee, or department chairman as a probable explanation for Dr. Mares' numerous problems. For this reason, appropriate steps to best help this resident were never implemented. This was attested to by the Department Chair, during the review, when Dr. Yaklic admitted, "We failed Jackie."

Dr. Mares fully acknowledged that her behaviors and communication skills were unprofessional and needed serious attention. She was never given any formal guidance in how she could improve in these areas. Nevertheless, on her own, she was able to significantly improve the scores of her medical student evaluations. This objectively supports her readiness and ability to make change. She was and she remains teachable.

From the accompanying letters of support from both faculty and Jackie's peers, it's apparent I'm not alone in my assessment of the young physician's value to our department and women's healthcare in general. It is my humble opinion that the system has truly failed this individual.

The recommendations of the review panel are not "an easy row to hoe" for Dr. Mares. Clinically, she is exceptionally competent. Her patients receive excellent care. There is little risk to the University and Department of OB/GYN to allow her to finish her residency. She has a group of dedicated faculty and peers to support her in meeting all the goals set before her.

Thank you for your time and consideration of this individual's future. Please free feel to contact me if you have any additional questions regarding Dr. Mares.

Sincerely,

Christopher S. Croom, MD
Chairman, Ethics Committee, Miami Valley Hospital
Clinical Assistant Professor, WSU, Dept. of OBG
Cell: 416-4565

1             DUE PROCESS HEARING

2                *   *   *

3   In re: Dr. Jackie Mares

4            TRANSCRIPT OF PROCEEDINGS

5                *   *   *

6   DATE OF HEARING:   Wednesday, November 7th, 2018

7

  PLACE OF HEARING:   Miami Valley Hospital

8                *   *   *

9

  ATTENDEES:

10

  Albert Painter, Psy.D
11 Melanie Glover, M.D.
  Jackie Mares, M.D.
12 Ted Talbot, M.D.
  Jerry Yaklic, M.D.
13 Lisa Boydston
  Stacey Poznanski, D.O.
14 Linda Barney, M.D.
  Christopher Croom, M.D.

15                *   *   *

16

17

18

19

20

21

22

23

24

25                    **EXHIBIT C**

2

 1              DR. PAINTER:  Dr. Talbot will begin

 2    by presenting the program's reasons for

 3    termination.  Dr. Yaklic is here as the chair

 4    supporting that and also presenting information

 5    and -- and data.

 6              During this proceeding, the panel may

 7    ask anyone anything at any time, okay?  So if you

 8    could -- if there's a question, we'll have -- Dr.

 9    Talbot's presenting about any of the information,

10    you may ask him.  The same thing with Dr. Yaklic.

11              During Dr. Mares' presentation of her

12    reasons for appeal, the same thing, you may ask

13    her any questions that you may have.

14              And, of course, Dr. Mares, you can

15    ask Dr. Talbot and Dr. Yaklic anything as well.

16              So does anyone have any questions?

17    What we will do after both parties have presented

18    and you all have exhausted the questions that you

19    have about the information that's been presented,

20    I will dismiss everyone except the three of you.

21              In the past, we have a chance here to

22    discuss the information, discuss your thoughts

23    about it, your opinions about it and we'll try to

24    come with a conclusion.

25              It does not have to be unanimous.

3

1  Two of three will constitute a quorum in that

2  respect.

3            I also want to make it clear that

4  what you -- your task here is not only to gather

5  information and draw a conclusion, but to make a

6  recommendation to two people, and those two people

7  are Dr. Dunn, who is the school of medicine dean,

8  and in this case, Mr. Maiberger, who is the CEO of

9  Miami Valley Hospital that's delegated his role in

10 making a decision about that recommendation to Dr.

11 Zryd, who is the chief academic officer for

12 Premier Health, and is very familiar with -- as

13 all of you know, very familiar with residency

14 functioning having been a resident program

15 director for, I think, fourteen years.

16           So we felt like she would, as an

17 executive for Premier and for the hospital, fill

18 that role more appropriately, if you would.

19           So before we begin, does anyone have

20 any questions?  I'll be glad to do the best I can

21 to answer.  Do you need anything else from us

22 before we start?

23           THE COURT REPORTER:  No, just make

24 sure everybody keeps their voice up.

25           Speak up.  All right.  I will --

4

1  without any questions -- and if you have questions

2  as we move through this, please just bring them up

3  and I'll do my best to answer them.

4          So, Dr. Talbot, I'm going to turn the

5  floor over to you.

6          DR. TALBOT:  Okay.  Thank you.  I

7  will skip a lot of the introductions, but just to

8  mention that I have been the program director

9  since July of this year filling in for Dr.

10 Galloway who has been program director for eight

11 years.

12         I was his associate program director

13 from 2014 until I took this program director

14 position, and also from 2016 until 2018, I was the

15 chair of our clinical competency committee which

16 advises the program director.

17         So once I became the program

18 director, I could no longer serve on the clinical

19 competency committee.

20         I have been a fully affiliated

21 faculty member since March of 2012, and I have had

22 privileges here at Miami Valley Hospital and been

23 a clinical faculty member dating back to 2007, so

24 I have worked with residents quite a bit.

25         Dr. Mares joined our program as a

5

```
 1  transfer in as a second year resident, and this is

 2  documented in her resident file.  She came from a

 3  program in Long Island.

 4              If you could pull up 30 -- page 37

 5  and 36 of her resident file and put it up there.

 6  By May of 2017, there was concerns from the

 7  rotations at Wright-Patterson Air Force Base and

 8  Miami Valley Hospital to warrant a letter of

 9  warning from Dr. Galloway as recommended by the

10  CCC.

11              Areas of concern were patient care,

12  practice based learning, interpersonal

13  communication and professionalism.

14              And on the bottom of that if you go

15  down to you will need to show, he at that time

16  said you will need to show significant improvement

17  in the core competencies listed above.

18              In the next paragraph it says you

19  risk not advancing past your current level of

20  repeating this year or being dismissed from the

21  residency program.  And Dr. Mares signed it.

22              The next -- so that obviously did not

23  happen or we would not be here today.  So in June

24  of 2007, there is an incident I will just briefly

25  touch base on with Dr. Mares refusing to see a
```

6

1  preterm patient -- preterm pregnant patient who

2  was having vaginal bleeding.

3           And doctor -- her chief had asked her

4  to evaluate the patient and she said -- instead

5  told the nurse to evaluate the patient.

6           The patient ultimately delivered and

7  Dr. Mares did not want to be any part of that

8  delivery.  So Dr. Galloway attempted to talk with

9  her, but she did not talk with him and left.

10          Then they later talked in the

11  afternoon and he recommended a five day mandatory

12  leave of absence.  In addition, he had urged her

13  at the letter of warning meeting and this meeting

14  to seek evaluation from a physician to assist her

15  if there were physical or mental health concerns

16  affecting her ability to perform as a resident, in

17  other words, fit for duty.

18          She was provided a phone number for

19  Premier Health employee assistance program

20  offered -- offering confidential assistance to

21  employees and conflict management and other

22  work-related problems.

23          Then in November of 2017, doctor --

24  this is on page 25 in that.  Dr. Galloway and Dr.

25  Barhan, our student clerkship coordinator, had met

7

1  with Dr. Brenda Roman and Dr. Painter regarding

2  unprofessional interactions with medical students.

3            It says there were several comments

4  that related to abuse of medical students by

5  residents related to verbal and unethical

6  behavior.  Dr. Jacqueline Mares was one of the

7  residents mentioned in the comments and -- section

8  of the evaluation.

9            Dr. Mares was formally notified of

10  this results and it's unacceptable performance of

11  professionalism related to medical student

12  interactions.

13            I would like to fast forward to a six

14  month evaluation that they had in January where

15  Dr. Galloway mentioned -- met with Dr. Mares and

16  they discussed that the main concern with Dr.

17  Mares was her self-knowledge, lack of confidence

18  and the lack of desire to pursue clinical practice

19  after residency, and that she was offered again

20  and declined access to counseling or professional

21  counseling at the time, but was aware that it was

22  available.

23            In March of 2008 (sic), March 8th,

24  that is page 13 and 14 in the -- on the -- in her

25  file, she was formally placed on probation by Dr.

1  Galloway.

2              There were three main reasons for the

3  probation, which I would like to discuss.  The

4  first was concerns related by faculty from

5  Wright-Patterson Air Force Base and that -- about

6  a lack of participation in the operating room,

7  concerns about poor attitude interfering with

8  patient care, and one example was cited at morning

9  rounds, instead of a formal checkout of each

10  patient, she said everyone is doing fine, and

11  handed the list to her colleague and left.

12              The second concern that placed her on

13  probation was an incomplete research project that

14  she had with less than two months from her

15  resident research day.

16              Dr. Galloway and Dr. Maxwell sent her

17  an e-mail of these concerns, this was on page 18

18  in the file, saying that there was little data and

19  little recruitment and little time to complete

20  it.

21              Dr. Maxwell asked me if I was willing

22  to allow her to present preliminary data that we

23  had on a study relating to barriers to prenatal

24  care, and I -- this is an example, I think, where

25  I more than advocated for her, so I helped her

9

1    out.

2              We let her present the data and meet

3    her minimum necessary requirements for research

4    data.

5              Dr. Maxwell has tried to continue the

6    project with her with little success, and

7    ultimately over the summer took her off the

8    project.  I'm not pushing it further because I

9    still feel she meets the minimum requirements for

10   the research component to graduate.

11             But the most important reason for the

12   probation was the continued poor evaluations and

13   remarks by medical students that continued from

14   the January to June, 2008 -- '18 segment.

15             And I -- this is what you guys have,

16   and I want to go to the second page where -- the

17   very top one that says, Jackie -- it's Jackie

18   Mares, we don't have a Meyers in our program.

19   Very disrespectful in front of patients and

20   interns -- or to intern during delivery to the

21   point where she overtook the delivery and did a

22   vacuum extraction without gloving, gowning or

23   washing her hands to prove a point.

24             She yelled at the intern the entire

25   time, even when Dr. Galloway is in the room.  She

10

 1   disrespected the attending in the situation as

 2   well saying that she was in charge and his

 3   opinions were inferior to hers.

 4                Another one halfway down the page

 5   says Dr. Jackie Mayers (sic) was utterly

 6   disrespectful to students, attendings, nurses and

 7   other co-residents on multiple occasions.

 8                Oftentimes when I was assigned to

 9   high risk, there was a senior for the team.  She

10   would not let me work with her.  Further, she was

11   disrespectful to her senior resident on the team

12   at the time, Tony.  She was swearing at him at one

13   point over something ridiculous.

14                She was also rude to nurses, had an

15   attitude.  Acted like they were dumb.  And then at

16   one point, I was trying to help her by starting a

17   history and physical note for her as she had asked

18   me to.

19                Then I was called to a delivery, thus

20   I pended the note.  When I returned, she had

21   complained about me to one of her seniors.  Made

22   it seem like I hadn't done what I was supposed

23   to.

24                She later told me that I ruined her

25   entire note.  I was embarrassed to be around her.

11

1              And finally, Dr. Mares was very

2    unprofessional.  She disregarded attendings'

3    instructions sometimes and was rude to them.

4              She blatantly told Dr. Croom that she

5    did not read and wasn't planning on it when he

6    asked her what she had been reading and learning

7    about.

8              She told me that I took a patient

9    that was too complicated for me and did not even

10   give me a chance to try to follow them.  She just

11   wanted me to follow patients that were simple.

12             There are many more -- several more,

13   but these are the most salient ones.

14             So it became clear with me taking

15   over the program director position in the summer,

16   that I had talked to Dr. Yaklic and that I would

17   be meeting with her periodically as required on

18   probation.

19             And our first meeting was April 20th.

20   That is on pages 11 and 12 in her resident file.

21   And basically at the -- on the April meeting I

22   told Jackie that I was starting over with her.

23   This was a new fresh perspective.  I was giving

24   her a clean slate and I wanted to start from the

25   beginning with what we -- I mean by

1  professionalism.

2            And so I talked to -- I meant

3  treating others with respect and honesty, a

4  diligent work ethic and attempting, when at all

5  possible, to not outwardly vocalize frustrations

6  to the extent that they become common that could

7  deceive as -- be perceived as hurtful to others;

8  expressions of anger, frustration, et cetera.

9            Then we had informal meetings in

10 the -- over the summer months.  In July, I

11 remember in the lounge off labor and delivery she

12 discussed with me her intention that we wanted to

13 do a missions trip to Africa, I believe, and being

14 in a remote site, she would have to be off of

15 probation and what did she need to do and when

16 could she be off probation.

17           And we had talked about late in this

18 calendar year, and that the main issue holding her

19 back was professionalism.

20           And I even remember relaying an

21 instance where I used an example of a resident I

22 worked with that would get pages in the middle of

23 the night, wake up, rant off ten, 12 expletives

24 and then calmly answer the phone.  This is Dr.

25 Paley answering a page, and we chuckled at that.

13

 1              And basically whatever somebody needs

 2    to do to vent and then not have it carry into

 3    their interactions.

 4              And then Dr. Yaklic and I, in August,

 5    were called by the medical school to answer to

 6    some of these comments that were in the first half

 7    of the year, as there is sometimes a lag, and we

 8    more than went to bat for her.

 9              We had discussed that we felt maybe

10    Dr. Galloway didn't emphasize it enough, that we

11    really did, and that fortunately from the student

12    clerkship, I was able to get a batch of

13    evaluations from July of this year that showed

14    that she involved students within the OR and did

15    some teaching, and so we advocated for her.

16              And I relayed that to her at her

17    August 29th meeting with me, which I thought was

18    an overly positive meeting, but then,

19    unfortunately, the wheels come off from here.

20              And I have several e-mails and

21    examples coming in these last few pages of your

22    little packet that I gave you.

23              The first instance was just two days

24    later after our meeting, I was made aware by Dr.

25    Madison of an incident where the OB service was

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 38 of 204 PAGEID #: 349
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

14

1   consulted on a patient with -- a pregnant patient

2   with a appendi -- or not appendicitis, pancreatis,

3   and Dr. Mares called into the operating room to

4   discuss with their chief resident, and she was

5   extremely rude to the nurse that took the phone

6   call, the chief resident and the attending, and

7   they brought it to Dr. Madison, our faculty's

8   attention.

9              And Dr. Madison confronted her about

10  the situation and reported Jackie responded that

11  she knew she had exploded and her behavior was out

12  of line and stated that she apologized to the

13  chief resident and took herself off the patient's

14  care team.

15             And while that might seem appropriate

16  in this situation, this has become a theme when

17  relations go south is that Dr. Mares excuses

18  herself from the teamwork care of the patient.

19             So this behavior was deemed

20  inappropriate, and Dr. Madison told her that if

21  she had unresolved concerns regarding patient

22  management, that the AO is a good impartial third

23  party.

24             The next incident is in the presence

25  of Dr. Yaklic on morning report.  We -- the night

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 39 of 204 PAGEID #: 350
Due process Hearing In Re: Jackie Mares, M.D.                          Hearing November 7, 2018

15

1  team was managing a psychiatric patient that

2  likely had psychosis, and had a mother that also

3  had violent tendencies, but it was deemed that the

4  patient would need a C-section because she wasn't

5  progressing in labor.

6              And in -- with morning report, five

7  or ten minutes into it, the full team of

8  residents, students, nurses, Dr. Mares -- and this

9  verbiage may not be exactly, but this is what I

10 was told, that she used profanity directed at the

11 medical illness using an adjective before the word

12 crazy, and that adjective described the guano of a

13 flying male.  I am not touching her.  You all can

14 do the C-section, I'm going to clinic.

15             And so Dr. Yaklic, I think -- I don't

16 want to speak for him, but wanted damage control,

17 he decided not to escalate the confrontation and

18 said, well, if you have other things to do, we

19 will take care of this patient, and he did the

20 C-section with a different resident.

21             And then lastly an incident I was

22 involved with as well as another faculty member,

23 Dr. Kindig, and she wrote to me, and so that is

24 also in your packet at -- let me find it.  The

25 page I believe is page five.

16

1           On September 23rd, I came on call to

2    relieve you at seven a.m.  You are aware of the

3    case that was handed over to me that day.  The

4    patient was 38 weeks pregnant and came to the

5    hospital with severe left-sided pain.

6           She had been observed in another

7    hospital in Lima and discharged, but she continued

8    to have pain, and so came to Miami Valley for a

9    second opinion.

10          I was told on report that there were

11   some personality issues with our chief resident,

12   Dr. Mares, and the patient's mother, a nurse from

13   Lima.

14          With my involvement the night before,

15   I can tell you the personality issues or clash

16   were related to Dr. Mares had strongly advocated

17   that the patient was acceptable for discharge.

18          The patient's mother and the father

19   of the baby were not comfortable with that.  It

20   started to escalate, and so I came and evaluated

21   the patient and felt that we did not have enough

22   information to feel comfortable discharging the

23   patient, so she was kept overnight.

24          Back to Dr. Kindig's account then, it

25   says I was told in morning report that the patient

1  had slept through the night and was -- pain was

2  improved so she was planned to be discharged, but

3  that was not the scenario.

4              Upon examination, she was very

5  uncomfortable, enough that I could not palpate her

6  abdomen on the left side.  I left the room and

7  called the chief resident, Dr. Mares, asking her

8  to come see the patient with me and bring the

9  ultrasound machine to evaluate.

10             She declined by refusing and stated

11 she was not going to have any more encounters with

12 this patient.  I suggested her mother was not here

13 and she told me to call the third year, who did

14 come.

15             They saw and evaluated the patient,

16 and after discussing options, they decided to do a

17 Cesarean.

18             Dr. Mares stated that she would not

19 be part of the Cesarean section.  At the time of

20 the Cesarean section, they found a small abruption

21 on the (inaudible) globe on the side of her pain

22 and an abnormal cord.

23             Dr. Kindig discussed these findings

24 with the team.  Dr. Mares did not respond.

25 Ultimately the patient and family were happy with

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 42 of 204 PAGEID #: 353
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

18

1   her outcome, but they did state that the intern

2   and Dr. Kindig were the only ones who evaluated

3   the patient by doing an examination, that Dr.

4   Mares did not touch the patient, just argued that

5   she needed to be discharged.

6           Dr. Kindig wrote my evaluations of

7   Dr. Mares have continually shown her attitude and

8   professionalism are inappropriate.  I am unable to

9   talk with her in person about her actions as she

10  becomes defensive and I am not her direct

11  supervisor.

12          She also had concerns because Dr.

13  Mares has verbalized to many people on occasion

14  that she does not plan to practice med -- OB-GYN

15  after residency, and that she had asked her that

16  in order -- if she wants to pursue a job in the

17  insurance industry, that she would need to be

18  taken care of -- or she would need to do clinical

19  medicine first.

20          Dr. Mares stated she would not be

21  taking care of patients in the future.  Dr. Kindig

22  felt that this was a safety issue as well as one

23  of professionalism.  If she is not the OB-GYN

24  physician taking full responsibility for the care

25  of that patient, then she believed that this was a

19

1  risk to patient safety, and should there not be a

2  backup provider, she feels for serious injury or

3  death under her watch.

4           This matter also escalated to the

5  point that the patient's mother and family

6  registered a formal complaint against -- no

7  residents in general, but primarily the senior

8  resident, related to this interaction.

9           And when I found out more from the

10 complaint, there were two things that stuck out.

11 Dr. Mares and the patient's mother, it was -- it

12 was escalating, and that -- there is some accounts

13 from the nurse that the mother was treating Dr.

14 Mares unfairly, but then she made some

15 inflammatory comments.

16           One was that all women late in

17 pregnancy are miserable, but we don't admit them

18 for that.  And, two, that should they elect to

19 stay, they would have to pay thirteen thousand

20 dollars per night.

21           And so Dr. Belcastro was concerned

22 basically how we're counseling patients and the

23 discussion of the patients.

24           So I had verified those statements

25 with the nurse that took care of her that day.  I

20

1    have since talked to all of the residents that

2    were involved, and I did try to talk to Dr. Mares

3    about it as well as did Dr. Yaklic and didn't get

4    anywhere.

5              So my -- let me -- I'm trying to come

6    to a conclusion here, that these incidents were

7    discussed at the CCC meeting on October the 3rd,

8    and this is presented in her file, and the

9    concerns were professionalism, communication,

10   patient care interaction, overall performance.

11             They reviewed evaluations and

12   numerous recent incidents, discussed at length and

13   posed serious concern for her overall progress

14   through the probationary status.

15             Much debate was centered on the fact

16   that she had verbalized she does not want to

17   continue to practice OB-GYN, like we discussed,

18   and they raised concern by attendings that she is

19   going through the motions to graduation and

20   presents a patient safety issue.

21             The two instances of her refusal to

22   care for a surgical patient with Dr. Yaklic and

23   Dr. Kindig were discussed, and a formal movement

24   was made to remove Dr. Mares from the residency

25   program.  It was seconded.  The official vote from

21

 1   the CCC was six to two in favor of removal.

 2              So the following day I met and had

 3   several conversations.  I had conversations with

 4   Dr. Croom, her advisor, Dr. -- both Dr. McKenna

 5   and Croom had been advising her.

 6              I had discussions with Dr. Yaklic.  I

 7   discussed with Dr. Mares.  I had her come in, and

 8   I asked her about those two specific incidents.

 9              Her answers to me was, with the one,

10   the patient had a knife, and that was why she

11   couldn't be any part of that psychiatric patient.

12              And then the two, on the patient that

13   was admitted where she had advocated for

14   discharge, she said, well, you changed the plan,

15   it's your -- the attendings had changed the plan.

16              And I thought, well, that answer

17   doesn't hold a lot of water with me because

18   residents are involved all the time with faculty

19   where the plan may be changed and they continue to

20   involve their care.

21              I really think probably the root of

22   the problem was the soured physician/patient

23   relationship with that patient and her mother,

24   that when it escalated and ongoing care was

25   needed, that was why Dr. Mares excused herself.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 46 of 204 PAGEID #: 357
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

22

1          So with all of those, I decided to

2    proceed with enacting the recommendations of the

3    CCC for dismissal.

4          So just to summarize, there are

5    deficiencies in professionalism, communication,

6    interpersonal skills to the extent that they

7    affect patient care and show a persistent and

8    pervasive lack of respect for all of the

9    following:  The profession of medicine, medical

10   students, resident colleagues, faculty attendings

11   in and outside of our department, nurses and even

12   patients.

13         Her behavior is inconsistent and

14   unpredictable.  It can be highly unprofessional,

15   and thus far, it has been proven to be unfixable.

16         I fear the continuation in our

17   program towards graduation that these instances

18   will continue.  In other words, past behavior is a

19   predictor of future behavior.

20         Why the CCC, I believe -- and this is

21   why the CCC had such concerns to vote six to two

22   in favor of dismissal from our program, including

23   members who had previously been strong supporters

24   of her earlier in her training, such as the former

25   program director.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 47 of 204 PAGEID #: 358
Due process Hearing In Re: Jackie Mares, M.D.                                    Hearing November 7, 2018

23

 1              My decision was very difficult in
 2    light of many things.  One, I am just three months
 3    into my tenure, and this is the last thing I
 4    wanted to have to do out of the gate.
 5              Two, we are short handed in that we
 6    had a chief transfer to family medicine and we
 7    have one that is on maternity leave, so we are
 8    currently at half our complement, but I cannot
 9    allow those reasons to affect this decision, and
10    ultimately I have to defend the integrity of our
11    resident program.  I cannot turn a blind eye.
12              This is why I wore the white coat
13    this morning, was that I do respect this
14    institution, our medical students, our residents,
15    my chair, our faculty, both on and off the CCC,
16    and all of our sites, and I feel that I am acting
17    in the best interests of the residency program.
18              I cannot allow this behavior to not
19    only tarnish the learning environment, but to be
20    perceived by others in our department that it is
21    acceptable on my part, whether it be junior
22    residents, nurses, patients or faculty physicians.
23              I do need the support of all of my
24    faculty at all the sites, and I am also concerned
25    with going forward and may have to justify to the

24

1    RRC of the ACGME in our self-study when we talk

2    about our CCC and what recommendations we view and

3    how does the program director respond, that if I

4    had disregarded these strong recommendations, that

5    I would not be doing our program, hence, myself,

6    any good.

7              So with that, I -- that is the basis

8    for my decision, and that's all I have for now.

9              DR. PAINTER:  Questions for Dr.

10   Talbot at this point?

11             DR. CROOM:  Ted, three sort of --

12   I'll use the term the sentinel cases, that's not

13   an appropriate term, but the cases that you cited;

14   did Dr. Mares have the opportunity to explain her

15   side of the story to you prior to those cases

16   being presented to the CCC?

17             DR. TALBOT:  I did not talk to her

18   about them prior to the CCC.  The biggest thing

19   was the -- the last case where I talked about the

20   patient had needed a C-section that Dr. Kindig was

21   on.

22             Dr. Kindig had talked to her.  My

23   main concern before -- even before the CCC --

24   because I was not made aware of this

25   patient-lodged complaint and going to Dr.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 49 of 204 PAGEID #: 360
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

25

1  Belcastro until the night before the CCC, the

2  e-mails are the night before.

3             And so that morning I tried to talk

4  with all three residents involved.  I did not see

5  Dr. Mares.  Now, maybe I missed her.  The

6  attending sheet may show, but I talked to the

7  other two residents involved, and mainly used it

8  as a learning experience.

9             I -- as far as the -- the -- but my

10 concern with her mainly was that she recused

11 herself of taking care of this patient ongoing.

12            When Dr. Kindig -- it wasn't the

13 problem that I changed plan or even that I

14 advocated for admitting, because it wasn't a clear

15 diagnosis at the time, there was some gray zones,

16 and the patient's mother was being overly

17 difficult.

18            So my concern was that in this kind

19 of situation, you don't just say I'm out, you

20 know, somebody else is going to have to deal with

21 this, and so I felt that Dr. Kindig had addressed

22 that.

23            I felt Dr. Madison had addressed

24 another incident.  In hindsight, you know, you can

25 always put this as a learning experience, I could

26

1  always do better.  I probably will going forward
2  try to talk with every single event I can with the
3  resident as soon as I'm aware of it happening, but
4  that was not the case this time.
5          DR. CROOM:  Well, as her mentor and
6  someone who would want to help her in these
7  situations, you know, neither myself or Dr.
8  McKenna were notified of any of these.  You know,
9  Dr. McKenna found out at the CCC.
10          DR. YAKLIC:  I think Ted's point is
11  that these events all occurred very closely in
12  time to the CCC meeting.  I think the other piece
13  of it is --
14          DR. CROOM:  Well, some of us --
15          DR. YAKLIC:  Each of them
16  individually probably would not have risen to the
17  point of a recommendation for dismissal.
18          The problem and the challenges six
19  months into probation for unprofessional behavior
20  at a time when Ted is hoping the CCC is going to
21  say, when you see some improvement, let's take her
22  off of probation; you're at the end of -- you're
23  halfway through your chief year almost and we need
24  to say that you've made progress.
25          We have not one, not two, but three

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 51 of 204 PAGEID #: 362
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

27

1  incidents that all occur within very short order

2  prior to the meeting showing that -- really that

3  the progress we thought we were making perhaps was

4  not as positive as we had -- we seen and that

5  actually it really just showed the same pattern of

6  behavior that had been going on both prior to

7  probation and during probation.

8          So it's -- you know, I wish that

9  morning in my report I would have said something,

10 but, again, it was like kind of shock, and you're

11 going, okay, well, let's just downplay it, not a

12 big deal.

13         It wasn't the event itself.  Again,

14 if you have a patient you can't deal with, clearly

15 you should recuse yourself from them, but you

16 don't do in that way in front of medical students,

17 your -- your junior residents and your -- and your

18 nursing staff, right?  You do it on the side

19 professionally.

20         And that's the unpredictability and

21 the unprofessional outbursts that create these

22 difficulties.

23         CCC includes representatives from

24 nursing who continually complained about these

25 issues and their ongoing nature.

28

1          I mean, I think Ted did everything in
2  his power to try to advocate on her behalf, but at
3  the end of the day, the data continued to show
4  problems during that probation period and at a
5  time where -- I mean, were Jackie a second year,
6  it might be a different story, right?  We could
7  maybe talk about it.  We have time to see if this
8  is going to improve.
9          This is a chief resident who's had
10  ongoing problems since her second year, has been
11  warned, has been put on probation, and has still
12  failed to make adequate progress.
13          I personally believe part of that is
14  because she has a lack of commitment to the field.
15  Whether you want to practice medicine or not is
16  irrelevant when it comes to finishing this
17  program, but if you're not committed to your
18  specialty, you're not committed to change
19  necessary to perform that obligation, and I think
20  that's unfortunately the situation.
21          I think Mike did what he could do to
22  try to remediate this, the short time he was
23  program director and as an associate program
24  director and as director or CCC for many years
25  there.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 53 of 204 PAGEID #: 364
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

29

1          It's -- I think it's an unfortunate

2    situation here as well.

3          DR. CROOM:  Well, I think it's my

4    concern you had a letter basically saying that she

5    was doing well in all areas, and then you said the

6    wheels fell off.

7          Now, somebody who's on probation for

8    what's a serious concern, every incident is

9    important.

10         DR. TALBOT:  Right.

11         DR. CROOM:  I mean, to sit back and

12   collect incidents -- I mean, to help someone, who

13   is -- my experience is you don't know what you

14   don't know, and if her behavior is inappropriate

15   and it's not addressed at the moment, particularly

16   with the people who have been sort of told,

17   you're -- even your mentors, I just -- I'm a

18   little -- when you say it was short order that the

19   CCC met in October, these things were in August

20   and September.  You had plenty of time in my mind

21   to have allowed us to address it.

22         DR. TALBOT:  I think part of the

23   frustration, not only with myself, but with other

24   faculty is that when we approached Jackie and they

25   had this issue at the base and they've had -- our

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 54 of 204 PAGEID #: 365
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

30

1  faculty has had it, that normally a person would

2  say, oh, yes, I'm sorry, whatever, what do I need

3  to do to get better?

4          Jackie would -- would like go into a

5  shell and she wouldn't talk about it and she would

6  say I need a leave of absence or give you a short

7  answer.

8          It just wasn't -- it wasn't -- I felt

9  like if you're really vested, you know, you really

10 want to graduate, show me what do I need to do,

11 how do I do it?  Do I need another resident coming

12 in every time I see a patient?  Do I need an

13 attending?  Does the hospital need a coach?  There

14 was none of that.  That was never suggested.

15         DR. CROOM:  That was the value of a

16 mentor.  Mentors are --

17         DR. TALBOT:  But it still happened.

18         (Thereupon, the court reporter

19 interrupted the proceedings.)

20         DR. CROOM:  A mentor is someone that

21 establishes that safe relationship, and I can tell

22 you it took some work to establish that, but it

23 was established, and, you know, to deny the mentor

24 the opportunity to discuss that case when there

25 was plenty of time to do it, it -- you know, I

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 55 of 204 PAGEID #: 366
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

31

1   just wanted to make that point.

2               DR. YAKLIC:  I will also say though,

3   Dave was her former mentor.  The two of you

4   started working together and she gravitated

5   more --

6               DR. CROOM:  But Dave was never

7   notified of this case.

8               DR. YAKLIC:  -- she gravitated more

9   towards you, and that was allowed by the

10  department because we felt that that personal

11  relationship was important, but Dave was involved

12  in that process as well.  Dave sits on our CCC.

13  Dave was a vote --

14              DR. CROOM:  But he wasn't notified of

15  these cases.

16              DR. YAKLIC:  Dave was a vote to

17  dismiss, and in recent discussions, has continued

18  to hold that opinion.  I know you guys have had

19  discussions.  You can agree to disagree, but there

20  was mentor input through that process.

21              DR. CROOM:  He wasn't aware of those

22  three cases.  Prospectively, Terry, he didn't

23  get -- he did not get --

24              DR. YAKLIC:  It didn't change his --

25              (Thereupon, the court reporter

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 56 of 204 PAGEID #: 367
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

32

1  interrupted the proceedings.)

2              DR. CROOM:  I just said that Dr.

3  McKenna was not prospectively informed of these

4  cases.  He found out about them the day the CCC

5  met.  Not an appropriate time for a mentor to

6  discuss the case.

7              DR. YAKLIC:  And his point at the CCC

8  was not let me sit down as her mentor and

9  re-discuss these.  It was a vote towards

10  termination.

11              He didn't feel that additional

12  discussion -- and I don't want to speak for Dave,

13  okay?  But Dave had the opportunity at that

14  meeting to sit there and say, I believe we need to

15  go back and talk to Jackie, I believe we need to

16  do more.

17              He felt that he could make a decision

18  at that point and his decision was to terminate

19  her.

20              And I -- like I said, I don't want to

21  speak for Dave, okay?  But -- but his vote, I

22  think, speaks for itself.

