**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

JACQUELYN MARES, M.D.,

      Plaintiff,

      -vs-

MIAMI VALLEY HOSPITAL, *et al.*,

      Defendants.

Case No. 3:20-CV-00453

JUDGE NEWMAN

MAGISTRATE JUDGE SILVAIN

---

**MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS
WRIGHT STATE UNIVERSITY d.b.a. BOONSHOFT SCHOOL OF MEDICINE,
JEROME YAKLIC, M.D., G. THEODORE TALBOT, M.D.,
AND ALBERT F. PAINTER, PSY.D.**

---

Respectfully Submitted,

DAVE YOST (0056290)
Attorney General of Ohio

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)
    dcp@zrlaw.com
Scott H. DeHart (0095463)
    shd@zrlaw.com
Zashin & Rich Co., L.P.A.
17 South High Street, Suite 900
Columbus, Ohio 43215
Telephone: (614) 224-4411
Facsimile: (614) 224-4433

*Attorneys for Defendants
Wright State University d.b.a. Boonshoft
School of Medicine, Jerome Yaklic, M.D.,
G. Theodore Talbot, M.D., and Albert F.
Painter, Psy.D.*

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS**

Pursuant to Federal Rule of Civil Procedure 56, Defendants Wright State University d.b.a. Boonshoft School of Medicine, Jerome Yaklic, M.D., G. Theodore Talbot, M.D., and Albert F. Painter, Psy.D. (together, the "WSU Defendants") hereby move for summary judgment on Plaintiff Jacquelyn Mares's five claims asserted against them, including: (1) procedural due process; (2) substantive due process; (3) breach of contract (employment); (4) breach of contract (enrollment); and (5) violation of Fourteenth Amendment Equal Protection Clause (Class of One).  In the alternative, Drs. Yaklic, Talbot and Painter (collectively, the "individual Defendants") move for a determination that qualified immunity bars the § 1983 claims against them in their respective individual capacities.

As set forth in the Memorandum in Support that follows, there are no material issues of disputed fact, and the WSU Defendants are entitled to judgment as a matter of law on all claims asserted against them.

Respectfully Submitted,

DAVE YOST (0056290)
Attorney General of Ohio

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)
    dcp@zrlaw.com
Scott H. DeHart (0095463)
    shd@zrlaw.com
Zashin & Rich Co., L.P.A.
17 South High Street, Suite 900
Columbus, Ohio 43215
Telephone: (614) 224-4411
Facsimile: (614) 224-4433

*Attorneys for the WSU Defendants*

ii

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   STATEMENT OF FACTS .......................................................................... 2

    A.    The Defendants. ............................................................................... 2

    B.    Plaintiff Enrolls in the WSU Residency Program........................... 3

    C.    Plaintiff is Evaluated – Performance Deficits Abound.................... 4

    D.    Plaintiff Receives a Letter of Warning on May 15, 2017................ 7

    E.    Plaintiff is Suspended for Five Days on June 7, 2017. ................... 7

    F.    Plaintiff's Evaluations Continue – Professionalism Concerns Persist............................ 8

    G.    Plaintiff is Placed on Probation on March 8, 2018. ........................ 9

    H.    Plaintiff Remains on Probation but Advances to her Fourth Year of Residency. ......... 11

    I.    Plaintiff Receives a Positive Evaluation on August 29, 2018, but Quickly Regresses.  11

    J.    The Clinical Competency Committee Recommends Plaintiff's Removal on October 3, 2018............ 12

    K.    Dr. Talbot Dismisses Plaintiff on October 5, 2018........................ 13

    L.    The Panel Hearing is Conducted on November 7, 2018................. 14

    M.    Drs. Dunn and Zryd Disagree with the Panel's Recommendation. .............. 15

    N.    Provost Edwards Upholds the Dismissal Decision of Drs. Dunn and Zryd. ............... 16

    O.    The Due Process Policy was Followed at Every Step. ................... 16

III.   LAW AND ARGUMENT ........................................................................ 17

    A.    The WSU Individual Defendants Did Not Violate Plaintiff's Constitutional Rights.... 18

       *All of Mares's claims against Defendants Yaklic and Painter must be dismissed, because neither acted as a "decisionmaker" with respect to any alleged deprivations of Mares's constitutional rights.*

    B.    Plaintiff's Procedural Due Process Claim Fails........................... 19

       *Mares had no protected interest in continued enrollment in the residency program.  Even if she did possess such a right,  Mares received all of the due process that is required for*

iii

*her dismissal from the program. Mares's dismissal was for academic reasons, which requires only notice to the student and a careful and deliberate decision, both of which Mares received. Mares was not entitled to a hearing or an appeal; she received both, and cannot identify any constitutional infirmity in the process she did receive.*

1.    It is Questionable Whether Mares is Entitled to Any Due Process in the First Place. 19

2.    Plaintiff Received All the Procedural Process She was Due, and Then Some........... 20

3.    Disagreement Does Not Rise to the Level of a Due Process Violation. .................... 23

4.    Plaintiff Had Notice and an Opportunity to Respond to the Ancillary Issues Discussed in the Dunn/Zryd Letter. ..................................................................................... 24

C.   Plaintiff's Substantive Due Process Claim Fails. ......................................................... 26

*Mares's continued enrollment in the residency program is not a 'fundamental right' protected under the doctrine of substantive due process. Even if it were, Mares's dismissal for unprofessional conduct was not conscience-shocking by any measure.*

D.   Plaintiff's "Class of One" Equal Protection Claim Fails. .............................................. 28

*A "class of one" equal protection claim is not available in the context of a dismissal from an educational program. Even if it were, Mares's claim fails on the merits because she cannot identify any evidence of a similarly-situated resident who was treated differently.*

E.   The Individual Defendants Are Entitled to Qualified Immunity on Mares's Claims Against Them in Their Individual Capacities. .............................................................. 30

*Mares's purported right to continued enrollment in the residency program was not 'clearly established' at the time of any alleged Constitutional violations, and thus the individual Defendants are entitled to qualified immunity.*

III.   CONCLUSION............................................................................................................. 33

# TABLE OF AUTHORITIES

## Cases

*Al-Dabagh v. Case Western Reserve Univ.*, 777 F.3d 355, 360 (6th Cir. 2015) ......................... 21

*Anderson v. Creighton*, 483 U.S. 635 (1987) .............................................................. 31

*Bd. of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 86 (1977) .............. 20, 21, 22

*Bell v. Ohio State Univ.*, 351 F.3d 240 (6th Cir. 2003) ................................................ 26

*Bishop v. Hackel*, 636 F.3d 757 (6th Cir. 2011) .......................................................... 30

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494
(1985) ................................................................................................................. 22

*Coffman v. Hutchinson Cmty. Coll.*, 2018 U.S. Dist. LEXIS 104671 (D. Kansas June 22, 2018) 29

*Cope v. Heltsley*, 128 F.3d 452 (6th Cir. 1997) ........................................................... 31

*Eid v. Wayne State Univ.*, 2022 U.S. Dist. LEXIS 72471 (E.D. Mich Apr. 20, 2022) ............... 21

*Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008).. 28

*Flaim v. Med. Coll. of Ohio*, 418 F.3d 629 (6th Cir. 2005) ............................................ 20

*Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958 (6th Cir. 2002) .......................... 31

*Heyerman v. County of Calhoun*, 680 F.3d 642 (6th Cir. 2012) ........................................... 18, 19

*Hill v. Bd. of Trs. of Michigan State Univ.*, 182 F.Supp.2d 621 (W.D. Mich. 2001) .................. 27

*Hope v. Pelzer* 536 U.S. 730 (2002) ........................................................................ 31

*Ku v. Tennessee*, 322 F.3d 431 (6th Cir. 2003) ....................................................... 21, 22, 23

*Levine v. Torvik*, 986 F.2d 1506 (6th Cir. 1993) ......................................................... 24

*Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 U.S. Dist. LEXIS 155291 (S.D. Ohio Nov. 17,
2015) ............................................................................................................. 20, 32

*Martinson v. Regents of the Univ. of Michigan,* 562 Fed. Appx. 365 (6th Cir. 2014) ................ 26

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ................................................................ 20

*McGee v. Schoolcraft Cmty. College*, 167 Fed. Appx. 429 (6th Cir. 2006) ........................... 20, 27

*Mumford v. Zieba*, 4 F.3d 429 (6th Cir. 1993) ............................................................. 31

*Nofsinger v. Va. Commonwealth Univ.*, No. 12-236, 2012 U.S. Dist. LEXIS 97857 (E.D. Va. July 13, 2012)........................................................................................................................ 29

