Dear Dr. Edwards,

I am writing to you to strongly appeal the decision to terminate me from my Obstetrics and Gynecology (Ob/Gyn) residency just months short of completing the program. Let us be realistic. At this point my termination from this program does not just end my employment at this institution – it ends my career. It makes my lifetime of dedication and years upon years of schooling and training completely useless. After being terminated in my final year, I have no chance of being accepted by another program to complete my residency, making me ineligible to become board certified in my specialty, which prevents me from practicing Ob/Gyn ever again. Being a physician is who I am, and working in women's healthcare is what I love, which is why I am writing an appeal to you to overturn the decision of the Dean and accept the recommendation made by the hearing committee to reinstate me.

I transferred to the Wright State University Ob/Gyn residency program my second year, which is arguably the hardest year of this program. Things were structured differently at my previous program, meaning I came to this program with roughly one hundred less surgeries than my fellow classmates, and no antepartum service experience. Without a formal plan in place to address these deficiencies, I tried as hard as I could to catch up – reading more, spending extra time in the skills lab, and seeking out additional procedures. By the end of my second year, my formal evaluations confirmed that the gap in deficiencies between my classmates and myself was rapidly closing, but I could feel something was off. Knowing there was still room for improvement, I did what I do best – I worked harder.

Third year was the Promised Land I looked forward to from the trenches of second year. I was finally a senior resident! I now had junior residents under my charge, with time to teach and mold them. Knowing how difficult the working environment is here, I paid particular attention to ensure my junior residents, individually, felt that they could excel. This was not a simple feat. In a stressful and unpredictable field like Ob/Gyn, tensions are high and feelings run the gamut on a daily basis. But, I did my best to make my junior residents feel that, together, we were a team and could face any adversities that came our way. They trusted me to teach them and not lead them awry, and I trusted them to manage our patients and ask for help when needed. That is why, enclosed, you will find letters of support from all of my fellow residents that I worked closely with.

Yet, even in the face of improved relationships with my colleagues, the feeling that something was off never fully went away. Then in January 2018, compounded by the loss of a close family friend, it hit me - I was burned out. For me, burnout was like falling down a deep well. I could see the top, I just could not get there, and I did not know what to do. I clung to patient care because connecting with patients and facilitating their healthcare journeys remained my main source of joy and satisfaction. But, treading water at the bottom of the well just to keep my head above water was exhausting, and soon daily niceties and my relationships with other members of the healthcare team began to require more energy than I had. This eventually degenerated into failing my responsibilities towards teaching and fostering medical students. As a result, I was placed on probation in March 2018, though I always maintained a high level of patient care.

EXHIBIT 29

Being placed on probation was terrible, but proved an effective wake-up call for me. My formal remediation plan was to continue monthly mentoring, which I had started in May 2017, and attend quarterly meetings with the Program Director. At the time of my probation, reference was also made to a "scholastic remediation program" as determined by the Clinical Competency Committee (CCC); however, I was informed that this was deemed unnecessary as I always demonstrated a strong fund of knowledge. Consequently, nothing else was arranged.

Dr. Galloway, the Program Director at the time, initially instructed me to refrain from working with medical students. However, telling medical students that I was not supposed to work with them, and declining to work with them when asked, was ultimately unrealistic. Inevitably, it also led to another onslaught of negative comments from medical students. Instead, I took it upon myself to change my approach and resume my work with medical students. With significant effort and progress, I was able to channel my passion for teaching residents into teaching medical students. As a result, my scores from medical students skyrocketed from 1-2 to an average of 4.33 on a 5-point scale.

In August 2018, despite losing my Aunt, who was one of my strongest supporters, it felt like, professionally, things were finally falling into place in my fourth year. My relationship with medical students was at an all-time high, I earned the respect needed to lead my healthcare team, I completed the ACGME's surgical requirements for graduation, and I had already fulfilled my research and Grand Rounds requirements satisfactorily. Indeed, I was so trusted by the Department that I was made to run the Obstetrics, Benign Gynecology, and Gynecologic Oncology services (services that would usually be run by three different fourth year residents) all at the same time as the sole fourth year resident during the days of September 22-25, 2018 while all of the fourth year Air Force residents were at a conference in Hawaii.

This drastic improvement was recognized at my quarterly meeting on August 29, 2018 with Dr. Talbot, the current Program Director, who stated that I could expect to come off of probation in December 2018. This is why I was so completely blindsided on October 4, 2018 when Dr. Talbot texted me to urgently meet with him and discuss my options following the CCC's meeting the day prior, where a vote passed to terminate me from the program.