23              DR. TALBOT:  And I don't know how

24  often she was --

25              DR. CROOM:  And then what it was was

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 57 of 204 PAGEID #: 368
Due process Hearing in Re: Jackie Mares, M.D.                    Hearing November 7, 2018

33

1    it a secret ballot --

2                    DR. TALBOT:  No.

3                    DR. YAKLIC:  No.

4                    DR. CROOM:  -- is what they told me,

5    so I don't know.

6                    DR. TALBOT:  No, it wasn't.

7                    DR. CROOM:  Okay.  So he -- all

8    right.

9                    DR. TALBOT:  I don't know that he was

10   still meeting with Jackie regularly.  He did say

11   at the CCC that he had wished that you could have

12   been there, but you were out of town, but in that

13   same instance, in that e-mail from Dr. --

14                   DR. CROOM:  Well, I wasn't out of

15   town.

16                   DR. TALBOT:  You weren't?  I don't

17   know.

18                   DR. CROOM:  No, I wasn't.

19                   DR. TALBOT:  But he just said he

20   wished you could be there, but in that same

21   instance where she -- that Dr. Kindig relays that

22   she had said that that morning, Dr. Mares was

23   arguing with Dr. McKenna about management of a

24   high risk patient.

25                        So I don't know.  Maybe that -- that

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 58 of 204 PAGEID #: 369
Due process Hearing In Re: Jackie Mares, M.D.                          Hearing November 7, 2018

34

1  relationship had soured.  I don't -- all I know is

2  that he -- when he has talked to me, he has said

3  the bad Jackie can be pretty bad, and I think

4  that's his concern, what ultimately led to his

5  vote.

6           I wasn't going to get into who voted

7  which way on the committee, other than to say that

8  those that had prior -- previously supported her

9  strongly no longer did.

10          DR. BARNEY:  Did the resident avail

11  herself of any of the opportunities for

12  professional help over -- since --

13          DR. YAKLIC:  Not that we're aware of.

14          DR. TALBOT:  No.

15          DR. POZNANSKI:  Was it ever mandated?

16          DR. TALBOT:  It was not mandated, and

17  actually I don't think it can be mandated.  I --

18          DR. POZNANSKI:  I didn't think so.

19          DR. TALBOT:  Yeah.

20          DR. PAINTER:  You can do a fitness

21  for duty, which is a different --

22          DR. BARNEY:  Right.

23          DR. POZNANSKI:  Was that -- can that

24  be mandated?

25          DR. TALBOT:  It can be strongly

35

1    encouraged, which it was back in the letter of

2    warning --

3                    DR. YAKLIC:  Strongly encouraged.

4                    DR. POZNANSKI:  But not required.

5                    DR. TALBOT:  -- it would have been on

6    the probation.

7                    (Thereupon, the court reporter

8    interrupted the proceedings.)

9                    DR. TALBOT:  I had mentioned

10   that over the summer just -- not in saying you

11   should do this in the summer.  Do you feel like

12   you're having issues with professional anxiety?

13   (Inaudible).

14                   I don't think it's that.  I think

15   it's more a personality and a difficulty

16   controlling anger with frustration or something

17   that doesn't go as she is anticipating.

18                   DR. POZNANSKI:  I have a -- kind of a

19   side question.  If a resident does not take their

20   Boards after completion of the program, how does

21   that affect perception of the program or numbers?

22                   I know if they don't pass, obviously

23   that's reflected.  If they don't take the Boards.

24                   DR. TALBOT:  The ACGME just requires

25   that of our graduating residents, 80 percent have

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 60 of 204 PAGEID #: 371
Due process Hearing In Re: Jackie Mares, M.D.                              Hearing November 7, 2018

36

1   to take the Boards, and of those that take it, 80

2   percent have to pass.  If you do not have that,

3   you get a citation.  So -- and that's when they

4   graduate.

5              So somebody could be -- and the

6   reason I would say 80 percent is somebody could be

7   out on maternity leave or something else and not

8   take it for six months or whatever and then the

9   program won't get penalized, but obviously we

10  encourage all of our residents to take it.

11             And if we -- you know, if we have

12  six, we can have one and still meet the 80

13  percent.  If we have less than that, not

14  necessarily.

15             DR. POZNANSKI:  Right.  I mean, it

16  just -- it begs the -- the question comes to mind

17  that with her indicating her lack of desire to go

18  into clinical work and potentially not even taking

19  the Boards, how that affects the program and

20  whether that plays into a decision to terminate.

21             DR. YAKLIC:  It -- it clearly can

22  have a negative impact on the program.

23             DR. POZNANSKI:  Sure.

24             DR. YAKLIC:  I don't think it plays

25  directly into the decision to terminate.  I think

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 61 of 204 PAGEID #: 372
Due process Hearing In Re: Jackie Mares, M.D.          Hearing November 7, 2018

37

1  if that were the only incident, clearly we would

2  not have terminated Jackie.  Desire to practice

3  your chosen specialty is not something we can

4  necessarily mandate, I mean, once you enter the

5  program.  We -- as Ted mentioned, one of her

6  classmates left and went into family medicine, you

7  know.

8              So, I mean, clearly that's okay.  I

9  think what it really reflects to me is, like I

10  say, a lack of commitment to the specialty, which

11  I think is a -- part of the reason for her lack of

12  motivation to change.

13             On numerous occasions her statement

14  was the only reason I'm finishing the program is

15  because I don't want to be an imposition to my

16  classmates.  Well, you're not going to have the

17  motivation to change your behavior if you're not

18  really committed to what you're trying to

19  accomplish, and I think that was -- that was my

20  ongoing concern.

21             I mean, I think you need to make the

22  commitment and make a commitment to change your

23  behavior in order to successfully complete that

24  commitment.

25             DR. CROOM:  Is there any question at

1   all about Jackie's work ethic?  I mean, you've

2   mentioned these cases where, you know, she has

3   chosen to not be involved.  In terms of her work

4   ethic.

5              DR. TALBOT:  The only example I have

6   of that is the research project.  That was put

7   together at the last second, and since she's

8   completed that presentation, Dr. Maxwell several

9   times has tried to get her participation in

10  actively treating patients or helping medical

11  students, and nobody got responses from her and

12  they took her off of the panel.

13             So I wasn't pushing that.  As again

14  though she met -- she's checked that box for the

15  resident research project, but that's the only

16  thing with respect to work ethic.

17             She shows up for her shift.  You

18  know, she doesn't say I'm not seeing this patient

19  in clinic, you know, et cetera, et cetera.  I

20  don't -- that's not a concern.

21             DR. BARNEY:  Do the junior residents

22  have the opportunity to evaluate the seniors in

23  your routine evaluation process?

24             DR. CROOM:  No formal evaluation, no.

25             DR. BARNEY:  Have there been any

1   other, other than the direct inferences where

2   residents have stated --

3              DR. YAKLIC:   Other than junior

4   resident complaints?

5              DR. BARNEY:   Yes.  Yes.

6              DR. YAKLIC:   Formal and in writing,

7   no.

8              DR. TALBOT:   And I have witnessed the

9   junior resident mistreatment even -- even in

10  this -- August our intern, Dr. Cook, she berated

11  her about having the history and physical for a

12  nine o'clock C-section not done by seven a.m.,

13  when there would be time after the rounds, and

14  brought that resident to tears, and I said,

15  Jackie, this is one of those situations where you

16  need to back off.

17             This can be done afterward.  You

18  pulled her from morning rounds and learning to go

19  complete this history and physical.

20             And so I felt -- I apologized on

21  the -- our intern's behalf, and I did not -- I

22  calmly recommended to Jackie that this is one of

23  those examples we're talking about where you need

24  to back off a little bit.

25             DR. POZNANSKI:   Has there been or can

40

1  there be any resident input regarding termination?

2  I don't know the answer to that.

3           DR. TALBOT:  I'm not sure I

4  understand the question.

5           DR. POZNANSKI:  Have you sought any

6  resident's input in terms of this decision?

7           DR. YAKLIC:  Not formally.

8           DR. TALBOT:  Now --

9           DR. POZNANSKI:  I don't know if there

10 can be.

11          DR. TALBOT:  Now --

12          DR. PAINTER:  It's -- it's not

13 appropriate.

14          DR. POZNANSKI:  Okay.

15          DR. PAINTER:  Obviously on the

16 information that is brought forward anecdotally

17 or, you know, in an instance, obviously it can be

18 shared, but in terms of should they be terminated

19 or not from another training program, no.

20          DR. POZNANSKI:  I didn't think so.  I

21 was just curious.

22          DR. YAKLIC:  Especially not if you're

23 a chief resident.

24          DR. POZNANSKI:  Sure.

25          DR. YAKLIC:  I mean, if it was a

1   junior resident, you could argue that their

2   chief's input would be a very important part, and

3   I'm a fan of 360, I like that we actually have the

4   formal evaluations from juniors, that's something

5   we might want to talk about, but I think at this

6   point it would be inappropriate to ask them.

7                    DR. POZNANSKI:  I just didn't know if

8   through the process there had ever been any formal

9   residents' involvements in any of the discussions.

10                   DR. YAKLIC:  We do have chief

11  residents that sit on our CCC.  So, I mean, which

12  in some of the earlier events when she was a

13  second year or third year, there was chief input,

14  but -- so that's through that process.

15                   DR. TALBOT:  They leave and --

16                   DR. POZNANSKI:  They were.

17                   DR. TALBOT:  -- we discuss their

18  class and they don't -- they don't vote.

19                   DR. POZNANSKI:  Similar to what we

20  do.  I was just curious.

21                   DR. YAKLIC:  And they give input into

22  the junior residents, but they don't get to see

23  that obviously.

24                   DR. BARNEY:  Have you had any other

25  residents on probation for professionalism

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 66 of 204 PAGEID #: 377
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

42

1   predominantly that were able to successfully

2   complete probation and finish the program?

3              DR. YAKLIC:  Not that I'm aware of.

4              DR. TALBOT:  I don't believe so.

5   Going at least back to the time that I've been

6   associate program director, the only one that

7   deals -- Dr. Hairwood (phonetic), but his was more

8   knowledge, surgery, all that.

9              The one that had significant

10  professional issues was dismissed her second year.

11  And then we've had one that was held back one year

12  and went to family medicine.

13             So, no, we have not had -- and then I

14  guess in the deliberation with the CCC, you know,

15  we have sometimes extended peoples' training.

16             Certainly if it's surgical

17  competency, just needing more experience and more

18  cases, we've extended training, but in a

19  professionalism issue, I don't see where that

20  helps.

21             DR. POZNANSKI:  How many residents

22  have been terminated or have been recommended for

23  termination?  I guess two different questions.

24             DR. TALBOT:  Into?

25             DR. POZNANSKI:  At all.

43

1              DR. TALBOT:  At all?

2              DR. POZNANSKI:  How many residents

3    have been terminated from the program?

4              DR. YAKLIC:  We've terminated one

5    resident in the last -- well, Jackie was the

6    second resident in the ten years that I've been

7    back in the faculty.

8              DR. CROOM:  That sounds about right,

9    yeah.

10             DR. YAKLIC:  And I don't think there

11   was any in the four or five years before that.

12   That would have been back even before I began, so

13   there's only the two in recent times that I can

14   think of.

15             DR. CROOM:  The one from family

16   medicine wasn't terminated, but --

17             DR. TALBOT:  No.

18             DR. CROOM:  -- he had repeated a year

19   and then left.

20             DR. YAKLIC:  And his was related more

21   to clinical skill.  I mean, he just -- he wasn't

22   really a proceduralist and wasn't happy in his

23   choice.

24             DR. PAINTER:  Other questions for Dr.

25   Talbot or Dr. Yaklic at this stage?

44

1            DR. CROOM:  Just on a couple of the

2    student comments.  The one who related to Dr.

3    Galloway, and we never saw a formal written

4    assessment of that scenario, it seems like it's a

5    pretty blatant thing that he might have responded

6    to, and I know the one with my name on it, I don't

7    know.  I mean, I'm a --

8            DR. TALBOT:  I don't know.

9            DR. CROOM:  You know, I guess, you

10   know, if it were presented to me as an insulting

11   remark, like it's suggested here, I clearly would

12   remember it, my skin is not that thick, and I

13   don't even recall this, so I just --

14           DR. TALBOT:  I don't know, but it's a

15   perception with --

16           DR. CROOM:  Correct.

17           DR. TALBOT:  -- the student.  So

18   whether it was banter back and forth, what are

19   reading?  I don't read, you know, whatever.  I

20   don't know, but that -- their perceptions are

21   often very different and they're the paying

22   customer.  They don't hold back.  They're young

23   and free-spirited and they -- they are in --

24   they're vested, you know, and --

25           DR. CROOM:  I understand that, but,

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 69 of 204 PAGEID #: 380
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

45

1  again, when we're talking about making critical

2  observations which affect someone's future, you

3  know, it's just -- you need to qualify that,

4  that's all I'm saying.

5              DR. YAKLIC:  Well, medicine takes

6  medical student evaluations very seriously.

7              DR. CROOM:  Yes, I understand that.

8              DR. TALBOT:  As you can tell.

9              DR. YAKLIC:  And any -- in all

10  honesty, I think he's -- give a view of what the

11  outsider is seeing.  Nursing evaluations are very

12  consistent with the student evaluations.  Again,

13  kind of an outsider looking in.

14              You know, I don't think any of these

15  incidents, again, by themselves -- Ted and I both

16  went to bat for Jackie, and then there was

17  pushback from the school of medicine to say that

18  this was an action that we should be considering

19  determination for.

20              This is a resident on probation that

21  has continued performance issues, and we went to

22  bat to say, we've seen some improvement.

23              We think there's a -- you know, some

24  movement in the right direction.  She's on

25  probation.  We should see how this continues to

46

1   go.

2                   Again, with less than six months left

3   to her program, you know, we now see a turn to the

4   negative again.  I'm not saying there isn't

5   progress.

6                   I think in the six months Jackie's

7   been on probation, she has improved, but it's

8   been, you know, two steps forward, one step back.

9   One step forward, two steps back.

10                  I mean, we -- I can't say -- you

11  know, I wasn't at the CCC meeting.  I was actually

12  I think talking about medical student evaluations

13  that day, but it is a scenario where I can't

14  disagree with the recommendation.  I sure can't

15  ignore it when they came to me and asked my

16  opinion.

17                  This is a strong recommendation from

18  the -- you know, a large portion of our faculty.

19                  You know, in the last year, I've been

20  much less clinical than I was previously, so I --

21  you know, I have my own perception, but I honestly

22  can't say that that's what I would base a decision

23  on when a large portion of our faculty, nursing,

24  our medical students continue to say there's

25  concern in the last six months of a resident's

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 71 of 204 PAGEID #: 382
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

47

1  tenure, I don't think it's something we can

2  ignore.

3           Like I said, I think Ted has gone

4  through this process and done everything he can as

5  diligently as possible.  It's a regrettable

6  situation to be in.

7           I wish perhaps we had been more

8  aggressive when she was a second year in

9  expressing the importance of changing these

10 behaviors, but it doesn't change the fact that

11 we're in the last six months of her chief year,

12 and there's continued significant ongoing concern

13 about her ability to practice medicine

14 independently.

15          I don't know that Ted -- I don't want

16 to speak for him, but, I mean, he has to sign her

17 certificate that says she's okay to practice.

18          In our discussions, he doesn't feel

19 that's something at this point that he's going to

20 be able to do.  That forces your hand if the only

21 alternative is to terminate her.

22          I mean, it would have been much

23 easier for us to wait till January after we had

24 our resident back off from maternity leave, but

25 that wouldn't have been fair to Jackie.

48

1           I mean, we reached a point.  If we

2    can't take her off of probation, we only have one

3    other alternative, and, unfortunately, that's

4    termination.

5           DR. POZNANSKI:  Were there any

6    indications of these kind of professionalism

7    issues from the previous program?

8           DR. TALBOT:  If there were, they're

9    not in her file, and Dr. Galloway admitted -- or,

10   you know, accepted her, interviewed her and

11   brought her into the program.

12          So we had a person that went into

13   psychiatry after his internship here, so that's

14   where that came down, but I don't know.  Dr. Mares

15   welcomed the circumstances of her departure.

16          DR. YAKLIC:  And Mike has spoken, our

17   previous program director, but there were no

18   concerns raised at that time.  Whether there were

19   unraised concerns, I can't answer that question.

20          DR. CROOM:  Just one other comment

21   about one of the cases, and I understand that the

22   concern is Jackie's not wanting to participate in

23   the case, but in the clinical scenario, I've

24   reviewed that case, and -- only because the

25   attending was pretty critical that this was a very

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 73 of 204 PAGEID #: 384
Due process Hearing In Re: Jackie Mares, M.D.                              Hearing November 7, 2018

49

1   sick patient.

2              DR. TALBOT:  Can you tell me which

3   case you're referring to?

4              DR. CROOM:  The abruption.  This was

5   someone who was felt to be safe enough to just

6   discharge from another hospital, and certainly

7   someone who you clinically suspect is an

8   abruption, and particularly at 38 weeks, you would

9   never send out of a hospital.

10             I'm curious as to why someone would

11  come to Dayton from Lima for a second opinion.  I

12  do know that that attending -- the critical

13  attending is from Lima, I don't know if there's

14  any connection to that.

15             There was no pathological support

16  diagnosis of an abruption.  There was not an

17  abruption.  There wasn't an abruption found at the

18  time of delivery.  Like I said, there was no

19  pathological diagnosis of that.

20             You made it very clear, and I agree

21  with you, it's a difficult diagnosis to make, and

22  I have no problem either way it was managed, but

23  the fact that it was presented in her case as

24  something that it wasn't, I think it's important

25  to point that out.

50

1          DR. YAKLIC:  I think the key is,

2    again, it wasn't a management decision that was

3    the question.  And clearly, we could argue back

4    and forth whether or not there was a -- I mean --

5          DR. CROOM:  No, I --

6          DR. YAKLIC:  -- I don't think that's

7    the point.  It wasn't a management decision.

8          DR. CROOM:  I'm not -- I -- that's

9    how I opened that comment, but I think the point

10   is that I wanted to make it clear that she did not

11   make a mistake clinically.  You can infer that

12   from --

13         DR. TALBOT:  And -- I'm not -- I am

14   not accusing her of making a clinical mistake.

15         DR. CROOM:  No, no.  Dr. Kindig

16   appears to have.

17         DR. TALBOT:  Oh, okay.  My -- I did

18   not -- I felt I did not have a good diagnosis.  I

19   did not suspect abruption.  She had no bleeding.

20   She wasn't really contracting.  The baby looked

21   great on the monitor.

22         So all these things we were

23   potentially worried about, I do not think -- but

24   based on what I saw when I talked to the patient,

25   I did not feel comfortable in sending her home.

51

1          And I didn't say, well, we may need

2    to get more imaging and we may need to get more

3    testing and keep you here longer.

4          I don't think that -- the family was

5    fine with that.  That was not the question, the --

6    the clinical decision-making and that sort of

7    thing.  It was other than --

8          DR. CROOM:  And honestly, I was

9    addressing the attending's comment because it

10   sounded like she missed the diagnosis, and I

11   wanted to make that clear, that that didn't

12   happen.

13         DR. TALBOT:  That was not my concern.

14         DR. CROOM:  No, no, I understand.

15         DR. TALBOT:  That might be Dr.

16   Kindig's interpretation, but that was not mine.

17         DR. CROOM:  But that's what you read

18   to us.

19         DR. TALBOT:  Right.  Well, I read her

20   account, yes.

21         DR. CROOM:  Right.

22         DR. YAKLIC:  Well, clearly the

23   interactions with the family were a concern.  I

24   mean, why did they come?  We're the region's

25   leader.  They came for a second opinion in a

1  tertiary care center and expected to get

2  evaluated.

3           The -- you know, one of the

4  complaints raised to Dr. Belcastro was she never

5  laid hands on them, walked in the room, said

6  they're going to pay an outrageous amount of

7  money, which was not a fact, true fact, and walked

8  out.

9           I don't believe that's what you're

10 supposed to do in a tertiary care center when a

11 patient comes in for a second opinion from a rural

12 hospital --

13          DR. CROOM:  I wasn't questioning

14 that.

15          DR. YAKLIC:  -- you're supposed to

16 evaluate the patient.  That's the unprofessional

17 behavior that we're questioning, not what the

18 diagnosis was or whether the -- I mean, for all

19 intents and purposes, the patient, her -- the

20 diagnosis could have been correct and the patient

21 could have went home and everything could have

22 been fine.

23          That's not the point.  She came for

24 an opinion and needed to be evaluated by the

25 senior resident.

53

1           DR. CROOM:  Yeah, I get that.

2           DR. POZNANSKI:  If all of the

3   professionalism, communication, interpersonal

4   issues improved substantially or were there, would

5   you be comfortable saying that she could practice

6   as a clinician?  Remove all the professionalism

7   issues.

8           DR. TALBOT:  You mean remove all of

9   it?

10          DR. POZNANSKI:  Right.

11          DR. YAKLIC:  Just judging her

12  clinical skills.

13          DR. POZNANSKI:  Just purely clinical

14  her ability to practice as a clinician in six

15  months at graduation --

16          DR. TALBOT:  Yeah, I don't think --

17          DR. POZNANSKI:  -- could you sign

18  that certificate?

19          DR. TALBOT:  I think I could.  I

20  think the CCC would support that.  That's not been

21  the concern.

22          DR. POZNANSKI:  Correct.  Correct.  I

23  just wanted to clarify.

24          DR. TALBOT:  But the concern has been

25  patient safety and patient care based on the

54

1 professionalism inhibiting so much her ability to

2 care for a patient, that it then does put a risk.

3            So what happens if I sign the

4 certificate and she's out, and six months from now

5 one of these interactions occurred?  Is her

6 partner every time going to come and be the one to

7 see the patient or is she going to go to other

8 members of the medical staff?

9            I don't know.  This is a concern.  So

10 it's not the ability to decide what is the

11 diagnosis and what do I need to do and do I need

12 to know how to do it; it's all these other factors

13 that play in that are preventing me from doing

14 that.

15            DR. POZNANSKI:  I just wanted to

16 clarify the clinical versus the professionalism.

17            DR. CROOM:  One other question in

18 regards to medical students, if I'm not mistaken,

19 someone from the university discussed with our

20 residents, in general, issues with relationships

21 to medical students, is that correct?

22            DR. PAINTER:  I'll try to answer your

23 question, Chris.  We do and have for the last five

24 or six years, a resident and teacher seminar for

25 all of the incoming interns, and we -- and it's

55

1  about a three-hour seminar, and they're -- it's
2  usually September or October, and we focus on
3  adult learning, how that's different from --
4  you're not teaching third graders.  How to present
5  a patient.
6           The area as we call them microskills
7  teaching, which is teaching on rounding and
8  teaching at the bedside and teaching sort of on
9  the fly, because that's where a lot of good
10 teaching, you know, in the moment comes.
11          And then the fourth area is feedback,
12 and that is how to give feedback to learners,
13 medical students in this case.
14          So, yes, all of our residents are
15 oriented as they enter our program to be able to
16 do that effectively.
17          DR. CROOM:  What I was speaking more
18 specifically about is my understanding from what
19 the residents told me was that some representative
20 from the medical school discussed with our
21 residents specifically their interaction with
22 medical students.
23          DR. YAKLIC:  With the core
24 evaluations.
25          DR. CROOM:  Yeah, and --

56

1          DR. TALBOT:  I did -- I did on

2    multiple occasions.

3          DR. CROOM:  I guess my point is there

4    was a culture of that among our residents that

5    needed to be addressed.

6          DR. TALBOT:  Right.

7          DR. CROOM:  And it's not unique to

8    Jackie.

9          DR. YAKLIC:  I'll -- I'll speak to

10   that.  There clearly is a culture of that among

11   our residents that we have been addressing for the

12   past several years --

13         DR. CROOM:  Right.

14         DR. YAKLIC:  -- and I think it has

15   slowly improved.  I will say, you know, other

16   residents are named in -- in student complaints.

17         None of them are named as

18   frequently -- I mean, in -- over the -- in the

19   past year evaluations, you know, over 50 percent

20   of the named complaints were Jackie, and we have

21   24 residents.

22         Over half of the named complaints

23   were Jackie, and the level of egregiousness, for

24   lack of a better word, there was no comparison.

25   She was unique in that regard.

57

1           DR. TALBOT:  I would just like to say

2     that obviously I'm picking this up, so I didn't

3     have thought with the last part, because Dr.

4     Galloway would have directly spoken with

5     residents, but since I took that over, I was at a

6     program director's meeting with no names

7     identified for residents, but I read off all of

8     the comments.

9           It was the good, the bad and the

10    ugly, and we went through every single one, and

11    afterwards I had residents come up to me and say,

12    I know, I was up there, I know, and I know the

13    situation.  And sometimes I was like, well, you

14    would not believe this student.  This is all

15    vengeance, you know.

16          And then other times, it was like I

17    guess I wasn't perceived that way.  So we did

18    that.  Then individually, Dr. Barhan and I -- we

19    get quarterly these types of statements, and we

20    have a -- if a new name surfaces, we meet with

21    that person.

22          So we met with two second year

23    residents earlier this month.  I don't know that

24    Dr. Galloway did that.  I don't -- I can't speak

25    and I can't change what happened in the past, but

58

1  I'm being proactive as much as I can be, because I

2  don't want to keep dealing with this type of

3  thing.

4              DR. CROOM:  Right.  And from your

5  documentation, it sounded like you had an impact

6  on Jackie from the medical student perspective.

7              DR. TALBOT:  I think he did and maybe

8  all it was was more emphasis on her, like this is

9  an intolerable type of thing.

10             DR. POZNANSKI:  When you had those

11 conversations, what was Jackie's response to those

12 complaints?

13             DR. TALBOT:  Well, I think she said

14 the same to you, but, yeah, I was pretty -- maybe

15 she used the word bitchy to medical students and

16 stuff and so -- but -- and the medical students'

17 accounts, in fairness, it's more than just to the

18 medical students, it's to nurses, it's to junior

19 level residents, senior level residents, it's to

20 faculty.

21             And I remember that instance where

22 it was mentioned her senior resident, Tony, and

23 Tony was upset about it.  And another resident

24 just said, well, that's just Jackie being

25 Jackie.

59

1          And I thought, well, yes, that's

2    true, but that doesn't necessarily mean that --

3    he was truly upset about it, and this is a guy

4    that I never see really get upset.  He's kind of

5    happy go lucky and very popular amongst residents.

6          So I think -- like I said, I think as

7    much as I could, I emphasized that that was a very

8    key component in her coming off of probation, and

9    I never would have gone -- I would have been --

10   had nothing to offer at the meeting with Dr. Roman

11   in Dr. Painter's office in mid August with Dr.

12   Yaklic if we didn't see improvement.

13         So I thought here, you know, we're

14   making progress, but like I said, in my mind, that

15   progress seemed to be short-lived based on the

16   incidents.

17         DR. BARNEY:  When you said there was

18   improvement, was it lack of negative or was it

19   truly positive, like this person's a good teacher

20   or this person helps me with my work or --

21         DR. TALBOT:  It was a lack of the

22   negative.

23         DR. BARNEY:  Lack of negative.

24         DR. TALBOT:  And then also when they

25   said before that they wouldn't involve her, she

60

1   wouldn't work with students.  Then one had said

2   she did involve -- they did involve her for that

3   student in the OR and had done some teaching,

4   so --

5             DR. YAKLIC:  Because of the ongoing

6   concerns, we had more frequent and more direct

7   questions of our residents -- or of our medical

8   students regarding resident behavior.

9             And so there was more direct

10  questions of how was this resident with -- so, you

11  know, there was some clear improvement, I'll say.

12            DR. PAINTER:  Other questions at this

13  juncture?  You can come back again certainly after

14  Dr. Mares make her presentation and readdress

15  other issues or new issues with Dr. Yaklic and

16  with Dr. Talbot.

17            So if we need to take a break, would

18  somebody just send some sort of -- you know, I

19  need a break for whatever reason.

20            DR. MARES:  I would like to take a

21  break.

22            DR. PAINTER:  You want to take a

23  break?  Okay.  We can take a break.

24            (Pause in proceedings.)

25            DR. PAINTER:  Dr. Mares, I'll turn

1    the hearing over to you.

2              DR. MARES:  Thank you.  I'm going to

3    have Dr. Glover, my acting advisor, to start off.

4              DR. GLOVER:  So, Doctors, again, my

5    name is Melanie Glover.  I've started my 16th year

6    as a physician here at Miami Valley Hospital.

7              I've also participated in clinical

8    duties at Wright-Patterson.  Because of my time

9    here, I completed a residency and I also completed

10   my fellowship here.

11             I've had a unique opportunity to be

12   the one in training, meet a lot of students and

13   also be an educator in the attending role.

14             Over this time, I've gotten to know

15   residents from 19 consecutive classes.  The 16th

16   since my actual start here and the three that

17   taught me, so my three senior classes.  A total of

18   19.

19             And we all come from a lot of

20   different places when we come here to train, and

21   training is never easy for any of us.  I know you

22   know this.

23             When we get here, we all have our own

24   unique challenges.  And I feel like as I've gotten

25   to know Jackie in her training, and especially

62

1   through this process, I'm convinced that when

2   Jackie came to us, she was not broken.

3           We have spent a lot of time telling

4   her otherwise.  And it -- it pains me to be so

5   invested in this program to feel like we failed

6   someone so miserably.

7           I have long, personal relationships

8   with almost every other attending in this

9   program.  Many of them have taught me.  I have

10  taught many of them, and many of the others I have

11  worked side by side with as a colleague.

12          Of the newest faculty at Wright

13  State, I don't have a long-standing relationship

14  with Dr. Kindig, and on occasion, many people flip

15  through the base, as is the nature of the base,

16  and so sometimes I don't know them, but by and

17  large, I have long-standing relationships with the

18  faculty.

19          They're good people.  They're good

20  doctors, but I think in the case of Dr. Mares,

21  they're making a mistake.  Dr. Mares, as you've

22  heard, is accused of having, quote, personality

23  issues.

24          And one of my questions has been, has

25  anyone ever really put forth the effort to get to

 1   know her from what she came and the circumstances

 2   of her being here and to really understand who

 3   this person is.

 4              I will be completely forthcoming.

 5   When I first met Dr. Mares, I was a bit put off.

 6   I found her a little hard to get to know, but

 7   instead of using that against her, I challenged

 8   myself to try harder to try to get to know this

 9   person, because certainly she was in a very

10   difficult position to come from another training

11   program that was completely structured in a

12   different way than this one, and to enter the

13   second year of this program, which is notoriously

14   the most difficult one, and to have no family, no

15   friends, no previous bonding with her resident

16   class because she wasn't an intern with them.

17              To come to this place and be

18   completely alone, and to be asked to catch up and

19   to teach and to kind of fend for yourself.

20              Jackie, and she's -- in our

21   conversations, she has affirmed this.  She is an

22   introvert, textbook definition, painfully so.

23              This young doctor struggles with

24   micromanagement.  It's a very intimidating sort of

25   situation for her to be in, and she admittedly

64

1    becomes very frustrated.

2              When she's allowed to have a little

3    room to breathe, her defenses come down and she's

4    able to logically work her way through situations

5    and function very well again, but she has admitted

6    to me that micromanagement is something that she

7    struggles with, and she would like to learn coping

8    mechanisms to help be better under those

9    situations.

10             She -- because of the way this type

11   of management affects her, naturally she does not

12   micromanage those that are working for her.

13             And so she has developed skills by

14   which she cannot be on top of her junior residents

15   and students, but by virtue of the EMR and our

16   ability to call nurses and to call other

17   residents -- and I've done this myself.

18             You can keep track of everything

19   they do on a labor and delivery unit or on a

20   medicine floor and not be there beside them.  You

21   can track them in the system, often the means by

22   which she will supervise her team.

23             Dr. Mares being the introverted

24   personality she is, she's not a villain.  She's an

25   empath.  She feels more than I feel most days, and

1  I think I'm pretty empathetic.  I have a big heart
2  and I'm really sensitive.
3           She's got me beat on this one.  She
4  bonds with her patients in ways that are superior
5  to almost every resident I have met in 19
6  consecutive classes.
7           Her ability to join them in their
8  journey in the most trying of times is nothing
9  short of exceptional.
10          I feel like as we've listened to the
11 cases described and the stories being told,
12 Jackie, it has been stated, has been given a
13 chance to tell her side, and this much is true.
14          I believe my colleagues have given
15 her the opportunity; however, I question whether
16 those opportunities and those environments felt
17 nurturing and safe to Jackie.
18          It's very difficult for someone to be
19 told you're not doing something well.  Especially
20 to be told that -- or to be implied either way
21 that there's something wrong with you and the way
22 you work with other humans.
23          It's very hard then to find trust and
24 be comfortable with the person who has delivered
25 those statements to you.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 90 of 204 PAGEID #: 401
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

66

1          I question to my colleagues their

2    choice of mentor for Dr. Mares.  The mentor I have

3    known for sixteen years.  He's been my teacher for

4    four years of residency and three years of

5    fellowship.