*Ohio Civil Service Employees Ass'n v. Seiter*, 858 F.2d 1171 (6th Cir. 1988)............................ 31

*Purisch v. Tennessee Tech. Univ.*, 76 F.3d 1414 (6th Cir. 1996) .................................................. 24

*Regents of U. Mich. v. Ewing*, 474 U.S. 214, 222-23 (1985) ...................................................... 21

*Reyes v. Bauer*, 2013 U.S. Dist. LEXIS 100338 (E.D. Mich July 18, 2013) ............. 25, 26, 28, 29

*Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014)....................................................................... 19

*Rogers v. Tenn. Bd. of Regents*, 273 Fed. Appx. 458 (6th Cir. 2008) ................................... 22, 26

*Salau v. Denton*, 139 F. Supp. 3d 988 (W.D. Mo. 2015)............................................................. 29

*Saucier v. Katz*, 533 U.S. 194 (2001) ......................................................................................... 31

*Silberstein v. City of Dayton*, 440 F.3d 306 (6th Cir. 2006) ....................................................... 31

*Stinebaugh v. City of Wapakoneta*, 630 Fed. Appx. 522 (6th Cir. 2015) ..................................... 19

*Sumpter v. Wayne County*, 868 F.3d 473 (6th Cir. 2017)............................................................ 31

*Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220 (6th Cir. 1997) ........................ 27

*Warren v. City of Athens, Ohio*, 411 F.3d 697 (6th Cir. 2005)..................................................... 28

*Worcester v. Stark State Coll.*, 2019 U.S. Dist. LEXIS 114493 (N.D. Ohio July 10, 2019)........ 27

*Yaldo v. Wayne State Univ.*, 266 F.Supp. 3d 988 (E.D. Mich 2017)............................................ 21

*Yan v. Penn State Univ.*, 10-00212, 2010 U.S. Dist. LEXIS 82812 (M.D. Pa. Aug. 13, 2010) ... 29

*Yoder v. Univ. of Louisville*, 526 Fed. Appx. 537, 549 (6th Cir. 2013)........................... 21, 22, 27

*Zimmeck v. Marshall Univ. Bd. of Governors,* 2014 U.S. Dist. LEXIS 3166 (S.D. W.Va. 2014)29

## Statutes

42 U.S.C. § 1983.......................................................................................................................... 17

## Rules

Fed. R. Civ. P. 56............................................................................................................................ ii

**MEMORANDUM IN SUPPORT**

## I.     INTRODUCTION

All of Plaintiff's claims flow from her dismissal as a medical resident in the Obstetrics and Gynecology Program of Defendants Wright State University ("WSU") and Miami Valley Hospital ("MVH").  Plaintiff was employed by Miami Valley Hospital ("MVH"), a private healthcare organization, while WSU provided the educational component of her Program.

From the outset, Plaintiff displayed a lack of professionalism.  Plaintiff largely admits these unprofessional incidents.  She was counseled on numerous occasions by WSU's OB/GYN Program Director.  She received a letter of warning on May 15, 2017, a five-day suspension on June 7, 2017, and was placed on probation on March 8, 2018.  Towards the end of her residency, she engaged in multiple unprofessional acts. WSU's Clinical Competency Committee (whose job it was to evaluate residents) recommended that Plaintiff be dismissed in a 6-2 vote.  The Program Director followed this recommendation and removed Plaintiff effective October 5, 2018.

Pursuant to WSU's policy, Plaintiff appealed this decision and her case was heard by a three-member hearing panel.  WSU complied with all hearing panel policies:  Plaintiff was provided an advisor to guide her through the process, she selected one of the panel members, she was able to introduce materials at the hearing, and she was able to respond fully to the charges against her.   The panel disagreed with the Program Director's removal decision and it recommended that Plaintiff be reinstated upon certain conditions.  The Medical School Dean and MVH's Chief Academic Officer disagreed with the panel's recommendation and upheld Plaintiff's removal.  Plaintiff appealed again, and the Provost agreed with the removal decision.

Plaintiff now claims that her procedural and substantive due process rights were violated.  She also brings a "class of one" Equal Protection claim.  These claims fail for simple reasons.

1

The Defendants went far above and beyond the procedural due process afforded to students dismissed for academic reasons. Plaintiff was on ample notice that her academic performance was unsatisfactory and the multi-layered decision-making process was both careful and deliberate. Plaintiff was not entitled to a hearing in the first place pursuant to well-established legal standards.

Further, numerous courts have held that there is no substantive due process right to continued enrollment at a state university. Numerous courts have also found a "class of one" Equal Protection claim to be inapplicable to educational dismissals.

The claims asserted against the individual defendants should also be dismissed, both on the merits and because of qualified immunity.

## II. STATEMENT OF FACTS

### A. <u>The Defendants.</u>

Wright State University Boonshoft School of Medicine sponsors a residency program in obstetrics and gynecology ("OB/GYN"). The program is certified by the Accreditation Council for Graduate Medical Education ("ACGME"), which is the national accreditation body. (Painter Dep. 8-9). Dr. Albert Painter is the Associate Dean for Graduate Medical Education and the Designated Institutional Official to the ACGME for the Boonshoft School of Medicine. (Painter Dep. 8). Dr. Ted Talbot was a faculty member in the Department of OB/GYN from April 2012 - November 2020. (Talbot Dep. 10). Dr. Talbot served as Associate Program Director to Dr. Michael Galloway for the OB/GYN residency program from 2016 until July 2018. He served as Residency Program Director from July 2018 - July 2020, when he left WSU. (Talbot Dep. 12-13). Dr. Jerome Yaklic was WSU's Chair of OB/GYN and Associate Dean for Clinical Affairs. (Yaklic Dep. 9). Dr. Yaklic oversaw graduate education in the OB/GYN program. *Id.*

2

During Plaintiff's residency program, Miami Valley Hospital/Premier Health Partners served as her employing institution, while WSU provided the educational portion of her program. (Talbot Dep. 27-28; Mares Dep. 38; Exs. C & D).

**B.    Plaintiff Enrolls in the WSU Residency Program.**

Mares graduated from medical school in 2015. (Mares Dep. 13). Upon graduation, she completed a preliminary year (2015-2016) in an OB/GYN residency program at Hofstra University/Northwell Health. (Mares Dep. 13). Mares completed this "preliminary year," but knew going into that program that she would need to complete the remaining three years of her residency at a different program. (Mares Dep. 22-23). Mares matriculated to WSU's OB/GYN residency program ("the Program") and started her second residency year on June 13, 2016. (Mares Dep. 31; Ex. A). She was scheduled to complete her remaining three residency years at WSU on June 30, 2019. (Mares Dep. 43; Ex. D). The Program has 24 residents: 6 residents in each of the Program's four years. (Mares Dep. 48-49; Talbot Dep. 23-24).

There is a "huge difference" between the two programs -- Mares's role at Hofstra was limited in terms of surgical procedures she could perform (*i.e.*, only vaginal deliveries), whereas WSU residents began performing any number of procedures on day one. (Mares Dep. 27-28). As a result, Mares was well aware that she needed to catch up, *e.g.* to increase her surgical experiences/skills at WSU. (Mares Dep. 29).

WSU issued a comprehensive Resident Program Manual to Mares during her orientation. (Mares Dep. 38-39, 41; Ex. 24). The Manual states that "the Program adheres to the Wright State University Resident Policy Manual's 'Academic and Professional Standards/Due Process' Policy #504. (Ex. 24, p. 44). Mares also executed a Resident-Fellow Agreement at the time she enrolled. (Ex. 1). This Agreement sets forth the obligations of residents, and also references

Item 504. (Ex. 1, p. 3). Item 504 is contained in WSU's Graduate Medical Education Policies & Procedures. (Ex. 23, pp. 43-45).

As set forth in the Resident-Fellow Agreement executed by Mares (Ex. D, p. 3), Mares understood that "Academic progress and completion of Residency is the sole discretion of the residency program director and relevant academic department clinical competency committee." (Mares Dep. 45-46). As discussed above, at the time of her enrollment, the Program Director was Dr. Michael Galloway. (Mares Dep. 46). Dr. Talbot assumed this role in July 2018. (Talbot Dep. 12; Mares Dep. 50-51).

The Clinical Competency Committee ("CCC") is comprised of "faculty members from the OB/GYN Department that advise the program director on matters of the residents' progression through the program towards graduation." (Talbot Dep. 18). The CCC meets quarterly, and every six months evaluates each resident on 24 different "milestones" promulgated by the ACGME. (Talbot Dep. 19-20).