Let me stress that I had not received any formal feedback that would even remotely suggest that I was at risk for immediate termination, as I was told I would be coming off of probation at my last meeting. Needless to say, I went into shock upon hearing that I had been terminated. After sharing the news, Dr. Talbot wanted answers from me and referenced plans for me to attend more meetings the same day. You can imagine how I felt at that point in time - my mind was still reeling from this abrupt and unexpected change, so I declined to answer any more questions and requested to leave. About fifteen minutes after this encounter, having regained some of my composure, I communicated with Dr. Talbot that I wanted to attend any meetings he saw fit, but requested they be postponed until the next day. A meeting was set for 15:00 on October 5, 2018, and I returned to my clinical duties and scheduled surgeries in the interim. However, instead of discussing options at this meeting with Dr. Talbot and Dr. Yaklic, I was promptly fired without any further discussion.

I contacted Dr. Painter that same afternoon to discuss my options of Due Process and emailed Dr. Talbot on October 8, 2018, requesting an outline of the case against me that led to my termination. I finally received this information on October 22, 2018, only after I sent a reminder email the day prior. There were five complaints lodged against me. The first two dealt with my treatment of residents, medical students, and other members of the healthcare team, which predated my meeting with Dr. Talbot on August 29, 2018, and had already been addressed as noted above.

The third referred to an isolated incident on August 31, 2018 when a surgical resident and I argued about the treatment of an obstetrical patient who had been under my team's care for five days without significant improvement in her gallstone pancreatitis. This argument became heated and I was inappropriately rude; however, I recognized this and promptly removed myself from direct interactions with the surgical team, informing my co-residents and attending of my outburst. Additionally, I later apologized and worked in a cordial fashion with the same surgical resident on-call that evening on a different case. I found out later that the surgical team had contacted Dr. Madison, an Ob/Gyn Faculty Member, but not the attending on this case, to discuss my behavior. Dr. Madison reached out to me and I relayed the story in full, again accepting complete responsibility and recognizing that I was out of line. She appreciated this and suggested enlisting the help of nursing administration in similar circumstances in the future. No one else spoke to me about this incident until it was referenced as a reason for my termination. I feel compelled to note that although there is no excuse for my reaction during this encounter, this was an isolated event and I enjoyed cordial relationships with many consulting services without any problems on a daily basis.

The next referenced case occurred on September 21, 2018. The complaint was that I refused to operate on a patient. While this is true, it is not the entire story. The previous team told me that the patient in question and her family had become progressively combative, both verbally and physically. They had made several threats to the nursing and resident staff to the point that providers had to be removed from the patient's care and the patient's mother had returned to the hospital premises with a knife, and was later detained by hospital security. It was agreed that the patient required a cesarean section as attempts to achieve a vaginal delivery had failed. However, participating in a surgical procedure as a physician who is unknown to a combative family has the potential to exacerbate already complicated circumstances, so I expressed concerns about my safety. I discussed this with the rest of the team, who understood and were comfortable with, and capable of, continuing to care for the patient. I remember stating, twice, to Dr. Yaklic that I felt unsafe performing the surgery, as he did not acknowledge my statement the first time, let alone ask me why I felt that way. In fact, no one spoke with me about this matter until it was referenced as a reason for my termination in the email I received October 22, 2018, an entire month after the incident.

The final complaint referenced a term obstetrical patient who presented for abdominal pain. She had previously been seen and discharged the same day from another hospital for the same complaint. Additionally, she had already been evaluated and managed in our triage for approximately five to six hours prior to the start of my shift. During that time she underwent an appropriate evaluation, including a laboratory workup and assessment of maternal and fetal status, all of which were very reassuring. She received intravenous Tylenol and anti-nausea

medications with complete resolution of her complaints, allowing her to sleep soundly for several hours in our triage. Upon reviewing this information with my team, I felt comfortable that we had ruled out any life-threatening complications and I agreed with their plan for discharge. As per our protocol, Dr. Talbot, the attending physician, was also called and agreed with the patient's discharge.