6          I would consider him a friend because

7    he is my partner, and I know his personality quite

8    well, and they're not a good fit.

9          He is a good person.  He is a great

10   mentor.  He is a great role model, but it is not

11   what Jackie needed.  I feel like she would have

12   been better suited by preferably a female mentor.

13          I think that could have helped let

14   some of the defenses down, and I think it would

15   have been more just to have a mentor who is not

16   directly related to these evaluations that we have

17   discussed and ultimately CCC decisions.

18          I would, myself, find it very

19   difficult to completely trust and be able to

20   confide in someone if I knew that they had that

21   kind of leverage over my career.

22          That's my own personal feeling.  And

23   I feel like we, as a community of physicians,

24   failed Jackie Mares when we did not give her an

25   opportunity to connect with a role model who she

67

1  could potentially have a trusting relationship

2  with and potentially work through some of the

3  difficulties she was having.

4          Jackie's natural tendency when she's

5  confronted or intimidated, and we all face this at

6  different times, you choose whether you fight or

7  whether you take flight.

8          Her tendency more often is to take

9  flight and go into a protective mode.

10         And she has admitted this to me and

11  she has openly expressed to me, again, that she

12  would like assistance in learning how to not rely

13  so much on that instinct, because she finds it

14  difficult when pushed to go into fight mode, she's

15  very misunderstood.  It's an uncomfortable place

16  for her to be in.  She would like real coaching

17  under these circumstances.

18         I have a lot of information from a

19  he said she said perspective that we can discuss

20  in this meeting regarding the different cases, and

21  some of it I would definitely like to share with

22  you.

23         But one thing I want to impress upon

24  everyone is that not only have I expressed to you

25  Jackie being in an especially delicate position

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 92 of 204 PAGEID #: 403
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

68

1   when she started our program, she was really

2   expected to do for herself in ways I think were --

3   it was more than what anyone should ask of any

4   resident in their program.

5               It put her in complicated situations

6   with medical students and other residents.  The

7   program Jackie came from, they did not operate as

8   interns.

9               This program is very different.  When

10  I graduated -- I'm sorry, when I advanced from my

11  first year, I had performed one hundred and fifty

12  Cesarean deliveries.  That's a lot of operating.

13              Now with the numbers as they

14  change -- as they've changed, they're not quite

15  that heavy anymore, but nonetheless, the interns

16  start their second year with a lot of surgical

17  experience under their belt.  Her program was not

18  stratified that way.

19              Whenever you moved into second, third

20  years, et cetera, you had rotations that were

21  completely dedicated to be in the OR.

22              When she came here, instead of us

23  being able to say to her, we understand that these

24  are your deficits simply because our programs are

25  structured differently, these are the things that

69

1   we are going to do to help you catch up.

2              Instead she was told you need to get

3   your numbers if you want to advance, and if you

4   have to, bump someone else.

5              I can't imagine how difficult it must

6   be to be the new person trying to foster

7   relationships within a residency program when

8   everyone's looking at you with a critical eye to

9   be in that position where you then have to jockey

10  for cases.

11             Everyone here is under pressure to

12  perform in the OR as much as possible.  We all

13  want to be good surgeons when we graduate, but to

14  have that added pressure -- I haven't seen

15  anywhere in the documentation where anything was

16  offered to Jackie to set her up with a faculty or

17  to ask a private provider if they would volunteer

18  to spend time with her in a special -- a specially

19  formulated rotation just to get her going

20  surgically.  That way she could be better

21  integrated into the second year.

22             If there was that effort, I would

23  love for that to be shared with the group, but I

24  don't think it happened.

25             So there were those things that were

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 94 of 204 PAGEID #: 405
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

70

1  just technically very difficult for her to take on

2  her own.

3           DR. YAKLIC:  Now, you said we could

4  ask questions as we moved along, correct?

5           DR. PAINTER:  What I prefer is to let

6  Dr. Glover and Dr. Mares do their part of the

7  presentation that they have, and then ask

8  questions afterwards as opposed to kind of

9  breaking that up.  So if you'll continue, Dr.

10 Glover.

11          DR. GLOVER:  Thank you, Dr. Painter.

12 So I am concerned that there hasn't been enough

13 proof in her records to convince me that we did

14 what we could to help her catch up from a

15 technical standpoint.

16          But what's more concerning to me is

17 I've really come to feel like there's a dichotomy

18 of expectations when it comes to the professional

19 standards that we, as attendings, are upholding

20 versus what we're expecting of our residents.

21          And, again, a lot of the things we're

22 discussing today, there's a lack of objective

23 data.

24          A lot of it's personal telling of a

25 story, but I have no reason to think that Dr.

71

1   Mares would lie to me and tell me that another

2   attending, in front of an ER full of physicians,

3   nurses, residents, students; I have no reason to

4   think that she would lie to me and tell me how

5   devastating it was, during these formative middle

6   years of her residency, for an attending physician

7   in our department to stand there and tell her she

8   is a fucking idiot.  It is completely

9   unacceptable, and I believe it happened.

10              And I think I have resident

11  documentation that this incident, as Dr. Mares has

12  described to me, can be supported.  And I feel

13  like what response came from the department was

14  more of a coverup for that attending's behavior

15  than it was to help her deal with such a

16  devastating blow.  Unacceptable.

17              And now we sit here.  She's

18  unemployed because we've told her she's not

19  professional.  What kind of examples have we set

20  for Dr. Mares?  If it's okay for me, as an

21  attending, to tell her she's a fucking idiot and

22  then apologize later and go through the coverup so

23  it doesn't get all the way up to the provost and

24  causes some real problems.

25              She was not broken when she came

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 96 of 204 PAGEID #: 407
Due process Hearing In Re: Jackie Mares, M.D.                          Hearing November 7, 2018

72

1   here, but there are a lot of things, like what

2   I've just described to you, that have happened

3   that I feel like we have done to potentially break

4   her.

5              And in this era of physician burnout,

6   depression and suicide, I can't express to you how

7   many days I have checked in on this doctor, is she

8   okay?  Do you feel like someone needs to intervene

9   for her safety?

10             I would like to hope that Dr. Mares

11  nor any of our other residents would ever

12  contemplate a suicide whenever they meet their

13  professional challenges, but I also feel like we

14  need to sit here and be completely honest with

15  ourselves and ask ourselves, is this a near miss?

16             I feel like this poor woman has not

17  been supported.  She has not been nurtured.  She

18  has been villainized.

19             And I feel like I've done too little

20  on my part.  I feel like I should have advocated

21  for her more.  I feel like I should have been

22  nosier.  I should have butted in.  I should have

23  asked more questions whenever it looked like

24  difficulties were occurring, and I didn't.  I have

25  failed Dr. Mares in that respect.

73

1          But I have watched her grow.  I have

2    operated.  I have gowned up with her.  I've

3    watched her hands learn how to perform.

4          I've watched her deliver dead babies

5    and hold them and tell their mothers how beautiful

6    they are.

7          And I've read cards from those

8    patients expressing their thanks to her because

9    she is a very good doctor and a lovely human

10   being.

11         I have some things, if I may, that I

12   would like to give you.  Dr. Painter, do I have

13   your permission to hand out some things?

14         DR. PAINTER:  Yes.

15         DR. GLOVER:  And I have copies for

16   you too, sir.  I apologize for all the sticky

17   notes.  I did not take my reading glasses to the

18   store and I bought the wrong tabs.  One for you,

19   and, Dr. Painter, these are for you.

20         So for the three of you across the

21   table in your blue or red folders, you will find

22   an example of a patient letter to Dr. Mares, and

23   this was a case that was managed here at Miami

24   Valley Hospital.

25         There's also a copy of a family

1   letter from a patient who was cared for at

2   Wright-Patterson Air Force Base.

3                You will find multiple letters of

4   support that have flooded my inbox in the last few

5   days.

6                Many of these are from fellow

7   residents.  The one on top is from Dr. Bembry.

8                Dr. Bembry is a hospital-employed

9   physician, as I am, and I think his interest in

10  Jackie's well-being is sincere and deeply rooted.

11               I don't know if you all know Dr.

12  Bembry.  He is a passionate man to the point of

13  being bombastic at times, and he, himself, has

14  been reprimanded for behavior in educational

15  situations and has gone through the necessary

16  steps to help restitute himself to become a better

17  educator.

18               And he took his experience to

19  genuinely make himself better and to help the

20  people who he's volunteered to train.  And so

21  that's a little background on Dr. Bembry for that

22  letter.

23               The others were -- I did not solicit

24  any residents for letters.  Like I said, they

25  approached me and these landed in my inbox.  And I

75

1   hope before you make the decision that you have to

2   make that you will have an opportunity to read

3   those.

4              Also in your folder that you're

5   looking at, there's a letter from Dr. Madison.  I

6   refer to it as a letter of clarification.

7              Dr. Madison is the faculty physician

8   who did her due diligence and informed Dr. Talbot

9   of Dr. Mares' lack of professionalism on Friday,

10  August 31st, 2018.

11             Dr. Talbot referred to Dr. Madison's

12  written report, and the copy of the e-mail that

13  you now have, you can see that it states, to whom

14  it may concern:  I would like to take a few

15  minutes to embellish on the below e-mail I sent to

16  Dr. Talbot two months ago.

17             When I spoke with Jackie after the

18  incident with the general surgery team, it was

19  clear to me that Jackie was remorseful and

20  realized her behavior was inappropriate.

21             While the manner in which she handled

22  the situation was unprofessional, her anger

23  clearly stemmed from her place of trying to do the

24  right thing for her patient and being her

25  patient's advocate.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 100 of 204 PAGEID #: 411
Due process Hearing In Re: Jackie Mares, M.D.                     Hearing November 7, 2018

76

1          At this moment, I would like to add

2  that this was an incredibly complex patient.  I

3  was actually the attending MFM the day that this

4  boiled up, and I wish that I had been the one

5  called instead of Dr. Madison, but that's a common

6  confusion, we don't blame our surgical colleagues

7  for not knowing who to call.

8          DR. POZNANSKI:  May I interrupt for

9  just a minute --

10          DR. GLOVER:  Yes, please.

11          DR. POZNANSKI:  -- so that I could

12  follow along with you?  Where -- which page are

13  you looking at?

14          DR. GLOVER:  It would be titled

15  Madison.  It's in your blue folder.  Yes.  So this

16  patient was late preterm.  She does not have a

17  grasp of our native language.

18          She declined hospital interpretation.

19  Had a supportive husband who was interpreting for

20  her.  So culturally, it was a more complicated

21  case.

22          She had had multiple admissions and

23  had gallstone pancreatis ultimately in the end.

24          And there had been some uncertainty

25  as to how to manage her, because she was, like I

1  said, late preterm, and coming so close to that

2  point with babies where sometimes we just try to

3  conservatively manage, deliver the baby, and then

4  do further interventions for the mom.  So I know

5  that had been complicating things.

6            But Dr. Mares, very intuitively, had

7  looked at the clinical information and had begun

8  to realize that not only was this patient

9  miserable with these multiple admissions, but that

10 she was sicker than she had been before, to the

11 point where, with gallstone pancreatis, this

12 patient was legitimately at risk for preterm

13 birth.

14           She was at risk for significant

15 maternal morbidity, but at this point also had

16 significantly increased risk for maternal

17 mortality.

18           And I, as the attending that day,

19 pushed Dr. Mares very hard.  Dr. Mares, please,

20 let's get to the bottom of this.  Please talk to

21 them.  Let's get a plan.  I need to know when

22 she's going to go to the OR.  I'm worried, too.

23           So I feel like she was certainly in a

24 high stress situation, that I participated in, and

25 in hindsight, she realized that her behavior was

78

1  emotionally charged yet still inappropriate.

2             And she took it upon herself to

3  apologize to the team and the nurse before she was

4  even confronted, and I think that speaks volumes

5  for her.

6             I don't know if she had the skills to

7  do that under such a volatile situation when she

8  first joined us as a second year resident, but

9  clearly she had developed the skill set necessary

10 to humble herself, acknowledge that she was

11 mistaken and offer up a sincere apology.

12            So that's Dr. Madison's entry.

13            DR. PAINTER:  Do you mind if I share

14 these with Dr. Talbot and Dr. Yaklic?

15            DR. GLOVER:  No, please.

16            DR. PAINTER:  Then we will all be on

17 the same page.

18            DR. GLOVER:  Absolutely.  I don't

19 mind at all.  Thank you for asking, Dr. Painter.

20            DR. PAINTER:  Okay.

21            DR. GLOVER:  If you would like me to

22 pause, please just say so.  I can see that you're

23 flipping through those.

24            DR. TALBOT:  I have a question --

25            DR. GLOVER:  I'm sorry, I couldn't

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 103 of 204 PAGEID #: 414
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

79

1    hear you.

2                DR. TALBOT:  I'm sorry.  You had just

3    said something earlier about you weren't

4    soliciting letters --

5                DR. GLOVER:  I did not solicit

6    residents for their letters.

7                DR. TALBOT:  You asked.

8                DR. GLOVER:  I asked.

9                DR. TALBOT:  Okay.  That's fine.  I

10   just was confused.

11               DR. PAINTER:  Just a point of

12   clarification; I think everyone's reading.  I want

13   to make sure that Dr. Mares has a chance to speak

14   on her behalf, so --

15               DR. GLOVER:  Would you like me to

16   continue?

17               DR. PAINTER:  If you have more, yes.

18               DR. GLOVER:  I have more.

19               DR. PAINTER:  Okay.  Please continue

20   then, yes.

21               DR. GLOVER:  Yes.  I just wanted to

22   be polite.

23               DR. PAINTER:  I couldn't tell whether

24   you were finished or whether you were --

25               DR. GLOVER:  No, no, I was just

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 104 of 204  PAGEID #: 415
Due process Hearing In Re: Jackie Mares, M.D.                Hearing November 7, 2018

80

 1   giving them some time.

 2                    DR. PAINTER:  Okay.

 3                    DR. GLOVER:  So in your other folder,

 4   I have included a couple of representative

 5   articles, and with your roles in leadership in

 6   resident education, I anticipate you've read far

 7   more about physician burnout and depression than I

 8   have, but I just wanted to point out to the

 9   committee that much of what is described in

10   burnout and depression amongst physicians has

11   actually been well-characterized by Dr. Talbot

12   today; however, he has not mentioned the potential

13   of burnout in Jackie.

14                    In the first article titled Physician

15   Burnout, its origin, symptoms and five main

16   causes, it very clearly explains cardinal symptoms

17   of physician burnout.

18                    One being exhaustion.  Another being

19   depersonalization and another being lack of

20   efficacy.  I think every resident is routinely

21   exhausted, but I think that's something that's

22   really been pointed out as special to Dr. Mares,

23   and her experience is how she's become

24   depersonalized during parts of her training

25   process.  Particularly as signaled by cynicism,

1   sarcasm, the need to vent about your job and

2   people involved in your job.

3              Certainly there are causes of burnout

4   that are numerable.  The big ones include the

5   actual practice of clinical medicine, what your

6   specific job might be and the demands of that job,

7   but this author goes to the effort to also

8   describe one of the top main causes of burnout is

9   the conditioning of our medical education and also

10  the leadership skills of your immediate

11  supervisors.

12             So I certainly feel like there is

13  potential that Jackie Mares was burned out.  In

14  fact, one of her junior residents, who is very

15  young, but very insightful, even mentioned that in

16  one of her letters.

17             One of her first impressions of Dr.

18  Mares was that she was burned out.

19             So I feel like one of our junior

20  residents recognized this, but we, as her

21  attending physicians, potentially failed to

22  recognize it and certainly didn't address it in a

23  more constructive manner.

24             Our other article for reference is

25  from Current Psychiatry.  It's titled Depression

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 106 of 204 PAGEID #: 417
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

82

1  and Suicide Among Physicians.  Predictors of

2  depression in physicians as referred to in table

3  one, the top of the list, difficult relationships

4  with senior doctors, staff and/or patients.

5          I keep pounding away at this point

6  because this is the reason that Jackie Mares has

7  been terminated from her role as a physician in

8  our training program, but I'd like to encourage

9  you before you make your decision today to please

10 look at her CV, look at the paper trail that

11 followed Jackie before she joined us.

12         She was a mentor.  She was in

13 position to educate others, and she seemed to have

14 a real passion for it, and it makes me question

15 all of us in this room what happened after Jackie

16 came here that extinguished that fire?

17         She had a natural drive to be a

18 teacher and to teach others the things that she

19 loves.  She has an interest in neuroscience and

20 psychiatry in addition to OB-GYN.

21         It's clear in her CV that she was

22 passionate about sharing the knowledge that she

23 had gained with others, and I don't expect someone

24 to lose passion for a field they love simply

25 because they become a resident.  I think it's much

83

1   more complicated than that.

2              So I challenge you to ask yourselves

3   if perhaps her own mental and emotional well-being

4   could have played a role in this and if we were

5   being appropriately supportive of her.

6              This article also refers to barriers

7   for treatment.  Many in this room may have -- I

8   don't know your personal stories, I can only tell

9   you mine.

10             It says physicians are hesitant to

11  seek mental health treatment.  They may fear

12  social stigma and could have trouble finding a

13  provider who they trust but is not a colleague.

14             Physicians might be concerned about

15  confidentiality and fear recrimination by

16  colleagues, facilities and their licensing

17  Boards.

18             I can attest to this, I've had the

19  conversation with any number of people, whether

20  it's people I know personally or people that I

21  have a kinship with on large social media groups.

22             This is a huge concern amongst

23  physicians today, and we're all trying to figure

24  out how do we seek the support we need in our own

25  mental health whenever we fear recrimination.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 108 of 204 PAGEID #: 419
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

84

1                And if you look at table two on this

2    article, it refers to manifestations of mental

3    illness in physicians.  And the top of the list

4    being severe irritability, anger resulting in

5    intrapersonal conflict.

6                Now, I'm not suggesting that Dr.

7    Mares is mentally ill, that's not the point I'm

8    trying to make.  It's not my judgment to make.

9                The point I'm trying to make is did

10   we do our due diligence to prove to ourselves that

11   she's mentally well.

12               When you confront a physician with

13   the question, are you well?  How are you doing?

14   How -- mentally, how are you holding up?

15               Many of us -- I would dare say most

16   of us would probably answer with, I'm fine, things

17   are good.  I don't think we're going to divulge

18   our personal doubts and emotions unless we're in a

19   trusting and nurturing environment with an

20   interpersonal relationship with a person who's

21   asking the question.

22               The other thing contained in this

23   particular folder are in the form of e-mails, and

24   I feel like these would be important for you to

25   review at some point in the process.

1          At the top, the first e-mail that you

2    see is a correspondence between Dr. Ing to Dr. Lo

3    to Dr. Talbot.

4                    DR. BARNEY:  Can I ask you something?

5                    DR. GLOVER:  Yes, please.

6                    DR. BARNEY:  Who's Dr. Ing?  I don't

7    know that person.

8                    DR. TALBOT:  Yeah, he graduated when

9    I did.

10                   DR. GLOVER:  Dr. Ing was a chief

11   resident in our program when Dr. Mares joined us

12   as a second year.

13                   DR. BARNEY:  Okay.  Thank you.

14                   DR. GLOVER:  Dr. Ing and Dr. Mares,

15   if I remember correctly, were together for

16   approximately half of the year, and if I am also

17   remembering correctly, she had one other chief

18   resident for the other half of the year, and

19   that's a bit unusual.

20                   Typically you have a more diverse

21   experience with your chiefs, but sometimes the

22   rotations do line up in such a way that that

23   happens.

24                   And I can speak to the tension

25   between Dr. Ing and Dr. Mares.  Sometimes that was

1   apparent whenever you were an attending physician

2   working with them; however, I do have my own

3   personal experience to reflect upon.

4              When one of my interns, when I was a

5   chief, had a similar experience.  This particular

6   intern was with one of my classmates for six

7   months, and then a couple others of us had her for

8   the other six months.

9              And the resident that I had

10  experience with is, ironically, a lot like Dr.

11  Mares, very introverted, incredibly bright,

12  well-versed in other topics that many of us don't

13  know a lot about, and she was with my classmate

14  for the first six months of her residency, and

15  during that period, I realized the kind of abuse

16  that she was getting from her chief and how she

17  wasn't fostering her.

18             And when I was able to have my

19  educational experience with this intern, it was a

20  lot of hard work.  She didn't trust me.  I had to

21  beg her, please trust me not to hurt you.  Please

22  trust me to teach you.

23             I'm not going to let -- I'm not going

24  to go place the blame on you.  I'm the head of

25  this service.  Everything goes through me.  I'm

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 111 of 204 PAGEID #: 422
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

87

1  going to protect you.

2              And the reason I'm telling you my own

3  personal account is just to help you understand my

4  perspective in some of the difficulties in the

5  relationship between Dr. Ing and Dr. Mares.

6              Dr. Ing's teaching style, it wasn't

7  wrong.  She was a good chief resident, but it was

8  a tough fit for Dr. Mares, and this can really

9  wear a resident down very quickly whenever they're

10 always in conflict or confrontation with their

11 chief resident.

12             But despite this, despite the tension

13 in their relationship, Dr. Ing reached out to Dr.

14 Lo and Dr. Talbot about Dr. Mares, and the

15 incident that I described to you earlier about the

16 attending physician defaming her with the

17 profanity that she used in the ER.

18             So this is what this e-mail is

19 referring to.

20             DR. YAKLIC:  Where is that, what tab?

21             DR. GLOVER:  It is titled e-mails.

22 And, again, I apologize for the sticky notes.  In

23 addition to this e-mail --

24             DR. YAKLIC:  Is this -- so where --

25             DR. TALBOT:  It says to Melanie

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 112 of 204 PAGEID #: 423
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

88

1   Glover, and then it says hi, Dr. Lo and Talbot.

2                DR. GLOVER:  That's because Dr. Mares

3   forwarded it to me.

4                DR. TALBOT:  I've never seen it

5   before.

6                DR. GLOVER:  And it has a mark here

7   at the top, on May 18th, 2017, at 7:47, Lisa Ing

8   at her address.

9                DR. TALBOT:  I must've just -- I

10  didn't ever see this, as I recall, but maybe she

11  sent it to Dr. Lo.

12               DR. GLOVER:  Dr. Lo apparently

13  received this e-mail.  As I've included in your

14  packet is an e-mail from Dr. Ing.

15               DR. BARNEY:  Sorry, who's Dr. Lo?

16               DR. TALBOT:  Dr. Lo is a faculty.

17  She's the other associate program director at the

18  Wright-Patterson Air Force Base.

19               DR. BARNEY:  Thanks.

20               DR. GLOVER:  It's a -- a long

21  correspondence between Dr. Ing and Dr. Lo, and

22  then also included is Dr. Lo's reported

23  correspondence with Drs. Yaklic, Galloway and

24  Talbot.

25               DR. BARNEY:  Can you tell me who's on

89

1   competency committee?  Because I don't really know

2   the names of the people.

3                   DR. TALBOT:  Yeah.  I mean, we could

4   get you a list.

5                   DR. BARNEY:  Okay.  Are any of these

6   people that --

7                   DR. TALBOT:  Dr. Lo is on competency

8   committee.

9                   DR. BARNEY:  Okay.

10                  DR. YAKLIC:  Dr. Kindig is not.  Dr.

11  Lo is.

12                  DR. BARNEY:  Are you on the

13  committee, Dr. Glover?

14                  DR. GLOVER:  No.

15                  DR. TALBOT:  Dr. McKenna is on the

16  committees.  Dr. Towers.

17                  DR. CROOM:  Dr. Galloway.

18                  DR. TALBOT:  Dr. Galloway, Dr. --

19  from the base, Dr. Massengill.

20                  DR. CROOM:  Dr. Barhan.

21                  DR. TALBOT:  Dr. Barhan, and then

22  Helen Bartlett is a nurse in labor and delivery.

23  Rose Maxwell, our research professor, and Dr.

24  Yaklic, so that would be it.

25                  DR. POZNANSKI:  And who was the

90

1   assigned mentor?

2              DR. TALBOT:  Dr. McKenna and then Dr.

3   Croom were --

4              (Thereupon, the court reporter

5   interrupted the proceedings.)

6              DR. POZNANSKI:  I asked who the

7   assigned mentor was.

8              DR. BARNEY:  Was there an attempt to

9   assign a mentor to Jackie prior to her

10  probationary period?

11             DR. GLOVER:  Am I allowed to ask

12  that?

13             DR. PAINTER:  Actually if you're a

14  witness, you can certainly give information --

15             DR. GLOVER:  But I'm also her

16  advisor.

17             DR. PAINTER:  You're an advisor to

18  her.

19             DR. GLOVER:  Jackie, if you'd like to

20  ask that question, the floor is yours.

21             DR. MARES:  So was I given a mentor

22  prior to being put on probation?

23             DR. TALBOT:  Yes, at the letter of

24  warning I believe is when.  I'd have to look,

25  because this was under Dr. Galloway.

1          DR. MARES:  Prior to that.

2          DR. TALBOT:  Prior to the letter of

3  warning?  I'm -- yes, it says -- in the letter of

4  warning it says the monitoring and mentoring with

5  Dr. McKenna, and I know that you saw him and then

6  ultimately gravitated to also meeting with Dr.

7  Croom.

8          DR. MARES:  So then prior to that, I

9  did not have a mentor, correct?

10          (Thereupon, the court reporter

11  interrupted the proceedings.)

12          DR. YAKLIC:  I asked her if she was

13  assigned a mentor in the second year.

14          DR. TALBOT:  I do know our policy was

15  instituted that all the interns do get assigned a

16  mentor.  I don't know whether at the time that

17  this -- if this was before that policy or whether

18  it didn't -- because she came in as a second year.

19          That would be something Dr. Galloway

20  would know.

21          DR. BARNEY:  So currently do the

22  interns all have a mentor assigned --

23          DR. TALBOT:  Yes.

24          DR. BARNEY:  -- as part of --

25          DR. TALBOT:  Yes.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 116 of 204 PAGEID #: 427
Due process Hearing In Re: Jackie Mares, M.D.                     Hearing November 7, 2018

92

1              DR. YAKLIC:  So we've done that for

2    at least two years.  I don't know if we did it

3    three years ago, but I believe we did.

4              DR. POZNANSKI:  Were you aware of the

5    mentor?

6              DR. YAKLIC:  Did you ask for one?

7              DR. MARES:  I didn't have a mentor

8    that I was aware of.  No, I did not specifically

9    ask for one.

10             DR. POZNANSKI:  What was the length

11   of time between the letter of warning and

12   probation?

13             DR. TALBOT:  The letter of warning

14   was in May of 2017, May 15th, and probation was

15   March 8th, 2018.

16             DR. POZNANSKI:  Okay.

17             DR. YAKLIC:  Just for clarification,

18   the CCC also includes Dr. Nagy --

19             DR. PAINTER:  Can you speak up?

20             DR. YAKLIC:  Dr. Nagy, N A G Y, she

21   was a former resident on the base and also was on

22   the CCC.

23             DR. GLOVER:  I know your time is

24   precious today.  If you'd like, I can proceed, or,

25   again, if you need me to pause, I will.  I feel

1   like I need to offer to you some account of some

2   of these specific cases that have been brought

3   against Jackie as means by which to support her

4   termination.

5                    If we can refer back to that patient

6   that had the questionable abruption, whom Dr.

7   Talbot and Dr. Kindig were the consecutive

8   attendings, I did not hear in Dr. Talbot's

9   rendition of the account that the mother of this

10  patient had gone so far to say, I'm going to go up

11  so that you don't falsify records and lie about

12  her pain.

13                   This is a nurse's personal account to

14  me in a conversation about this case as she was

15  trying to explain to me in detail how rude and

16  threatening the patient's mother had been to Dr.

17  Mares in the triage.

18                   So I wanted -- and, again, I can't --

19  I can't give you documentation because this is a

20  personal account; however, in trying to respect

21  this nurse's privacy, I can tell you that she gave

22  her account to Dr. Talbot upon request, and that

23  she is someone who -- she is a very senior nurse

24  on labor and delivery.

25                   She's been doing this job for decades

94

1   and she was a nurse present during all of my

2   training.  I feel like I have a very good

3   relationship with her, and she is never anything

4   but fair to the residents.

5               She's never played games.  She calls

6   us out whenever we're out of line, and she

7   supports us when we're in the right.

8               And in her account of that particular

9   story, she said to me, Dr. Glover, this was no

10  different really than so many of the other cases

11  we have come through labor and delivery.  You know

12  how it is up there.  This happens all the time.

13              But what was exceptional was how rude

14  this mother was to Dr. Mares, and she said I felt

15  like Dr. Mares had represented appropriately the

16  assessment of that patient and plan up until that

17  point.

18              Mind you this person had been in

19  triage for six hours.  So she had technically been

20  under supervisory care for a very long time.

21              She said that Dr. Mares represented

22  the plan and was polite and professional to the

23  patient and her family as was -- were the other

24  two junior residents.

25              This nurse told me that she stepped

1  out to ask Dr. Talbot to come to the bedside

2  because the situation was escalating, and in her

3  description to me she did it not because she had

4  doubt in her residents, but because she wanted to

5  protect them.

6         And that's what we do as attending

7  physicians whenever situations escalate, we step

8  in and protect our own while giving quality care

9  to our patients and their families.

10        She said the initial response she got

11 from Dr. Talbot was to have Dr. Mares call him.

12 So as instructed, she went back to the bedside

13 with Dr. Mares, and before she could relay the

14 message, she said that Dr. Talbot presented

15 himself to the bedside, and, as his right as the

16 attending physician, made a plan to keep her.

17        That's her account of the story.  But

18 she said in no way were any of the residents ever

19 inappropriate with this family.

20        And the family dynamic is rather

21 complicated.  The patient was lying in bed,

22 appropriately medicated and silent, not responding

23 for herself.

24        Her partner also not responding.  It

25 was the mother who was rude to our residents who

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 120 of 204 PAGEID #: 431
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

96

1  was representing the patient.  So thank you for

2  allowing me to add a little clarification, I hope,

3  to that.

4              We've already discussed, I hope, some

5  clarifying thoughts for the pancreatitis case as

6  well, and I just realized, if you would please

7  respect the privacy of the nurse, I do have a copy

8  of the e-mail that she sent to Dr. Talbot of her

9  account of that matter.  Actually, Dr. Croom, if

10  you could pass those down.

11              Before I leave this case, I just want

12  to beg you all to reconsider this nurse's account

13  again, what she says that the patient threatened

14  to accuse them of falsifying a medical record and

15  lying about her daughter's clinical status,

16  because this is the same patient -- or, I'm

17  sorry -- this is the same person who had the

18  conversation as documented per Dr. Belcastro.

19              So for what that's worth, I'd like

20  you to consider it.

21              I do want to point out that in Dr.

22  Barhan's response to Dr. Talbot in the e-mail from

23  Dr. Belcastro regarding this patient, Dr. Barhan,

24  much to her credit, made a statement that's very

25  simple, but really stands out to me when she said

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 121 of 204 PAGEID #: 432
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

97

1  this is real good material for teaching, and I

2  completely agree with her.

3          I would argue that instead of using

4  this as a means by which to terminate a resident

5  who is dealing with a very, very difficult patient

6  interaction, that perhaps we could have gathered

7  ourselves to make a teaching experience occur.

8          She's certainly mature enough in her

9  clinical training to be able to advance to

10  learning how to deal more with a difficult

11  patient.

12          It takes a lot of years and a lot of

13  mentoring to learn how to do that, but I feel like

14  Dr. Mares was ready at that time, and Dr. Barhan

15  made a very good point.

16          The other e-mail that I included was

17  from Dr. Talbot to Dr. Mares, and it -- I won't

18  berate you with going through it because it

19  discusses the things that we've already discussed

20  regarding unprofessional behavior with medical

21  students, nurses, residents, the particular cases,

22  but it's outstanding to me that Jackie, if I'm

23  remembering correctly, had her meeting with Ty and

24  Dr. Talbot on October 4th, followed with an

25  official letter of dismissal on October 5th.

1          On October 8th, I believe an e-mail

2     trail could be confirmed to show that Jackie

3     e-mailed Dr. Talbot to inform him of her due

4     process decision, and at that time she asked him

5     for a detailed account of the accusations that had

6     led to her dismissal.

7          That was October 8th, three days

8     after receipt of the letter, four days after their

9     meeting.

10          The following day, Dr. Talbot

11     e-mailed Jackie to request -- to appropriately

12     request, I might add, that she use her Wright

13     State University account.  So a protective

14     extension.  We appreciate that, Dr. Talbot.

15          That was the 9th of October.  It

16     wasn't until the 21st of October that Jackie

17     e-mailed Dr. Talbot again to follow up requesting

18     for the detailed account the terms of her

19     dismissal.