The Program residents rotated at various medical facilities for two to three months at a time, including multiple MVH rotations, Kettering Hospital, and Wright-Patterson Air Force Base ("WPAFB"). (Mares Dep. 51-52).

### C.   Plaintiff is Evaluated – Performance Deficits Abound.

Mares completed her first rotation at MVH from July 1 – September 30, 2016. (Mares Dep. 57; Ex. I). Dr. Galloway issued her first evaluation during a meeting on November 16, 2016, and noted weaknesses in the area of "communicating with peers and senior regarding plan of care." (Ex I. p. 2). Dr. Galloway also commented that Mares's "surgical skills are slightly behind peers" due to her inexperience in this area due to her first year program. (Mares Dep. 57-

4

59 ; Ex. I). Attendings also noted that "Dr. Mares needs 'to know what she doesn't know.'" (Mares Dep. 59-60; Ex. I, p. 3).

Mares next rotated at WPAFB. (Mares Dep. 61). Dr. Nancy Lo provided a Memorandum to Mares on December 20, 2016. Dr. Lo identified four "areas of improvement," including patient relationships, faculty relationships, knowledge base, and surgical skills. (Mares Dep. 62-63; Ex. J).

On January 16, 2017, Dr. Galloway conducted a resident feedback meeting with Mares in which he shared critiques provided by the CCC. (Mares Dep. 64; Ex. K). Resident feedback meetings were conducted two-three times per year. (Mares Dep. 64-65).

Dr. Galloway shared that the "[Mares's] current level of surgical skills are still behind her class and she can improve in detail of presentations. Dr. Mares also was discussed in the areas of professionalism in relating to students, nurses and other residents. She was encouraged to have understanding and patience and provide appropriate supervision and education for medical students." (Ex. K).

Around this same time, Dr. Galloway met with Mares "on the floor between cases" and told her she and one other resident had been the subject of professionalism concerns identified in medical student reviews. (Mares Dep. 70-71). More specifically, the document was entitled "Student Mistreatment Concerns" (Ex. K), and Dr. Galloway instructed Mares that "it's a larger problem, but it's a problem that we need to fix." (Mares Dep. 71). Medical students expressed specific concerns regarding Mares, including that "Dr. Mares was extremely hostile to every medical student she worked with and insulted attendings, fellow residents, and students routinely while I and other students worked with her." (Ex. K, p. 2).[1] Mares claims Dr. Galloway did not

---

[1] Medical students made numerous scathing comments regarding Mares throughout her time in the Program. Comments included: "Dr. Mares is a malignancy to the program"; "Jackie Mares' treatment of

cite this specific comment; however, he told her "there were troubles with medical students, with a lot of residents. I was one that was identified, and it was not okay." (Mares Dep. 72-73).

On April 20, 2017, Dr. Galloway conducted a formal feedback meeting with Mares. (Mares Dep. 74). Dr. Galloway, under the summary section, stated: "Dr. Mares continues to show improvement in areas of deficiency from her transition from her intern year. She has been labeled at times to be over confident and under-skilled and not realizing her limitations." (Ex. M, p. 2; Mares Dep. 82-83).

On May 3, 2017, Dr. Lo had a formal meeting with Mares regarding her WPAFB rotation. (Mares Dep. 84; Ex. N). Dr. Lo addressed three specific areas: not meeting the standards of resident education pertaining to her triaging labor and delivery patients without notifying the attending; developing methods for communication between Mares and her team, including "observe your tone when communicating with your nurses and technicians"; and discussing changes in plans of care with your supervising attending. (Mares Dep. 84-87; Ex. N).

On May 10, 2017, Dr. Talbot notified Mares that she was advancing to her third residency year; however, the CCC "noted some concerns in overall professionalism, specifically with respect to communication with colleagues, nursing and faculty both here at Miami Valley Hospital and at Wright Patterson Air Force Base." (Ex. O). Her ACGME milestones in professionalism were "lagging." "While we see this primarily as an opportunity for improvement, it also serves as a *warning that we expect to see progression on these fronts if you are to complete the program on schedule*." (Mares Dep. 89-90; Dep. O) (emphasis added).

---

her intern on night call was nothing short of atrocious hazing"; "Mares is a terrible human most of the time"; and "Jackie Mares was utterly disrespectful to students, attendings, nurses and other co-residents on multiple occasions." (Ex. MMM). And Mares herself admitted at her panel hearing that her behavior towards medical students during her second year was "atrocious." (Mares Dep. 297; Ex. YY, p. 101).

**D.     Plaintiff Receives a Letter of Warning on May 15, 2017.**

On May 15, 2017, Dr. Galloway met with Mares and issued a letter of warning to her regarding the following areas of concern as identified by the CCC:  patient care, practice-based learning, interpersonal/communication, and professionalism. (Mares Dep. 95; Ex. P). Professionalism was the biggest issue:  "your demeanor, attitude, willingness to be responsive are a major concern." (Ex. P).   "You risk not advancing past your current level and repeating this year level or being dismissed from the residency program.   The Professionalism and Communication areas need to improve now." (Ex. P).  Dr. Galloway directed Mares to complete a remediation plan, which included monthly mentoring with Dr. David McKenna and quarterly program director meetings, and strongly encouraged her to have a physical exam with a physician.  (Mares Dep. 99; Ex. P).

Mares was aware that she was at risk of being placed on probation if she did not complete the three items identified in Dr. Galloway's letter of warning.[2]  (Mares Dep. 94).   However, Mares concedes she did not seek out any professionalism/communication courses or educational opportunities.  (Mares Dep. 100-01).

**E.     Plaintiff is Suspended for Five Days on June 7, 2017.**

On June 7, 2017, Dr. Galloway suspended Mares for five days due to an unprofessional interaction she had with Dr. Ng.  (Ex. Q).  During an exchange with Dr. Ng in the delivery room, Mares admittedly "lost [her] temper, and I said you can deliver the baby.  And I left, and I called Dr. Galloway right away to tell him what had happened." (Mares Dep. 105).  Mares concedes that her interaction with Dr. Ng that day was unprofessional.  (Mares Dep. 107).

Mares requested a meeting for later that afternoon with Dr. Galloway and Dr. Ng.  It was

scheduled to begin at 4:30, but Mares overslept and did not arrive until 4:45. Dr. Ng had left by that point. (Mares Dep. 106-07). Part of the purpose of the meeting was to have an "open discussion" with Dr. Ng and Mares, but that did not occur because Mares was late. (Mares Dep. 106; Ex. Q). At the meeting, Dr. Galloway informed her that other doctors in the Program also found her to be unprofessional. (Mares Dep. 108).

Dr. Galloway noted in Mares's suspension letter that "These [professionalism] issues were pointed out to Dr. Mares and continued concerns with her interpersonal and communication skills and professionalism, which ultimately can affect patient care. There ha[ve] been at least 2 or 3 incidences over the last couple of weeks where professionalism and interpersonal communication has lead [sic] to a slight delay in the diagnosis and subsequent care of a patient." (Ex. Q). Dr. Galloway also provided Mares with a phone number for an Employee Assistance Program hotline. She called it on one occasion, but she hung up because she believed it to be for "urgent physician intervention," which is not what she needed. (Mares Dep. 111).

### F.    Plaintiff's Evaluations Continue – Professionalism Concerns Persist.

On July 21, 2017, Dr. Galloway conducted an evaluation of Mares. (Mares Dep. 117). Interpersonal skills were identified as an improvement area, but Dr. Galloway did not dwell on them as "we (and her) are all aware of these, and it is for this reason I have given her lower scores." (Ex. T).

On October 4, 2017, the CCC met to review the progress of all OB/GYN residents. With respect to Mares, the CCC identified professionalism concerns along with surgical skills/technique. (Mares Dep. 119-20; Ex. U).

On November 7, 2017, Dr. Galloway issued a letter to Mares entitled "Professionalism

---

[2] Mares met with Dr. McKenna monthly. At some point in time, Mares switched mentors to Dr. Croom,

and Medical Student Interactions." (Ex. V). Medical students submitted evaluations and called out Mares by name "related to abuse of medical students by residents related to verbal and unethical behavior." (Ex. V). Dr. Galloway reviewed this letter with Mares and warned her that further complaints may result in disciplinary action. (Mares Dep. 124-25; Ex. V).

On December 13, 2017, the CCC again reviewed the progress of all OB/GYN residents. (Ex. W). With respect to Mares, the CCC noted that she was previously identified as having professionalism concerns, "specifically in communication and working effectively with other residents/faculty in the program, and nursing in some instances." As memorialized, the consensus was that Plaintiff had improved in this area, but "'depending on the day' you are not sure what you will get." (Mares Dep. 119-20; Ex. W). Dr. Galloway expressed this "Dr. Jekyll and Mr. Hyde thing" to Mares. She did not agree with it, but it was brought to her attention. (Mares Dep. 127-28).