I heard nothing further about the patient until I was informed over an hour later that she was still here and the patient's mother wanted to speak to me. It was explained to me that she had already spoken to the first and third year residents and desired to go up the chain of command, prompting the request for me to speak with her as the new chief resident on the service. By this time, the patient's mother was already very irritated. With the nurse at the bedside, I attempted to calmly engage the patient's mother and explain our work up and reasoning. The patient's mother quickly became irate, verbally aggressive, and nearly physically aggressive to the point that I felt the need to cross my arms in front of my chest in order to create space between the patient's mother and myself. Still, I remained calm and we ultimately agreed that the patient would remain in triage and be treated with the oral version of the medications that she had previously received, with a planned reassessment after a few hours. As I turned to confer with the bedside nurse regarding when it would be safe for the patient to have these medications repeated, Dr. Talbot entered the triage and announced that the patient would be admitted.

Feeling as though my relationship with the family had been compromised, I excused myself from the room, alerted my team of the plans to admit the patient, and carried on with my other clinical duties. Dr. Talbot later shared with me that sometimes with difficult patients who refuse to go home, it is easier to admit them and reassess in the morning. He did not ask me about my encounter with the patient's mother, nor did he reprimand me in any way.

After the patient slept soundly throughout the night, we recommended discharge to the oncoming attending, Dr. Kindig. Several hours later, Dr. Kindig asked me to see the patient with her. I declined because I did not feel that I would be able to instill a sense of trust and confidence with the family knowing that Dr. Talbot had overturned my counseling and plan in front of them the night before. Instead, I explained that I would be happy to send the third year resident in my place, promptly briefed my third year resident on the case, and sent her to find Dr. Kindig.

Aside from offering the third year resident to see this patient with Dr. Kindig early that morning, Dr. Kindig did not attempt to talk to me about this case for the rest of the day. As she simply replied, "okay" when I offered the third year resident, I had absolutely no cause to think that she so strongly disapproved of my actions on this case. I cannot be expected to change if no one is willing to discuss these matters with me as they occur, or within a reasonable timeframe. As in the previous case, no one ever mentioned this case to me, nor did they inform me that the patient's mother had formally complained until I was fired two weeks later. To this day I still have not seen, nor have I been asked to discuss, the complaint regarding this incident; save as it was addressed at my hearing on November 7, 2018.

The hearing on November 7, 2018 was the next step in the Due Process. At that hearing, everyone had a chance to raise their concerns and discuss any and all issues in front of an impartial panel. As such, I was very surprised to read of "deficiencies in critical communications

obligations and entering incorrect information in a patient safety report" cited for the first time in the Dean's reasoning to overturn the hearing committee's recommendations. I have combed through my entire personnel file, all formal communication I have received from the program, and the transcript of the hearing. I cannot find reference to any such specific "critical communications obligations," or my failure to meet them. As for the patient safety report, I have enclosed a copy for your perusal. You will see that nothing was entered incorrectly. Instead, it was determined that the standard of care was met, and everything was addressed and managed appropriately. I find it very disconcerting that these issues appeared to impact the Dean's decision so strongly, yet were never referenced by Dr. Talbot in his written reasons for my termination, or at the hearing where they could be discussed fairly.

Still, at the conclusion of the hearing, it was agreed that while there were many faults and lapses on both sides, I never stopped trying. I did everything that was asked of me. I went to every meeting, sought out every surgery, improved my scores with medical students, and earned appreciation from my peers. It was not perfection, but it was persistent effort and objective progress.

I have continued to change and progress since my termination. Previously, I expressed concern about practicing medicine after residency and thought of settling for a medicine-related field such as insurance or pharmaceuticals. Honestly, some members of the Ob/Gyn Department made me feel that I was an undesirable candidate for clinical medicine. However, the support that I have received from the clinical faculty, nurses, and my fellow residents in the weeks that have elapsed since my termination has been clarifying. I now realize that I am not only capable of practicing medicine, but that I do not want to do anything else. I have invested my entire life and education into becoming a physician, and I plan to see that goal through.

To that end, I continue to work everyday to better myself and prepare to return to work. Before the end of October 2018 I sought out and began regular counseling of my own volition, which I plan to continue. Still, it is said it takes a village. So, I have asked for help and enlisted faculty, residents, and nursing staff who know me, my strengths and weaknesses, and are prepared and willing to help me succeed.

I appreciate that coming back to this program will not be easy, but I believe that with the additional recommendations set forth by the hearing committee of weekly meetings with my mentors, and a formal course on professionalism and clinical practice regularly discussed with my Program Director, I have what it takes to cross the finish line. I am months away from finishing my residency and being able to practice as a physician in the field I love, and I will continue to exhaust every option that is available to me to ensure that I am able to finish what I started here at Wright State University - my village and I are ready.

Sincerely,


Jacquelyn Mares