20          It was on the 22nd that Dr. Talbot

21     sent the e-mail that I've included in your folder.

22     And then finally on the 31st Jackie e-mailed in

23     return that she will not challenge that these

24     events occurred.  She's owned them, they're hers,

25     but she would like to discuss the details in front

1   of the appeals committee.  That's what brought us

2   here with regard to these e-mails that I have

3   mentioned.

4                  Are there any questions for me at

5   this point or do I need to pause?

6                  DR. PAINTER:  Do you have any more

7   information or are you at an end of --

8                  DR. GLOVER:  We're nearing the end.

9                  DR. PAINTER:  Okay.

10                  DR. GLOVER:  I just want to point

11  out, and this is my opinion as I'm trying to learn

12  about this process, I've never been a program

13  director or an associate program director.

14                  I've never been a faculty involved in

15  these things, but as I come through Jackie's file

16  and I read the letters from her program directors,

17  I read the evaluations from the CCC, there's one

18  thing that I can never piece together for myself,

19  because as I'm reading these, I ask myself, had I

20  been asked to be her mentor, would I be able to

21  evaluate her file and pull from that file clear

22  objective benchmarks that she needed to meet in

23  order for me to mentor her and help her succeed,

24  and I'll be quite honest with you, I have not been

25  able to do that.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 124 of 204 PAGEID #: 435
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

100

1          I have read over and over, I've

2    highlighted, I've made notes, and there are always

3    references to the manual, the policy, the

4    procedure, the number.  But as far as explicit

5    examples, Jackie, we would like to see you improve

6    your professionalism with medical students by

7    engaging in these activities, I can't find it.

8          And I feel if I had been asked to be

9    her mentor, I would have had to have put forth

10   that effort to some way try to extract from the

11   committee and the directors exactly what it was

12   being tasked upon me to help her with.

13          Now, the mentors who were assigned to

14   her, I'm not aware at any time that they were

15   given explicit objective information as to how to

16   help her.

17          They were told that they needed to

18   meet with her monthly and mentor her, and that

19   seems pretty vague to me.

20          And I think with that, I'll allow

21   Jackie, if there's anything that you want to add

22   on your behalf.

23          DR. MARES:  Sure.  I don't feel like

24   I have much to say at this point in time.  I think

25   that everything has been clearly stated by both

1  sides.

2           As I have said before and as Dr.

3  Glover has mentioned, you know, I've never denied

4  that any of these things have happened.

5           I don't think in my mind that I've

6  underplayed them at all.  I've always owned them.

7  I was completely atrocious to medical students in

8  the second year.  I don't deny that.  It's

9  absolutely true.

10          But I think that what's not pointed

11 out is how much improvement I tried to make since

12 then, and I feel like I did the best that I could

13 with, you know, what I thought I had to offer in

14 terms of trying to improve on everything that I

15 was told about.

16          And I think that even if you read

17 through everything, even the letters from the

18 clinical competency committee, et cetera,

19 everybody comments on how I continued to make

20 improvements, and I still feel like to this day I

21 continue to make improvements.

22          You know, I'm not going to be perfect

23 anytime soon or likely ever, but I do want to be

24 better.  I don't want to have these types of

25 problems.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 126 of 204 PAGEID #: 437
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

102

1          So I have tried to continue to figure

2     out what these are.  It's apparent to me with just

3     kind of how the situation was handled, that I

4     likely have some sort of blind spot to how people

5     perceive situations and how I perceive situations,

6     because I feel like they're very different.

7          So since being fired, I have elicited

8     the help of a counselor that I've met with

9     regularly for coaching on professionalism and

10    communication, and, you know, I want to continue

11    to make strides in that regardless of, you know,

12    whatever happens today.  But I just wanted to

13    point that out.

14          I don't think I have anything else to

15    say.

16          DR. PAINTER:  Okay.  Questions from

17    the panel?

18          DR. BARNEY:  Jackie, did you at the

19    time that you were given a letter of warning and

20    then subsequently placed on probation and offered

21    the opportunity to seek professional help, did

22    you --

23          DR. MARES:  I did.

24          DR. BARNEY:  -- understand what the

25    professional help options were for you and that

1  that would be arranged for you and you weren't

2  going to -- you weren't going to be financially

3  burdened by this opportunity or something else

4  getting in the way of you seeking that?

5          DR. MARES:  No, I wouldn't say that I

6  was fully aware of that.  You know, I got this

7  warning letter obviously that you guys saw that

8  said, you know, meet monthly with Dr. McKenna,

9  which I did every month, and frequently more times

10 than that.

11         And to meet regularly with Dr.

12 Galloway, who then transitioned to Dr. Talbot,

13 which I also did, and it recommended that I go to

14 see a physician, which I also did.

15         And I see that that letter isn't in

16 here, but I have a letter from the physician that

17 I saw, but I can easily get a copy of, but I did

18 go and see a physician when it was recommended to

19 me.

20         And, yes, people would always be like

21 we have counseling available to you, but that was

22 it.  And I think for a while I didn't think that

23 counseling would be helpful to me.  I didn't feel

24 like I had a problem.

25         You know, I felt like there was just

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 128 of 204 PAGEID #: 439
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

104

1    a lot of extenuating circumstances, a lot of

2    people weren't understanding, and part of that's

3    true and part of that's probably not true, but,

4    no, I don't think I understood kind of maybe

5    everything that they were trying to offer.

6                    DR. BARNEY:  Did you feel that you

7    had the opportunity to seek help from an advocate

8    early on in your residency, an attending, a senior

9    resident that -- that could speak on your behalf

10   when there were questions?  Or did you feel you

11   had to be appointed an official mentor to have a

12   mentor?

13                   DR. MARES:  I think I just didn't

14   know.  I think I came into the second year and

15   just tried to do what they told me to do.

16                   As a second year, you don't really

17   have a relationship with attendings or with other

18   people besides your co-residents, so I didn't feel

19   comfortable going to any of them and that I didn't

20   know them.  I didn't know anything about them.

21   It felt awkward to me be, like, hey, do you want

22   to be my mentor.

23                   And then in terms of chief residents,

24   I guess I never really thought of them in that

25   way, you know, since I was a chief resident, I

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 129 of 204 PAGEID #: 440
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

105

1   didn't see myself going that way, but at the time

2   I didn't appreciate that.

3                  (Thereupon, the court reporter

4   interrupted the proceedings.)

5                  DR. YAKLIC:  I asked her did she meet

6   with Dr. Galloway, our program director, on a

7   regular basis.  Because I believe the intent was

8   that he was functioning as your mentor as you

9   transferred into second.

10                 DR. MARES:  I think I met with him

11  every three to six months.

12                 DR. YAKLIC:  Formally?

13                 DR. MARES:  Right, formally for my

14  feedback on clinical competency committee and what

15  they thought.

16                 DR. POZNANSKI:  Throughout several of

17  these comments that I've read and that have been

18  shared, there have been many comments that

19  patients come first and that you've been a big

20  patient advocate, and what has struck me of late

21  that appears to be different is the subject of

22  patient abandonment, and you were one of the ones

23  who took care of those patients and recusing

24  yourself from those.  I'm hoping to get some

25  clarification as to why that was the chosen

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 130 of 204 PAGEID #: 441
Due process Hearing In Re: Jackie Mares, M.D.          Hearing November 7, 2018

106

1  action.

2           DR. MARES:  Sure.  So in the first

3  instance with the patient in triage, I came in

4  late that day, we were working strange hours,

5  because we had all of our chief class, aside from

6  myself and another one, out at the Air Force

7  district meeting.  So one of us was covering it.

8  So one of us were covering days for quite a few

9  days while they were gone.

10           I came in Saturday night.  I received

11  checkout from the chief who was on, and I saw the

12  patient was in triage, and I asked, you know, new

13  or old, do you know anything about her?

14           And the chief on at that time wasn't

15  familiar with her.  So I asked the under level

16  resident to conditionally take care of triage

17  patients.

18           In this case it was a term patient,

19  so they're seen first by an intern and then

20  they're managed by the third year.  And then in

21  terms of admission or discharge, it's run through

22  the chief resident and then the attending.

23           So I was aware that the patient had

24  already been there for six hours by the time that

25  I arrived, and they had already kind of done their

107

1   workup.  They had done initial treatment.  They

2   explained to me kind of all of her course, and,

3   you know, I agreed that they had kind of done

4   their due diligence.

5              They had, you know, safely ruled out

6   major things like abruption, et cetera.  And that

7   they had given her Tylenol and that she had slept

8   for several hours in triage.

9              So I said, okay, staying or going,

10  and they said that, you know, they felt that since

11  they gave her Tylenol and she slept for several

12  hours, that she was a candidate for discharge

13  home, and I agreed and then spoke with the

14  attending, who so happened to be Dr. Talbot, and

15  he also agreed the plan was to send the patient

16  home.

17             The first year went and spoke with

18  the patient, as is what is usually done at our

19  program, and then he elicited the help of the

20  third year because he felt like he wasn't able to

21  get through to this patient and their family.

22             And then I was called by the third

23  year who said that the patient asked to go over

24  the chain of command, and that they were asking to

25  speak with me.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 132 of 204  PAGEID #: 443
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

108

1            So I went and spoke to the mother,

2    too, because I was asked to.  I did not personally

3    evaluate the patient myself, I mean, obviously she

4    was in the room, but I went up to speak to the

5    mother because I was asked to do that.

6            DR. POZNANSKI:  Is it customary to --

7    as a third year to evaluate the patients?

8            THE WITNESS:  No.  We just receive

9    phone calls from them.  I mean, we're a part of

10   their care, but we're already a part of their --

11           DR. YAKLIC:  Jackie, as a third year,

12   aren't you responsible for overseeing everything

13   that occurs on your service?

14           DR. MARES:  Right.

15           DR. YAKLIC:  If there's a question

16   from the care being performed by any of your

17   junior residents, aren't you responsible for

18   overseeing what's occurring?

19           DR. MARES:  So let me rephrase that.

20   I felt as if you were asking is it typical for me

21   to oversee, as in go to the bedside and personally

22   evaluate.

23           DR. YAKLIC:  And that's my point.  If

24   there's a question about the evaluation that's

25   been performed by one of your junior residents,

1   the buck stops with the chief.

2               DR. MARES:  I agree.

3               DR. YAKLIC:  Right?  You are

4   responsible for overseeing all care, and if that

5   means reevaluating a patient, that is what you

6   would expect to occur, right?

7               DR. MARES:  Correct.  And what I'm

8   saying is that I did not have a problem with the

9   assessment that my team, myself or the attending

10  had made.

11              So when I saw her, I'm sure we spoke

12  with the mother, and I did not reassess the

13  patient.  And at that point, the mother was

14  already very angry, and at that point in the

15  conversation she was literally standing so close

16  to my face that I couldn't even look her in both

17  eyes at once.  I could only look at one eye.

18              And she was very aggressive, and it

19  became clear to me, even through trying to explain

20  calmly, you know, what our thoughts were like, you

21  know, when she came in with pain and we needed to

22  appreciate that, but she improved with Tylenol,

23  and we feel like we could give her Tylenol or

24  other antiemetics and she can go home with that,

25  and obviously come back if there's a problem.  We

110

1   felt comfortable going home.

2            The reference to, you know, how much

3   it costs, like I did make a reference later to,

4   you know, the cost of staying overnight, saying

5   that, you know, it's not absolutely free and you

6   would get the same medications, but that wasn't

7   like a point of you have to go home or it's going

8   to cost you thirteen thousand dollars.

9            And then ultimately the conclusion

10  that we came to was that they felt comfortable

11  with the Tylenol and how it had helped her pain.

12  They didn't feel comfortable going home until they

13  had already tried the oral medications that they

14  were going to be sent home with.

15           So the decision before Dr. Talbot

16  even came into the room was that the patient would

17  stay and receive oral medications.  And I had

18  spoken with the nurse about the orals, and I was

19  pretty much done with that encounter.

20           Then the attending walked in and

21  announced their plan, and obviously whatever they

22  want to do is whatever we do, and that's what we

23  did.

24           So, you know, I went to my first and

25  third year, I said, you know, transition over

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 135 of 204 PAGEID #: 446
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

111

1  to -- I spoke with the nurse to kind of make sure

2  we had tried that medication on her, you know, in

3  terms of how the patient is doing.

4            So the nurse very diligently

5  documented about every hour to every two hours, is

6  the patient sleeping, no concerns, things like

7  that.  Just making sure that we had all of our

8  documentation on board because I knew that it was

9  a very difficult patient.

10            And then in the morning, the first

11  year and third year had seen her again, and,

12  again, all agreed.  The nurse said the patient

13  pretty much slept through the night and that she

14  was fine to go home.  And so that was the plan

15  that was presented to the attending.

16            I received a call later that morning

17  that -- from Dr. Kindig that, you know, she wanted

18  me to come and talk, you know, with the family

19  about this patient's course of care.

20            And I said that I didn't feel like I

21  was the best person to do that because, you know,

22  the last time I had seen the patient, we had come

23  up with a plan, we were comfortable with that plan

24  and then the plan changed.

25            And so I kind of felt like I had been

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 136 of 204 PAGEID #: 447
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

112

1  made, and I didn't have the trust of the patient

2  anymore, and it seemed strange to them to be the

3  one to go back in there and try to convince them

4  of something else now.

5           So I offered her the next most senior

6  resident, my third year, who then continued in the

7  care with Dr. Kindig regarding that patient, and I

8  didn't hear anything else about that patient.

9           Dr. Kindig didn't speak to me again

10 about her.  She never said that she had a problem

11 with how I sent the third year instead of going to

12 see her myself.

13          The only reason I even found out that

14 they were doing a C-section is because I was

15 called by the nurses asking whose gloves, whose

16 cards to pull, and I said, well, I wouldn't pull

17 mine because I didn't even know this was

18 happening, so I assumed I wasn't part of this.

19          And I was never asked to be part of

20 the surgery by Dr. Kindig, by the third year, by

21 anybody.  And then that was it.

22          That's all I ever heard of this

23 situation until I was fired, and then more of it

24 came to light and then I was told actually by the

25 third year that the family had complained.  I

1  didn't even know about that either.

2              So that's the one situation, and how

3  I felt in that situation.  I appreciate that I

4  probably could have continued to go with that

5  family, but at that time, I felt like I had other

6  competent residents who could do that, and I just

7  felt like I just didn't have any credibility left

8  with that family after the nights -- after the

9  preceding events the night before.  So that was

10  the one situation.

11              The second situation with the

12  gallstone pancreatitis, I was present and pretty

13  much, more or less, responsible for her care for

14  the entire week that she was with us.

15              We had admitted her back on a Monday

16  and her surgery wasn't until the next weekend, so

17  many, many days later.

18              I had taken that responsibility

19  largely from the junior residents because we were

20  having a lot of difficulties, as is normal with

21  anybody just kind of getting ahold of the

22  different consultant teams.  It was taking up a

23  lot of her time.  I could see it was very

24  stressful to her, and we had a very busy service

25  otherwise.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 138 of 204 PAGEID #: 449
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

114

```
 1              So I was the main person responsible

 2   for kind of coordinating all of the care, all of

 3   the consultants, and with everything that

 4   happened, we had a very difficult time getting in

 5   touch with surgery on a regular basis,

 6   communicating with surgery, kind of knowing what

 7   the plans were, which was very uncomfortable for

 8   everybody involved.

 9              You know, from our team as the

10   primary care team trying to tell the patient

11   what's going on, and we had very little idea.

12   That was very stressful.

13              You know, the patient, even though

14   she didn't speak English, you know, her husband

15   spoke perfect English, when he was more than once,

16   you know, up at the nurse's station being like

17   what you are doing, what are you doing, my wife is

18   dying, you're not doing anything.  You know, is

19   she going to die, all of these things.

20              And she had been booked for surgery

21   two or three times and the surgery had never

22   happened.  And sometimes -- I mean, it's not that

23   there was a very good excuse.  There was always,

24   you know, something else going on.

25              So the first time she was booked, she
```

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 139 of 204 PAGEID #: 450
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

115

1  was booked as an add on.  They ran too late.  They

2  couldn't get her done.  It happens all the time.

3  It happens to us on a regular basis all the time.

4  So she was scheduled for the next day.

5              So the next day there was a sign out

6  and it said okay, today's the day, you know,

7  everybody's on board.  She's finally getting her

8  surgery.  We expect improvement.  And then that

9  also didn't happen.

10             From my understanding -- and I only

11  found this out actually speaking with our GI

12  consultant, because, again, I was, myself and

13  other members on the team, unable to get ahold of

14  surgery.

15             But we found out that GI had

16  basically kind of cut them off at the knees as we

17  were giving the patient Vaxzane (phonetic), no,

18  no, no, she needs an ERCP.

19             So the GI consultant called me and

20  said, yes, you know, we stopped her surgery, we're

21  initiating ERCP.  The plan is for her -- to get

22  her ERCP, stay under sedation, be transferred over

23  and then continue the surgery as previously

24  scheduled, and so I was like, okay, fine.

25             And then it was much to my chagrin

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 140 of 204 PAGEID #: 451
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

116

1  when I found her back in her room around about an

2  hour later with no surgery and no idea why she

3  didn't have that surgery.

4              And that is when I called the general

5  surgery resident, and after about two hours, I was

6  finally able to get ahold of him, and I flew off

7  the handle.  It was inappropriate and

8  unacceptable, but I just felt like nobody was

9  paying attention to that patient and she was very,

10  very sick and nobody was taking the time to then

11  explain to anybody as part of her primary team,

12  let alone the patient herself or her husband why

13  things weren't going as we told them that they

14  were going to go.

15              And so after that outburst, I

16  apologized to the chief resident, I think the

17  attending was also there, also the other people

18  involved.

19              I called Dr. Glover, who was the MFM

20  on that day, who generally takes care of these

21  patients with us, and I told her that I had lost

22  my cool and that I felt like it would be best if I

23  stepped away in terms of direct communication.

24              So I did.  And then I told, you know,

25  my resident team what happened and I apologized to

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 141 of 204 PAGEID #: 452
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

117

1  them that they were likely going to have a harder

2  time trying to kind of get things done because of

3  what I had done.

4         Obviously I was still involved in her

5  care and I was still taking calls on her, but I

6  asked my junior residents to take up that role

7  again of communicating with the other teams

8  because it felt unprofessional in my mind for me

9  to continue to do that.  So that was that patient.

10        So essentially that was a Friday and

11 I wasn't on call that weekend.  So that was just

12 kind of the natural end to my involvement with

13 that patient.

14        DR. POZNANSKI:  I need to interrupt

15 you just a minute.  If you were to complete the

16 program and become an acting clinician and you, I

17 think your words, lose your cool, who's going to

18 take care of the patient then?

19        DR. MARES:  I appreciate that nobody

20 else could do that.  Well, sometimes somebody can,

21 but likely that responsibility will not be there

22 and I won't always have co-residents who can do

23 those things and pick up my slack, so I do

24 appreciate that.

25        DR. POZNANSKI:  Okay.

118

1          DR. PAINTER:  Other questions for Dr.

2    Mares?

3          DR. POZNANSKI:  I would like you to

4    elaborate on the patient whose mother was being

5    held off campus for trespass after yielding a

6    knife.  I think that would be helpful for you to

7    cover that for us to better understand it, because

8    that was another accusatory thing.

9          DR. MARES:  Right.  So with that

10   patient, I was the chief covering OB days.

11   There's only one chief on consult because that

12   program is a little short.

13          And I was vaguely familiar with the

14   patient because she was admitted the day prior,

15   and I had also been getting updates through the

16   night chief about kind of what her status had

17   been.

18          Her obstetrical course had always

19   been, you know, more or less, truly unremarkable,

20   but she had multiple, for lack of a better word,

21   just kind of, you know, mental health issues that

22   were providing barriers to her care.

23          I was told by nursing staff that they

24   felt very uncomfortable taking care of her.  We

25   had nurses who were, you know, crying at the

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 143 of 204  PAGEID #: 454
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

119

1   bedside dealing with this patient and who had

2   been, you know, kind of removed from that case.

3           She had been -- my junior residents

4   had been working well with her, so she was a term

5   patient.  Again, the responsibility of my first

6   and third year.  The first year was not involved

7   in her care.  I'm not even sure why that was, but

8   she was being followed by the second year and the

9   third year, who both knew her and both had a

10  relationship with her.

11          And then I came in the next morning

12  and I also received kind of a very quick sign out

13  from the night chief before we went to our sign

14  out about the events that had unfolded that night.

15          The patient had become increasingly

16  combative, both verbally and physically.  She had

17  threatened to multiple members of the staff,

18  including, you know, my co-chief and nurses that

19  she was planning on breaking the neck of the

20  intern who was taking care of her that night if

21  she ever came back in that room.

22          So the intern was taken off of that

23  case.  And that at one point in the night the

24  patient's mother had come in with a knife to the

25  hospital premises and was removed by security.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 144 of 204 PAGEID #: 455
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

120

1          So it seemed very clear to me that

2   not only were they making a lot of these threats,

3   but they also had some intention on carrying

4   through some of these threats.

5          So when the patient was presented at

6   our sign out, I said I don't feel comfortable

7   taking part in this C-section.

8          You know, I've never met this patient

9   face to face.  She has a well-established

10  relationship with both my second and third year,

11  who are both perfectly competent of doing a

12  primary Cesarean section for a non-emergent

13  reason.

14          I don't recall ever using expletives,

15  although that is what Dr. Yaklic said.  So if I

16  did, I am sorry.  That was not my intention.

17          My intention was just to say that I

18  didn't feel comfortable doing that, because in the

19  research that I've done about these patients, I

20  actually did my grand rounds on dealing with

21  peripartum mood disorders.

22          Dealing with a psychotic patient is

23  actually an entire chapter in obstetrical books

24  under obstetrical emergencies.

25          And the number one thing that it says

1  is to keep them in situations and with people that

2  they feel comfortable with.  So I felt that going

3  in there as a person that didn't know them,

4  that -- you know, I had no face value with them,

5  it felt unnecessary and almost wrong, when

6  literally the people sitting next to me are the

7  second and third year who were taking care of her

8  the day before and who had already established a

9  relationship with them, and who, from my asking

10 them, still felt comfortable participating in her

11 care, because I did ask and I told them what

12 happened that night.  I said do you still feel

13 comfortable participating in her care, and they

14 said yes.

15              And so that was the plan.  It was a

16 Tuesday or Thursday morning, so our baseline chief

17 is generally not on the floor for Cesarean

18 sections, except in emergency situations because

19 they're supposed to be done in our high risk

20 clinic.

21              So that surgery and generally any

22 non-urgent Cesarean section is generally performed

23 by the second year who is running the entire board

24 that morning, as it were, and then the attending.

25              And so I believe that's what

122

1   happened, although I don't know.  And, again, this

2   situation was also never discussed with me until I

3   was being fired for it.

4               So I just wish that if people had

5   such a level of concern about how I acted, that

6   they would have spoken with me, and I appreciate

7   that I haven't made it easy for other people to

8   approach me, but I still think that they should

9   probably have tried, because in my mind,

10  unfortunately, we have patients like this every

11  day, and some of them, you know, like I walk in,

12  you know, everything goes well, you know, I'm

13  going to get past it.

14              And in other situations like this, it

15  can be more difficult, but I still have all of

16  these other patients to care for, and so I move

17  on.  You know, I acknowledge the situation

18  happened.  I think about what happened.  I try to

19  make steps that I can do to make sure that

20  something like that doesn't happen again, and then

21  I just move on with my day, and then I'm never

22  told about it until it's clearly already bubbled

23  over to a head.

24              DR. YAKLIC:  Can I stop you for one

25  second?  It was the 21st, it was a Friday, it

 1  wasn't a Thursday.

 2              DR. MARES:  Okay.

 3              DR. YAKLIC:  You -- if you would have

 4  handled it in the call night, it wouldn't have

 5  been an incident, but you didn't.  You emotionally

 6  blew up.  Insisted you were not caring for the

 7  patient.

 8              You didn't talk with the junior

 9  residents.  Your junior resident wasn't involved

10  in the case, other than the intern who had not

11  submitted.

12              It wasn't like you sat there and said

13  do you have a relationship with these patients, I

14  need you, why won't you take care of it?  That

15  wasn't what you did, Jackie.  You blew up and you

16  refused to care for her.

17              DR. MARES:  The second year --

18              DR. YAKLIC:  That is a different

19  situation.

20              DR. MARES:  And as you're saying,

21  yes, I agree, but the second year and third year

22  were sitting next to me who took care of her the

23  day before and who knew that patient.

24              DR. YAKLIC:  She wasn't -- but the

25  point is you're saying you didn't have a

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 148 of 204 PAGEID #: 459
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

124

1   relationship with the patient, that's why you

2   didn't want to care for her?  Your point was you

3   did have a relationship with the patient and her

4   mother had been threatening you.  So you're

5   contradicting your own reason for not wanting to

6   speak with her.

7                  DR. MARES:  No, I didn't say that.

8   The patient was never threatening to me.  This was

9   something that happened overnight with a different

10  team and I was --

11                 DR. YAKLIC:  But you had cared for

12  the patient the day before.  You had been involved

13  in her care.

14                 DR. MARES:  I was the chief on call

15  the day before.  I never formally met her.  I

16  was --

17                 DR. YAKLIC:  You had a relationship

18  with her.

19                 (Thereupon, the court reporter

20  interrupted the proceedings.)

21                 DR. YAKLIC:  You had a relationship

22  with her.

23                 DR. PAINTER:  Just one at a time.

24                 DR. TALBOT:  Can I say one thing as

25  well about the -- a couple of the accusations

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 149 of 204 PAGEID #: 460
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

125

1  about that this was never talked to me until I was

2  fired?

3            I talked to Dr. Mares on the floor.

4  I sent her a text.  I said I need to meet with you

5  today, it's very important, and I reviewed it,

6  what I had been given by the CCC.

7            It was not like I was intending the

8  CCC -- I knew this was coming from the CCC.  This

9  did catch me a little bit by surprise, not

10  completely, but the overwhelming urgency of it.

11            So I brought Dr. Mares into my office

12  with my coordinator, and there is my account from

13  that on the 4th and her account.  Dr. -- or Ty

14  Gebhard, her summary as -- as she witnessed the

15  same conversation.

16            I had said at that point that I am

17  doing my due diligence.  I am unbiased.  I'm

18  trying to get all information I can to help me

19  make this decision.

20            And that's when she said, well, this

21  decision has already been made kind of thing.

22  It's all in there from -- in her file from that --

23  this day.

24            And so I don't think that's fair that

25  this was never discussed until she was fired.  I

 1   think, if anything, this was just another example

 2   of an unprofessional response to I'm throwing you

 3   this lifeline.

 4              If you want to finish, you want to

 5   get this -- through this year, you tell me all

 6   of the -- all of what you told today.  This was

 7   not the Jackie that I get.

 8              And so maybe I'm not the same person

 9   as Dr. Croom or Dr. Glover that can learn -- know

10   her on that same level, but I can certainly

11   advocate for her, as I did at the start of when I

12   became -- when it was clear I was going to become

13   the program director.

14              And I said on the 5th when -- that is

15   when I had made the decision, and that is when Dr.

16   Yaklic met when I -- and I said that again to her.

17   I said I really felt I gave you a fresh start and

18   a clean slate.

19              So I think that is a little bit

20   unfair statement about this that nobody talked to

21   me until I was fired.

22              DR. CROOM:  Can I comment on one

23   thing?  I agree with you, the actual firing did

24   not take place until that meeting you just

25   described, and I think that was on a Friday, if

 1   I'm not mistaken.

 2                  DR. TALBOT:  Right.

 3                  DR. CROOM:  I got a call Wednesday

 4   afternoon from Dave McKenna who told me the

 5   decision of the committee.  I had no idea they

 6   were meeting, I had no input into that, and I was

 7   told by Dave McKenna, I think it's important if

 8   you call Ted, okay?

 9                  I tried to reach you that day and

10   wasn't able to.  I was out of town the next day,

11   but we touched base --

12                  DR. TALBOT:  We touched base twice.

13                  DR. CROOM:  Yeah, on Friday.

14                  DR. TALBOT:  On Friday we touched

15   base and also I believe late in the day on

16   Thursday.  You wanted to know when I was off

17   seeing patients and when I was there.

18                  DR. CROOM:  Right.  And I can tell

19   you the feeling that I had, based on what Dave

20   said, and the way I was almost begging you to give

21   her some sort of second chance, I had the feeling

22   that it was a decision already made.  I mean, that

23   was the impression I had from that conversation,

24   okay?

25                  I knew that officially you could

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 152 of 204 PAGEID #: 463
Due process Hearing In Re: Jackie Mares, M.D.                Hearing November 7, 2018

128

 1  disagree with the -- the committee, and you told

 2  me that, but you also shared with me that you

 3  really were put under some pressure.  You were

 4  told by some of the committee, are you going to

 5  follow through with our recommendation?  Are we

 6  going to continue to behave like we have in the

 7  past?

 8              And so I felt you were -- you were

 9  put under some -- what I thought was very unfair

10  pressure by some of the committee members, and I

11  just had the feeling that it was kind of a done

12  deal, and I'm not Jackie, I haven't experienced

13  what Jackie has felt, but the fact that she walked

14  in there and felt that way, you know, I'm not

15  surprised by that.

16              DR. YAKLIC:  The CCC clearly had made

17  a recommendation.  Their decision was made.

18              DR. CROOM.  Right.

19              DR. YAKLIC:  And it was sent to the

20  program director.

21              DR. CROOM:  Correct.

22              DR. YAKLIC:  I know that at least

23  twice during that time period, we also spoke with

24  Dr. Painter and others in school administration to

25  discuss the options.  It was not a done deal.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 153 of 204 PAGEID #: 464
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

129

1          And Ted really was looking for her to

2   say, I understand.  He didn't get it.  He got a

3   refusal to even speak.  Three times account of

4   their meeting.  There was a third party sitting

5   there.  She refused to speak.

6          She was given the opportunity to --

7   for that input, and, unfortunately, reacted in the

8   way she always reacts to these stressful,

9   difficult situations.

10          DR. POZNANSKI:  Jackie, could you --

11          DR. YAKLIC:  She turned around and

12   stormed out.

13          (Thereupon, the court reporter

14   interrupted the proceedings.)

15          DR. POZNANSKI:  I asked Jackie if she

16   could comment on that meeting in terms of her

17   response.

18          DR. MARES:  I knew going into the

19   meeting that it wasn't going to be a good one,

20   because as Dr. Talbot had mentioned, he just

21   texted me in the middle of my working day on

22   Thursday like we need to meet.

23          Unfortunately, there weren't a lot of

24   cases scheduled that day, so I said fine, and we

25   set up a time and we went over there, and Ty was

1   there, and Ty is -- I don't know what her title

2   is.  I think she's like a residency coordinator,

3   but in each of the situations previously with my

4   warning, my probation, the residency coordinator,

5   who was not previously Ty, but nobody's been

6   there.

7                  So I knew walking into it that it was

8   something bad, just by the fact that she was

9   there, and previously when I met with Dr. Talbot

10  or other people, you know, nobody else would be

11  there.

12                 So I did feel very offensive by that,

13  and he started out by just talking about the

14  clinical competency committee, and like I already

15  knew it was something bad, and so I didn't know

16  why he was like rambling on about this clinical

17  competency committee.  It didn't like mean

18  anything to me, and I wasn't really listening to

19  what he was saying.

20                 I wanted him to just say what he had

21  clearly called me in to say.  And then he told me,

22  and I did feel very like taken aback, because the

23  last time I had met with Dr. Talbot, the decision

24  was that I was doing better, I was coming off of

25  probation, I was going to be able to work, you

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 155 of 204 PAGEID #: 466
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

131

1  know, abroad during my rotation, and obviously I

2  knew that these other situations had happened,

3  but, again, nobody had approached me about them

4  otherwise, and so I didn't really have like a

5  major cause for concern that that was exactly what

6  was going on.

7              And I became very irritated, because

8  it just -- to me, it just felt like it was coming

9  out of nowhere.

10             Like the last meeting that we had

11 had, I was coming off of probation.

12             DR. GLOVER:  At the very end of

13 August?

14             DR. MARES:  Right.  So, yeah, that's

15 how I felt.  And I remember trying to -- like he

16 didn't even ask what I thought had happened in

17 those situations.  He just told me what, you know,

18 the accounts were.

19             So like the e-mail from Dr. Kindig.

20 He told me that, you know, Dr. Yaklic had a

21 problem with that thing.

22             And I said it seems very clear to me

23 that you've already made up your mind, you know,

24 and like you never even asked me what I thought

25 or, you know, what my perspective was in those

132

1   situations.  And he said that, you know, clearly

2   there were just so many situations and that like I

3   was the common denominator, so there was a

4   problem.

5            And like my perspective on what

6   happened wasn't overly relevant because it still

7   happened and it was still a problem.