On January 11, 2018, Dr. Galloway conducted a review of Mares for the July 1 – December 31, 2017 time period. She received low scores in the areas of professionalism and communication. (Ex. X, p. 1). Dr. Galloway shared with Mares that she "shut down" when she does not know the answer to a question. (Mares Dep. 130; Ex. X, p. 1). She was offered and declined access to career counseling and professional counseling. (Mares Dep. 135-36). Dr. Galloway reminded Mares that her letter of warning was still in place and that professionalism/interpersonal communication needed to improve. (Ex. X, p. 4).

### G. Plaintiff is Placed on Probation on March 8, 2018.

Mares did not improve. Dr. Galloway therefore met with Mares on March 8, 2018 and

---

although she still met with Dr. McKenna monthly. (Mares Dep. 96).

placed her on probation.[3]  (Mares Dep. 146; Ex. Z).  The Notice of Probation indicated that Mares had not made sufficient progress since her Letter of Warning was issued on May 15, 2017. (Ex. Z).  Specifically, the CCC noted four areas of concern: Patient Care, Practice-Based Learning, Interpersonal/Communication and Professionalism.  (Ex. Z).  But the main concerns were professionalism and interpersonal communication: "your demeanor, attitude, and willingness to be responsive remain a major concern."  (*Id.*)  These issues "not only interfere with teaching by the Attending they have a negative effect on transitions of patient care and thus impact patient safety."  (*Id.*)  "Of significant concern are serious complaints from medical students on clerkship rotations related to professionalism along the same lines." (*Id.*)

Mares admits that Dr. Galloway informed her that she was in jeopardy of being dismissed from the Program.  (Mares Dep. 150).  She reviewed this notice with her mentors, Drs. Croom and McKenna.  Mares had the right to appeal this action, but she decided against it in consultation with her mentors. (Mares Dep. 146-48).  As set forth in the Notice, any appeal would be subject to Item 504, entitled "Academic and Professional Standards/Due Process."  A copy of Item 504 was attached to this Notice (Ex. Z, pp. 3-5), and Mares reviewed Item 504 with her mentors.  (Mares Dep. 149).  As the name suggests, Item 504 describes residents' procedural due process rights in great detail.  (Ex. Z, pp. 3-5). Mares was never removed from probation prior to her dismissal in October 2018.

Dr. Talbot, who assumed the role of Program Director in July 2018 (Talbot Dep. 12), regularly conducted probation meetings with Mares.  (Mares Dep. 157).  He conducted the first such meeting on April 20, 2018.  (Ex. CC).

---

[3]  On March 6, 2018, Dr. Lo sent a detailed email to Dr. Galloway outlining Mares's performance deficits.  (Ex. Y).  Professionalism was identified as a key deficiency.  Dr. Talbot (who was taking over for Dr. Galloway as Program Director in July 2018) responded and agreed that Mares's professionalism

**H.**     <u>**Plaintiff Remains on Probation but Advances to her Fourth Year of Residency.**</u>

On July 6, 2018, Dr. Talbot issued a letter to Mares notifying her that she was advancing to her fourth year of residency. (Mares Dep. 161-62; Ex. EE). Dr. Talbot included a hand-written addendum on the letter specifically noting that Mares remained on the probation instituted in March 2018. (Ex. EE). The addendum also reflects that the goal was to have Mares removed from probation by the end of 2018. Mares agrees that Dr. Talbot shared this year-end goal with her. (Mares Dep. 162).

**I.**     <u>**Plaintiff Receives a Positive Evaluation on August 29, 2018, but Quickly Regresses.**</u>

On August 29, 2018, Dr. Talbot issued an evaluation to Mares for the first half of 2018. (Ex. FF). Mares had demonstrated "dramatic improvement" and "is making up deficits in that component [professionalism] of milestones." (Ex. FF). The evaluation concluded by stating that if Mares "continues to show improvement [] she would be taken off probation by the middle of December." (Ex. FF). Unfortunately for Mares, however, she reverted to her old ways and engaged in multiple unprofessional acts in a short time prior to the CCC vote to dismiss her as a resident. (Yaklic Dep. 19-21; Talbot Dep. 60-61). Dr. Talbot provided Mares with a list of representative events as part of the termination due process. (Ex. TT, p. 3).

On September 7, 2018, Dr. Madison brought an incident that occurred on August 31st to the attention of Dr. Talbot. (Ex. GG). Dr. Madison reported that Mares was "rude, abrasive and inappropriate" to an operating room nurse, chief resident, and attending physician. (Ex. GG; Ex. TT, p. 3, incident #3; Ex. YY, pp. 13-14). Dr. Madison confronted Mares about her behavior on September 4th, and she admitted she "exploded and her behavior was out of line." (Ex. GG).

---

issues were "to the point of patient safety and resident team dynamics that then hurt the whole program."

Mares does not dispute that her behavior was unprofessional and she was in the wrong; she apologized to the others involved. (Mares Dep. 169-73).

On October 2, 2018, Dr. Belcastro (MVH's Chief Medical Officer) made Dr. Talbot aware of a patient complaint filed against Mares. In summary, Mares had recommended that a patient (whose mother happened to be a critical care nurse) be discharged. The mother disagreed and requested that her daughter be admitted. (Ex. HH; Ex. TT, p. 3, incident #5). It turned out that the mother was correct as the patient had a placental abruption which resulted in a C-section the following day.[4] In Mares's discussion with the patient, she made a comment to the effect of "if you choose to stay, you will have to pay $13,000 per night." (Ex. HH; Mares Dep. 179-80).

Further, Mares admits she refused to perform a cesarean section on a psychotic patient. (Mares Dep. 190-91). This incident was cited in Dr. Talbot's list. (Ex. TT, p. 3, incident #4). It was also addressed in the dismissal hearing. (Ex. YY, pp. 14-15). It was a simple issue for Dr. Yaklic: "There was a morning report incident where Dr. Mares refused to continue the care of a patient who needed to move to a cesarean section." (Yaklic Dep. 16). As evidenced by this interaction, Yaklic noted that Mares's professionalism concerns were not merely "getting into it with residents or staff," it escalated to the point of "[r]efusing to care for patients, basically what came to be interpreted by many as patient abandonment." (Yaklic. Dep. 31).

**J.     The Clinical Competency Committee Recommends Plaintiff's Removal on October 3, 2018.**

On October 3, 2018, the CCC voted to recommend that Mares be removed from the Program. The vote was 6 in favor of removal, and 2 against. (Exs. II; NNN). Even Dr. McKenna, who served as Mares's mentor, voted in favor of dismissal. (Mares Dep. 187).

_____

(Ex. Y). Dr. Talbot informed Dr. Lo that Mares was being placed on probation later that week. (*Id.*)

Dr. Talbot notified Mares of the CCC recommendation vote the following day. (Mares Dep. 183-86; Exs. II, JJ). He cited specific events in his letter, including "1) refusal to perform cesarean sections or other necessary care of at least two patients, 2) inappropriate behavior on a consultation on the surgical service and 3) inappropriate behavior and comments to our faculty on morning rounds." (Ex. II).

The CCC makes a recommendation to the Program Director, who then can accept, reject of modify the CCC's recommendation. (Talbot Dep. 21, 70). The purpose of Dr. Talbot's meeting with Mares was to allow her to provide her side of the story prior to acting on the CCC's recommendation. (Mares Dep. 189-92; Talbot Dep. 64-65; Ex. II). Mares understood that the CCC made a dismissal recommendation to Dr. Talbot in his capacity as Program Director, who made the decision to terminate her. (Mares Dep. 197-98).

### K.    Dr. Talbot Dismisses Plaintiff on October 5, 2018.

Drs. Talbot and Yaklic met with Mares on October 5, 2018 and notified her of Dr. Talbot's dismissal decision. (Mares Dep. 201; Talbot Dep. 86; Exs. KK & LL). The dismissal letter notified her that she had five days to appeal the decision to Designated Institution Official Al Painter pursuant to Item 504. (Mares Dep. 203-04; Ex. KK). Dr. Painter, in his capacity as DIO, facilitated the appeal/hearing process. (Mares Dep. 210; Painter Dep. 12-13).