8            So I didn't really feel like sharing.

9   So I left and I asked to leave and I then texted

10  Dr. Talbot, I don't know, maybe about 15 minutes

11  later and said sorry, for just kind of leaving

12  that way.

13           He had mentioned that he wanted me to

14  go to a meeting with all of these people that I

15  didn't know, and I said I want to go to that

16  meeting, I just don't want to go today.  And he

17  said fine, and that we'd find a time to meet on

18  Friday.

19           So I returned to, you know, the

20  things I was doing on Thursday, and, you know, I

21  did my duties and things on Friday until that

22  meeting, at which point I thought we were going to

23  talk about options that I had, because Dr. Talbot

24  had mentioned that there were options, but instead

25  I was just dismissed from the program.  So that's

1   my recount of what happened.  I can't speak for

2   obviously what they thought happened, but that's

3   my perspective.

4                   DR. BARNEY:  Help me understand.  In

5   August you said you met and you were told you were

6   coming off of probation?

7                   DR. MARES:  (Witness nodding head up

8   and down.)

9                   DR. BARNEY:  Like effective what date

10  you would be off of probation?

11                  DR. MARES:  They said by December --

12                  DR. YAKLIC:  (Inaudible.)

13                  DR. MARES:  They said by the end of

14  the year.

15                  (Thereupon, the court reporter

16  interrupted the proceedings.)

17                  DR. PAINTER:  Hold on.

18                  DR. TALBOT:  Well, there's an August

19  29th --

20                  (Thereupon, the court reporter

21  interrupted the proceedings.)

22                  DR. PAINTER:  One at a time.  We

23  understand your challenge here.

24                  DR. BARNEY:  So I'm just seeking

25  clarification as to your understanding of what

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 158 of 204 PAGEID #: 469
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

134

1  happened in August regarding your probation

2  status.

3              DR. POZNANSKI:  I'll just add -- I'll

4  add onto that question, it was your interpretation

5  that you were coming off of probation.  Was it

6  your interpretation that that was a set deal or

7  did you have certain things that you had to

8  complete in order to make that happen?

9              DR. GLOVER:  If she can pull that up,

10 it's described in the letter.

11             DR. POZNANSKI:  I understand.  I've

12 seen it in one of the previous documents.  I want

13 to know what your interpretation was.

14             DR. MARES:  I wasn't told that there

15 was anything else specifically that I had to do

16 between now and then.  I was just told that they

17 were going to be taking me off of probation by the

18 end of the year, like in December, and I said

19 okay.

20             I didn't -- in retrospect, I should

21 have asked, you know, why December, what's

22 supposed to happen between now and then?  But I

23 didn't.  I just said okay and that was it.

24             DR. BARNEY:  Was there a letter?

25             DR. TALBOT:  There is a letter.

135

1              (Thereupon, several people in the
2    room were having a discussion.)
3              DR. BARNEY:  Is it in the resident
4    file or is this the other file?
5              DR. TALBOT:  It's in the resident
6    file.
7              DR. BARNEY:  The other question,
8    while we're hunting for that, Dr. Mares, is maybe
9    I don't completely understand how the service
10   works on OB-GYN, but my understanding from being
11   an educator in a teaching service is that in team
12   care, the attending is always -- the buck stops at
13   the attending, and ideally you're in a training
14   environment, so the attending is the responsible
15   person.  Is that not the way it happens on OB-GYN?
16   Every patient has an attending assigned to them.
17             DR. MARES:  Right.
18             DR. BARNEY:  So there's some
19   attending's name on the chart who ultimately, if
20   there's a conflict or a question, some interaction
21   with the attending would be the last step in a
22   problem?
23             DR. MARES:  Correct.
24             DR. BARNEY:  So did you have -- in
25   these experiences, did you have a sense that you

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 160 of 204 PAGEID #: 471
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

136

1  were not able to talk to the attendings when there

2  were issues where you felt like I'm -- I shouldn't

3  be involved in this case anymore, I should talk to

4  my attending and just say, hey, this is -- you

5  know, this is going south and I think for

6  everybody's benefit, I should step back and let

7  these other residents be involved?  Is that not a

8  process that normally happens?

9            DR. MARES:  I -- I'm not sure I can

10  really answer your question.  I think from, you

11  know, me and like what you're referencing to, you

12  know, like I usually did tell my attending when

13  these things happened.

14            So, I mean, I told Dr. Glover about

15  the one case, and it was absolutely my intention

16  to speak with Dr. Talbot about the other case,

17  although that just wasn't necessary because of how

18  that panned out.

19            We do take a very authoritative

20  role, I guess, as a chief resident.  They're

21  viewed as our patients, and the attending is

22  always there, but the -- they're there in an

23  observer role.  Like you call them and you tell

24  them what the plan is, and that's that

25  expectation.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 161 of 204 PAGEID #: 472
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

137

1              So, I mean, it wasn't a surprise to
2    me that, you know, as they were initiating the
3    chain, that they called me first before calling
4    somebody else.  That is how things are done in our
5    program, and I think that we would all say that we
6    feel the need to be ready and have things done,
7    you know, so that by the time we go to the
8    attendings --
9              DR. BARNEY:  Okay.
10             DR. YAKLIC:  I will say I think our
11   service is a little bit different than surgery.
12   The patient is really your patient.  The residents
13   are involved in our service, especially our OB
14   staff service and emergency staff service.
15             It's the -- we consider that the
16   chief section.  We're rotating on their service,
17   they're not rotating on our service, so you're
18   always going to have that attending as your backup
19   person, but there is always an attending.
20             I mean, we consider to be practicing
21   like the ACGME says.  Independently under
22   supervision.  There's always supervision.  There's
23   always that person there to ask, but the
24   expectation is they should take ownership of their
25   patient.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 162 of 204 PAGEID #: 473
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

138

1          It is just like a private practice,

2  and, you know, and they're treated as if

3  they're -- you're the chief.  And the expectation

4  is they should really be caring for that patient.

5  And as an attending, you don't refuse to continue

6  caring for your patient.

7          I think that's the challenge.  And if

8  you do get to that situation, you need to discuss

9  it in a professional manner.

10          DR. GLOVER:  May I make a comment as

11  Jackie's advisor?  As an attending physician, and

12  this is my practice, when I have a resident who's

13  having a meltdown or telling me they're

14  uncomfortable, I try to understand what they're

15  trying to tell me.

16          I hope that when Jackie told you that

17  she was uncomfortable dealing with a patient who's

18  acutely psychotic, for good --

19          (Thereupon, Dr. Yaklic interrupted

20  the proceedings.)

21          (Thereupon, the court reporter

22  interrupted the proceedings.)

23          DR. GLOVER:  -- for good clinical

24  explanation for the patient's benefit, but I hope

25  you also inquired about the team's safety.  How do

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 163 of 204 PAGEID #: 474
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

139

1  you feel?  Is anyone physically threatened?

2              Because I know you've never been the

3  small woman in the room, Jerry, you haven't.

4              And there's a reason I got myself

5  physically beat on two to three times a week for

6  several years to get a black belt so I could

7  physically be more capable in this place.

8              So I hope, I hope that -- despite our

9  greatest frustrations of a resident who we're

10 perceiving as belligerent and emotional, I hope

11 we're still thinking about their safety.

12             DR. YAKLIC:  And I'm not referring to

13 that case in particular.

14             DR. GLOVER:  I am.

15             DR. YAKLIC:  Okay?  That's fine.  In

16 that situation, I would have been more than happy

17 to have that discussion with the chief resident

18 because --

19             DR. GLOVER:  But did you initiate

20 it?

21             DR. PAINTER:  One at a time.

22             DR. GLOVER:  Sorry.  Sorry.

23             DR. YAKLIC:  Because she flew off the

24 handle, was acting unprofessional, and at that

25 point, in all honesty, my feeling was -- and I

140

1   wish I would have brought a bigger attention to it

2   sitting here now.  I've said that to Ted three

3   times; however, at that time, to make a bigger

4   deal of it would have been to point out the

5   unprofessionalism either further to the junior

6   residents, nurses and others in the room.

7                  It -- it caught me completely by

8   surprise.  It was a completely by surprise

9   approach.  I -- there's not a resident in this

10  program that will tell you at any given time, you

11  tell me, will you please do this C-section for me,

12  the answer is always yes.

13                 It drives you crazy pacing around

14  with your hands behind your back because you're

15  not doing the surgery.  I'm always happy to help

16  out in any situation, whether it's because

17  someone's uncomfortable caring for this particular

18  patient, it's going to be a particularly difficult

19  case, the service is overflowing and busy.

20                 That wasn't the response.  It had

21  nothing to do with her not caring for that

22  patient.  It was the unprofessional nature in

23  which she dismissively (sic) said, I'm not dealing

24  with this, and basically stormed off.  That was

25  the problem.

1           And even when I relayed that message

2   to Ted, I mean, fortunately I had surgery that

3   afternoon, I was leaving town for vacation, I was

4   looking for a private moment to talk to Jackie

5   about it and it never came up, unfortunately,

6   before I left.

7           But I did call Ted and relayed it to

8   him, and even when I said it, I'm like, you know,

9   I know she's on probation, I don't personally

10  think this is a big enough issue to change

11  anything, but you need to be made aware of it,

12  okay?

13          No, that -- I -- that episode in

14  isolation would not have been anything that would

15  have prompted dismissal, okay?

16          DR. POZNANSKI:  Do you happen to know

17  who the residents or junior residents were that

18  were on that particular case?

19          DR. YAKLIC:  Yeah, you know who it

20  was.  Who were your residents?

21          DR. MARES:  Dr. Brant, Dr. Paulette,

22  Dr. Hancox and Dr. Candeaa.

23          DR. POZNANSKI:  And when you say the

24  second and third year were comfortable doing

25  that --

142

1          DR. MARES:  That was Dr. Paulette and

2    Dr. Durrant.  And I would also just like to say

3    that I truly, from my perspective, don't feel that

4    I was acting completely irrational in saying I

5    didn't feel comfortable doing that.

6          I also did not feel like I was flying

7    off the handle.  I said that I didn't feel

8    comfortable doing it, and you said nothing, and we

9    moved on and finished sign out.  I didn't abruptly

10   leave.

11         We continued with patient care, as we

12   always do, and then I went on with my business as

13   I always do.

14         DR. GLOVER:  This patient and her

15   family were so difficult.  It did not stop with

16   this case.  Her younger sister, who is a minor,

17   soon thereafter had a scheduled elective

18   C-section.

19         I was the attending on that day, and

20   there was the whole thing again with the mom who

21   had been -- who had trespassed and bearing the

22   knife and she was acting out for campus police

23   that day, and I had the father there, and he

24   wouldn't consent to his minor daughter having the

25   surgery, and I was supposed to supervise, unless

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 167 of 204 PAGEID #: 478
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

143

 1   his wife could be there.

 2              And it this whole -- we spent the

 3   whole morning, just the whole morning, delaying

 4   the surgery because I couldn't get consent because

 5   this family was being so disruptive to the point

 6   where I said, maybe we should just reschedule

 7   this, it's not going well.  This is how difficult

 8   they were.

 9              DR. TALBOT:  Just one more --

10              DR. PAINTER:  We're going to get

11   kicked out of here at noon and we can go across

12   the room if we need to.

13              DR. TALBOT:  No, that's the only

14   question about probation.  It says in there we

15   discussed her coming off probation in the next

16   three months if she continues to progress as she

17   has been.

18              And then on the bottom it is, we'll

19   continue to meet monthly regarding her progress.

20   It is my plan if she continues to show

21   improvement, she will be taken off probation by

22   the middle of December, the reasons why and if I

23   could help her in any way.

24              So it was contingent on that we

25   continued to see improvement, and the CCC, when

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 168 of 204 PAGEID #: 479
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

144

1  they met again, these issues were discussed.

2  There was -- there's also several other residents

3  that are discussed.  So there -- we spent at least

4  a half an hour or more on Dr. Mares, and a lot of

5  the conversation did address these issues, but not

6  with every one did they say, well, what's her side

7  of the story to justify this.

8              There was a continual pattern of

9  unprofessional behavior such that they deemed that

10 she would not come off of probation.  That was the

11 take home message from all this.

12             DR. CROOM:  Ted, I mean --

13             DR. TALBOT:  The minutes are there,

14 too.  I'm sorry.

15             DR. CROOM:  No, no, no, what I'm

16 saying is, the questions that this panel has asked

17 are primarily what was Dr. Mares' side of the

18 story, and I think it would have been helpful if

19 the CCC had had some input prior to making that

20 decision.  That was never done.

21             DR. YAKLIC:  Are you suggesting that

22 you think she should have been allowed to come and

23 talk to the CCC?

24             DR. CROOM:  No, no, someone should

25 have presented that for her.  Her mentor or

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 169 of 204 PAGEID #: 480
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

145

1  someone should have presented that.

2             DR. YAKLIC:  Dave was her former

3  mentor.

4             DR. CROOM:  That's not what I said.

5  Someone should have presented her side and it was

6  never presented.  I mean, that's not her fault.

7             DR. TALBOT:  Well, we're getting her

8  side today.  It wasn't --

9             DR. CROOM:  Well, I understand that.

10            DR. TALBOT:  It wasn't --

11            (Thereupon, the court reporter

12  interrupted the proceedings.)

13            DR. BARNEY:  One at a time.

14            DR. PAINTER:  One at a time.

15            DR. TALBOT:  I think we tried to ask

16  for that, the attendings that were involved and

17  approached her and never could get it.  We're

18  getting today much more than we ever did.  So

19  they --

20            DR. POZNANSKI:  Why do you think that

21  is?  I mean, you made a comment earlier that this

22  is not the Jackie you had before.

23            DR. YAKLIC:  Well, the first time I

24  heard Jackie say --

25            DR. POZNANSKI:  What's changed?

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 170 of 204 PAGEID #: 481
Due process Hearing In Re: Jackie Mares, M.D.                                    Hearing November 7, 2018

146

1    DR. YAKLIC:  The first time I heard

2  Jackie say she needed to finish this program and

3  cared about finishing this program was the day she

4  got her dismissal letter.  I mean, I guess I'll

5  ask the question, you know, rhetorically to Jackie

6  and she can answer if she'd like.

7    When she was given a formal letter of

8  warning and then put on probation, did she not

9  seriously feel that she was at risk of not

10  completing the program enough to change her

11  behavior and make that full effort.

12    You said you seeked -- sought

13  counseling since being dismissed.  Did you

14  consider doing it prior to that?  Did you realize

15  your behavior was a problem?

16    You were told on numerous occasions

17  in all those letters that you were risking

18  dismissal from the program.  Why didn't you care

19  about it?  I mean, I really wish -- I want to

20  know.  Why didn't you care about it until you were

21  dismissed?

22    Because I -- we -- I personally asked

23  you, mentioned in the hall a couple times

24  informally, and said you really need to graduate.

25  You really need to sit for your Boards.  You

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 171 of 204 PAGEID #: 482
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

147

1  really need to be a Board certified OB-GYN even if

2  you choose to walk away after that.

3            I wanted you to succeed and I wanted

4  you to care enough to succeed, and you didn't

5  until we dismissed you, and I wish you would have

6  done something earlier.

7            And I did speak to you on several

8  occasions, and I'm sorry if I didn't do it enough.

9            I agree with Melanie, we failed you

10  okay?  But you failed us, too.  We asked you to

11  improve and you didn't do it.  You didn't take it

12  seriously until you were dismissed.

13            DR. POZNANSKI:  I would like to hear

14  Jackie's response to that.

15            DR. MARES:  I -- I personally always

16  felt very dedicated to this program, and I think

17  that you'll see that in the letters that, you

18  know, my co-residents wrote on my behalf, and

19  regardless of what I plan to do afterwards, I

20  always planned on, you know, putting in 100

21  percent to finish this program and to do it to the

22  best of my ability.

23            And I know that I -- I knew that I

24  needed, you know, to continue to grow and improve

25  in a lot of areas, and I feel like I made

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 172 of 204 PAGEID #: 483
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

148

1    concerted steps in the best way that I knew how to

2    do that.

3              I did seek counseling earlier in my

4    third year, which I did not think was relevant to

5    previously disclose you, but I didn't do that

6    because I did appreciate the gravity of the

7    situation, but at that point in time, it just -- I

8    kind of felt just so broken down that it didn't

9    really matter like what else I did.

10             I was just going to continuously

11   disappoint everybody.  So I just tried to, you

12   know, go through each day with each thing that was

13   presented, and, you know, as I continued to do

14   that, my perspective changed and I found something

15   that I became very passionate about that ideally I

16   would like to pursue, you know, if I were to

17   graduate, but I just felt like I couldn't ever

18   truly talk to somebody about, you know, why I

19   wasn't going to like take my Boards or why I

20   wasn't going to practice.

21             I don't feel like people really

22   asked, and if they did, it was to ask me like, you

23   know, how are you doing today; fine.  You know,

24   like, so why aren't you, you know -- like, oh,

25   like talking to me across the OR table like so why

1   aren't you taking your Boards?  I'm not going to

2   talk to you across the OR table about, you know,

3   why I'm not taking my Boards, so, yeah, I just --

4   that's why.

5                   DR. POZNANSKI:  It seems to me that

6   you've been a big patient advocate and that you

7   enjoy clinical care.  Why aren't you taking your

8   Boards?  What is the decision to step away from

9   that going forward?

10                  DR. MARES:  So from my perspective,

11  you know, I was a problem resident.  I had a

12  warning letter.  I was on probation.  I clearly

13  wasn't performing to the standards of my residency

14  program.  I didn't feel like anybody would hire

15  me.  I wouldn't hire me.

16                  So I felt like it would probably be

17  better if I just tried to find something else to

18  do.  That's why.

19                  DR. POZNANSKI:  Do you want to be a

20  clinician?

21                  DR. MARES:  Yes, I do.

22                  DR. GLOVER:  Why don't you offer to

23  them a patient population that has really drawn

24  your affection that you were alluding to wanting

25  to take care of other patients?

150

1          DR. MARES:  We are in the opioid

2   capital of the United States and we deal with a

3   lot of addicted mothers and addicted women in

4   general, and our program has taken a specific

5   interest in helping these women, and the residents

6   have been invited into that care, and I just -- it

7   was like the one patient population that I work

8   with where I know a lot of other people don't

9   enjoy working in that setting, but it's just -- I

10  didn't feel like it was work.

11          It didn't feel hard.  It felt really

12  easy, and, so, you know, I'd like to continue

13  working with them theoretically in substance abuse

14  and disorders, and I was recently told that there

15  was even a fellowship in addiction, which I didn't

16  know about until a few months ago.  So, yeah.

17          DR. CROOM:  Jackie is working with me

18  in my clinic for opioid addicted moms, and you

19  know, I was never asked about this reoccurring

20  thing about her not taking the Boards.

21          My conversation made it very clear,

22  Jackie, in order to do a fellowship in addiction

23  medicine, you have to be Boarded.  And my

24  understanding, the conversations we had, was that

25  was the direction she was headed in, to get

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 175 of 204 PAGEID #: 486
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

151

1    Boarded in OB-GYN, but she would be practicing

2    addiction medicine.  To get into a fellowship, you

3    have to be Boarded, and I never got the

4    opportunity to share any of that.

5              The other thing I want to make -- I

6    mean, Jerry, it -- it -- I was glad that you

7    shared that you thought we failed Jackie.

8              DR. YAKLIC:  We did.

9              DR. CROOM:  Because, I mean,

10   Melanie's compelling.  I mean, you know, I didn't

11   realize the depths until I got to know Jackie

12   fairly well, but not to the degree of everything

13   that she shared with us and the big picture that

14   we all missed, and the fact that we both played a

15   part in this, I find it disturbing that only one

16   person is receiving consequences from that.

17             DR. YAKLIC:  Nobody -- the program

18   does not take pleasure in discharging a resident,

19   okay?  And anybody who feels that the program

20   director and the chair being here at this

21   proceeding instead of interviewing next year's

22   incoming interns and that doesn't have a

23   consequence for the program, I think that's an

24   unfair statement, okay?

25             But this -- this was a very difficult

1  decision for Ted taking over as the new PD.  This

2  was a very difficult decision for the faculty.

3  This was a very difficult decision for the

4  clinical competency committee.

5           You know, I'll talk about additional

6  consequences.  You know, we had several other

7  residents.  One of them is a former grad, so it's

8  not all current residents.

9           I can tell you at least one of the

10  residents who wrote a letter and another one of

11  the chiefs were in my office with that other chief

12  crying because they were coerced, they felt, to

13  write letters on her behalf by you.

14           I'm not saying that the letters that

15  were written weren't intentional or weren't

16  indicative of what their feelings for Jackie are,

17  there's clearly support, but it damages -- this

18  just clearly damages our program.

19           Nobody -- the easy thing to do would

20  have been to graduate Jackie, and that's

21  unfortunately in some cases in the past what we've

22  done, but our prior mistakes don't make future

23  mistakes correct either, okay?

24           I've heard from several people, we've

25  graduated worse residents.  You know, I don't say

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 177 of 204 PAGEID #: 488
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

153

1    I'm going to agree or disagree, but that doesn't

2    mean we should continue to do that.

3                    We are trying to improve this

4    program.  Trying to improve our standards.  I made

5    efforts.  You know, I -- too many jobs.  I haven't

6    been around clinically as much as I would like to

7    recently.

8                    I clearly feel we failed Jackie, I

9    really do, but, you know, you can't help somebody

10   who isn't willing to help themselves, and we've

11   offered on many occasions the opportunity to help.

12                   I can tell you personally, several

13   residents in our program that have had depression

14   and other issues that have asked me, how do I get

15   a confidential counseling?  Military residents,

16   how do I do this without the military finding out?

17                   We found people for them.  I can't

18   help you if you don't ask me to help you.

19                   And, I mean, to Melanie's point, you

20   know, well, maybe we should have mandated a

21   psychiatric evaluation.

22                   Would that have been less damaging to

23   somebody's career than seeking confidential

24   counseling?  I -- I don't think that anybody ever

25   felt that there was a psychiatric condition.

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 178 of 204  PAGEID #: 489
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

154

1            DR. GLOVER:  Jerry, I never said

2    that.

3            DR. YAKLIC:  Yeah, you did, because I

4    wrote it down when you said it.

5            DR. GLOVER:  I did not say mandates.

6            DR. TALBOT:  Dr. Croom said that to

7    me in the phone calls, and I have that in my --

8            DR. CROOM:  I asked is that something

9    that could be mandated.

10            DR. TALBOT:  You can't.  Well, no, it

11    can't because I've got here -- this is from

12    residents remediation, probation and dismissal.

13    It's in the pathology letter, and it says, medical

14    or mental health issues that affect resident

15    performance are also grounds for remediation,

16    probation or dismissal.

17            A resident cannot be forced to seek

18    counseling or therapy, and the program director

19    should not attempt to diagnose the perceived

20    medical or mental issue for the resident or insist

21    that a resident seek specific care; however, the

22    program can expect that the resident take any

23    necessary steps to address medical or mental

24    health issues and produce a fit for duty letter.

25            This was done at the letter of

155

1   warning.  It was done again at the five day

2   absences the month later.  It was done on formal

3   probation and it was done with my initial April

4   letter.

5             So I don't know more what -- like

6   he said, what more we could do on that aspect.

7             DR. GLOVER:  You could have gotten to

8   know her and understood how lonely she was and how

9   self-deprecating she was every time her failures

10  were pointed out to her and how --

11            DR. YAKLIC:  I don't know how we

12  force someone to allow us to get to know them.

13            DR. GLOVER:  You can't force it.

14            DR. YAKLIC:  I guess that's --

15            DR. GLOVER:  You have to foster an

16  environment in which they allow themselves to be

17  known.

18            DR. YAKLIC:  All I'll say is in the

19  last three years in the time that Jackie's been

20  here, my door has always been open, and many other

21  residents have come in.  Several of them have

22  asked for help in obtaining counseling and other

23  things.

24            Again, I'm not claiming I'm perfect,

25  and we all go through periods of growth, but I

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 180 of 204 PAGEID #: 491
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

156

 1  don't know what else I could have done.

 2          DR. GLOVER:  It's -- please, just

 3  what I'm trying to say is it's very different to

 4  ask for help under the circumstance of your own

 5  volition.  It's --

 6          DR. YAKLIC:  Okay.  I understand

 7  that.  Melanie, did you identify that there was --

 8  you have a close relationship.  You knew that

 9  there were these concerns.  Did you bring them to

10  myself, Dr. Talbot, Dr. Galloway?

11          DR. GLOVER:  I developed my

12  relationship with Jackie in the --

13          DR. YAKLIC:  Did you advise her to

14  come and talk to one of us?

15          DR. GLOVER:  So she --

16          (Thereupon, the court reporter

17  interrupted the proceedings.)

18          DR. PAINTER:  Hold on.

19          DR. YAKLIC:  Prior?

20          DR. GLOVER:  I did not know her that

21  way.  I did not know -- I did not know she was on

22  probation.  I don't know what I don't know.

23          DR. POZNANSKI:  When did you get

24  involved?

25          DR. GLOVER:  After she was fired, I

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 181 of 204 PAGEID #: 492
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

157

1  was asked to be her advisor.  Up until that point,

2  my relationship with Jackie has purely been from

3  our academic and clinical interactions together,

4  with lectures, she's delivered my patients.  I've

5  covered the board on labor and deliver.

6            DR. BARNEY:  Just for a point of

7  clarification, I'm not sure that -- that voluntary

8  faculty are apprised of -- of a resident's

9  probation status because of concerns of

10 influencing -- I mean, unless there's --

11            DR. YAKLIC:  It's a violation of --

12            DR. BARNEY:  Yeah, I was going to

13 say, I don't know that that is common that people

14 know for the residents' safety in allowing them a

15 fair shake by individual evaluators.

16            DR. YAKLIC:  Unless they need to

17 know.

18            DR. PAINTER:  We can have one or two

19 more questions.  I think we're going to have to

20 adjourn to another room, and the court reporter

21 who seems to have developed a cramped hand.

22            DR. CROOM:  I just want to make one

23 point.  I -- if I implied that there were no

24 consequences to you in the program, I'm in error,

25 because I appreciate what you said.  I'm

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 182 of 204 PAGEID #: 493
Due process Hearing In Re: Jackie Mares, M.D.                                    Hearing November 7, 2018

158

 1  talking -- I should have the gravity of the

 2  consequences, okay?

 3              DR. YAKLIC:  And I would still state,

 4  we've just missed an entire end of the day, and I

 5  think that's pretty significant.

 6              DR. CROOM:  We go on with our lives.

 7  The next group of residents --

 8              DR. YAKLIC:  Well, hopefully we do a

 9  better job.

10              DR. PAINTER:  Other questions or the

11  last questions?

12              DR. POZNANSKI:  If you were to be

13  given another opportunity, do you think you'd be

14  ready to graduate in six months or when you're

15  supposed to graduate, and if not, what --

16  regardless, do you think you'd be ready to

17  graduate, and then what do you think you need

18  to be able to be ready to graduate in how much

19  time?

20              DR. MARES:  I think I would be ready

21  to graduate.  I don't believe that I lack in

22  clinical or surgical deficiencies.  So more to do

23  with my personality and my attitude.

24              So I don't know what can help

25  this.  Counseling has been helpful.  So I guess

159

1  continuing with that, I'm open to suggestions, but

2  that's about all I can think of.

3              DR. PAINTER:  Does anyone have any

4  other questions?

5              DR. GLOVER:  I don't have any other

6  questions.

7              DR. POZNANSKI:  At one point you also

8  said I was atrocious to medical students, and you

9  admitted that why?

10             DR. MARES:  I think that it's been

11 made very clear I had a difficult time

12 transitioning into this program, and to terribly

13 use the whole proverb, shit runs downhill.

14             Melanie was very clear.  I was

15 getting it from one end and I delivered it then to

16 my medical students that were under my charge, and

17 I know that that wasn't right and I have made

18 significant strides in that area.

19             It's not just a lack of the negative

20 comments, there have been positive comments that

21 have been shared with me, so I feel like in that

22 area, I have made significant growth.

23             I think I maybe even corrected that

24 problem.

25             DR. YAKLIC:  Just one other thing.  I

1  mean, Melanie made the point about when Jackie

2  came in, she was behind clinically and surgically.

3  And it was recognized, and it's something I know.

4                  I interviewed her and Dr. Galloway

5  interviewed her, and we talked extensively about

6  it was a concern that she was coming to this

7  program.

8                  We talked with Jackie about the fact

9  that that would be a challenge and something she

10  would have to do.  Melanie suggested, well, we

11  should have done some special rotation or

12  something.

13                  Our residents scrub every privacy

14  section.  This was an identified problem before

15  Jackie joined.  We knew it was going to be a

16  challenge.  Jackie knew it was going to be a

17  challenge.

18                  Again, hindsight is 20/20, but short

19  of sending her someplace else, I don't know what

20  we could have done to give her an opportunity to

21  do more surgery that wasn't taken away from

22  somebody else.

23                  This situation of you had to steal

24  them from your junior residents to get more cases

25  was unavoidable.  That was part of the challenge

Case: 3:20-cv-00453-MJN Doc #: 31-5 Filed: 12/22/21 Page: 185 of 204 PAGEID #: 496
Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

161

 1  of coming here.

 2             We've had other residents in similar

 3  situations that have come and been successful.

 4             We identified that it was going to be

 5  a concern moving forward.  It wasn't like we

 6  ignored that fact.

 7             I -- again, you know, the only

 8  alternative would have been not to accept Jackie

 9  in the program in the first place, and I don't

10  know that that would have been fair to Jackie

11  either.

12             DR. POZNANSKI:  Why did you leave the

13  other program?

14             DR. MARES:  I was in a preliminary

15  position.

16             DR. YAKLIC:  Well, we -- we had an

17  opening and she had a need and we -- yeah, we knew

18  there would be challenges.  I'm not saying we

19  didn't, but in all honesty objectively, the only

20  alternative would have been not accept her.

21             DR. PAINTER:  Going once.  Going

22  twice.  Where are we going before we're going to

23  get kicked out of here in --

24             DR. BARNEY:  So I have a question.

25  Is the panel discussion done or is this group

162

1    going to be --

2                   DR. PAINTER:  Dismissed?

3                   DR. BARNEY:  -- dismissed, right.

4                   DR. PAINTER:  So the court reporter

5    is dismissed.

6                   (Thereupon, the hearing was concluded

7    at 11:39 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

163

1  STATE OF OHIO)

2  COUNTY OF MONTGOMERY)   SS:   CERTIFICATE

3          I, Barbara A. Nikolai, a Notary Public

4  within and for the State of Ohio, duly

5  commissioned and qualified,

6          DO HEREBY CERTIFY that the above-named

7  proceeding was reduced to writing by me

8  stenographically in the presence of the parties

9  and thereafter reduced to typewriting.

10          I FURTHER CERTIFY that I am not a relative

11  or Attorney of either party nor in any manner

12  interested in the event of this action.

13          IN WITNESS WHEREOF, I have hereunto set my

14  hand and seal of office at Dayton, Ohio, on this

15  10th day of December, 2018.