Mares appealed Program Director Talbot's decision to a three-member panel. (Mares Dep. 198; Ex. PP). Prior to the hearing, Mares requested that Dr. Talbot provide her with a list of all "complaints, lapses, citations of actions/professional standards, and any other grievances you wish to address at the due process hearing." (Ex. TT, p. 1). Dr. Talbot provided the non-exhaustive list, which included specific events that occurred between Mares's evaluation on

---

[4] On October 10, 2018, Dr. Kindig provided a Memo to Dr. Talbot regarding this incident and other

August 29, 2018 and the CCC removal recommendation on October 3, 2018.  (Ex. TT, p. 3).

Mares did not challenge the veracity of the events cited by Dr. Talbot.  (Mares Dep. 214; 255).  "I never challenged the fact that they happened."  (Mares Dep. 288).  "[I]t's a long time coming and a lot of this bad stuff they are pinning on me is actually true.  I am no saint." (Mares Dep. 283; Ex. RRR, p. 2).  As Mares shared with Drs. Talbot and Painter, she was not "challenging whether or not these specific events happened; but rather, propose that there were many different variables, perspectives, and interpretations that were not taken into account or addressed."  (Ex. OO, p. 3).

**L.** **The Panel Hearing is Conducted on November 7, 2018.**

Per Item 504, Mares was allowed to, and did, recommended three names to serve as hearing panel members.  Also per Item 504, one of her nominees was chosen for the panel:  Dr. Croom.  (Mares Dep. 208-09; Ex. MM).  Drs. Barney and Posnanski were also selected to serve on the panel.  Mares did not know them.  (Mares Dep. 210).

Mares had questions about the hearing process, and Dr. Painter met with her to explain the "due process process."  (Mares Dep. 219-20; Painter Dep. 10-11; Exs. PP, RR).  Per Item 504, Dr. Melanie Glover served as Mares's advisor in preparation for the hearing and at the hearing.  (Mares Dep. 211).  In advance of the hearing, Dr. Painter provided Mares with Dr. Talbot's list of reasons for her termination and her resident file.  (Mares Dep. 216; Ex. OO, p. 4).

The hearing went forward on November 7, 2018.  (Mares Dep. 225; Ex. SS).  It was transcribed (Ex. YY) and a copy was provided to her.  (Ex. DDD).  Prior to the opening of the hearing the Review Panel Chair (Dr. Barney) reviewed the Due Process Policy (Item 504).  (Ex. ZZ, p. 2).  Mares chose not to call any witnesses at the hearing, and instead submitted written

professionalism concerns she had with Mares.  (Ex. QQ).

statements. She was comfortable with that decision. (Mares Dep. 228; Ex. VV). Drs. Talbot and Yaklic presented the Program's portion of the case. (Mares Dep. 228-29). Mares admits she was able to introduce materials and documents at the hearing and was not restricted in any way from introducing exhibits. (Mares Dep. 217). Mares was fully able to respond to the events cited by Dr. Talbot at the hearing. (Mares Dep. 214).

### M.    Drs. Dunn and Zryd Disagree with the Panel's Recommendation.

Following the hearing (and in compliance with Item 504), on November 14, 2018, the panel sent a memo containing recommendations to Medical School Dean Margaret Dunn and Chief Academic Officer Teresa Zryd.[5] (Ex. ZZ). The panel recommended that Mares be reinstated subject to a number of conditions. (*Id.*) The first recommendation was that Mares "will remain on probation until her graduation from the program." (Ex. ZZ, p. 2). This was not feasible for basic reasons. Yaklic testified, "To me, being on probation is saying you're not making adequate progress in your program. It is impossible to graduate while you are not making progress." (Yaklic Dep. 23). Then-Provost Susan Edwards testified similarly: "Technically, that is unsound. It's about competency. And you cannot have somebody on – I could not grant a degree, in this case, it's not a degree, to somebody who's not proved to be competent and needs to be on probation." (Edwards Dep. 19-20).

Drs. Dunn and Zryd disagreed with the recommendations provided and determined that Mares should be terminated from the Program. (Ex. BBB). "Dr. Zryd and I felt there was substantial documentation of a failure to improve while on probation and substantial lapses in

---

[5] On November 16, 2018, Dr. Lo (assistant Residency Program Director) and Dr. Lloyd (Director of Medical Education) sent a letter to Dr. Yaklic requesting that Mares be terminated from the Program. (Ex. AAA). "Her unprofessionalism and poor performance are well documented. She has also been given opportunities to change her behaviors and failed." (Ex. AAA). Drs. Lo and Lloyd concluded their letter with the request that, in the event Mares was reinstated, she not be allowed to rotate at Wright Patterson Air Force Base. (*Id.*)

patient care and in the treatment of learners that were inconsistent with successful completion of this program." (Dunn Dep. 39).

### N.      Provost Edwards Upholds the Dismissal Decision of Drs. Dunn and Zryd.

Mares appealed this decision to then-Provost Edwards, who possessed the ultimate decision-making authority. (Mares Dep. 246; Edwards Dep. 11). Provost Edwards agreed with the decision of Drs. Dunn and Zryd and upheld Mares's dismissal. (Ex. 18). Provost Edwards read and "re-read" the appeal packet that was provided to her. (Edwards Dep. 17). She understood this was a "major decision" for Mares and wanted to ensure both that the process had been followed and that the outcome was appropriate based upon the relevant information. (Edwards Dep. 16). Provost Edwards found that Plaintiff's dismissal was appropriate because there were "multiple instances of actions that Dr. Mares had been involved in. And she had been informed and given feedback along the way and corrective action was not taken. My job is to ensure that anyone associated with Boonshoft School of Medicine is both competent, which clearly that's not the case here, but also professional and ethical." (Edwards Dep. 22-23).

### O.      The Due Process Policy was Followed at Every Step.

Mares received a copy of the resident manual (Ex. 24) each year she was enrolled in the Program. (Mares Dep. 269-71; Exs. E; R; DD). The manual (Ex. 23, pp. 44-45) details each step of the due process procedure as contained in Item 504. Mares concedes that the Program followed each step in effectuating her removal. (Mares Dep. 272-78). Those steps included:

- Written notice of the Program's intended action (dismissal)
- Mares's request for review of the intended action within five working days
- The designated institutional official (Dr. Painter) convened a hearing withing 60 calendar days of the resident's request for review
- A three-member hearing panel was convened
- Mares nominated one of the panel members
- Mares was aware that the purpose of the review was to determine whether there was substantial evidence to support the Program's intended action

- Mares was made aware that she could have an attorney attend the hearing (but chose not to exercise that right)
- The hearing was recorded and a transcript was provided to Mares
- Dr. Talbot, the Program Director, presented the basis for the Program's intended action
- Mares spoke at the hearing and admits that she was, 'by and large," able to respond to the allegations asserted against her
- Her representative (Dr. Glover) was able to respond to Dr. Talbot's presentation
- Mares responded to questions posed by the hearing panel
- Mares had the ability to call witnesses (but chose to submit written statements instead).

## III.  LAW AND ARGUMENT

Mares asserts five causes of action in her Amended Complaint.  (Doc 39).  It is not entirely clear which claims she is asserting against which Defendants:

- Count I alleges a violation of procedural due process against unidentified Defendants, presumably pursuant to 42 U.S.C. § 1983.  (Amended Comp't ¶¶ 2-3, 25-28).

- Count II alleges a violation of substantive due process against unidentified Defendants, presumably pursuant to 42 U.S.C. § 1983.  (Amended Comp't ¶¶ 2-3, 29-30).

- Count III alleges a breach of Dr. Mares's contract of employment presumably under Ohio state law against Defendants WSU, PHP and MVH.  (Amended Comp't ¶¶ 2-3, 31-32).

- Count IV alleges a breach of Mares's contract of enrollment in her residency program, presumably under Ohio state law against Defendants WSU, PHP and MVH.  (Amended Comp't ¶¶ 2-3, 33-34).

- Count V alleges a violation of the Fourteenth Amendment Equal Protection Clause (Class of One) presumably pursuant to 42 U.S.C. § 1983.  (Amended Comp't ¶¶ 2-3, 35-40).

With respect to Counts I and II, in the course of briefing on Defendants' Motion for Judgment on the Pleadings, Mares conceded that she brings her procedural due process claims against the individual WSU Defendants in their individual capacities, and seeks non-monetary relief (*i.e.*, reinstatement to the academic program) under *Ex Parte Young* against these same Defendants in their official capacities.  (Doc. 13, PAGEID#90-91).  Plaintiff's theory presumably remains unchanged.  However, in the event Plaintiff attempts to broaden the scope of

these claims, the WSU Defendants incorporate and reassert their sovereign immunity argument, as set forth in the Motions for Judgment on the Pleadings. (Docs. 7, pp. 5-7, PAGEID#56-58; 24, pp. 6-8, PAGEID#139-141). Further, Defendants assume that Mares also brings Count V against the individual WSU Defendants in their individual capacities, and seeks non-monetary relief (*i.e.*, reinstatement to the academic program) under *Ex Parte Young* against these same Defendants in their official capacities. Again, if she does not, the Defendants assert their sovereign immunity argument as if fully rewritten herein.