16

17          _Barbara A. Nikolai_

18          BARBARA A. NIKOLAI
            NOTARY PUBLIC, STATE OF OHIO
19          My commission expires 12-13-2018

20

21

22

23

24

25

**1**

**100** 147:20
**11** 11:20
**12** 11:20 12:23
**13** 7:24
**14** 7:24
**15** 132:10
**15th** 92:14
**16th** 61:5,15
**18** 8:17 9:14
**18th** 88:7
**19** 61:15,18 65:5

**2**

**2007** 4:23 5:24
**2008** 7:23 9:14
**2012** 4:21
**2014** 4:13
**2016** 4:14
**2017** 5:6 6:23 88:7 92:14
**2018** 4:14 75:10 92:15
**20th** 11:19
**21st** 98:16 122:25
**22nd** 98:20
**23rd** 16:1
**24** 56:21
**25** 6:24
**29th** 13:17 133:19

**3**

**30** 5:4
**31st** 75:10 98:22
**36** 5:5
**360** 41:3
**37** 5:4
**38** 16:4 49:8
**3rd** 20:7

**4**

**4th** 97:24 125:13

**5**

**50** 56:19

**5th** 97:25 126:14

**7**

**7:47** 88:7

**8**

**80** 35:25 36:1,6,12
**8th** 7:23 92:15 98:1,7

**9**

**9th** 98:15

**A**

**a.m.** 16:2 39:12
**aback** 130:22
**abandonment** 105:22
**abdomen** 17:6
**ability** 6:16 47:13 53:14
    54:1,10 64:16 65:7 147:22
**abnormal** 17:22
**abroad** 131:1
**abruption** 17:20 49:4,8,
    16,17 50:19 93:6 107:6
**abruptly** 142:9
**absence** 6:12 30:6
**absences** 155:2
**absolutely** 78:18 101:9
    110:5 136:15
**abuse** 7:4 86:15 150:13
**academic** 3:11
**acceptable** 16:17 23:21
**accepted** 48:10
**access** 7:20
**accomplish** 37:19
**account** 16:24 51:20 87:3
    93:1,9,13,20,22 94:8 95:17
    96:9,12 98:5,13,18 125:12,
    13 129:3
**accounts** 19:12 58:17
    131:18
**accusations** 98:5 124:25
**accusatory** 118:8
**accuse** 96:14
**accused** 62:22
**accusing** 50:14
**ACGME** 24:1 35:24
    137:21

**acknowledge** 78:10
    122:17
**acted** 10:15 122:5
**acting** 23:16 61:3 117:16
    139:24 142:4,22
**action** 45:18 106:1
**actions** 18:9
**actively** 38:10
**activities** 100:7
**actual** 61:16 81:5 126:23
**acutely** 138:18
**add** 76:1 96:2 98:12
    100:21 115:1 134:3,4
**added** 69:14
**addicted** 150:3,18
**addiction** 150:15,22
    151:2
**addition** 6:12 82:20 87:23
**additional** 32:11 152:5
**address** 29:21 81:22 88:8
    144:5 154:23
**addressed** 25:21,23
    29:15 56:5
**addressing** 51:9 56:11
**adequate** 28:12
**adjective** 15:11,12
**administration** 128:24
**admission** 106:21
**admissions** 76:22 77:9
**admit** 19:17
**admitted** 21:13 48:9 64:5
    67:10 113:15 118:14
**admittedly** 63:25
**admitting** 25:14
**adult** 55:3
**advance** 69:3 97:9
**advanced** 68:10
**advancing** 5:19
**advise** 156:13
**advises** 4:16
**advising** 21:5
**advisor** 21:4 61:3 90:16,
    17 138:11
**advocate** 28:2 75:25
    104:7 105:20 126:11 149:6
**advocated** 8:25 13:15
    16:16 21:13 25:14 72:20
**affect** 22:7 23:9 35:21
    45:2 154:14

**affecting** 6:16
**affection** 149:24
**affects** 36:19 64:11
**affiliated** 4:20
**affirmed** 63:21
**Africa** 12:13
**afternoon** 6:11 127:4
    141:3
**afterward** 39:17
**aggressive** 47:8 109:18
**agree** 31:19 49:20 97:2
    109:2 123:21 126:23 147:9
    153:1
**agreed** 107:3,13,15
    111:12
**ahold** 113:21 115:13
    116:6
**Air** 5:7 8:5 74:2 88:18
    106:6
**allowed** 29:21 31:9 64:2
    90:11 144:22
**allowing** 96:2
**alluding** 149:24
**alternative** 47:21 48:3
**amount** 52:6
**and/or** 82:4
**anecdotally** 40:16
**anger** 12:8 35:16 75:22
    84:4
**angry** 109:14
**announced** 110:21
**answering** 12:25
**answers** 21:9
**anticipate** 80:6
**anticipating** 35:17
**antiemetics** 109:24
**anxiety** 35:12
**anymore** 68:15 112:2
    136:3
**anytime** 101:23
**AO** 14:22
**apologize** 71:22 73:16
    78:3 87:22
**apologized** 14:12 39:20
    116:16,25
**apology** 78:11
**apparent** 86:1 102:2
**apparently** 88:12
**appeal** 2:12

appeals 99:1

appears 50:16 105:21

appendi 14:2

appendicitis 14:2

appointed 104:11

approach 122:8 140:9

approached 29:24 74:25 131:3 145:17

appropriately 3:18 83:5 94:15 95:22 98:11

approximately 85:16

April 11:19,21 155:3

area 55:6,11

areas 5:11 29:5 147:25

argue 41:1 50:3 97:3

argued 18:4

arguing 33:23

arranged 103:1

arrived 106:25

article 80:14 81:24 83:6 84:2

articles 80:5

aspect 155:6

assessment 44:4 94:16 109:9

assign 90:9

assigned 10:8 90:1,7 91:13,15,22 100:13 135:16

assist 6:14

assistance 6:19,20 67:12

assumed 112:18

atrocious 101:7

attempt 90:8 154:19

attempted 6:8

attempting 12:4

attending 10:1 14:6 25:6 30:13 48:25 49:12,13 61:13 62:8 71:2,6,21 76:3 77:18 81:21 86:1 87:16 95:6,16 104:8 106:22 107:14 109:9 110:20 111:15 116:17 121:24 135:12,13,14,16,21 136:4, 12,21 137:18,19 138:5,11 142:19

attending's 51:9 71:14 135:19

attendings 10:6 20:18 21:15 22:10 70:19 93:8 104:17 136:1 137:3 145:16

attendings' 11:2

attention 14:8 116:9 140:1

attest 83:18

attitude 8:7 10:15 18:7

August 13:4,17 29:19 39:10 59:11 75:10 131:13 133:5,18 134:1

author 81:7

authoritative 136:19

avail 34:10

aware 7:21 13:24 16:2 24:24 26:3 31:21 34:13 42:3 92:4,8 100:14 103:6 106:23 141:11

awkward 104:21

---

**B**

babies 73:4 77:2

baby 16:19 50:20 77:3

back 4:23 12:19 16:24 29:11 32:15 35:1 39:16,24 42:5,11 43:7,12 44:18,22 46:8,9 47:24 50:3 60:13 93:5 95:12 109:25 112:3 113:15 116:1 119:21 136:6 140:14

background 74:21

backup 19:2 137:18

bad 34:3 57:9 130:8,15

ballot 33:1

banter 44:18

Barhan 6:25 57:18 89:20, 21 96:23 97:14

Barhan's 96:22

BARNEY 34:10,22 38:21, 25 39:5 41:24 59:17,23 85:4,6,13 88:15,19,25 89:5,9,12 90:8 91:21,24 102:18,24 104:6 133:4,9, 24 134:24 135:3,7,18,24 137:9 145:13

barriers 8:23 83:6 118:22

Bartlett 89:22

base 5:7,25 8:5 29:25 46:22 62:15 74:2 88:18 89:19 92:21 127:11,12,15

based 5:12 50:24 53:25 59:15 127:19

baseline 121:16

basically 11:21 13:1 19:22 29:4 115:16 140:24

basis 24:7 105:7 114:5

115:3

bat 13:8 45:16,22

batch 13:12

bearing 142:21

beat 65:3 139:5

beautiful 73:5

bed 95:21

bedside 55:8 95:1,12,15 108:21 119:1

beg 86:21 96:12

began 43:12

begging 127:20

begin 2:1 3:19

beginning 11:25

begs 36:16

begun 77:7

behalf 28:2 39:21 79:14 100:22 104:9 147:18 152:13

behave 128:6

behavior 7:6 14:11,19 22:13,18,19 23:18 26:19 27:6 29:14 37:17,23 52:17 60:8 71:14 74:14 75:20 77:25 97:20 144:9 146:11, 15

behaviors 47:10

Belcastro 19:21 25:1 52:4 96:18,23

believed 18:25

belligerent 139:10

belt 68:17 139:6

Bembry 74:7,8,12,21

benchmarks 99:22

benefit 136:6 138:24

berate 97:18

berated 39:10

big 27:12 65:1 81:4 105:19 141:10 149:6 151:13

bigger 140:1,3

biggest 24:18

birth 77:13

bit 4:24 39:24 63:5 85:19 125:9 126:19 137:11

bitchy 58:15

black 139:6

blame 76:6 86:24

blatant 44:5

blatantly 11:4

bleeding 6:2 50:19

blew 123:6,15

blind 23:11 102:4

blow 71:16

blue 73:21 76:15

board 111:8 115:7 121:23 147:1

Boarded 150:23 151:1,3

Boards 35:20,23 36:1,19 83:17 146:25 148:19 149:1,3,8 150:20

boiled 76:4

bombastic 74:13

bonding 63:15

bonds 65:4

booked 114:20,25 115:1

books 120:23

bottom 5:14 77:20 143:18

bought 73:18

box 38:14

Brant 141:21

break 60:17,19,21,23 72:3

breaking 70:9 119:19

breathe 64:3

Brenda 7:1

briefly 5:24

bright 86:11

bring 4:2 17:8 156:9

broken 62:2 71:25 148:8

brought 14:7 39:14 40:16 48:11 93:2 99:1 125:11 140:1

bubbled 122:22

buck 109:1 135:12

bump 69:4

burdened 103:3

burned 81:13,18

burnout 72:5 80:7,10,13, 15,17 81:3,8

business 12:12

busy 113:24 140:19

butted 72:22

---

**C**

C-SECTION 15:4,14,20 24:20 39:12 112:14 120:7 140:11 142:18

**calendar** 12:18

**call** 14:6 16:1 17:13 55:6 64:16 76:7 95:11 111:16 117:11 123:4 124:14 127:3,8 136:23 141:7

**called** 10:19 13:5 14:3 17:7 76:5 107:22 112:15 115:19 116:4,19 130:21 137:3

**calling** 137:3

**calls** 94:5 108:9 117:5 154:7

**calmly** 12:24 39:22 109:20

**campus** 118:5 142:22

**Candeaa** 141:22

**candidate** 107:12

**capable** 139:7

**capital** 150:2

**cardinal** 80:16

**cards** 73:7 112:16

**care** 5:11 8:8,24 14:14,18 15:19 18:18,21,24 19:25 20:10,22 21:20,24 22:7 25:11 52:1,10 53:25 54:2 94:20 95:8 105:23 106:16 108:10,16 109:4 111:19 112:7 113:13 114:2,10 116:20 117:5,18 118:22,24 119:7,20 121:7,11,13 122:16 123:14,16,22 124:2,13 135:12 142:11 146:18,20 147:4 149:7,25 150:6 154:21

**cared** 74:1 124:11 146:3

**career** 66:21 153:23

**caring** 123:6 138:4,6 140:17,21

**carry** 13:2

**carrying** 120:3

**case** 3:8 16:3 24:19 26:4 30:24 31:7 32:6 48:23,24 49:3,23 55:13 62:20 73:23 76:21 93:14 96:5,11 106:18 119:2,23 123:10 136:3,15,16 139:13 140:19 141:18 142:16

**cases** 24:12,13,15 31:15, 22 32:4 38:2 42:18 48:21 65:11 67:20 69:10 93:2 94:10 97:21 129:24 152:21

**catch** 63:18 69:1 70:14 125:9

**caught** 140:7

**CCC** 5:10 20:7 21:1 22:3, 20,21 23:15 24:2,16,18,23 25:1 26:9,12,20 27:23 28:24 29:19 31:12 32:4,7

3:11 41:11 42:14 46:11 53:20 66:17 92:18,22 99:17 125:6,8 128:16 143:25 144:19,23

**center** 52:1,10

**centered** 20:15

**CEO** 3:8

**certificate** 47:17 53:18 54:4

**certified** 147:1

**Cesarean** 17:17,19,20 68:12 120:12 121:17,22

**cetera** 12:8 38:19 68:20 101:18 107:6

**chagrin** 115:25

**chain** 107:24 137:3

**chair** 2:3 4:15 23:15 151:20

**challenge** 83:2 98:23 133:23 138:7

**challenged** 63:7

**challenges** 26:18 61:24 72:13

**chance** 2:21 11:10 65:13 79:13 127:21

**change** 28:18 31:24 37:12,17,22 47:10 57:25 68:14 141:10 146:10

**changed** 21:14,15,19 25:13 68:14 111:24 145:25 148:14

**changing** 47:9

**chapter** 120:23

**charge** 10:2

**charged** 78:1

**chart** 135:19

**checked** 38:14 72:7

**checkout** 8:9 106:11

**chief** 3:11 6:3 14:4,6,13 16:11 17:7 23:6 26:23 28:9 40:23 41:10,13 47:11 85:10,17 86:5,16 87:7,11 104:23,25 106:5,11,14,22 109:1 116:16 118:10,11,16 119:13 121:16 124:14 136:20 137:16 138:3 139:17 152:11

**chief's** 41:2

**chiefs** 85:21 152:11

**choice** 43:23 66:2

**choose** 67:6 147:2

**chosen** 37:3 38:3 105:25

**Chris** 54:23

**chuckled** 12:25

**circumstance** 156:4

**circumstances** 48:15 63:1 67:17 104:1

**citation** 36:3

**cited** 8:8 24:13

**claiming** 155:24

**clarification** 75:6 79:12 92:17 96:2 105:25 133:25

**clarify** 53:23 54:16

**clarifying** 96:5

**clash** 16:15

**class** 41:18 63:16 106:5

**classes** 61:15,17 65:6

**classmate** 86:13

**classmates** 37:6,16 86:6

**clean** 11:24 126:18

**clear** 3:3 11:14 25:14 49:20 50:10 51:11 60:11 75:19 82:21 99:21 109:19 120:1 126:12 131:22 150:21

**clerkship** 6:25 13:12

**clinic** 15:14 38:19 121:20 150:18

**clinical** 4:15,18,23 7:18 18:18 36:18 43:21 46:20 48:23 50:14 51:6 53:12,13 54:16 61:7 77:7 81:5 96:15 97:9 101:18 105:14 130:14,16 138:23 149:7 152:4

**clinically** 49:7 50:11 153:6

**clinician** 53:6,14 117:16 149:20

**close** 77:1 109:15 156:8

**closely** 26:11

**co-chief** 119:18

**co-residents** 10:7 104:18 117:22 147:18

**coach** 30:13

**coaching** 67:16 102:9

**coat** 23:12

**coerced** 152:12

**colleague** 8:11 62:11 83:13

**colleagues** 22:10 65:14 66:1 76:6 83:16

**collect** 29:12

**combative** 119:16

**comfortable** 16:19,22 50:25 53:5 65:24 104:19 110:1,10,12 111:23 120:6, 18 121:2,10,13 141:24 142:5,8

**command** 107:24

**comment** 48:20 50:9 51:9 126:22 129:16 138:10 145:21

**comments** 7:3,7 13:6 19:15 44:2 57:8 101:19 105:17,18

**commitment** 28:14 37:10,22,24

**committed** 28:17,18 37:18

**committee** 4:15,19 34:7 80:9 89:1,8,13 99:1 100:11 101:18 105:14 127:5 128:1,4,10 130:14,17 152:4

**committees** 89:16

**common** 12:6 76:5 132:3

**communicating** 114:6 117:7

**communication** 5:13 20:9 22:5 53:3 102:10 116:23

**community** 66:23

**comparison** 56:24

**compelling** 151:10

**competencies** 5:17

**competency** 4:15,19 42:17 89:1,7 101:18 105:14 130:14,17 152:4

**competent** 113:6 120:11

**complained** 10:21 27:24 112:25

**complaint** 19:6,10 24:25

**complaints** 39:4 52:4 56:16,20,22 58:12

**complement** 23:8

**complete** 8:19 37:23 39:19 42:2 117:15 134:8

**completed** 38:8 61:9

**completely** 63:4,11,18 66:19 68:21 71:8 72:14 97:2 101:7 125:10 135:9 140:7,8 142:4

**completing** 146:10

**completion** 35:20

**complex** 76:2

**complicated** 11:9 68:5 76:20 83:1 95:21

**complicating** 77:5

**component** 9:10 59:8

**concern** 5:11 7:16 8:12
20:13,18 24:23 25:10,18
29:4,8 34:4 37:20 38:20
46:25 47:12 48:22 51:13,
23 53:21,24 54:9 75:14
83:22 122:5 131:5

**concerned** 19:21 23:24
70:12 83:14

**concerns** 5:6 6:15 8:4,7,
17 14:21 18:12 20:9 22:21
48:18,19 60:6 111:6 156:9

**concerted** 148:1

**conclusion** 2:24 3:5 20:6
110:9

**condition** 153:25

**conditionally** 106:16

**conditioning** 81:9

**confide** 66:20

**confidence** 7:17

**confidential** 6:20 153:15,
23

**confidentiality** 83:15

**confirmed** 98:2

**conflict** 6:21 84:5 87:10
135:20

**confront** 84:12

**confrontation** 15:17
87:10

**confronted** 14:9 67:5
78:4

**confused** 79:10

**confusion** 76:6

**connect** 66:25

**connection** 49:14

**consecutive** 61:15 65:6
93:7

**consent** 142:24 143:4

**consequence** 151:23

**consequences** 151:16
152:6

**conservatively** 77:3

**consistent** 45:12

**constitute** 3:1

**constructive** 81:23

**consult** 118:11

**consultant** 113:22
115:12,19

**consultants** 114:3

**consulted** 14:1

**contained** 84:22

**contemplate** 72:12

**contingent** 143:24

**continual** 144:8

**continually** 18:7 27:24

**continuation** 22:16

**continue** 9:5 20:17 21:19
22:18 46:24 70:9 79:16,19
101:21 102:1,10 115:23
117:9 128:6 138:5 143:19
147:24 150:12 153:2

**continued** 9:12,13 16:7
28:3 31:17 45:21 47:12
101:19 112:6 113:4 142:11
143:25 148:13

**continues** 45:25 143:16,
20

**continuously** 148:10

**contracting** 50:20

**contradicting** 124:5

**control** 15:16

**controlling** 35:16

**conversation** 83:19
93:14 96:18 109:15 125:15
127:23 144:5 150:21

**conversations** 21:3
58:11 63:21 150:24

**convince** 70:13 112:3

**convinced** 62:1

**Cook** 39:10

**cool** 116:22 117:17

**coordinating** 114:2

**coordinator** 6:25 125:12
130:2,4

**copies** 73:15

**coping** 64:7

**copy** 73:25 75:12 96:7
103:17

**cord** 17:22

**core** 5:17 55:23

**correct** 44:16 52:20 53:22
54:21 70:4 91:9 109:7
128:21 135:23 152:23

**correctly** 85:15,17 97:23

**correspondence** 85:2
88:21,23

**cost** 110:4,8

**costs** 110:3

**counseling** 7:20,21 19:22
103:21,23 146:13 148:3
153:15,24 154:18 155:22

**counselor** 102:8

**couple** 44:1 80:4 86:7
124:25 146:23

**court** 3:23 30:18 31:25
35:7 90:4 91:10 105:3
124:19 129:13 133:15,20
138:21 145:11 156:16

**cover** 118:7

**covering** 106:7,8 118:10

**coverup** 71:14,22

**crazy** 15:12 140:13

**create** 27:21

**credibility** 113:7

**credit** 96:24

**critical** 45:1 48:25 49:12
69:8

**Croom** 11:4 21:4,5 24:11
26:5,14 29:3,11 30:15,20
31:6,14,21 32:2,25 33:4,7,
14,18 37:25 38:24 43:8,15,
18 44:1,9,16,25 45:7 48:20
49:4 50:5,8,15 51:8,14,17,
21 52:13 53:1 54:17 55:17,
25 56:3,7,13 58:4 89:17,20
90:3 91:7 96:9 126:9,22
127:3,13,18 128:18,21
144:12,15,24 145:4,9
150:17 151:9 154:6,8

**crying** 118:25 152:12

**culturally** 76:20

**culture** 56:4,10

**curious** 40:21 41:20
49:10

**current** 5:19 81:25 152:8

**customary** 108:6

**customer** 44:22

**cut** 115:16

**CV** 82:10,21

**cynicism** 80:25

**D**

**damage** 15:16

**damages** 152:17,18

**damaging** 153:22

**dare** 84:15

**data** 2:5 8:18,22 9:2,4 28:3
70:23

**date** 133:9

**dating** 4:23

**daughter** 142:24

**daughter's** 96:15

**Dave** 31:3,6,11,12,13,16
32:12,13,21 127:4,7,19
145:2

**day** 6:11 8:15 16:3 19:25
21:2 28:3 32:4 46:13 76:3
77:18 98:10 101:20 106:4
115:4,5,6 116:20 118:14
121:8 122:11,21 123:23
124:12,15 125:23 127:9,
10,15 129:21,24 142:19,23
146:3 148:12 155:1

**days** 13:23 64:25 72:7
74:5 98:7,8 106:8,9 113:17
118:10

**Dayton** 49:11

**dead** 73:4

**deal** 25:20 27:12,14 71:15
97:10 128:12,25 134:6
140:4 150:2

**dealing** 58:2 97:5 119:1
120:20,22 138:17 140:23

**deals** 42:7

**dean** 3:7

**death** 19:3

**debate** 20:15

**decades** 93:25

**deceive** 12:7

**December** 133:11 134:18,
21 143:22

**decide** 54:10

**decided** 15:17 17:16 22:1

**decision** 3:10 23:1,9 24:8
32:17,18 36:20,25 40:6
46:22 50:2,7 75:1 82:9
98:4 110:15 125:19,21
126:15 127:5,22 128:17
130:23 144:20 149:8
152:1,2,3

**decision-making** 51:6

**decisions** 66:17

**declined** 7:20 17:10 76:18

**dedicated** 68:21 147:16

**deemed** 14:19 15:3 144:9

**deeply** 74:10

**defaming** 87:16

**defend** 23:10

**defenses** 64:3 66:14

**defensive** 18:10

**deficiencies** 22:5

**deficits** 68:24

**definition** 63:22

**degree** 151:12

**delaying** 143:3

**delegated** 3:9

**deliberation** 42:14

**delicate** 67:25

**deliver** 73:4 77:3

**delivered** 6:6 65:24

**deliveries** 68:12

**delivery** 6:8 9:20,21 10:19 12:11 49:18 64:19 89:22 93:24 94:11

**demands** 81:6

**denied** 101:3

**denominator** 132:3

**deny** 30:23 101:8

**department** 22:11 23:20 31:10 71:7,13

**departure** 48:15

**depersonalization** 80:19

**depersonalized** 80:24

**depression** 72:6 80:7,10 81:25 82:2 153:13

**depths** 151:11

**describe** 81:8

**description** 95:3

**desire** 7:18 36:17 37:2

**detail** 93:15

**detailed** 98:5,18

**details** 98:25

**determination** 45:19

**devastating** 71:5,16

**developed** 64:13 78:9 156:11

**diagnose** 154:19

**diagnosis** 25:15 49:16, 19,21 50:18 51:10 52:18, 20 54:11

**dichotomy** 70:17

**die** 114:19

**differently** 68:25

**difficult** 23:1 25:17 49:21 63:10,14 65:18 66:19 67:14 69:5 70:1 82:3 97:5, 10 111:9 114:4 122:15 129:9 140:18 142:15 143:7 151:25 152:2,3

**difficulties** 27:22 67:3 72:24 87:4 113:20

**difficulty** 35:15

**diligence** 75:8 84:10 107:4 125:17

**diligent** 12:4

**diligently** 47:5 111:4

**direct** 18:10 39:1 60:6,9 116:23

**directed** 15:10

**direction** 45:24 150:25

**directly** 36:25 57:4 66:16

**director** 3:15 4:8,10,12, 13,16,18 11:15 22:25 24:3 28:23,24 42:6 48:17 88:17 99:13 105:6 126:13 128:20 151:20 154:18

**director's** 57:6

**directors** 99:16 100:11

**disagree** 31:19 46:14 128:1 153:1

**disappoint** 148:11

**discharge** 16:17 21:14 49:6 106:21 107:12

**discharged** 16:7 17:2 18:5

**discharging** 16:22 151:18

**disclose** 148:5

**discuss** 2:22 8:3 14:4 30:24 32:6 41:17 67:19 98:25 128:25 138:8

**discussed** 7:16 12:12 13:9 17:23 20:7,12,17,23 21:7 54:19 55:20 66:17 96:4 97:19 122:2 125:25 143:15 144:1,3

**discusses** 97:19

**discussing** 17:16 70:22

**discussion** 19:23 32:12 135:2 139:17

**discussions** 21:6 31:17, 19 41:9 47:18

**dismiss** 2:20 31:17

**dismissal** 22:3,22 26:17 97:25 98:6,19 141:15 146:4,18 154:12,16

**dismissed** 5:20 42:10 132:25 146:13,21 147:5,12

**dismissively** 140:23

**disorders** 120:21 150:14

**disregarded** 11:2 24:4

**disrespected** 10:1

**disrespectful** 9:19 10:6, 11

**disruptive** 143:5

**district** 106:7

**disturbing** 151:15

**diverse** 85:20

**divulge** 84:17

**doctor** 6:3,23 63:23 72:7 73:9

**doctors** 61:4 62:20 82:4

**documentation** 58:5 69:15 71:11 93:19 111:8

**documented** 5:2 96:18 111:5

**documents** 134:12

**dollars** 19:20 110:8

**door** 155:20

**doubt** 95:4

**doubts** 84:18

**downplay** 27:11

**draw** 3:5

**drawn** 149:23

**drive** 82:17

**drives** 140:13

**Drs** 88:23

**due** 75:8 84:10 98:3 107:4 125:17

**dumb** 10:15

**Dunn** 3:7

**Durrant** 142:2

**duties** 61:8 132:21

**duty** 6:17 34:21 154:24

**dying** 114:18

**dynamic** 95:20

---

### E

**e-mail** 8:17 33:13 75:12, 15 85:1 87:18,23 88:13,14 96:8,22 97:16 98:1,21 131:19

**e-mailed** 98:3,11,17,22

**e-mails** 13:20 25:2 84:23 87:21 99:2

**earlier** 22:24 41:12 57:23 79:3 87:15 145:21 147:6 148:3

**early** 104:8

**easier** 47:23

**easily** 103:17

**easy** 61:21 122:7 150:12 152:19

**educate** 82:13

**education** 80:6 81:9

**educational** 74:14 86:19

**educator** 61:13 74:17 135:11

**effective** 133:9

**effectively** 55:16

**efficacy** 80:20

**effort** 62:25 69:22 81:7 100:10 146:11

**efforts** 153:5

**egregiousness** 56:23

**elaborate** 118:4

**elect** 19:18

**elective** 142:17

**elicited** 102:7 107:19

**embarrassed** 10:25

**embellish** 75:15

**emergencies** 120:24

**emergency** 121:18 137:14

**emotional** 83:3 139:10

**emotionally** 78:1 123:5

**emotions** 84:18

**empath** 64:25

**empathetic** 65:1

**emphasis** 58:8

**emphasize** 13:10

**emphasized** 59:7

**employee** 6:19

**employees** 6:21

**EMR** 64:15

**enacting** 22:2

**encounter** 110:19

**encounters** 17:11

**encourage** 36:10 82:8

**encouraged** 35:1,3

**end** 26:22 28:3 76:23 99:7, 8 117:12 131:12 133:13 134:18

**engaging** 100:7

**English** 114:14,15

**enjoy** 149:7 150:9

**enter** 37:4 55:15 63:12

**entire** 9:24 10:25 113:14 120:23 121:23

**entry** 78:12

**environment** 23:19 84:19 135:14 155:16

environments 65:16

episode 141:13

ER 71:2 87:17

era 72:5

ERCP 115:18,21,22

escalate 15:17 16:20 95:7

escalated 19:4 21:24

escalating 19:12 95:2

essentially 117:10

establish 30:22

established 30:23 121:8

establishes 30:21

ethic 12:4 38:1,4,16

evaluate 6:4,5 17:9 38:22
52:16 99:21 108:3,7,22

evaluated 16:20 17:15
18:2 52:2,24

evaluation 6:14 7:8,14
38:23,24 108:24 153:21

evaluations 9:12 13:13
18:6 20:11 41:4 45:6,11,12
46:12 55:24 56:19 66:16
99:17

event 26:2 27:13

events 26:11 41:12 98:24
113:9 119:14

everybody's 115:7 136:6

everyone's 69:8 79:12

examination 17:4 18:3

examples 13:21 39:23
71:19 100:5

exceptional 65:9 94:13

excuse 114:23

excused 21:25

excuses 14:17

executive 3:17

exhausted 2:18 80:21

exhaustion 80:18

expect 82:23 109:6 115:8
154:22

expectation 136:25
137:24 138:3

expectations 70:18

expected 52:1 68:2

expecting 70:20

experience 25:8,25 29:13
42:17 68:17 74:18 80:23
85:21 86:3,5,10,19 97:7

experienced 128:12

experiences 135:25

explain 24:14 93:15
109:19 116:11

explained 107:2

explains 80:16

explanation 138:24

expletives 12:23 120:14

explicit 100:4,15

exploded 14:11

express 72:6

expressed 67:11,24

expressing 47:9 73:8

expressions 12:8

extended 42:15,18

extension 98:14

extent 12:6 22:6

extenuating 104:1

extinguished 82:16

extract 100:10

extraction 9:22

extremely 14:5

eye 23:11 69:8 109:17

eyes 109:17

## F

face 67:5 109:16 120:9
121:4

facilities 83:16

fact 20:15 47:10 49:23
52:7 81:14 128:13 130:8
151:14

factors 54:12

faculty 4:21,23 8:4 15:22
21:18 22:10 23:15,22,24
29:24 30:1 43:7 46:18,23
58:20 62:12,18 69:16 75:7
88:16 99:14 152:2

faculty's 14:7

failed 28:12 62:5 66:24
72:25 81:21 147:9,10
151:7 153:8

failures 155:9

fair 47:25 94:4 125:24

fairly 151:12

fairness 58:17

falsify 93:11

falsifying 96:14

familiar 3:12,13 106:15
118:13

families 95:9

family 17:25 19:5 23:6
37:6 42:12 43:15 51:4,23
63:14 73:25 94:23 95:19,
20 107:21 111:18 112:25
113:5,8 142:15 143:5

fan 41:3

fast 7:13

father 16:18 142:23

fault 145:6

favor 21:1 22:22

fear 22:16 83:11,15,25

feedback 55:11,12 105:14

feel 9:9 16:22 23:16 32:11
35:11 47:18 50:25 61:24
62:5 64:25 65:10 66:11,23
70:17 71:12 72:3,8,13,16,
19,20,21 77:23 81:12,19
84:24 92:25 94:2 97:13
100:8,23 101:12,20 102:6
103:23 104:6,10,18 109:23
110:12 111:20 120:6,18
121:2,12 130:12,22 132:8
137:6 139:1 142:3,5,6,7
146:9 147:25 148:21
149:14 150:10,11 153:8

feeling 66:22 127:19,21
128:11 139:25

feelings 152:16

feels 19:2 64:25 151:19

fell 29:6

fellow 74:6

fellowship 61:10 66:5
150:15,22 151:2

felt 3:16 13:9 16:21 18:22
25:21,23 30:8 31:10 32:17
39:20 49:5 50:18 65:16
94:14 103:25 104:21
107:10,20 108:20 110:1,10
111:25 113:3,5,7 116:8,22
117:8 118:24 121:2,5,10
126:17 128:8,13,14 131:8,
15 136:2 147:16 148:8,17
149:16 150:11 152:12
153:25

female 66:12

fend 63:19

field 28:14 82:24

fifty 68:11

fight 67:6,14

figure 83:23 102:1

file 5:2,5 7:25 8:18 11:20
20:8 48:9 99:15,21 125:22
135:4,6

fill 3:17

filling 4:9

finally 11:1 98:22 115:7
116:6

financially 103:2

find 15:24 65:23 66:18
73:21 74:3 100:7 132:17
149:17 151:15

finding 83:12 153:16

findings 17:23

finds 67:13

fine 8:10 51:5 52:22 79:9
84:16 111:14 115:24
129:24 132:17 139:15
148:23

finish 42:2 126:4 146:2
147:21

finished 79:24 142:9

finishing 28:16 37:14
146:3

fire 82:16

fired 102:7 112:23 122:3
125:2,25 126:21 156:25

firing 126:23

fit 6:17 66:8 87:8 154:24

fitness 34:20

flew 116:6 139:23

flight 67:7,9

flip 62:14

flipping 78:23

flooded 74:4

floor 4:5 64:20 90:20
121:17 125:3

fly 55:9

flying 15:13 142:6

focus 55:2

folder 75:4 76:15 80:3
84:23 98:21

folders 73:21

follow 11:10,11 76:12
98:17 128:5

force 5:7 8:5 74:2 88:18
106:6 155:12,13

forced 154:17

forces 47:20

form 84:23

formal 8:9 19:6 20:23
38:24 39:6 41:4,8 44:3
146:7 155:2

formally 7:9,25 40:7
105:12,13 124:15

formative 71:5

formulated 69:19

forthcoming 63:4

fortunately 13:11 141:2

forward 7:13 23:25 26:1 40:16 46:8,9 149:9

forwarded 88:3

foster 69:6 155:15

fostering 86:17

found 17:20 19:9 26:9 32:4 49:17 63:6 112:13 115:11,15 116:1 148:14 153:17

fourteen 3:15

fourth 55:11

free 110:5

free-spirited 44:23

frequent 60:6

frequently 56:18 103:9

fresh 11:23 126:17

Friday 75:9 117:10 122:25 126:25 127:13,14 132:18, 21

friend 66:6

friends 63:15

front 9:19 27:16 71:2 98:25

frustrated 64:1

frustration 12:8 29:23 35:16

frustrations 12:5 139:9

fucking 71:8,21

full 15:7 18:24 71:2 146:11

fully 4:20 103:6

function 64:5

functioning 3:14 105:8

future 18:21 22:19 45:2 152:22

G

gained 82:23

Galloway 4:10 5:9 6:8,24 7:15 8:1,16 9:25 13:10 44:3 48:9 57:4,24 88:23 89:17,18 90:25 91:19 103:12 105:6 156:10

gallstone 76:23 77:11 113:12

games 94:5

gate 23:4

gather 3:4

gathered 97:6

gave 13:22 93:21 107:11 126:17

Gebhard 125:14

general 19:7 54:20 75:18 116:4 150:4

generally 116:20 121:17, 21,22

genuinely 74:19

get all 71:23 125:18

GI 115:11,15,19

give 11:10 30:6 41:21 45:10 55:12 66:24 73:12 90:14 93:19 109:23 127:20

giving 11:23 80:1 95:8 115:17

glad 3:20 151:6

glasses 73:17

globe 17:21

Glover 61:3,4,5 70:6,10, 11 73:15 76:10,14 78:15, 18,21,25 79:5,8,15,18,21, 25 80:3 85:5,10,14 87:21 88:1,2,6,12,20 89:13,14 90:11,15,19 92:23 94:9 99:8,10 101:3 116:19 126:9 131:12 134:9 136:14 138:10,23 139:14,19,22 142:14 149:22 154:1,5 155:7,13,15 156:2,11,15, 20,25

gloves 112:15

gloving 9:22

good 14:22 24:6 50:18 55:9 57:9 59:19 62:19 66:8,9 69:13 73:9 84:17 87:7 94:2 97:1,15 114:23 129:19 138:18,23

gowned 73:2

gowning 9:22

grad 152:7

graders 55:4

graduate 9:10 30:10 36:4 69:13 146:24 148:17 152:20

graduated 68:10 85:8 152:25

graduating 35:25

graduation 20:19 22:17 53:15

grand 120:20

grasp 76:17

gravitated 31:4,8 91:6

gravity 148:6

gray 25:15

great 50:21 66:9,10

greatest 139:9

grounds 154:15

group 69:23

groups 83:21

grow 73:1 147:24

growth 155:25

guano 15:12

guess 42:14,23 44:9 56:3 57:17 104:24 136:20 146:4 155:14

guy 59:3

guys 9:15 31:18 103:7

H

Hairwood 42:7

half 13:6 23:8 56:22 85:16, 18 144:4

halfway 10:4 26:23

hall 146:23

Hancox 141:22

hand 47:20 73:13

handed 8:11 16:3 23:5

handle 116:7 139:24 142:7

handled 75:21 102:3 123:4

hands 9:23 52:5 73:3 140:14

happen 5:23 51:12 115:9 122:20 134:8,22 141:16

happened 30:17 57:25 69:24 71:9 72:2 82:15 101:4 107:14 114:4,22 116:25 121:12 122:1,18 124:9 131:2,16 132:6,7 133:1,2 134:1 136:13

happening 26:3 112:18

happy 17:25 43:22 59:5 139:16 140:15

hard 63:6 65:23 77:19 86:20 150:11

harder 63:8 117:1

head 86:24 122:23 133:7

headed 150:25

health 3:12 6:15,19 83:11, 25 118:21 154:14,24

hear 79:1 93:8 112:8 147:13

heard 62:22 112:22 145:24 146:1 152:24

hearing 61:1

heart 65:1

heavy 68:15

held 42:11 118:5

Helen 89:22

helped 8:25 66:13 110:11

helpful 103:23 118:6 144:18

helping 38:10 150:5

helps 42:20 59:20

hesitant 83:10

hey 104:21 136:4

high 10:9 33:24 77:24 121:19

highlighted 100:2

highly 22:14

hindsight 25:24 77:25

hire 149:14,15

history 10:17 39:11,19

hold 21:17 31:18 44:22 73:5 133:17 156:18

holding 12:18 84:14

home 50:25 52:21 107:13, 16 109:24 110:1,7,12,14 111:14 144:11

honest 72:14 99:24

honestly 46:21 51:8

honesty 12:3 45:10 139:25

hope 72:10 75:1 96:2,4 138:16,24 139:8,10

hoping 26:20 105:24

hospital 3:9,17 4:22 5:8 16:5,7 30:13 49:6,9 52:12 61:6 73:24 76:18 119:25

hospital-employed 74:8

hour 111:5 116:2 144:4

hours 94:19 106:4,24 107:8,12 111:5 116:5

huge 83:22

human 73:9

humans 65:22

humble 78:10

hundred 68:11

hunting 135:8

hurt 86:21

hurtful 12:7

Due process Hearing In Re: Jackie Mares, M.D.                    Hearing November 7, 2018