With respect to Counts III and IV, Mares has represented that she has abandoned those claims against WSU and the individual WSU Defendants. (Doc. 29, p. 11, PAGEID#219). She is asserting Counts III and IV against MVH and PHP only. (*Id.*) Accordingly, the undersigned Defendants will not address those claims. However, in the event Mares changes course, they reassert the same arguments set forth in the Motions for Judgment on the Pleadings. (Docs. 7, pp. 14-16, PAGEID#65-67; 24, pp. 14-16, PAGEID#147-149).

Counts I, II and V will be addressed in turn.

A.      **The WSU Individual Defendants Did Not Violate Plaintiff's Constitutional Rights.**

Before turning to an analysis of Counts I, II and V, it is undisputed that Drs. Painter and Yaklic were not decision-makers who recommended that Mares be dismissed from the Program. All remaining claims should be dismissed as to these individual Defendants for the simple reason that they did not deprive Mares of any Constitutional rights. They could not have, given their respective roles, as detailed in the Facts section above.

To state a § 1983 claim against an individual, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Heyerman v. County*

*of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (citation omitted). "Persons sued in their individual capacities under § 1983 can be held liable based *only on their own unconstitutional behavior*." *Id.* (citation omitted). That is, a plaintiff must prove "that the violation was committed *personally* by the defendant." *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014).

The identity of the decision makers was not a secret to Mares. Mares failed to name Drs. Dunn, or Zryd or Edwards. In contrast to the aforementioned individuals, Dr. Painter had no decision-making role in the process at all -- he simply facilitated the hearing process. And Dr. Yaklic was not a decision maker either. Because neither of these individual Defendants acted to deprive Mares of any alleged constitutional rights, her claims against them must be dismissed.

Of the three named individual Defendants, only Dr. Talbot had any decision-making authority. He made the *initial* determination to dismiss Mares (based upon the CCC's recommendation), but his decision was later appealed to Drs. Dunn and Zryd as well as Provost Edwards. The WSU Defendants concede that Dr. Talbot meets the "independent recommender" standard for purposes of summary judgment and are not seeking his dismissal on this basis, although Mares's claims against Dr. Talbot fail on other grounds as argued *infra*. *See, e.g. Stinebaugh v. City of Wapakoneta*, 630 Fed. Appx. 522, 530 n.2 (6th Cir. 2015) ("an influential recommender can be liable under § 1983 without being the final decision maker, if the recommendations are shown to be sufficiently influential.") (citation omitted).

### B. Plaintiff's Procedural Due Process Claim Fails.

#### 1. It is Questionable Whether Mares is Entitled to Any Due Process in the First Place.

As Defendants have previously pointed out (which has gone unrebutted thus far by Plaintiff), this Court has observed, "it is not entirely settled in the Sixth Circuit as to whether a student's continued enrollment at a state university is an interest protected by procedural due

process." *Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 U.S. Dist. LEXIS 155291, *37 (S.D. Ohio Nov. 17, 2015) ("*Compare McGee v. Schoolcraft Cmty. College*, 167 Fed. Appx. 429, 437 (6th Cir. 2006) ('The issue of whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has not been resolved.') *with Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) ('In this Circuit, we have held that the Due Process Clause is implicated by higher education disciplinary decisions.'"). Accordingly, as a threshold matter, Defendants submit that Mares does not have any interest protected by the Due Process Clause in continued enrollment in WSU's Residency Program. The fact that this issue remains unresolved also has significant implications in the qualified immunity context (as discussed below).

### 2. <u>Plaintiff Received All the Procedural Process She was Due, and Then Some.</u>

Assuming *arguendo* that Mares has a protected interest in continued enrollment, the amount of process due to a higher education disciplinary decision varies according to the facts of the situation and is determined using the framework set forth by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976).  *Flaim,* 418 F.3d at 634. The Supreme Court -- without determining whether there is a constitutionally protected interest in pursuing a medical career -- has held that dismissal based on "the failure of a student to meet academic standards" "calls for far less stringent procedural requirements" than those based on "the violation by a student of valid rules of conduct."  *Bd. of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 86 (1977).  Pursuant to *Horowitz*, the initial issue is to determine whether Plaintiff was dismissed for "academic" or "disciplinary" reasons, as this dictates the amount of process she is due.  Here, it is clear that the stated reason for removal, professionalism, is <u>academic</u> in nature.  (Emphasis added).

"The term 'academic' in this context is somewhat misleading." *Yoder v. Univ. of Louisville*, 526 Fed. Appx. 537, 550 (6th Cir. 2013). What constitutes an "academic" dismissal is far-reaching. The Sixth Circuit has repeatedly emphasized that "academic evaluations" may permissibly extend beyond "raw grades [and] other objective criteria." *Al-Dabagh v. Case Western Reserve Univ.*, 777 F.3d 355, 360 (6th Cir. 2015), citing *Ku v. Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003); *Yoder*, 526 Fed. Appx. at 549-50. And professionalism, which was the reason cited by WSU to dismiss Mares, has been explicitly found to be academic in nature. *See Al-Dabagh*, 777 F.3d at 359 ("Professionalism has been a part of the doctor's role since at least ancient Greece."); *Eid v. Wayne State Univ.*, 2022 U.S. Dist. LEXIS 72471, *5 (E.D. Mich Apr. 20, 2022) (citing *Yaldo v. Wayne State Univ.*, 266 F.Supp. 3d 988, 1005 (E.D. Mich 2017), citing *Al-Dabagh*, 777 F.3d at 360 ("[i]n the Sixth Circuit, dismissing a medical student for lack of professionalism is <u>academic</u> evaluation.") (Emphasis added).

When a student is dismissed for academic reasons, "a student is entitled only to notice that his or her academic performance was not satisfactory and a 'careful and deliberate' decision regarding [the school's] punishment." *Yoder*, 526 Fed. Appx. at 549 (citing *Horowitz*, 435 U.S. at 85; *Ku*, 322 F.3d at 436). In academic dismissals, a court "should show great respect for the faculty's professional judgment" and "may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of U. Mich. v. Ewing*, 474 U.S. 214, 222-23 (1985).

The due process required for academic decisions is "minimal." *Yoder*, 526 Fed. Appx. at 549.[6] "In the case of an academic dismissal or suspension from a state educational institution, when the student has been fully informed of the faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was careful and deliberate, the Fourteenth Amendment's procedural due process requirement has been met." *Ku*, 322 F.3d at 436 (citing *Horowitz*, 435 U.S. at 85-86). "No formal hearing is required for academic decisions because such academic decisions 'require[] an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking.'" *Ku*, 322 F.3d at 436 (citing *Horowitz*, 435 U.S. at 91).

Here, Mares admits that WSU followed each step of its Due Process Policy (Mares Dep. 271-78), which included a full hearing and multiple levels of appeal. Even had her dismissal been "disciplinary" in nature, WSU's Item 504 procedures afford more-than-sufficient "notice" and "opportunity to be heard," which are the hallmarks of procedural due process. *See generally, Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985). But more importantly, she was not entitled to any of this process in the first place since her dismissal was academic in nature.

Mares has not and cannot pursue any argument that she lacked notice of the faculty's dissatisfaction with her professionalism and of her failure to improve this deficit. She had regular meetings with her Program Director, she received written feedback and evaluations, she was referred to a mentor, and she was issued a written warning, placed on suspension, and placed on probation due to ongoing professionalism concerns. *See, e.g., Rogers v. Tenn. Bd. of Regents*, 273 Fed. Appx. 458, 462 (6th Cir. 2008) (clinical instructor's written evaluations satisfy due

---

[6] Courts reviewing a disciplinary action must conduct a "more searching inquiry." *Flaim,* 418 F.3d at 634. Not that there is any dispute, but WSU's robust appeal process certainly satisfies the heightened

process, even though certain notice procedures set forth in Handbook were not followed). Defendants met the low bar established in *Ku*:  Mares was most certainly fully informed of the faculty's dissatisfaction with her, and the dismissal decision was both careful and deliberate, including multiple layers of review and input obtained from all stakeholders.