**husband** 76:19 114:14
116:12

---

**I**

**idea** 114:11 116:2 127:5

**ideally** 135:13 148:15

**identified** 57:7

**identify** 156:7

**idiot** 71:8,21

**ignore** 46:15 47:2

**ill** 84:7

**illness** 15:11 84:3

**imagine** 69:5

**imaging** 51:2

**impact** 36:22 58:5

**impartial** 14:22

**implied** 65:20

**importance** 47:9

**important** 9:11 29:9
31:11 41:2 49:24 84:24
125:5 127:7

**imposition** 37:15

**impress** 67:23

**impression** 127:23

**impressions** 81:17

**improve** 28:8 100:5
101:14 147:11,24 153:3,4

**improved** 17:2 46:7 53:4
56:15 109:22

**improvement** 5:16 26:21
45:22 59:12,18 60:11
101:11 115:8 143:21,25

**improvements** 101:20,
21

**inappropriate** 14:20 18:8
29:14 41:6 75:20 78:1
95:19 116:7

**inaudible** 17:21 35:13
133:12

**inbox** 74:4,25

**incident** 5:24 13:25 14:24
15:21 25:24 29:8 37:1
71:11 75:18 87:15 123:5

**incidents** 20:6,12 21:8
27:1 29:12 45:15 59:16

**include** 81:4

**included** 80:4 88:13,22
97:16 98:21

**includes** 27:23 92:18

**including** 22:22 119:18

**incoming** 54:25 151:22

**incomplete** 8:13

**inconsistent** 22:13

**increased** 77:16

**increasingly** 119:15

**incredibly** 76:2 86:11

**independently** 47:14
137:21

**indicating** 36:17

**indications** 48:6

**indicative** 152:16

**individually** 26:16 57:18

**industry** 18:17

**infer** 50:11

**inferences** 39:1

**inferior** 10:3

**inflammatory** 19:15

**inform** 98:3

**informal** 12:9

**informally** 146:24

**information** 2:4,9,19,22
3:5 16:22 40:16 67:18 77:7
90:14 99:7 100:15 125:18

**informed** 32:3 75:8

**lng** 85:2,6,10,14,25 87:5,
13 88:7,14,21

**lng's** 87:6

**inhibiting** 54:1

**initial** 95:10 107:1 155:3

**initiate** 139:19

**initiating** 115:21 137:2

**injury** 19:2

**input** 31:20 40:1,6 41:2,
13,21 127:6 129:7 144:19

**inquired** 138:25

**insightful** 81:15

**insist** 154:20

**Insisted** 123:6

**instance** 12:21 13:23
33:13,21 40:17 58:21
106:3

**instances** 20:21 22:17

**instinct** 67:13

**instituted** 91:15

**institution** 23:14

**instructed** 95:12

**instructions** 11:3

**insulting** 44:10

**insurance** 18:17

**integrated** 69:21

**integrity** 23:10

**intending** 125:7

**intent** 105:7

**intention** 12:12 120:3,16,
17 136:15

**intentional** 152:15

**intents** 52:19

**interaction** 19:8 20:10
55:21 97:6 135:20

**interactions** 7:2,12 13:3
51:23 54:5

**interest** 74:9 82:19 150:5

**interests** 23:17

**interfering** 8:7

**intern** 9:20,24 18:1 39:10
63:16 86:6,19 106:19
119:20,22 123:10

**intern's** 39:21

**interns** 9:20 54:25 68:8,15
86:4 91:15,22 151:22

**internship** 48:13

**interpersonal** 5:12 22:6
53:3 84:20

**interpretation** 51:16
76:18 134:4,6,13

**interpreting** 76:19

**interrupt** 76:8 117:14

**interrupted** 30:19 32:1
35:8 90:5 91:11 105:4
124:20 129:14 133:16,21
138:19,22 145:12 156:17

**intervene** 72:8

**interventions** 77:4

**interviewed** 48:10

**interviewing** 151:21

**intimidated** 67:5

**intimidating** 63:24

**intolerable** 58:9

**intrapersonal** 84:5

**introductions** 4:7

**introvert** 63:22

**introverted** 64:23 86:11

**intuitively** 77:6

**invested** 62:5

**invited** 150:6

**involve** 21:20 59:25 60:2

**involved** 13:14 15:22 20:2
21:18 25:4,7 31:11 38:3
81:2 99:14 114:8 116:18
117:4 119:6 123:9 124:12
136:3,7 137:13 145:16
156:24

**involvement** 16:14
117:12

**involvements** 41:9

**ironically** 86:10

**irrational** 142:4

**irrelevant** 28:16

**irritability** 84:4

**irritated** 131:7

**Island** 5:3

**isolation** 141:14

**issue** 12:18 18:22 20:20
29:25 42:19 141:10 154:20

**issues** 16:11,15 27:25
35:12 42:10 45:21 48:7
53:4,7 54:20 60:15 62:23
118:21 136:2 144:1,5
153:14 154:14,24

---

**J**

**Jackie** 9:17 10:5 11:22
14:10 28:5 29:24 30:4
32:15 33:10 34:3 37:2
39:15,22 43:5 45:16 47:25
56:8,20,23 58:6,24,25
61:25 62:2 63:20 65:12,17
66:11,24 67:25 68:7 69:16
75:17,19 80:13 81:13 82:6,
11,15 90:9,19 93:3 97:22
98:2,11,16,22 100:5,21
102:18 108:11 123:15
126:7 128:12,13 129:10,15
138:16 141:4 145:22,24
146:2,5 150:17,22 151:7,
11 152:16,20 153:8 156:12

**Jackie's** 38:1 46:6 48:22
58:11 67:4 74:10 99:15
138:11 147:14 155:19

**Jacqueline** 7:6

**January** 7:14 9:14 47:23

**Jerry** 139:3 151:6 154:1

**job** 18:16 81:1,2,6 93:25

**jobs** 153:5

**jockey** 69:9

**join** 65:7

**joined** 4:25 78:8 82:11
85:11

**journey** 65:8

**judging** 53:11

**judgment** 84:8

**July** 4:9 12:10 13:13

**juncture** 60:13

**June** 5:23 9:14

**junior** 23:21 27:17 38:21
39:3,9 41:1,22 58:18 64:14
81:14,19 94:24 108:17,25
113:19 117:6 119:3 123:8,
9 140:5 141:17

**juniors** 41:4

**justify** 23:25 144:7

---

**K**

**key** 50:1 59:8

**kicked** 143:11

**kind** 25:18 27:10 35:18
45:13 48:6 59:4 63:19
66:21 70:8 71:19 86:15
102:3 104:4 106:25 107:2,
3 111:1,25 113:21 114:2,6
115:16 117:2,12 118:16,21
119:2,12 125:21 128:11
132:11 148:8

**Kindig** 15:23 17:23 18:2,6,
21 20:23 24:20,22 25:12,
21 33:21 50:15 62:14
89:10 93:7 111:17 112:7,9,
20 131:19

**Kindig's** 16:24 51:16

**kinship** 83:21

**knees** 115:16

**knew** 14:11 66:20 111:8
119:9 123:23 125:8 127:25
129:18 130:7,15 131:2
147:23 148:1 156:8

**knife** 21:10 118:6 119:24
142:22

**knowing** 76:7 114:6

**knowledge** 42:8 82:22

---

**L**

**labor** 12:11 15:5 64:19
89:22 93:24 94:11

**lack** 7:17,18 8:6 22:8
28:14 36:17 37:10,11
56:24 59:18,21,23 70:22
75:9 80:19 118:20

**lag** 13:7

**laid** 52:5

**landed** 74:25

**language** 76:17

**large** 46:18,23 62:17
83:21

**largely** 113:19

**lastly** 15:21

**late** 12:17 19:16 76:16
77:1 105:20 106:4 115:1
127:15

**leader** 51:25

**leadership** 80:5 81:10

**learn** 64:7 73:3 97:13
99:11 126:9

**learners** 55:12

**learning** 5:12 11:6 23:19
25:8,25 39:18 55:3 67:12
97:10

**leave** 6:12 23:7 30:6 36:7
41:15 47:24 96:11 132:9
142:10

**leaving** 132:11 141:3

**led** 34:4 98:6

**left** 6:9 8:11 17:6 37:6
43:19 46:2 113:7 132:9
141:6

**left-sided** 16:5

**legitimately** 77:12

**length** 20:12 92:10

**let alone** 116:12

**letter** 5:8 6:13 29:4 35:1
73:22 74:1,22 75:5,6 90:23
91:2,3 92:11,13 97:25 98:8
102:19 103:7,15,16
134:10,24,25 146:4,7
149:12 152:10 154:13,24,
25 155:4

**letters** 74:3,24 79:4,6
81:16 99:16 101:17 146:17
147:17 152:13,14

**level** 5:19 56:23 58:19
106:15 122:5 126:10

**leverage** 66:21

**licensing** 83:16

**lie** 71:1,4 93:11

**lifeline** 126:3

**light** 23:2 112:24

**Lima** 16:7,13 49:11,13

**Lisa** 88:7

**list** 8:11 82:3 84:3 89:4

**listed** 5:17

**listened** 65:10

**listening** 130:18

**literally** 109:15 121:6

**Lo** 85:2 87:14 88:1,11,12,
15,16,21 89:7,11

**Lo's** 88:22

**logically** 64:4

**lonely** 155:8

**long** 5:3 62:7 88:20 94:20

**long-standing** 62:13,17

**longer** 4:18 34:9 51:3

**looked** 50:20 72:23 77:7

**lose** 82:24 117:17

**lost** 116:21

**lot** 4:7 21:17 55:9 61:12,19
62:3 67:18 68:12,16 70:21,
24 72:1 86:10,13,20 97:12
104:1 113:20,23 120:2
129:23 144:4 147:25
150:3,8

**lounge** 12:11

**love** 69:23 82:24

**lovely** 73:9

**loves** 82:19

**lucky** 59:5

**lying** 95:21 96:15

---

**M**

**machine** 17:9

**made** 10:21 13:24 19:14
20:24 24:24 26:24 49:20
95:16 96:24 97:15 100:2
109:10 112:1 122:7 125:21
126:15 127:22 128:16,17
131:23 141:11 145:21
147:25 150:21 153:4

**Madison** 13:25 14:7,9,20
25:23 75:5,7 76:5,15

**Madison's** 75:11 78:12

**Maiberger** 3:8

**main** 7:16 8:2 12:18 24:23
80:15 81:8 114:1

**major** 107:6 131:5

**make** 3:3,5,23 28:12 31:1
32:17 37:21,22 49:21
50:10,11 51:11 60:14
74:19 75:1,2 79:13 82:9
84:8,9 97:7 101:11,19,21
102:11 110:3 111:1 122:19
125:19 134:8 138:10 140:3
146:11 151:5 152:22

**makes** 82:14

**making** 3:10 27:3 45:1
50:14 59:14 62:21 111:7
120:2 144:19

**male** 15:13

**man** 74:12

**manage** 76:25 77:3

**managed** 49:22 73:23
106:20

**management** 6:21 14:22
33:23 50:2,7 64:11

**managing** 15:1

**mandate** 37:4

**mandated** 34:15,16,17,24
153:20 154:9

**mandates** 154:5

**mandatory** 6:11

**manifestations** 84:2

**manner** 75:21 81:23
138:9

**manual** 100:3

**March** 4:21 7:23 92:15

**Mares** 2:14 4:25 5:21,25
6:7 7:6,9,15,17 9:18 11:1
14:3,17 15:8 16:12,16
17:7,18,24 18:4,7,13,20
19:11,14 20:2,24 21:7,25
24:14 25:5 33:22 48:14
60:14,20,25 61:2 62:20,21
63:5 64:23 66:2,24 70:6
71:1,11,20 72:10,25 73:22
77:6,19 79:13 80:22 81:13,
18 82:6 84:7 85:11,14,25
86:11 87:5,8,14 88:2 90:21
91:1,8 92:7 93:17 94:14,
15,21 95:11,13 97:14,17
100:23 102:23 103:5
104:13 105:10,13 106:2
108:14,19 109:2,7 117:19
118:2,9 123:2,17,20 124:7,
14 125:3,11 129:18 131:14
133:7,11,13 134:14 135:8,
17,23 136:9 141:21 142:1
144:4 147:15 149:10,21
150:1

**Mares'** 2:11 75:9 144:17

**mark** 88:6

**Massengill** 89:19

**material** 97:1

**maternal** 77:15,16

**maternity** 23:7 36:7 47:24

**matter** 19:4 96:9 148:9

**mature** 97:8

**Maxwell** 8:16,21 9:5 38:8
89:23

**Mayers** 10:5

**Mckenna** 21:4 26:8,9 32:3
33:23 89:15 90:2 91:5
103:8 127:4,7

**means** 64:21 93:3 97:4
109:5

**meant** 12:2

**mechanisms** 64:8

**med** 18:14

**media** 83:21

**medical** 7:2,4,11 9:13
13:5 15:11 22:9 23:14
27:16 38:10 45:6 46:12,24
54:8,18,21 55:13,20,22
58:6,15,16,18 60:7 68:6
81:9 96:14 97:20 100:6
101:7 154:13,20,23

**medicated** 95:22

**medication** 111:2

**medications** 110:6,13,17

**medicine** 3:7 18:19 22:9
23:6 28:15 37:6 42:12
43:16 45:5,17 47:13 64:20
81:5 150:23 151:2

**meet** 9:2 36:12 57:20
61:12 72:12 99:22 100:18
103:8,11 105:5 125:4
129:22 132:17 143:19

**meeting** 6:13 11:17,19,21
13:17,18,24 20:7 26:12
27:2 32:14 33:10 46:11
57:6 59:10 67:20 91:6
97:23 98:9 106:7 126:24
127:6 129:4,16,19 131:10
132:14,16,22

**meetings** 12:9

**meets** 9:9

**Melanie** 61:5 87:25 147:9
156:7

**Melanie's** 151:10 153:19

**meltdown** 138:13

**member** 4:21,23 15:22

**members** 22:23 54:8
115:13 119:17 128:10

**mental** 6:15 83:3,11,25
84:2 118:21 154:14,20,23

**mentally** 84:7,11,14

**mention** 4:8

**mentioned** 7:7,15 35:9
37:5 38:2 58:22 80:12
81:15 99:3 101:3 129:20
132:13,24 146:23

**mentor** 26:5 30:16,20,23
31:3,20 32:5,8 66:2,10,12,
15 82:12 90:1,7,9,21 91:9,
13,16,22 92:5,7 99:20,23
100:9,18 104:11,12,22
105:8 144:25 145:3

**mentoring** 91:4 97:13

**mentors** 29:17 30:16
100:13

**message** 95:14 141:1
144:11

**met** 6:25 7:15 21:2 29:19
32:5 38:14 57:22 63:5 65:5
102:8 105:10 120:8 124:15
126:16 130:9,23 133:5
144:1

**Meyers** 9:18

**MFM** 76:3 116:19

**Miami** 3:9 4:22 5:8 16:8
61:6 73:23

**micromanage** 64:12

**micromanagement**
63:24 64:6

**microskills** 55:6

**mid** 59:11

**middle** 12:22 71:5 129:21
143:22

**Mike** 28:21 48:16

**military** 153:15,16

**mind** 29:20 36:16 59:14
78:13,19 94:18 101:5
117:8 122:9 131:23

**mine** 51:16 83:9 112:17

**minimum** 9:3,9

**minor** 142:16,24

**minute** 76:9 117:15

**minutes** 15:7 75:15
132:10 144:13

**miserable** 19:17 77:9

**miserably** 62:6

**missed** 25:5 51:10 151:14

**missions** 12:13

**mistake** 50:11,14 62:21

**mistaken** 54:18 78:11
127:1

**mistakes** 152:22,23

**mistreatment** 39:9

**misunderstood** 67:15

**mode** 67:9,14

**model** 66:10,25

**mom** 77:4 142:20

**moment** 29:15 55:10 76:1
141:4

**moms** 150:18

**Monday** 113:15

**money** 52:7

**monitor** 50:21

**monitoring** 91:4

**month** 7:14 57:23 103:9
155:2

**monthly** 100:18 103:8
143:19

**months** 8:14 12:10 23:2
26:19 36:8 46:2,6,25 47:11
53:15 54:4 75:16 86:7,8,14
105:11 143:16 150:16

**mood** 120:21

**morbidity** 77:15

**morning** 8:8 14:25 15:6
16:25 23:13 25:3 27:9
33:22 39:18 111:10,16
119:11 121:16,24 143:3

**mortality** 77:17

**mother** 15:2 16:12,18
17:12 19:5,11,13 21:23
25:16 93:16 94:14 95:25
108:1,5 109:12,13 118:4
119:24 124:4

**mothers** 73:5 150:3

**motions** 20:19

**motivation** 37:12,17

**move** 4:2 122:16,21

**moved** 68:19 70:4 142:9

**movement** 20:23 45:24

**multiple** 10:7 56:2 74:3
76:22 77:9 118:20 119:17

**must've** 88:9

---

**N**

**Nagy** 92:18,20

**named** 56:16,17,20,22

**names** 57:6 89:2

**native** 76:17

**natural** 67:4 82:17 117:12

**naturally** 64:11

**nature** 27:25 62:15 140:22

**nearing** 99:8

**necessarily** 36:14 37:4
59:2

**neck** 119:19

**needed** 18:5 21:25 24:20
52:24 56:5 66:11 99:22
100:17 109:21 146:2
147:24

**needing** 42:17

**negative** 36:22 46:4
59:18,22,23

**neuroscience** 82:19

**newest** 62:12

**night** 12:23 14:25 16:14
17:1 19:20 25:1,2 106:10
111:13 113:9 118:16

**nights** 113:8

**nobody's** 130:5

**nodding** 133:7

**non-emergent** 120:12

**non-urgent** 121:22

**nonetheless** 68:15

**noon** 143:11

**normal** 113:20

**nosier** 72:22

**note** 10:17,20,25

**notes** 73:17 87:22 100:2

**notified** 7:9 26:8 31:7,14

**notoriously** 63:13

**November** 6:23

**number** 6:18 83:19 100:4
120:25

**numbers** 35:21 68:13
69:3

**numerable** 81:4

**numerous** 20:12 37:13
146:16

**nurse** 6:5 14:5 16:12
19:13,25 78:3 89:22 93:23
94:1,25 96:7 110:18 111:1,
4,12

**nurse's** 93:13,21 96:12
114:16

**nurses** 10:6,14 15:8 22:11
23:22 58:18 64:16 71:3
97:21 112:15 118:25
119:18 140:6

**nursing** 27:18,24 45:11
46:23 118:23

**nurtured** 72:17

**nurturing** 65:17 84:19

---

119:13,14,20,23 121:12
123:4

---

**O**

**OB** 13:25 118:10 137:13

**OB-GYN** 18:14,23 20:17
82:20 135:10,15 147:1
151:1

**objective** 70:22 99:22
100:15

**obligation** 28:19

**observations** 45:2

**observed** 16:6

**observer** 136:23

**obstetrical** 118:18
120:23,24

**obtaining** 155:22

**occasion** 18:13 62:14

**occasions** 10:7 37:13 56:2 146:16 147:8 153:11

**occur** 27:1 97:7 109:6

**occurred** 26:11 54:5 98:24

**occurring** 72:24 108:18

**occurs** 108:13

**October** 20:7 29:19 55:2 97:24,25 98:1,7,15,16

**offensive** 130:12

**offer** 59:10 78:11 93:1 101:13 104:5 149:22

**offered** 6:20 7:19 69:16 102:20 112:5 153:11

**offering** 6:20

**office** 59:11 125:11 152:11

**officer** 3:11

**official** 20:25 97:25 104:11

**officially** 127:25

**Oftentimes** 10:8

**ongoing** 21:24 25:11 27:25 28:10 37:20 47:12 60:5

**open** 155:20

**opened** 50:9

**openly** 67:11

**operate** 68:7

**operated** 73:2

**operating** 8:6 14:3 68:12

**opinion** 16:9 31:18 46:16 49:11 51:25 52:11,24 99:11

**opinions** 2:23 10:3

**opioid** 150:1,18

**opportunities** 34:11 65:16

**opportunity** 24:14 30:24 32:13 38:22 61:11 65:15 66:25 75:2 102:21 103:3 104:7 129:6 151:4 153:11

**opposed** 70:8

**options** 17:16 102:25 128:25 132:23,24

**oral** 110:13,17

**orals** 110:18

**order** 18:16 27:1 29:18 37:23 99:23 134:8 150:22

**oriented** 55:15

**origin** 80:15

**outburst** 116:15

**outbursts** 27:21

**outcome** 18:1

**outrageous** 52:6

**outsider** 45:11,13

**outstanding** 97:22

**outwardly** 12:5

**overflowing** 140:19

**overly** 13:18 25:16 132:6

**overnight** 16:23 110:4 124:9

**oversee** 108:21

**overseeing** 108:12,18 109:4

**overtook** 9:21

**overwhelming** 125:10

**owned** 98:24 101:6

**ownership** 137:24

---

**P**

**pacing** 140:13

**packet** 13:22 15:24 88:14

**pages** 11:20 12:22 13:21

**pain** 16:5,8 17:1,21 93:12 109:21 110:11

**painfully** 63:22

**pains** 62:4

**Painter** 2:1 7:1 24:9 34:20 40:12,15 43:24 54:22 60:12,22,25 70:5,11 73:12, 14,19 78:13,16,19,20 79:11,17,19,23 80:2 90:13, 17 92:19 99:6,9 102:16 118:1 124:23 128:24 133:17,22 139:21 143:10 145:14 156:18

**Painter's** 59:11

**Paley** 12:25

**palpate** 17:5

**pancreatis** 14:2 76:23 77:11

**pancreatitis** 96:5 113:12

**panel** 2:6 38:12 102:17 144:16

**panned** 136:18

**paper** 82:10

**paragraph** 5:18

**part** 6:7 17:19 21:11 23:21 28:13 29:22 37:11 41:2 57:3 70:6 72:20 91:24 104:2,3 108:9,10 112:18, 19 116:11 120:7 151:15

**participate** 48:22

**participated** 61:7 77:24

**participating** 121:10,13

**participation** 8:6 38:9

**parties** 2:17

**partner** 54:6 66:7 95:24

**parts** 80:24

**party** 14:23 129:4

**pass** 35:22 36:2 96:10

**passion** 82:14,24

**passionate** 74:12 82:22 148:15

**past** 2:21 5:19 22:18 56:12,19 57:25 122:13 128:7 152:21

**pathological** 49:15,19

**pathology** 154:13

**patient** 5:11 6:1,4,5,6 8:8, 10 11:8 14:1,18,21 15:1,4, 19 16:4,17,21,23,25 17:8, 12,15,25 18:3,4,25 19:1 20:10,20,22 21:10,11,12, 23 22:7 24:20 25:11 27:14 30:12 33:24 38:18 49:1 50:24 52:11,16,19,20 53:25 54:2,7 55:5 73:22 74:1 75:24 76:2,16 77:8,12 93:5,10 94:16,23 95:21 96:1,13,16,23 97:5,11 105:20,22 106:3,12,18,23 107:15,18,21,23 108:3 109:5,13 110:16 111:3,6,9, 12,22 112:1,7,8 114:10,13 115:17 116:9,12 117:9,13, 18 118:4,10,14 119:1,5,15 120:5,8,22 123:7,23 124:1, 3,8,12 135:16 137:12,25 138:4,6,17 140:18,22 142:11,14 149:6,23 150:7

**patient's** 14:13 16:12,18 19:5,11 25:16 75:25 93:16 111:19 119:24 138:24

**patient-lodged** 24:25

**patients** 9:19 11:11 18:21 19:22,23 22:12 23:22 38:10 65:4 73:8 82:4 95:9 105:19,23 106:17 108:7 116:21 120:19 122:10,16 123:13 127:17 136:21 149:25

**pattern** 27:5 144:8

**Paulette** 141:21 142:1

**pause** 60:24 78:22 92:25

99:5

**pay** 19:19 52:6

**paying** 44:21 116:9

**PD** 152:1

**penalized** 36:9

**pended** 10:20

**people** 3:6 18:13 29:16 62:14,19 74:20 81:2 83:19, 20 89:2,6 102:4 103:20 104:2,18 116:17 121:1,6 122:4,7 130:10 132:14 135:1 148:21 150:8 152:24 153:17

**peoples'** 42:15

**perceive** 102:5

**perceived** 12:7 23:20 57:17 154:19

**perceiving** 139:10

**percent** 35:25 36:2,6,13 56:19 147:21

**perception** 35:21 44:15 46:21

**perceptions** 44:20

**perfect** 101:22 114:15 155:24

**perfectly** 120:11

**perform** 6:16 28:19 69:12 73:3

**performance** 7:10 20:10 45:21 154:15

**performed** 68:11 108:16, 25 121:22

**performing** 149:13

**period** 28:4 86:15 90:10 128:23

**periodically** 11:17

**periods** 155:25

**peripartum** 120:21

**permission** 73:13

**persistent** 22:7

**person** 18:9 30:1 48:12 57:21 59:20 63:3,9 65:24 66:9 69:6 84:20 85:7 94:18 96:17 111:21 114:1 121:3 126:8 135:15 137:19,23 151:16

**person's** 59:19

**personal** 31:10 62:7 66:22 70:24 83:8 84:18 86:3 87:3 93:13,20

**personality** 16:11,15 35:15 62:22 64:24 66:7

**personally** 28:13 83:20

108:2,21 141:9 146:22
147:15 153:12

**perspective** 11:23 58:6
67:19 87:4 131:25 132:5
133:3 142:3 148:14 149:10

**pervasive** 22:8

**phone** 6:18 12:24 14:5
108:9 154:7

**phonetic** 42:7 115:17

**physical** 6:15 10:17
39:11,19

**physically** 119:16 139:1,
5,7

**physician** 6:14 18:24
61:6 71:6 72:5 74:9 75:7
80:7,14,17 82:7 84:12 86:1
87:16 95:16 103:14,16,18
138:11

**physician/patient** 21:22

**physicians** 23:22 66:23
71:2 80:10 81:21 82:1,2
83:10,14,23 84:3 95:7

**pick** 117:23

**picking** 57:2

**picture** 151:13

**piece** 26:12 99:18

**place** 63:17 67:15 75:23
86:24 126:24 139:7

**places** 61:20

**plan** 18:14 21:14,15,19
25:13 77:21 94:16,22
95:16 107:15 110:21
111:14,23,24 115:21
121:15 136:24 143:20
147:19

**planned** 17:2 147:20

**planning** 11:5 119:19

**plans** 114:7

**play** 54:13

**played** 83:4 94:5 151:14

**plays** 36:20,24

**pleasure** 151:18

**plenty** 29:20 30:25

**point** 9:21,23 10:13,16
19:5 24:10 26:10,17 31:1
32:7,18 41:6 47:19 48:1
49:25 50:7,9 52:23 56:3
74:12 77:2,11,15 79:11
80:8 82:5 84:7,9,25 94:17
96:21 97:15 99:5,10
100:24 102:13 108:23
109:13,14 110:7 119:23
123:25 124:2 125:16
132:22 139:25 140:4 143:5
148:7 153:19

**pointed** 80:22 101:10
155:10

**police** 142:22

**policy** 91:14,17 100:3

**polite** 79:22 94:22

**poor** 8:7 9:12 72:16

**popular** 59:5

**population** 149:23 150:7

**portion** 46:18,23

**posed** 20:13

**position** 4:14 11:15 63:10
67:25 69:9 82:13

**positive** 13:18 27:4 59:19

**potential** 80:12 81:13

**potentially** 36:18 50:23
67:1,2 72:3 81:21

**pounding** 82:5

**power** 28:2

**POZNANSKI** 34:15,18,23
35:4,18 36:15,23 39:25
40:5,9,14,20,24 41:7,16,19
42:21,25 43:2 48:5 53:2,
10,13,17,22 54:15 58:10
76:8,11 89:25 90:6 92:4,
10,16 105:16 108:6
117:14,25 118:3 129:10,15
134:3,11 141:16,23
145:20,25 147:13 149:5,19
156:23