### 3. Disagreement Does Not Rise to the Level of a Due Process Violation.

While it is not entirely clear how Mares will try to argue she was not afforded procedural due process, she does contend in her Amended Complaint that Defendants denied her "the value of that property interest when they ignored the hearing committee's recommendation following an evidentiary hearing that there was insufficient evidence to support her termination from the program." (Doc. 39, ¶27).  As an initial matter (and as discussed *supra*), Mares did not name any individual Defendants that "ignored" the recommendation of the hearing panel.  Drs. Dunn and Zryd disagreed with the panel's recommendations, and reached their own independent conclusion.  Drs. Talbot, Yaklic, and Painter did not participate in this effort whatsoever.  None of the individually named Defendants engaged in the purportedly unlawful conduct.

Second, and not to belabor the point, but Mares was not entitled to a hearing in the first place, as the basis for her removal was academic and not disciplinary.  She was aware of the Program's dissatisfaction with her and the removal decision was careful and deliberate.  The Constitution does not require a uniform consensus of thought between every stakeholder at every point in an appeals process (or even an appeals process at all).

Third, it appears that Mares may be attempting to "constitutionalize" every discrete step of the Item 504 hearing process – even though Item 504 makes explicit that the hearing panel makes a **written recommendation** (not a **decision**) that is subject to being accepted or rejected

---

disciplinary standard as well.

by Drs. Dunn and Zryd. (Ex. 23, p. 45). Even if the Defendants had deviated in some respect from the written appeals procedure (which did not occur here, as Item 504 was followed to a tee), such procedural irregularities in a state's hearing procedure do not rise to the level of a constitutional violation. *Purisch v. Tennessee Tech. Univ.*, 76 F.3d 1414, 1423 (6th Cir. 1996). "A state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable." *Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir. 1993). Thus, any such argument by Mares on this point would miss the mark; the procedural due process analysis in the academic dismissal context looks at the larger picture.

### 4. Plaintiff Had Notice and an Opportunity to Respond to the Ancillary Issues Discussed in the Dunn/Zryd Letter.

Plaintiff contends she did not receive procedural due process (Mares Dep. 245-46) due to two concerns identified in the Dunn/Zryd letter than were not addressed at the hearing: "Moreover, concerns have been raised regarding your deficiencies in critical communications obligations and entering incorrect information in a patient safety report." (Ex. BBB). But, as discussed above, academic procedural due process is met when the faculty's dissatisfaction regarding a student's performance is expressed, which it certainly was in this instance. While there may have been ancillary deficiencies in Mares's academic performance, professionalism was always at the center of the Program's expressed concerns with her performance as a resident. (Talbot Dep. 59; Yaklic Dep. 25-26, 29).

Regarding the critical communication issue, Dr. Edwards recalled reviewing, as part of the appeal packet, a communication sent by an attending physician at WPAFB to Mares regarding critical communications. (Edwards Dep. 30-32). Dr. Edwards located the email in question, which contained a recommendation stating: "OB Resident [Mares] needs to stop in the

nursing station, ask who is caring for the patient and COMMUNICATE with the nurse caring for the pt." (Edwards Dep. 31-32; Ex. BBBB, p. 2). Given the clear unhappiness with Mares, and the fact that the reference to communicate was in capital letters, Dr. Edwards assumed this was the "critical communications" issue in question. (Edwards Dep. 32). Accordingly, Mares had an opportunity to address this issue at the time it occurred. (Ex. BBBB, pp. 3-5). Moreover, the critical communications issue was not particularly important to the ultimate decisionmaker, Dr. Edwards. She did not accept the critical communications statement in the Dunn/Zryd letter as true; rather, "professionalism and interpersonal communication were key." (Edwards Dep. 29).

Further, Mares had ample opportunity to address the patient safety report **both** at the time it occurred in May 2018 (Mares Dep. 241; Ex. BBBB), and in her detailed written appeal to Provost Edwards. (Mares Dep. 291, 295; Ex. AAAA). Dr. Lo at WPAFB emailed Plaintiff on May 8, 2018 and asked her to provide her "recollection of events" in response to the report. (Ex. BBBB, p. 1). Plaintiff provided a detailed explanation in response. (Ex. BBBB, pp. 3-5). Then, when the Report was cited in the Dunn/Zryd letter, Plaintiff admits that she was likewise free to address any issues she wanted to in her final appeal to Provost Edwards. (Mares Dep. 291). She admits she was able to share the patient safety report correspondence from May 2018 with Provost Edwards. (Id.) Provost Edwards reviewed the May 2018 email exchange between Mares and Dr. Lo regarding the patient safety report because it was included in the appeal packet. (Edwards Dep. 34). And Mares addressed the issue in her appeal to Provost Edwards. (Ex. AAAA, pp. 5-6).

At least one court in this Circuit has held that a student's written response to allegations presented against her is sufficient for due process purposes (as opposed to addressing the matter in a hearing). *Reyes v. Bauer*, 2013 U.S. Dist. LEXIS 100338, *40 (E.D. Mich July 18, 2013)

("When the [Executive Committee] met to determine whether Plaintiff would continue at school, it received Plaintiff's letter explaining her situation and there is no evidence that the [Executive Committee] did not consider Plaintiff's situation carefully or deliberately. The [Executive Committee] also informed Plaintiff that its decision was based off of Plaintiff's entire academic career, not solely the Y grade in Dr. Bauer's class.")  In *Reyes*, the Court looked at the totality of the circumstances that resulted in Plaintiff's dismissal for due process purposes, not just one particular item or step.  Again, the focus is whether the decision was "careful and deliberate," not a piecemeal approach as to what was/was not addressed in a formal evidentiary hearing.  As made clear by the cases above, Mares was not entitled to a hearing in the first place.  She was fully aware of the Program's dissatisfaction with her – that is the standard.

### C.  Plaintiff's Substantive Due Process Claim Fails.

*Reyes* contains a detailed explanation of a student's substantive due process rights – or more appropriately, the lack thereof – in continuing her medical school education.  *Reyes*, *supra*, at *31-33. Many of these same cases were cited in Defendants' Motion for Judgment on the Pleadings.  (Doc. 24, pp. 12-14, PAGEID#145-147).

The Sixth Circuit has concluded that, absent an equal protection violation, there is no substantive due process right to continued enrollment at a state university. *Bell v. Ohio State Univ.*, 351 F.3d 240, 251 (6th Cir. 2003).  In *Bell,* the Court rejected the contention that "arbitrary or capricious" actions by a school were sufficient to state a substantive due process violation.  *Id*.  The Sixth Circuit has since held that a nursing student's "interest in her nursing education is not protected by substantive due process."  *Rogers v. Tenn. Bd. of Regents*, 273 Fed. Appx. 458 (6th Cir. 2008).  *See also, Martinson v. Regents of the Univ. of Michigan,* 562 Fed. Appx. 365, 375 (6th Cir. 2014) (following *Bell* to reject nursing student's substantive due

process challenge to expulsion and recognizing that "the Supreme Court never has held that the interest in continued education at a public university constitutes a fundamental property or liberty interest that finds refuge in the substantive protections of the Due Process Clause."); *Yoder*, 526 Fed. Appx. 537, at 549, FN7 (noting that the Sixth Circuit "has rejected the notion that substantive due process protects a medical or nursing student's interest in his or her continued enrollment."); and *McGee*, 167 Fed. Appx. at 437 (same) and *Doe v. Miami Univ.* 882 F.3d 579, 598 (6th Cir 2018) (same); *Hill v. Bd. of Trs. of Michigan State Univ.*, 182 F.Supp.2d 621, 626-27 (W.D. Mich. 2001) ("The Sixth Circuit has recognized that the right to attend public high school is not a fundamental right for purposes of substantive due process analysis. The right to a public college education and the right to receive notice prior to suspension are *even less fundamental*.")

But even if analyzed on the merits, and as previously addressed in the Motion for Judgment on the Pleadings briefing, "[s]ubstantive due process claims may be loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997) (citations omitted). With respect to the first category, Defendants have cited any number of cases that stand for the simple proposition that Mares does not have a substantive due process interest in her continued enrollment in WSU's medical Residency Program. With respect to the second category, Mares has provided no evidence remotely approaching such a standard. *See, e.g., Worcester v. Stark State Coll.*, 2019 U.S. Dist. LEXIS 114493, *12-13 (N.D. Ohio July 10, 2019) ("[Plaintiff's] dismissal from the dental hygiene program because of her failure to meet the academic, safety, and professionalism standards of SSC, and her outright disregard for her supervisor's directives, is not conscience-shocking by any measure.")

Plaintiff falls far short of establishing a substantive due process claim.