**practice** 5:12 7:18 18:14
20:17 28:15 37:2 47:13,17
53:5,14 81:5 138:1,12
148:20

**practicing** 137:20 151:1

**preceding** 113:9

**precious** 92:24

**predictor** 22:19

**Predictors** 82:1

**predominantly** 42:1

**prefer** 70:5

**preferably** 66:12

**pregnancy** 19:17

**pregnant** 6:1 14:1 16:4

**preliminary** 8:22

**Premier** 3:12,17 6:19

**premises** 119:25

**prenatal** 8:23

**presence** 14:24

**present** 8:22 9:2 55:4
94:1 113:12

**presentation** 2:11 38:8
60:14 70:7

**presented** 2:17,19 20:8
24:16 44:10 49:23 95:14
111:15 120:5 144:25
145:1,5,6 148:13

**presenting** 2:2,4,9

**presents** 20:20

**pressure** 69:11,14 128:3,
10

**preterm** 6:1 76:16 77:1,12

**pretty** 34:3 44:5 48:25
58:14 65:1 100:19 110:19
111:13 113:12

**preventing** 54:13

**previous** 48:7,17 63:15
134:12

**previously** 22:23 34:8
46:20 115:23 130:3,5,9
148:5

**primarily** 19:7 144:17

**primary** 114:10 116:11
120:12

**prior** 24:15,18 27:2,6 34:8
90:9,22 91:1,2,8 118:14
144:19 146:14 152:22
156:19

**privacy** 93:21 96:7

**private** 69:17 138:1 141:4

**privileges** 4:22

**proactive** 58:1

**probation** 7:25 8:3,13
9:12 11:18 12:15,16 26:19,
22 27:7 28:4,11 29:7 35:6
41:25 42:2 45:20,25 46:7
48:2 59:8 90:22 92:12,14
102:20 130:4,25 131:11
133:6,10 134:1,5,17 141:9
143:14,15,21 144:10 146:8
149:12 154:12,16 155:3
156:22

**probationary** 20:14
90:10

**problem** 21:22 25:13
26:18 49:22 103:24 109:8,
25 112:10 131:21 132:4,7
135:22 140:25 146:15
149:11

**problems** 6:22 28:4,10
71:24 101:25

**proceduralist** 43:22

**procedure** 100:4

**proceed** 22:2 92:24

**proceeding** 2:6 151:21

**proceedings** 30:19 32:1
35:8 60:24 90:5 91:11
105:4 124:20 129:14
133:16,21 138:20,22

145:12 156:17

**process** 31:12,20 38:23
41:8,14 47:4 62:1 80:25
84:25 98:4 99:12 136:8

**produce** 154:24

**profanity** 15:10 87:17

**profession** 22:9

**professional** 7:20 34:12
35:12 42:10 70:18 71:19
72:13 94:22 102:21,25
138:9

**professionalism** 5:13
7:11 12:1,19 18:8,23 20:9
22:5 41:25 42:19 48:6
53:3,6 54:1,16 75:9 100:6
102:9

**professionally** 27:19

**professor** 89:23

**program** 3:14 4:8,10,12,
13,16,17,25 5:3,21 6:19
9:18 11:15 20:25 22:17,22,
25 23:11,17 24:3,5 28:17,
23 35:20,21 36:9,19,22
37:5,14 40:19 42:2,6 43:3
46:3 48:7,11,17 55:15 57:6
62:5,9 63:11,13 68:1,4,7,9,
17 69:7 82:8 85:11 88:17
99:12,13,16 105:6 107:19
117:16 118:12 126:13
128:20 132:25 137:5
140:10 146:2,3,10,18
147:16,21 149:14 150:4
151:17,19,23 152:18
153:4,13 154:18,22

**program's** 2:2

**programs** 68:24

**progress** 20:13 26:24
27:3 28:12 46:5 59:14,15
143:16,19

**progressing** 15:5

**project** 8:13 9:6,8 38:6,15

**prompted** 141:15

**proof** 70:13

**prospectively** 31:22 32:3

**protect** 87:1 95:5,8

**protective** 67:9 98:13

**prove** 9:23 84:10

**proven** 22:15

**provided** 6:18

**provider** 19:2 69:17 83:13

**providing** 118:22

**provost** 71:23

**psychiatric** 15:1 21:11
153:21,25

**psychiatry** 48:13 81:25 82:20

**psychosis** 15:2

**psychotic** 120:22 138:18

**pull** 5:4 99:21 112:16 134:9

**pulled** 39:18

**purely** 53:13

**purposes** 52:19

**pursue** 7:18 18:16 148:16

**pushback** 45:17

**pushed** 67:14 77:19

**pushing** 9:8 38:13

**put** 5:5 25:25 28:11 38:6 54:2 62:25 63:5 68:5 90:22 100:9 128:3,9 146:8

**putting** 147:20

---

**Q**

**qualify** 45:3

**quality** 95:8

**quarterly** 57:19

**question** 2:8 35:19 36:16 37:25 40:4 48:19 50:3 51:5 54:17,23 65:15 66:1 78:24 82:14 84:13,21 90:20 108:15,24 134:4 135:7,20 136:10 143:14 146:5

**questionable** 93:6

**questioning** 52:13,17

**questions** 2:13,16,18 3:20 4:1 24:9 42:23 43:24 60:7,10,12 62:24 70:4,8 72:23 99:4 102:16 104:10 118:1 144:16

**quick** 119:12

**quickly** 87:9

**quorum** 3:1

**quote** 62:22

---

**R**

**raised** 20:18 48:18 52:4

**rambling** 130:16

**ran** 115:1

**rant** 12:23

**re-discuss** 32:9

**reach** 127:9

**reached** 48:1 87:13

**reacted** 129:7

**reacts** 129:8

**read** 11:5 44:19 51:17,19 57:7 73:7 75:2 80:6 99:16, 17 100:1 101:16 105:17

**readdress** 60:14

**reading** 11:6 44:19 73:17 79:12 99:19

**ready** 97:14 137:6

**real** 67:16 71:24 82:14 97:1

**realize** 77:8 146:14 151:11

**realized** 75:20 77:25 86:15 96:6

**reason** 9:11 36:6 37:11,14 60:19 70:25 71:3 82:6 87:2 112:13 120:13 124:5 139:4

**reasons** 2:2,12 8:2 23:9 143:22

**reassess** 109:12

**recall** 44:13 88:10 120:14

**receipt** 98:8

**receive** 108:8 110:17

**received** 88:13 106:10 111:16 119:12

**receiving** 151:16

**recent** 20:12 31:17 43:13

**recently** 150:14 153:7

**recognize** 81:22

**recognized** 81:20

**recommendation** 3:6,10 26:17 46:14,17 128:5,17

**recommendations** 22:2 24:2,4

**recommended** 5:9 6:11 39:22 42:22 103:13,18

**reconsider** 96:12

**record** 96:14

**records** 70:13 93:11

**recount** 133:1

**recrimination** 83:15,25

**recruitment** 8:19

**recuse** 27:15

**recused** 25:10

**recusing** 105:23

**red** 73:21

**reevaluating** 109:5

**refer** 75:6 93:5

**reference** 81:24 110:2,3

**references** 100:3

**referencing** 136:11

**referred** 75:11 82:2

**referring** 49:3 87:19 139:12

**refers** 83:6 84:2

**reflect** 86:3

**reflected** 35:23

**reflects** 37:9

**refusal** 20:21 129:3

**refuse** 138:5

**refused** 123:16 129:5

**refusing** 5:25 17:10

**regard** 56:25 99:2

**region's** 51:24

**registered** 19:6

**regrettable** 47:5

**regular** 105:7 114:5 115:3

**regularly** 33:10 102:9 103:11

**related** 7:4,5,11 8:4 16:16 19:8 43:20 44:2 66:16

**relating** 8:23

**relations** 14:17

**relationship** 21:23 30:21 31:11 34:1 62:13 67:1 84:20 87:5,13 94:3 104:17 119:10 120:10 121:9 123:13 124:1,3,17,21 156:8,12

**relationships** 54:20 62:7, 17 69:7 82:3

**relay** 95:13

**relayed** 13:16 141:1,7

**relaying** 12:20

**relays** 33:21

**relevant** 132:6 148:4

**relieve** 16:2

**rely** 67:12

**remark** 44:11

**remarks** 9:13

**remediate** 28:22

**remediation** 154:12,15

**remember** 12:11,20 44:12 58:21 85:15 131:15

**remembering** 85:17 97:23

**remorseful** 75:19

**remote** 12:14

**removal** 21:1

**remove** 20:24 53:6,8

**removed** 119:2,25

**rendition** 93:9

**reoccurring** 150:19

**repeated** 43:18

**repeating** 5:20

**rephrase** 108:19

**report** 14:25 15:6 16:10, 25 27:9 75:12

**reported** 14:10 88:22

**reporter** 3:23 30:18 31:25 35:7 90:4 91:10 105:3 124:19 129:13 133:15,20 138:21 145:11 156:16

**representative** 55:19 80:4

**representatives** 27:23

**represented** 94:15,21

**representing** 96:1

**reprimanded** 74:14

**request** 93:22 98:11,12

**requesting** 98:17

**required** 11:17 35:4

**requirements** 9:3,9

**requires** 35:24

**reschedule** 143:6

**research** 8:13,15 9:3,10 38:6,15 89:23 120:19

**residency** 3:13 5:21 7:19 18:15 20:24 23:17 61:9 66:4 69:7 71:6 86:14 104:8 130:2,4 149:13

**resident** 3:14 5:1,2,5 6:16 8:15 10:11 11:20 12:21 14:4,6,13 15:20 16:11 17:7 19:8 22:10 23:11 26:3 28:9 30:11 34:10 35:19 38:15 39:4,9,14 40:1,23 41:1 43:5,6 45:20 47:24 52:25 54:24 58:22,23 60:8,10 63:15 65:5 68:4 71:10 78:8 80:6,20 82:25 85:11,18 86:9 87:7,9,11 92:21 97:4 104:9,25 106:16,22 112:6 116:5,16,25 123:9 135:3,5 136:20 138:12 139:9,17 140:9 149:11 151:18 154:14,17,20,21,22

**resident's** 40:6 46:25

**residents** 4:24 7:5,7 15:8 19:7 20:1 21:18 23:14,22 25:4,7 27:17 35:25 36:10 38:21 39:2 41:11,22,25 42:21 43:2 54:20 55:14,19, 21 56:4,11,16,21 57:5,7, 11,23 58:19 59:5 60:7

61:15 64:14,17 68:6 70:20
71:3 72:11 74:7,24 79:6
81:14,20 94:4,24 95:4,18,
25 97:21 104:23 108:17,25
113:6,19 117:6 119:3
123:9 136:7 137:12 140:6
141:17,20 144:2 150:5
152:7,8,10,25 153:13,15
154:12 155:21

**residents'** 41:9

**respect** 3:2 12:3 22:8
23:13 38:16 72:25 93:20
96:7

**respond** 17:24 24:3

**responded** 14:10 44:5

**responding** 95:22,24

**response** 58:11 71:13
95:10 96:22 126:2 129:17
140:20 147:14

**responses** 38:11

**responsibility** 18:24
113:18 117:21 119:5

**responsible** 108:12,17
109:4 113:13 114:1 135:14

**restitute** 74:16

**resulting** 84:4

**results** 7:10

**retrospect** 134:20

**return** 98:23

**returned** 10:20 132:19

**review** 84:25

**reviewed** 20:11 48:24
125:5

**rhetorically** 146:5

**ridiculous** 10:13

**risen** 26:16

**risk** 5:19 10:9 19:1 33:24
54:2 77:12,14,16 121:19
146:9

**risking** 146:17

**role** 3:9,18 61:13 66:10,25
82:7 83:4 117:6 136:20,23

**roles** 80:5

**Roman** 7:1 59:10

**room** 8:6 9:25 14:3 17:6
52:5 64:3 82:15 83:7 108:4
110:16 116:1 119:21 135:2
139:3 140:6 143:12

**root** 21:21

**rooted** 74:10

**Rose** 89:23

**rotating** 137:16,17

**rotation** 69:19 131:1

**rotations** 5:7 68:20 85:22

**rounding** 55:7

**rounds** 8:9 39:13,18
120:20

**routine** 38:23

**routinely** 80:20

**RRC** 24:1

**rude** 10:14 11:3 14:5
93:15 94:13 95:25

**ruined** 10:24

**ruled** 107:5

**run** 106:21

**running** 121:23

**rural** 52:11

**S**

**safe** 30:21 49:5 65:17

**safely** 107:5

**safety** 18:22 19:1 20:20
53:25 72:9 138:25 139:11

**salient** 11:13

**sarcasm** 81:1

**sat** 123:12

**Saturday** 106:10

**scenario** 17:3 44:4 46:13
48:23

**scheduled** 115:4,24
129:24 142:17

**school** 3:7 13:5 45:17
55:20 128:24

**seconded** 20:25

**secret** 33:1

**section** 7:7 17:19,20
120:12 121:22 137:16

**sections** 121:18

**security** 119:25

**sedation** 115:22

**seek** 6:14 83:11,24 102:21
104:7 148:3 154:17,21

**seeked** 146:12

**seeking** 103:4 133:24
153:23

**segment** 9:14

**self-deprecating** 155:9

**self-knowledge** 7:17

**self-study** 24:1

**seminar** 54:24 55:1

**send** 49:9 60:18 107:15

**sending** 50:25

**senior** 10:9,11 19:7 52:25
58:19,22 61:17 82:4 93:23
104:8 112:5

**seniors** 10:21 38:22

**sense** 135:25

**sensitive** 65:2

**sentinel** 24:12

**September** 16:1 29:20
55:2

**serve** 4:18

**service** 13:25 86:25
108:13 113:24 135:9,11
137:11,13,14,16,17 140:19

**set** 69:16 71:19 78:9
129:25 134:6

**setting** 150:9

**severe** 16:5 84:4

**share** 67:21 78:13 151:4

**shared** 40:18 69:23
105:18 128:2 151:7,13

**sharing** 82:22 132:8

**she'd** 146:6

**sheet** 25:6

**shell** 30:5

**shift** 38:17

**shock** 27:10

**short** 23:5 27:1 28:22
29:18 30:6 65:9 118:12

**short-lived** 59:15

**show** 5:15,16 22:7 25:6
28:3 30:10 98:2 143:20

**showed** 13:13 27:5

**showing** 27:2

**shown** 18:7

**shows** 38:17

**sic** 7:23 10:5 140:23

**sick** 49:1 116:10

**sicker** 77:10

**side** 17:6,21 24:15 27:18
35:19 62:11 65:13 144:6,
17 145:5,8

**sides** 101:1

**sign** 47:16 53:17 54:3
115:5 119:12,13 120:6
142:9

**signaled** 80:25

**signed** 5:21

**significant** 5:16 42:9
47:12 77:14

**significantly** 77:16

**silent** 95:22

**similar** 41:19 86:5

**simple** 11:11 96:25

**simply** 68:24 82:24

**sincere** 74:10 78:11

**single** 26:2 57:10

**sir** 73:16

**sister** 142:16

**sit** 29:11 32:8,14 41:11
71:17 72:14 146:25

**site** 12:14

**sites** 23:16,24

**sits** 31:12

**sitting** 121:6 123:22 129:4
140:2

**situation** 10:1 14:10,16
25:19 28:20 29:2 47:6
57:13 63:25 75:22 77:24
78:7 95:2 102:3 112:23
113:2,3,10,11 122:2,17
123:19 138:8 139:16
140:16 148:7

**situations** 26:7 39:15
64:4,9 68:5 74:15 95:7
102:5 121:1,18 122:14
129:9 130:3 131:2,17
132:1,2

**sixteen** 66:3

**skill** 43:21 78:9

**skills** 22:6 53:12 64:13
78:6 81:10

**skin** 44:12

**skip** 4:7

**slack** 117:23

**slate** 11:24 126:18

**sleeping** 111:6

**slept** 17:1 107:7,11 111:13

**slowly** 56:15

**small** 17:20 139:3

**social** 83:12,21

**solicit** 74:23 79:5

**soliciting** 79:4

**somebody's** 153:23

**someone's** 45:2 140:17

**sort** 24:11 29:16 51:6 55:8
60:18 63:24 102:4 127:21

**sought** 40:5 146:12

**sounded** 51:10 58:5

**sounds** 43:8

**soured** 21:22 34:1

**south** 14:17 136:5

**speak** 3:25 15:16 32:12,21 47:16 56:9 57:24 79:13 85:24 92:19 104:9 107:25 108:4 112:9 114:14 124:6 129:3,5 133:1 136:16 147:7

**speaking** 55:17 115:11

**speaks** 32:22 78:4

**special** 69:18 80:22

**specially** 69:18

**specialty** 28:18 37:3,10

**specific** 21:8 81:6 93:2 150:4 154:21

**specifically** 55:18,21 92:8 134:15

**spend** 69:18

**spent** 62:3 143:2 144:3

**spoke** 75:17 107:13,17 108:1 109:11 111:1 114:15 128:23

**spoken** 48:16 57:4 110:18 122:6

**spot** 102:4

**staff** 27:18 54:8 82:4 118:23 119:17 137:14

**stage** 43:25

**stand** 71:7

**standards** 70:19 149:13 153:4

**standing** 109:15

**standpoint** 70:15

**stands** 96:25

**start** 3:22 11:24 61:3,16 68:16 126:11,17

**started** 16:20 31:4 61:5 68:1 130:13

**starting** 10:16 11:22

**state** 18:1 62:13 98:13

**stated** 14:12 17:10,18 18:20 39:2 65:12 100:25

**statement** 37:13 96:24 126:20 151:24

**statements** 19:24 57:19 65:25

**states** 75:13 150:2

**station** 114:16

**status** 20:14 96:15 118:16 134:2

**stay** 19:19 110:17 115:22

**staying** 107:9 110:4

**stemmed** 75:23

**step** 46:8,9 95:7 135:21 136:6 149:8

**stepped** 94:25 116:23

**steps** 46:8,9 74:16 122:19 148:1 154:23

**sticky** 73:16 87:22

**stigma** 83:12

**stop** 122:24 142:15

**stopped** 115:20

**stops** 109:1 135:12

**store** 73:18

**stories** 65:11 83:8

**stormed** 129:12 140:24

**story** 24:15 28:6 70:25 94:9 95:17 144:7,18

**strange** 106:4 112:2

**stratified** 68:18

**stress** 77:24

**stressful** 113:24 114:12 129:8

**strides** 102:11

**strong** 22:23 24:4 46:17

**strongly** 16:16 34:9,25 35:3

**struck** 105:20

**structured** 63:11 68:25

**struggles** 63:23 64:7

**stuck** 19:10

**student** 6:25 7:11 13:11 44:2,17 45:6,12 46:12 56:16 57:14 58:6 60:3

**students** 7:2,4 9:13 10:6 13:14 15:8 22:10 23:14 27:16 38:11 46:24 54:18, 21 55:13,22 58:15,18 60:1, 8 61:12 64:15 68:6 71:3 97:21 100:6 101:7

**students'** 58:16

**study** 8:23

**stuff** 58:16

**style** 87:6

**subject** 105:21

**submitted** 123:11

**subsequently** 102:20

**substance** 150:13

**substantially** 53:4

**succeed** 99:23 147:3,4

**success** 9:6

**successfully** 37:23 42:1

**suggested** 17:12 30:14 44:11

**suggesting** 84:6 144:21

**suicide** 72:6,12 82:1

**suited** 66:12

**summarize** 22:4

**summary** 125:14

**summer** 9:7 11:15 12:10 35:10,11

**superior** 65:4

**supervise** 64:22 142:25

**supervision** 137:22

**supervisor** 18:11

**supervisors** 81:11

**supervisory** 94:20

**support** 23:23 49:15 53:20 74:4 83:24 93:3 152:17

**supported** 34:8 71:12 72:17

**supporters** 22:23

**supporting** 2:4

**supportive** 76:19 83:5

**supports** 94:7

**supposed** 10:22 52:10,15 121:19 134:22 142:25

**surfaces** 57:20

**surgeons** 69:13

**surgery** 42:8 75:18 112:20 113:16 114:5,6,20, 21 115:8,14,20,23 116:2,3, 5 121:21 137:11 140:15 141:2 142:25 143:4

**surgical** 20:22 42:16 68:16 76:6

**surgically** 69:20

**surprise** 125:9 137:1 140:8

**surprised** 128:15

**suspect** 49:7 50:19

**swearing** 10:12

**symptoms** 80:15,16

**system** 64:21

---

**T**

**tab** 87:20

**table** 73:21 82:2 84:1 148:25 149:2

**tabs** 73:18

**takes** 45:5 97:12 116:20

**taking** 11:14 18:21,24 25:11 36:18 113:22 116:10 117:5 118:24 119:20 120:7 121:7 134:17 149:1,3,7 150:20 152:1

**Talbot** 2:1,15 4:4,6 24:10, 17 29:10,22 30:17 32:23 33:2,6,9,16,19 34:14,16, 19,25 35:5,9,24 38:5 39:8 40:3,8,11 41:15,17 42:4,24 43:1,17,25 44:8,14,17 45:8 48:8 49:2 50:13,17 51:13, 15,19 53:8,16,19,24 56:1,6 57:1 58:7,13 59:21,24 60:16 75:8,11,16 78:14,24 79:2,7,9 80:11 85:3,8 87:14,25 88:1,4,9,16,24 89:3,7,15,18,21 90:2,23 91:2,14,23,25 92:13 93:7, 22 95:1,11,14 96:8,22 97:17,24 98:3,10,14,17,20 103:12 107:14 110:15 124:24 127:2,12,14 129:20 130:9,23 132:10,23 133:18 134:25 135:5 136:16 143:9,13 144:13 145:7,10, 15 154:6,10 156:10

**Talbot's** 2:9 93:8

**talk** 6:8,9 18:9 20:2 24:1, 17 25:3 26:2 28:7 30:5 32:15 41:5 77:20 111:18 123:8 132:23 136:1,3 141:4 144:23 148:18 149:2 152:5 156:14

**talked** 6:10 11:16 12:2,17 20:1 24:19,22 25:6 34:2 50:24 125:1,3 126:20

**talking** 39:23 45:1 46:12 130:13 148:25

**tarnish** 23:19

**task** 3:4

**tasked** 100:12

**taught** 61:17 62:9,10

**teach** 63:19 82:18 86:22

**teacher** 54:24 59:19 66:3 82:18

**teaching** 13:15 55:4,7,8, 10 60:3 87:6 97:1,7 135:11

**team** 10:9,11 14:14 15:1,7 17:24 64:22 75:18 78:3 109:9 114:9,10 115:13 116:11,25 124:10 135:11

**team's** 138:25

**teams** 113:22 117:7

**teamwork** 14:18

tears 39:14

technical 70:15

technically 70:1 94:19

Ted 24:11 26:20 28:1 37:5 45:15 47:3,15 127:8 129:1 140:2 141:2,7 144:12 152:1

Ted's 26:10

telling 62:3 70:24 87:2 138:13

ten 12:23 15:7 43:6

tendencies 15:3

tendency 67:4,8

tension 85:24 87:12

tenure 23:3 47:1

term 24:12,13 106:18 119:4

terminate 32:18 36:20,25 47:21 97:4

terminated 37:2 40:18 42:22 43:3,4,16 82:7

termination 2:3 32:10 40:1 42:23 48:4 93:4

terms 38:3 40:6,18 98:18 101:14 104:23 106:21 111:3 116:23 129:16

Terry 31:22

tertiary 52:1,10

testing 51:3

text 125:4

textbook 63:22

texted 129:21 132:9

theme 14:16

theoretically 150:13

therapy 154:18

thick 44:12

thing 2:10,12 23:3 24:18 38:16 44:5 51:7 58:3,9 67:23 75:24 84:22 99:18 118:8 120:25 124:24 125:21 126:23 131:21 142:20 148:12 150:20 151:5 152:19

things 15:18 19:10 23:2 29:19 50:22 68:25 69:25 70:21 72:1 73:11,13 77:5 82:18 84:16 97:19 99:15 101:4 107:6 111:6 114:19 116:13 117:2,23 132:20,21 134:7 136:13 137:4,6 155:23

thinking 139:11

thirteen 19:19 110:8

thought 13:17 21:16 27:3 57:3 59:1,13 101:13 104:24 105:15 128:9 131:16,24 132:22 133:2 151:7

thoughts 2:22 96:5 109:20

thousand 19:19 110:8

threatened 96:13 119:17 139:1

threatening 93:16 124:4, 8

threats 120:2,4

three-hour 55:1

throwing 126:2

Thursday 121:16 123:1 127:16 129:22 132:20

till 47:23

time 2:7 5:15 7:21 8:19 9:25 10:12 17:19 21:18 25:15 26:4,12,20 28:5,7,22 29:20 30:12,25 32:5 39:13 42:5 48:18 49:18 54:6 61:8,14 62:3 69:18 80:1 91:16 92:11,23 94:12,20 97:14 98:4 100:14,24 102:19 105:1 106:14,24 111:22 113:5,23 114:4,25 115:2,3 116:10 117:2 124:23 128:23 129:25 130:23 132:17 133:22 137:7 139:21 140:3,10 145:13,14,23 146:1 148:7 155:9,19

times 38:9 43:13 57:16 65:8 67:6 74:13 103:9 114:21 129:3 139:5 140:3 146:23

title 130:1

titled 76:14 80:14 81:25 87:21

today 5:23 70:22 80:12 82:9 83:23 92:24 102:12 125:5 126:6 132:16 145:8, 18 148:23

today's 115:6

told 6:5 10:24 11:4,8,22 14:20 15:10 16:10,25 17:13 29:16 33:4 55:19 65:11,19,20 69:2 71:18 94:25 100:17 101:15 104:15 112:24 116:13,21, 24 118:23 121:11 122:22 126:6 127:4,7 128:1,4 130:21 131:17,20 133:5 134:14,16 136:14 138:16 146:16 150:14

Tony 10:12 58:22,23

top 9:17 64:14 74:7 81:8 82:3 84:3 85:1 88:7

topics 86:12

total 61:17

touch 5:25 18:4 114:5

touched 127:11,12,14

touching 15:13

tough 87:8

Towers 89:16

town 33:12,15 127:10 141:3

track 64:18,21

trail 82:10 98:2

train 61:20 74:20

training 22:24 40:19 42:15,18 61:12,21,25 63:10 80:24 82:8 94:2 97:9 135:13

transfer 5:1 23:6

transferred 105:9 115:22

transition 10:25

transitioned 103:12

treated 138:2

treating 12:3 19:13 38:10

treatment 83:7,11 107:1

trespass 118:5

trespassed 142:21

triage 93:17 94:19 106:3, 12,16 107:8

trip 12:13

trouble 83:12

true 52:7 59:2 65:13 101:9 104:3

trust 65:23 66:19 83:13 86:20,21,22 112:1

trusting 67:1 84:19

Tuesday 121:16

turn 4:4 23:11 46:3 60:25

turned 129:11

Ty 97:23 125:13 129:25 130:1,5

Tylenol 107:7,11 109:22, 23 110:11

type 58:2,9 64:10

types 57:19 101:24

typical 108:20

Typically 85:20

___

**U**

ugly 57:10

ultimately 6:6 9:7 17:25 23:10 34:4 66:17 76:23 91:6 110:9 135:19

ultrasound 17:9

unable 18:8 115:13

unacceptable 7:10 71:9, 16 116:8

unanimous 2:25

unbiased 125:17

uncertainty 76:24

uncomfortable 17:5 67:15 114:7 118:24 138:14,17 140:17

underplayed 101:6

understand 40:4 44:25 45:7 48:21 51:14 63:2 68:23 87:3 102:24 118:7 129:2 133:4,23 134:11 135:9 138:14 145:9 156:6

understanding 55:18 104:2 115:10 133:25 135:10 150:24

understood 104:4 155:8

unemployed 71:18

unethical 7:5

unfair 126:20 128:9 151:24

unfairly 19:14

unfixable 22:15

unfolded 119:14

unfortunate 29:1

unique 56:7,25 61:11,24

unit 64:19

United 150:2

university 54:19 98:13

unnecessary 121:5

unpredictability 27:20

unpredictable 22:14

unprofessional 7:2 11:2 22:14 26:19 27:21 52:16 75:22 97:20 117:8 126:2 139:24 140:22 144:9

unprofessionalism 140:5

unraised 48:19

unremarkable 118:19

unresolved 14:21

unusual 85:19

updates 118:15

upholding 70:19

**upset** 58:23 59:3,4

**urged** 6:12

**urgency** 125:10

**utterly** 10:5

___

**V**

**vacation** 141:3

**vacuum** 9:22

**vaginal** 6:2

**vague** 100:19

**vaguely** 118:13

**Valley** 3:9 4:22 5:8 16:8 61:6 73:24

**Vaxzane** 115:17

**vengeance** 57:15

**vent** 13:2 81:1

**verbal** 7:5

**verbalized** 18:13 20:16

**verbally** 119:16

**verbiage** 15:9

**verified** 19:24

**versus** 54:16 70:20

**vested** 30:9 44:24

**view** 24:2 45:10

**viewed** 136:21

**villain** 64:24

**villainized** 72:18

**violent** 15:3

**virtue** 64:15

**vocalize** 12:5

**voice** 3:24

**volatile** 78:7

**volition** 156:5

**volumes** 78:4

**volunteer** 69:17

**volunteered** 74:20

**vote** 20:25 22:21 31:13,16 32:9,21 34:5 41:18

**voted** 34:6

___

**W**

**wait** 47:23

**wake** 12:23

**walk** 122:11 147:2

**walked** 52:5,7 110:20 128:13

**walking** 130:7

**wanted** 11:11,24 12:12 15:16 23:4 31:1 50:10 51:11 53:23 54:15 79:21 80:8 93:18 95:4 102:12 111:17 127:16 130:20 132:13 147:3

**wanting** 48:22 124:5 149:24

**warned** 28:11

**warning** 5:9 6:13 35:2 90:24 91:3,4 92:11,13 102:19 103:7 130:4 146:8 149:12 155:1

**warrant** 5:8

**washing** 9:23

**watch** 19:3

**watched** 73:1,3,4

**water** 21:17

**ways** 65:4 68:2

**wear** 87:9

**Wednesday** 127:3

**week** 113:14 139:5

**weekend** 113:16 117:11

**weeks** 16:4 49:8

**welcomed** 48:15

**well-being** 74:10 83:3

**well-characterized** 80:11

**well-established** 120:9

**well-versed** 86:12

**wheels** 13:19 29:6

**white** 23:12

**wife** 114:17 143:1

**wished** 33:11,20

**witnessed** 39:8 125:14

**woman** 72:16 139:3

**women** 19:16 150:3,5

**word** 15:11 56:24 58:15 118:20

**words** 6:17 22:18 117:17

**wore** 23:12

**work** 10:10 12:4 30:22 36:18 38:1,3,16 59:20 60:1 64:4 65:22 67:2 86:20 130:25 150:7,10

**work-related** 6:22

**worked** 4:24 12:22 62:11

**working** 31:4 64:12 86:2 106:4 119:4 129:21 150:9, 13,17

**works** 135:10

**workup** 107:1

**worried** 50:23 77:22

**worse** 152:25

**worth** 96:19

**Wright** 62:12 98:12

**Wright-patterson** 5:7 8:5 61:8 74:2 88:18

**write** 152:13

**writing** 39:6

**written** 44:3 75:12 152:15

**wrong** 65:21 73:18 87:7 121:5

**wrote** 15:23 18:6 147:18 152:10 154:4

___

**Y**

**Yaklic** 2:3,10,15 11:16 13:4 14:25 15:15 20:3,22 21:6 26:10,15 31:2,8,16,24 32:7 33:3 34:13 35:3 36:21,24 39:3,6 40:7,22,25 41:10,21 42:3 43:4,10,20, 25 45:5,9 48:16 50:1,6 51:22 52:15 53:11 55:23 56:9,14 59:12 60:5,15 70:3 78:14 87:20,24 88:23 89:10,24 91:12 92:1,6,17, 20 105:5,12 108:11,15,23 109:3 120:15 122:24 123:3,18,24 124:11,17,21 126:16 128:16,19,22 129:11 131:20 133:12 137:10 138:19 139:12,15, 23 141:19 144:21 145:2,23 146:1 151:8,17 154:3 155:11,14,18 156:6,13,19

**year** 4:9 5:1,20 12:18 13:7, 13 17:13 26:23 28:5,10 41:13 42:10,11 43:18 46:19 47:8,11 56:19 57:22 61:5 63:13 68:11,16 69:21 78:8 85:12,16,18 91:13,18 101:8 104:14,16 106:20 107:17,20,23 108:7,11 110:25 111:11 112:6,11, 20,25 119:6,8,9 120:10 121:7,23 123:17,21 126:5 133:14 134:18 141:24 148:4

**year's** 151:21

**years** 3:15 4:11 28:24 43:6,11 54:24 56:12 66:3,4 68:20 71:6 92:2,3 97:12 139:6 155:19

**yelled** 9:24

**yielding** 118:5

**young** 44:22 63:23 81:15

**younger** 142:16

___

**Z**

**zones** 25:15

**Zryd** 3:11