**D.      Plaintiff's "Class of One" Equal Protection Claim Fails.**

There is a dearth of law analyzing "class of one" Equal Protection claims in the higher educational context.  However, the *Reyes* decision contains an exhaustive analysis of this issue, and there the Court found such a theory to be inapplicable to educational dismissals (from the University of Michigan's Dental School in that case).  To Defendants' knowledge, every court that has analyzed this issue has found such a claim to be inapplicable to dismissals from educational programs.

As discussed in *Reyes*, at *20-21, the "class of one" theory can be brought in certain circumstances:

> A plaintiff can bring a class of one Equal Protection claim when she "alleges that the state treated [her] differently from others similarly situated and that there is no rational basis for such difference in treatment."  *Warren v. City of Athens, Ohio*, 411 F.3d 697, 710 (6th Cir. 2005) (citation omitted). "The 'rational basis' test means that **courts will not overturn government action 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational**."  *Id.*  at  710-11 (citations omitted, insertions in *Warren*). "A 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways; either by 'negativ[ing]' every conceivable basis which might support' the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren v. City of Athens, Ohio*, 411 F.3d 697, 710 (6th Cir. 2005) (citations omitted, insertion in *Warren*.).

> The Supreme Court, though, has limited the "class of one" Equal Protection claim in the public employment context.  *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008). While this case does not involve public employment, i.e., Plaintiff is not an employee of the school, the Court must go through a review of *Engquist* to show how the class of one theory applies in very limited circumstances, and not here.

The *Reyes* Court undertook an extensive analysis of *Engquist* and found that it provided a "structure for the Court to analyze Plaintiff's situation, a student alleging a class of one Equal

Protection theory against a professor or continuing education institution." *Id.* at \*24. It also observed that other courts have extended *Engquist* to the education context. "These courts have 'found the public education context an equally poor fit for class-of-one equal protection claims due to the inherently discretionary decisionmaking that occurs there." *Nofsinger v. Va. Commonwealth Univ.*, No. 12-236, 2012 U.S. Dist. LEXIS 97857, \*11 (E.D. Va. July 13, 2012) (also noting the "deleterious effects that would befall our public institutions of higher education if constitutional questions constantly arose out of grades and evaluations.") *See also, Yan v. Penn State Univ.*, 10-00212, 2010 U.S. Dist. LEXIS 82812, \*5-6 (M.D. Pa. Aug. 13, 2010) (holding that *Engquist* precluded plaintiff from brining class of one theory of Equal Protection against university for expulsion from Ph.D. program).

The *Reyes* Court agreed with this analysis and found a "class of one Equal Protection claim is a poor fit for the facts. Here there is no clear standard by which Dr. Bauer evaluated students retaking parts of her class, for she testified that she had the discretion to allow certain students who failed portions of her class to redo those specific portions." *Id.* at \*25.

Other District Courts have cited *Reyes* with approval and reached the same conclusion that, pursuant to the *Engquist* analysis, the class of one theory is unavailable in higher education cases. *Coffman v. Hutchinson Cmty. Coll.*, 2018 U.S. Dist. LEXIS 104671, \*11 (D. Kansas June 22, 2018) (citing *Salau v. Denton*, 139 F. Supp. 3d 988, 1007 (W.D. Mo. 2015) ("Because of the discretionary nature of the student disciplinary proceedings, this action is not suited for a 'class of one' theory."); *Zimmeck v. Marshall Univ. Bd. of Governors,* 2014 U.S. Dist. LEXIS 3166, \*5 (S.D. W.Va. 2014) (class-of-one theory does not apply in public education settings).

However, the *Coffman* Court went one step further and conducted an analysis of the claim and determined that the plaintiff "is unable to allege the facts needed to satisfy the exacting

standards required for such a claim. Nothing he has submitted shows he can adequately allege that he was similarly-situated to another student in all material respects based on behavior, attitude, experience, and performance in the clinical setting." *Id.* at *45.

Similarly, Mares's claim fails on substantive grounds because she simply does not and cannot identify any other resident with a disciplinary history matching hers, let alone who was treated differently. Her claim fails for the additional reason that this was the only instance in which Provost (now President) Edwards weighed in on the potential removal of a medical resident. (Edwards Dep. 19). In other words, there is no one else Mares can point to who was subjected to this process culminating in final discipline issued by Dr. Edwards.

Plaintiff's Equal Protection claim fails because a "class of one" theory is unavailable in these circumstances. And even if it were available, Mares's case would fail on the merits.

### E.    The Individual Defendants Are Entitled to Qualified Immunity on Mares's Claims Against Them in Their Individual Capacities.

Assuming for the sake of argument that Drs. Talbot, Yaklic and Painter are properly named Defendants (*i.e.,* that they *personally* engaged in unconstitutional behavior, which they did not), Counts I, II and V should be dismissed for the additional reason that they are entitled to qualified immunity. The qualified immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights. *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011). "Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A qualified immunity defense may be resolved under the first or second prong, as there is no "rigid order of battle." *Id.* at 234. Once a defendant invokes qualified immunity, the plaintiff

bears the burden to show that qualified immunity is inappropriate. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). A plaintiff must satisfy both parts of the inquiry to defeat the assertion of qualified immunity. *Sumpter v. Wayne County*, 868 F.3d 473, 480 (6th Cir. 2017).

Whether law is "clearly established" is normally determined with reference to the published decisions of the Supreme Court, the Sixth Circuit, or perhaps, the district court in the district where the conduct occurred. *Ohio Civil Service Employees Ass'n v. Seiter*, 858 F.2d 1171 (6th Cir. 1988). "[I]t is only in extraordinary cases that we can look beyond Supreme Court and Sixth Circuit precedent to find clearly established law." *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002). "Although decisions of other courts can clearly establish the law, such decisions must both point unmistakably to the unconstitutionality of the conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional.'" *Mumford v. Zieba*, 4 F.3d 429, 432-33 (6th Cir. 1993).

The fundamental inquiry is whether public officials are "'on notice their conduct is unlawful.'" *Hope v. Pelzer* 536 U.S. 730, 739 (2002), *quoting Saucier v. Katz*, 533 U.S. 194, 206 (2001). "'[I]n light of pre-existing law, the unlawfulness must be apparent.'" *Id.*, *quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Thus, under the *specific facts* with which the defendant was confronted, pre-existing law must "'dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*.'" *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997).

As discussed above (in the analysis of Mares's procedural due process claim), this Court has recently observed that "it is not entirely settled in the Sixth Circuit as to whether a student's

continued enrollment at a state university is an interest protected by procedural due process." *Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 U.S. Dist. LEXIS 155291, *37 (S.D. Ohio Nov. 17, 2015) (citations omitted). If this Court has reached such a conclusion, then surely qualified immunity shields the individual Defendants actions here, because Mares's right to continued enrollment was far from "clearly established."

Thus, even in the event that the Court should find Mares's rights were violated in Counts I and/or II and/or V, the constitutional rights were not *clearly established* at the time of the violation and Drs. Talbot, Yaklic and Painter remain entitled to qualified immunity.

Mares's claims do not fare any better when analyzed substantively. With respect to procedural due process, Mares received all the process that she was due (and then some), whether viewed from an "academic" or "disciplinary" standpoint. The individual Defendants are unaware of any Sixth Circuit or District Court decision with a remotely analogous factual scenario in which a medical school resident was provided extensive warnings and evaluations; placed on suspension, warning, and probation; and then afforded a full evidentiary hearing with multiple layers of appeal.

With respect to Mares's substantive due process claim, any number of Sixth Circuit decisions cited above stand for the simple proposition that substantive due process does not extend protections to a medical student's interest in continued enrollment.

With respect to Mares's equal protection "class of one" theory, multiple judicial decisions cited above hold that students are precluded from bringing such claims for expulsion from educational programs.

## III.  CONCLUSION

For the foregoing reasons, the WSU Defendants respectfully request that the Court grant their Motion for Summary Judgment.  There are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law.  This lawsuit should be dismissed against Wright State University and the three individual Defendants.

Respectfully Submitted,

DAVE YOST (0056290)
Attorney General of Ohio

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)
    dcp@zrlaw.com
Scott H. DeHart (0095463)
    shd@zrlaw.com
Zashin & Rich Co., L.P.A.
17 South High Street, Suite 900
Columbus, Ohio 43215
Telephone: (614) 224-4411
Facsimile: (614) 224-4433

*Attorneys for Defendants,*
*Wright State University d.b.a. Boonshoft*
*School of Medicine, Jerome Yaklic, M.D.,*
*G. Theodore Talbot, M.D., and Albert F.*
*Painter, Psy.D.*

## CERTIFICATE OF SERVICE

This will certify that the foregoing was filed electronically on September 12, 2022. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)
Zashin & Rich Co., L.P.A.