UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

JACQUELYN MARES, M.D.,

      Plaintiff,

vs.

MIAMI VALLEY HOSPITAL, *et al.*,

      Defendants.

Case No. 3:20-cv-453

District Judge Michael J. Newman

---

### ORDER: (1) GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Doc. Nos. 49, 57); AND (2) TERMINATING THIS CASE ON THE DOCKET

---

This civil case, consisting of federal claims and state law claims between diverse parties, is before the Court on two motions for summary judgment filed by: (1) Defendants Albert F. Painter, Psy.D. ("Dr. Painter"); Theodore Talbot, M.D. ("Dr. Talbot"); Jerome L. Yaklic, M.D. ("Dr. Yaklic"); and Wright State University, d/b/a Boonshoft School of Medicine ("Wright State") (collectively, "Wright State Defendants"; or, as to the individual doctors, "individual Wright State Defendants"); and (2) Miami Valley Hospital ("MVH"); and Premier Health Partners ("Premier Health"). Doc. Nos. 49, 57. Plaintiff Jacquelyn Mares, M.D. ("Dr. Mares") filed a response in opposition. Doc. No. 66. The Wright State Defendants, MVH, and Premier Health replied. Doc. Nos. 67, 68. This matter is ripe for review.

### I. Undisputed Facts

#### A. Wright State's Residency Program

Wright State runs a medical residency program through the Boonshoft School of Medicine ("Boonshoft"), where it educates aspiring obstetricians and gynecologists. *See* Doc. Nos. 52-9, 54-1. Wright State partners with MVH and Premier Health to employ the residents. Doc. No. 54-

1.  Three documents govern a resident's relationship with Boonshoft: (1) the Resident Program Manual; (2) the Graduate Medical Agreement, which is between Boonshoft and the resident and serves as the resident's enrollment contract; and (3) an individualized Resident-Fellow Agreement, which serves as the resident's employment contract with MVH and Premier Health.  Doc. Nos. 54-1, 54-23.

Boonshoft put together its manual to comply with the Accreditation Council for Graduate Medical Education's ("Accreditation Council") program requirements for Obstetrics and Gynecology programs nationwide.  *See* Doc. No. 54-24 at PageID 2117.  The Accreditation Council notes, "[g]raduate medical education transforms medical students" into practitioners, while mandating that residency programs follow its requirements to "serve as role models of excellence, compassion, professionalism, and scholarship."  Doc. No. 54-20 at PageID 1884.  The Accreditation Council provides that residency "educational programs" should last 48 months and impose evaluations of a resident's performance "at the end of each rotation[,]" while the residency program director reviews the evaluations "every six months."  *Id.* at 1914.  For those residents who struggle to meet the program's requirements, the Accreditation Council advises institutions to develop an "individual remediation plan" to resolve a resident's deficiencies.  *Id.*  When an institution deems it appropriate to dismiss a resident, the Accreditation Council warns that the program directors must "ensure the program's compliance with the Sponsoring Institution's policies and procedures for due process when action is taken to suspend or dismiss[.]"  *Id.*

Inculcating professionalism is an important part of a residency program, according to the Accreditation Council.  *See, e.g.*, *id.* at PageID 1927.  Among other things, a resident "must demonstrate an understanding of their personal role in the . . . provision of patient[] and family-centered care[,]" and the "safety and welfare of the patients entrusted to their care, including the

2

ability to report unsafe conditions and adverse events[.]"  *Id.* at PageID 1928.  "[A]ccurate reporting of clinical and educational work hours, patient outcomes, and clinical experience data" are also essential facets of any residency program.  *Id.*

Boonshoft's manual provides several academic and professional standards that its residents must follow.  Doc. No. 54-23 at PageID 2056, 2077.  Professionalism is a resident's core competency, manifested through good behavior.  *Id.* at PageID 2049.  Boonshoft requires that "resident[s] must perform all responsibilities . . . competently, efficiently, and maturely."  *Id.* at PageID 2077.  If a resident violates any standard of professionalism, Boonshoft warns that this "constitute[s] sufficient grounds for disciplinary suspension, disciplinary termination, or disciplinary non-renewal of the resident's appointment."  *Id.*

Wright State's Resident-Fellow Agreement notes that it, too, requires residents to adhere to the Accreditation Council's standards.  Doc. No. 54-1 at PageID 1826.  The Resident-Fellow Agreement is between Wright State (doing business as Boonshoft), the individual resident, and a sponsoring hospital—in this case, MVH.  *See id.*  The agreement permits MVH to remove a resident from its employment if he or she "is terminated" from or "substantially fails to meet any of the general requirements" of his or her residency.  *Id.* at PageID 1828.  Additionally, the agreement notes that it "abide[s] by . . . Ohio law[] concerning employment at will[,]" and "either party may terminate this agreement by giving written notice to the other at any time . . . for any reason that does not contradict the . . . due process procedures . . . for residents."  *Id.* at PageID 1827 (internal quotation marks omitted).

To monitor a resident's progression through the program, Boonshoft faculty regularly provide feedback to residents in informal and formal meetings.  Doc. No. 54-23 at PageID 2056. Boonshoft also has a "Clinical Competency Committee" ("Competency Committee"), made up of

obstetrics and gynecology faculty members.  Doc. No. 54 at PageID 1754, 1804.  The Competency Committee meets every six months to evaluate whether a resident is meeting the Accreditation Council's twenty-four resident education "milestones."  *Id.* at PageID 1755–56.  The Competency Committee cannot dismiss a resident, but it may recommend dismissal to the program director if the majority of the Competency Committee so recommends.  *Id.* at PageID 1757.

To officially dismiss a resident from the program, however, Boonshoft has procedures—which it dubs its "due process procedures" or "Item 504"—that it first must follow.  Doc. No. 54-23 at PageID 2078.  Initially, if a resident is not meeting Boonshoft's academic or professional standards, the program must submit a written notice of intent to take adverse action, like suspension or termination, against the resident no later than 120 days before the end of his or her contract.  *Id.*  Next, Item 504 requires the program abide by the following seven[1] steps:

1. Five days after receiving the written notice, the resident can request review of Boonshoft's anticipated action.  *Id.*

2. Sixty days after receiving the resident's request, Boonshoft must hold a hearing.  *Id.*

3. Boonshoft must compose a review panel for the hearing consisting of three faculty members, "who are knowledgeable of the program's academic content."  *Id.*  The dean of Boonshoft and MVH's CEO appoint the members jointly.  *Id.*  The resident nominates one member and may submit a list of nominees, from which the dean and MVH's CEO pick one member.  *Id.*  The dean and MVH's CEO pick the final member.  *Id.*

4. The review's stated purpose "is to determine if there is substantial evidence" to support the action.  *Id.*  The resident may have an attorney as an observer at the hearing, but the attorney may not represent the resident during the hearing.  *Id.*  Boonshoft—through its director—can call witnesses (after giving a 15-day advanced notice to the resident) and question the resident and his or her witnesses.  *Id.*  The resident may speak at the hearing; question the evidence, director, and Boonshoft's witnesses; present witness testimony; and have a faculty advisor assist him or her.  *Id.* at PageID 2079.  Finally, the hearing panel may question the witnesses called, but it "will not consider any information related to the resident's

---

[1] There are additional steps, irrelevant here, that Boonshoft follows for residents serving in the military.  Doc. No. 54-23 at PageID 2078–79.

performance after the program's decision." *Id.*

5. Ten days after the hearing, the panel submits a written recommendation to the dean and CEO. *Id.* By a majority vote, the panel recommends affirming the intended action, taking revised action, or not acting. *Id.*

6. The dean and CEO, fifteen days after receiving the recommendation, send their written decision to affirm, take revised action, or reject the intended action. *Id.*

7. Ten days later, the resident may appeal the decision to Wright State's provost in writing. *Id.* Fifteen days after receiving the appeal, the provost "must notify the resident in writing of the decision to affirm or not affirm the action." *Id.*

**B.  Dr. Mares's Residency**

Dr. Mares, an aspiring OB/GYN, graduated from George Washington University's medical school in 2015.[2]  Doc. No. 52 at PageID 876, 884–85.  After completing a preliminary year at Hofstra University, she entered Boonshoft's OB/GYN residency program in June 2016.  *Id.* at PageID 885–86; Doc. No. 52-1.

She completed her first rotation at MVH on November 16, 2016, and met with Dr. Michael Galloway, Boonshoft's program director, for her first evaluation.  Doc. No. 52 at PageID 919; *see* Doc. No. 52-26.  It was generally favorable, but Dr. Galloway noted that Dr. Mares was behind her peers in surgical skills and struggled with communication.  Doc. No. 52-26 at PageID 1319.

Next came Dr. Mares's rotation at Wright-Patterson Air Force Base, which lasted until December 21, 2016.  Doc. No. 52-28.  Her supervisor found her punctual, attentive, and efficient. *Id.* at PageID 1322.  But her supervisor also identified her surgical skills, her knowledge base, and her understanding of faculty and patient relationships as areas for improvement.  *Id.*

After the Competency Committee evaluated Dr. Mares's first-year performance, Dr. Galloway met with her on January 16, 2017 to discuss the Competency Committee's feedback.

---

[2] Dr. Mares testified at her deposition that, after her termination, she received her "medical license . . . and a controlled substance license . . . through the State of Michigan."  Doc. No. 52 at PageID 876.

Doc. No. 52 at PageID 926; Doc. No. 52-30 at PageID 1324.  While praising her knowledge, the Competency Committee identified her struggles with communicating effectively with her peers, nurses, and medical students.  Doc. No. 52-30 at PageID 1324.  Thus, Dr. Galloway suggested she work on her "professionalism in relation to fellow residents, nurses and medical students" and "focus on positive interactions and collaboration with others."  *Id.*  Around that time, Dr. Galloway—in a separate discussion with Dr. Mares during her rotation—flagged several complaints about Dr. Mares from medical students, who claimed she mistreated them in her interactions with them.[3]  *See* Doc. No. 52 at PageID 933–34; Doc. No. 52-32.  He told her this was "not acceptable[.]"  Doc. No. 52 at PageID 935–36.

Dr. Mares's actions throughout her 2017 rotations prompted several meetings with Dr. Galloway.  On April 20, 2017, Dr. Galloway noted that Dr. Mares was steadily improving her skills but remained "over[-]confident and under-skilled and not realizing her limitations."  Doc. No. 52-35 at PageID 1332.  By May 3, 2017, one of Dr. Mares's supervisors in her rotation advised her to "[o]bserve [her] tone when communicating with [her] nurses and technicians[,]" criticized her ability triaging labor and delivery patients, and said she did not communicate effectively with her supervisors.  Doc. No. 52 at PageID 946–48; Doc. No. 52-38 at PageID 1337.

Dr. Mares received a letter on May 10, 2017 from Dr. Talbot—then-chair of the Competency Committee—that she was advancing to her third year.  Doc. No. 52-41.  Dr. Talbot commended Dr. Mares's knowledge and work ethic, but warned her that the Competency Committee "noted some concerns in overall professionalism, specifically with respect to

---

[3] At her deposition, Dr. Mares testified that she was unaware of the specifics contained in the reports of mistreatment that several medical students levied against her, but she was aware that she was "identified in . . . medical student reviews" and it was "a problem that we need[ed] to fix."  Doc. No. 52 at PageID 933–35.  The reports stated, "Dr. Mares was extremely hostile to every medical student she worked with and insulted attendings, fellow residents, and students routinely while I and other students worked with her."  Doc. No. 52-32 at PageID 1327.

communication with colleagues, nursing, and faculty . . . ." *Id.* at PageID 1340. Dr. Talbot advised Dr. Mares that the letter "serves as a warning that we expect to see progression on these fronts if you are to complete the program on schedule." Doc. No. 52-41 at PageID 1340.

Then, Boonshoft issued a letter of warning on May 15, 2017. Doc. No. 52-43. Stating that her Accreditation Council competency levels were "below that expected for [her] current level of training[,]" Dr. Galloway's letter identified, "Patient Care, Practice-Based Learning, Interpersonal/Communication and Professionalism" as areas of concern. *Id.* at PageID 1346. The letter described Dr. Mares's "lack of respect" and "somewhat rude" demeanor when attending to patients. *Id.* To avoid probation, Dr. Mares started an individual remediation plan, during which she would have monthly mentoring meetings with a faculty mentor, attend quarterly meetings with Dr. Galloway, and get an exam from a physician. *Id.* at PageID 1347. The letter concluded by warning her that, if she did not complete these steps and improve, she risked "being dismissed from the residency program." *Id.* at PageID 1346.

There is no genuine dispute that Dr. Mares's problems continued to escalate. She was then suspended for five days on June 7, 2017. Doc. No. 52-45. The suspension came after Dr. Mares had an incident with Dr. Ng, who was the chief on-call physician during her rotation that day. *Id.* at PageID 1350. Dr. Mares testified at her deposition that, right before she left her shift, she received a call that a pregnant patient was bleeding. Doc. No. 52 at PageID 966; *see* Doc. No. 52-45 at PageID 1350. She asked a nurse to check the patient and continued trying to sign out and leave. Doc. No. 52-45 at PageID 966–67. When Dr. Ng confronted Dr. Mares for leaving, Dr. Mares lost her temper; yelled, "You can deliver the baby[;]" and left. Doc. No. 52 at PageID 967; Doc. No. 52-45 at PageID 1350. Dr. Mares was supposed to meet with Dr. Galloway and Dr. Ng at 4:30 p.m. that day, but Dr. Mares showed up at 4:45 p.m.—prompting Dr. Ng to leave around

4:30 p.m.  Doc. No. 52 at PageID 967; Doc. No. 52-45 at PageID 1350.  As Dr. Galloway wrote later, "[s]ince Dr. Mares was late, part of the purpose of the meeting was to have an open discussion with both [her and Dr. Ng] present to encourage professionalism and effective communication on the team and to work through any grievances."  Doc. No. 52-45 at PageID 1350.  With Dr. Ng gone, Dr. Galloway used the meeting to reprimand Dr. Mares for her unprofessional behavior.  *Id.* at PageID 1351.

Dr. Mares continued receiving criticism about her professionalism over the next few months.  A Competency Committee review on October 4, 2017 flagged continuing concerns about Dr. Mares's professionalism.  *See* Doc. No. 52-55.  Several medical students accused her of "verbal and unethical behavior[,]" leading Dr. Galloway to bring these concerns to her attention again on November 7, 2017.  Doc. No. 52-57 at PageID 1478.  She acknowledged these concerns, promised to work on it, and noted that—combined with her latest letter of warning—Boonshoft was closely scrutinizing her.  *Id.*  Things got better on January 11, 2018, when Dr. Mares received another evaluation that acknowledged her improvement in her communication skills with residents and other faculty.  *See* Doc. No. 52 at PageID 991–92; Doc. No. 52-61 at PageID 1486–87.

But, ultimately, on March 8, 2018, Dr. Mares was placed on probation (Doc. No. 52-65) because Boonshoft determined that her professionalism and demeanor had not sufficiently improved.  *Id.* at PageID 1676.  Boonshoft was troubled by her poor reviews from medical students, claiming mistreatment; her lagging surgical skills; and her alleged failure to "properly check out patient care changes."  *Id.*  Dr. Mares later testified at her deposition that she received the letter, including the portion identifying her issues with properly checking out patient care changes, and she was aware that if she did not complete the remediation program, she was "liable to be dismissed[.]"  Doc. No. 52 at PageID 1012.

Throughout 2018, Dr. Mares continued meeting with Dr. Talbot, who took over as program director that July. *Id.* at PageID 1019. Dr. Talbot noted, in a July 6, 2018 letter, that Dr. Mares deserved to advance to her fourth year, but she was to remain on probation with the hopes that she would surpass the need for probation by the end of the year. Doc. No. 52-16; *see* Doc. No. 52 at PageID 1024.

Dr. Mares's resident evaluation on August 29, 2018 signaled an improvement. Dr. Talbot noted that she "showed professionalism and a deep level of knowledge when interacting with those around her," marking "a dramatic improvement" from her prior ways. Doc. No. 52-19 at PageID 1306. It appeared that Dr. Mares was well on her way to "com[ing] off probation by mid[-]December" 2018. *Id.* at PageID 1307.

However, that hope proved fleeting. Several incidents later that year called Dr. Mares's improvement into question. *See* Doc. No. 52-54 at PageID 1473; Doc. No. 54 at PageID 1797. On September 7, 2018, Dr. Mares acted "extremely rude . . . abrasive, and inappropriate" to the nurses and doctors on staff during a rotation. Doc. No. 52-22 at PageID 1311; *see also* Doc. No. 52 at PageID 1031 (Dr. Mares's testified that she "exploded" and "was not very professional, and I . . . apologized to everybody"). Two weeks later, Dr. Mares refused to admit a pregnant patient in pain, despite the patient's protests. *See* Doc. No. 52-24; Doc. No. 52 at PageID 1037–38. The patient ended up having a placental abruption, leading to a cesarean section the next day. *See* Doc. No. 52-24. Finally, on October 2, 2018, Dr. Mares refused to perform a cesarean section on a reportedly "psychotic" patient. Doc. No. 52 at PageID 1052–53; Doc. No. 55 at PageID 2149.

On October 3, 2018, the Competency Committee voted, six members in favor and two against, to recommend to Dr. Talbot (as the Program Director) that he dismiss Dr. Mares from the residency program. Doc. No. 52 at PageID 1049; Doc. No. 52-40. The Competency Committee's

internal debate focused on Dr. Mares's "professionalism, communication, patient care interactions, and overall performance abilities."  Doc. No. 52-40 at PageID 1339; *see also* Doc. No. 52-27.  It also considered the two instances where Dr. Mares did not care for pregnant patients, citing "patient safety" concerns.  Doc. No. 52-40 at PageID 1339.  The Competency Committee made this recommendation despite Dr. Christopher Croom ("Dr. Croom"), another Boonshoft faculty member, proposing that Dr. Mares receive mental health counseling in lieu of dismissal.[4]  Doc. No. 52-27 at PageID 1320.

Dr. Talbot called Dr. Mares in for a probationary meeting on October 4, 2018, where he told her that the Competency Committee recommended her dismissal.  Doc. No. 52 at PageID 1045–46; Doc. No. 52-27.  He explained the basis for the recommendation—*i.e.*, her refusal to perform cesarean sections; unprofessional conduct; inappropriate comments; and behavior to residents, doctors, and students.  Doc. No. 52-27 at PageID 1320.  Dr. Mares acknowledged these concerns and claimed she never had a chance to explain her perspective.  *Id.* at PageID 1320–21; *see also* Doc. No. 52 at PageID 1054–55.  Dr. Mares met Dr. Talbot and Dr. Yaklic, head of Boonshoft's OB/GYN program, for a follow-up meeting the next day.  Doc. No. 52 at PageID 1058; Doc. No. 54 at PageID 1872; Doc. No. 55 at PageID 2411–12.  She was formally dismissed from the program at that meeting, based on Boonshoft's continuing concerns with her communication and professionalism.  Doc. No. 52 at PageID 1058; Doc. No. 52-33; Doc. No. 54 at PageID 1872.

### C.  The Appeal Hearing and Post-Hearing Dismissal

Dr. Mares appealed her dismissal under Item 504.  Doc. No. 52 at PageID 1060.  She requested, and received, a copy of "all of the complaints, lapses, citations of academic/professional

---

[4] Dr. Croom further advocated for Dr. Mares to Dr. Talbot after the Competency Committee meeting.  Doc. No. 52-33.

standards, and any other grievances" that motivated Dr. Talbot's decision, before the hearing.  Doc. No. 52-54 at PageID 1472.  As was her right, Dr. Mares nominated three doctors to serve on the panel, including Dr. Croom, who served as a panelist.[5]  Doc. No. 52 at PageID 1070–71. Moreover, she met with Dr. Melanie Glover—her hearing advisor—before the hearing, while Dr. Painter, Boonshoft's Associate Dean, emailed her Boonshoft's justifications for her dismissal on November 2, 2018.  Doc. No. 52 at PageID 1073–74; Doc. No. 52-42 at PageID 1344.  She also was directed to—and availed herself of—Item 504's procedures to familiarize herself with them before the hearing.  Doc. No. 52 at PageID 1071–74; Doc. No. 52-51.

Dr. Mares appeared at the hearing on November 7, 2018.  Doc. No. 52-64.  In opening the hearing, Dr. Painter noted to the panel that its "task" included making "a recommendation to . . . Dr. Dunn, who is the school of medicine dean, and . . . Mr. Maiberger, who is the CEO of [MVH.]" *Id.* at PageID 1498.

Dr. Talbot and Dr. Yaklic presented reasons for Dr. Mares's termination.  *See id.* at PageID 1497.  They focused on her "areas of concern[,]" including "patient care, practice-based learning, interpersonal communication, and professionalism."  *Id.* at PageID 1500.  Examples included: (1) the two incidents where Dr. Mares did not treat pregnant patients on her rotations; (2) alleged rudeness to students, nurses, and doctors; (3) a patient's safety complaint lodged against Dr. Mares; and, among other things, (4) her failure to improve while on probation.  *Id.* at PageID 1500–15. They concluded by noting that allowing Dr. Mares to stay in the residency program would "tarnish the learning environment" that Boonshoft sought to cultivate.  *Id.* at PageID 1518.  The panel pushed back on Drs. Talbot and Yaklic, questioning them about whether dismissal was the proper remedy.  *Id.* at PageID 1519–21, 1528–30, 1534–35.  They responded that, given Dr. Mares's

---

[5] The panel consisted of Dr. Croom, Dr. Stacey Poznaski, and Dr. Linda Barney.  Doc. No. 52 at PageID 1070–71.

repeated struggles with professionalism, terminating her was necessary to uphold Boonshoft's standards. *Id.* at PageID 1537–43.

The panel next heard from Dr. Glover. *Id.* at PageID 1565. Establishing that Dr. Mares was contrite, "remorseful and realized her behavior was inappropriate[,]" Dr. Glover argued that Dr. Mares's actions were due to Boonshoft's failure to nurture her professional development, along with physician burnout and mental health issues. *Id.* at PageID 1566–67, 1570–71, 1575–77.

Then, Dr. Mares had an opportunity to speak. Dr. Mares elected not to present any witnesses at the hearing, and only submitted written questions for the panel. Doc. No. 52 at PageID 1089–90. She acknowledged that she had "never denied that [the events] happened" and "was completely atrocious to medical students in second year." Doc. No. 52-64 at PageID 1596, 1617; *see also* Doc. No. 52-58 at PageID 1480 (Dr. Mares's email to Dr. Painter before the hearing, noting that she "d[id] not plan on challenging whether or not these events happened"). She expressed her desire to be given another opportunity and answered questions. *Id.* at PageID 1597–1656. On November 14, 2018, the panel voted to recommend to Dr. Dunn to reinstate Dr. Mares to the residency program, subject to her remaining on probation, among other conditions. Doc. No. 52-66.

Dr. Dunn and Dr. Teresa Zyrd, MVH's Vice President—who could accept or reject the panel's recommendation under Item 504—disagreed. *See* Doc. No. 52-7; Doc. No. 52-43 at PageID 2078. They wrote to Dr. Mares informing her they rejected the panel's recommendation, citing Dr. Mares's "unprofessional and insubordinate conduct[,]" as well as "deficiencies" with communication and "entering incorrect information in a patient safety report." *Id.* at PageID 1266; *see also* Doc. No. 50 at PageID 756–57, 760–61.

Dr. Mares appealed this decision to Wright State's Provost, Susan Edwards. Doc. No. 52

at PageID 1108. Edwards, in considering the appeal, reviewed a packet containing, among other things, letters of support from various doctors affiliated with Boonshoft (Doc. No. 51-1); the complete transcripts of the Competency Committee and panel hearings (Doc. No. 51 at PageID 794); and a statement from Dr. Mares advocating that she remain in the program (Doc. No. 51-2). Edwards testified at her deposition that she received "all of the chain of evidence" documenting Dr. Mares's behavior that led to her termination. Doc. No. 50 at PageID 797. After reviewing this evidence for over a week, Edwards upheld the decision to terminate Dr. Mares's residency for "multiple instances" of unprofessional conduct and behavior. *Id.* at PageID 799, 804–05. As Edwards later testified at her deposition, she was ultimately concerned with Dr. Mares staying on probation and receiving a degree because Edwards would not advance "somebody who's not proved to be competent and needs to be on probation." *Id.* at PageID 801–02.

### D. Procedural History

Dr. Mares, proceeding with the assistance of counsel, filed this lawsuit on November 5, 2020. Doc. Nos 1, 39. In her amended complaint, she alleges, under 42 U.S.C. § 1983, that all Defendants terminated her residency in violation of her procedural and substantive due process rights.[6] Doc. No. 39 at PageID 582. She claims a federal Equal Protection Clause violation, under a class-of-one theory, against all Defendants. *Id.* at PageID 583. Proceeding under state law, she alleges that MVH and Premier Health breached their enrollment and employment contracts with her, but she abandoned those claims as to the Wright State Defendants. *See* Doc. No. 29 at PageID 219; Doc. No. 39 at PageID 582–83. She seeks injunctive relief against the individual Wright

---

[6] The Eleventh Amendment does not bar these claims. Dr. Mares may sue Wright State, Boonshoft, and the individual doctors in their official capacities under 42 U.S.C. § 1983 for injunctive relief. *See Doe v. Univ. of Cincinnati*, 219 F. Supp. 3d 645, 654–55 (S.D. Ohio 2016). She may also sue the individual doctors in their individual capacities for damages. *See, e.g.*, *Shepherd v. Wellman*, 313 F.3d 963, 967 (6th Cir. 2002).

State Defendants in their official capacities and sues them in their individual capacities for her § 1983 claims. *See* Doc. No. 13 at PageID 90–91. Following six months of discovery, the parties engaged in mediation with a Magistrate Judge, which was unsuccessful in resolving the instant dispute. The parties then resumed discovery and filed the instant summary judgment motions. *See* Doc. No. 58.

## II. Legal Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *See* Fed. R. Civ. P. 56(c)(1)(A) and (B). A court considering a motion for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "[t]he non-moving party . . . may not rest upon [his or her] mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citations omitted).

### III. Analysis

There is no genuine dispute of material fact that Defendants did not violate Dr. Mares's constitutional rights.[7]  As a medical resident, she was entitled to minimal due process and Boonshoft could dismiss her for professionalism—an academic concern—without a hearing.  Even if Dr. Mares deserved greater due process than an ordinary student, Defendants provided her with it, including ample notice and several opportunities to be fully heard.[8]  Boonshoft's decision does not implicate a substantive due process violation, a narrow category reserved for only the most egregious constitutional deprivations.  Similarly, Defendants are entitled to a judgment as a matter of law on her equal protection claim because the decision to dismiss Dr. Mares was reasonably related to upholding Boonshoft's professional standards.  Finally, Boonshoft, MVH, and Premier Health did not breach any contract implicated in this case.[9]

### A.  Federal Claims Against All Defendants

#### 1.  Procedural Due Process

The Due Process Clause of the Fourteenth Amendment forbids depriving any individual of "life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  "Under the guarantee, some form of process, sometimes elemental, sometimes formal, must precede any governmental deprivation of a person's property."  *Williams v. City of Detroit*, 54 F.4th 895, 898 (6th Cir. 2022).  A "plaintiff has the burden of showing that (1) he had a life, liberty, or property

---

[7] The Court assumes, *arguendo*, in Dr. Mares's favor, that all Defendants are "influential decisionmaker[s]" who may be sued under § 1983.  *Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 530 n.2 (6th Cir. 2015).

[8] The Item 504 procedures entitled her to have an attorney present for the hearing, Doc. No. 54-23 at PageID 2079, but Dr. Mares chose only to have Dr. Glover present with her at that time.  Doc. No. 52-64 at PageID 1565.

[9] As Dr. Mares is a Texan suing Ohioans for an amount exceeding $75,000, *see* Doc. No. 39 at PageID 577–79, the Court has diversity jurisdiction over her contract claims.  It would be error to decline to exercise supplemental jurisdiction over these state-law claims because there is an independent basis for jurisdiction. *See Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705, 715–16 (6th Cir. 2012).

interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (citations and internal quotation marks omitted). In any claim, "there are two basic due process requirements: (1) notice, and (2) an opportunity to be heard." *Flaim*, 418 F.3d at 634 (citing *Goss v. Lopez*, 419 U.S. 565, 579 (1975)). A crucial question to any procedural due process claim is "how much process" is owed to the individual—a question that turns on the facts, including the individual's status and the interests at stake. *J. Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281, 297 (6th Cir. 2019); *see also Flaim*, 418 F.3d 634.

This case turns on how much process is owed to Dr. Mares, a medical resident. Defendants contend that Dr. Mares is owed the amount of process due to a student because her relationship with Boonshoft approximates that of a student and university. Doc. No. 68 at PageID 2803–07. Dr. Mares argues that, as a doctor who completed medical school before her residency, she is akin to an employee, entitled to more process than a student. Doc. No. 66 at PageID 2770.

The record in the present case shows that Dr. Mares's relationship with Boonshoft was closer to a student than an employee, for several reasons. Boonshoft follows the Accreditation Council's accreditation standards, which require all medical schools to provide an "educational program" to mold students into doctors. *See* Doc. No. 54-20 at PageID 1883–84, 1914. Each resident, like a student, is subject to different standards and a specialized curriculum each year. Doc. No. 54-24 at PageID 2127–39. Boonshoft measures a resident's progress in the program—through meetings and written feedback—in the same manner as grading a student. Doc. No. 54 at PageID 1755–56; Doc. No. 54-23 at PageID 2056, 2140–41. Boonshoft's manual describes the program as having "a structured educational environment" but notes that, as residents progress,

16

they move "from total supervision to essentially independent function[.]"  Doc. No. 54-23 at PageID 2135.  It describes the supervising physicians as "faculty," rather than employers.  *See id.* at PageID 2046–47.  Residents even present a mandatory research project during their third year as part of their "curriculum."  *Id.* at PageID 2041, 2138.  Granted, Dr. Mares had an employment contract with MVH and already graduated medical school. Doc. No. 52 at PageID 875; Doc. No. 54-1.  But the facts in the record, in sum, demonstrate that her relationship with Boonshoft had the trappings of a student, including, *inter alia*, receiving academic evaluations; answering to faculty; and following academic accreditation standards.  *See* Doc. No. 54 at PageID 1755–56; 54-24 at PageID 2127–39.

This determination accords with analogous cases.  *See, e.g.*, *Fenje v. Feld*, 398 F.3d 620, 625–26 (7th Cir. 2005); *Shaboon v. Duncan*, 252 F.3d 722 (5th Cir. 2001); *Ezekwo v. N.Y. City Health & Hosps. Corp.*, 940 F.2d 775, 784–86 (2d Cir. 1991); *Davis v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989) ("It is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program"); *Allahverdi v. Regents of Univ. of N.M.*, No. Civ 05-277, 2006 WL 1313807, at *16–18 (D.N.M. Apr. 25, 2006) (collecting cases).  The primary purpose for Dr. Mares's residency was education and instruction in a quasi-academic environment.  *See* Doc. No. 54-23 at PageID 2056, 2077; *Davis*, 882 F.2d at 974.  Accordingly, the Court must analyze Dr. Mares's procedural due process claim under the framework governing students' claims.

Although Dr. Mares is considered a student for due process purposes, she is still entitled to some due process protections.  A student's continued enrollment in an academic program, including a residency program, "'clearly implicates' a protected property interest[.]"  *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) (quoting *Doe v. Cummins*, 662 F. App'x 437, 445

17

(6th Cir. 2016)). Students' due process claims challenging their dismissals fall into two categories: (1) disciplinary dismissals, and (2) academic dismissals. *See J. Endres*, 938 F.3d at 297 (comparing *Goss v. Lopez*, 419 U.S. 565 (1975), *with Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78 (1978)). "A decision is disciplinary when the university engages in first-level factfinding to resolve a disputed, objective question about the student's conduct—and the outcome of that inquiry could lead to the student's dismissal or a long suspension." *Id.* at 300. In an academic dismissal, "the university's 'critical decision requires a subjective, expert evaluation as to whether [the student's] performance satisfies some predetermined standard of academic competence,' which itself 'is set by a similarly expert judgment.'" *Id.* (quoting *Horowitz*, 435 U.S. at 95 n.5 (Powell, J., concurring)). "No formal hearing is required for academic decisions[.]" *Ku v. Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003). A university affords constitutionally adequate due process "when the student has been fully informed of the faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was careful and deliberate[.]" *Id.* (citations omitted).

"Courts are particularly ill-equipped to evaluate academic performance." *Horowitz*, 435 U.S. at 92. That includes dismissing a medical student for being unprofessional, an academic decision. *See Al-Dabagh v. Case W. Res. Univ.*, 777 F.3d 355, 359–61 (6th Cir. 2015). In evaluating such a dismissal, a reviewing court "must 'show great respect for the faculty's professional judgment' and may not 'override' that judgment 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the . . . committee responsible did not actually exercise professional judgment.'" *Id.* (alteration in original) (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)).

Dr. Mares's termination constituted an academic dismissal and is entitled to deference.

18

Boonshoft's academic handbook reveals that inculcating professionalism is core to its curriculum. Doc. No. 54-23 at PageID 2056, 2077; *see, e.g.*, *Al-Dabagh*, 777 F.3d at 359 ("Professionalism has been a part of the doctor's role since at least ancient Greece").  Moreover, it is beyond any genuine dispute that Boonshoft informed Dr. Mares that she was dismissed from the program for unprofessional actions, including rude behavior, disputes with fellow residents, and refusing to attend to patients.  *See* Doc. No. 52 at PageID 951–52, 954, 1045–46; Doc. No. 52-27; Doc. No. 52-58 at PageID 1480.  Indeed, throughout every instance in which Boonshoft contemplated Dr. Mares's dismissal, it emphasized her "unprofessional" behavior: a justifiable basis for dismissal. *See* Doc. No. 50 at PageID 756–57, 760–61; Doc. No. 52-7; Doc. No. 52-64 at PageID 1500–11; *see, e.g.*, *Horowitz*, 435 U.S. at 84–89 (medical school could dismiss student from program without a hearing for poor hygiene and timeliness).  The record further reveals that Dr. Mares has acknowledged the factual basis for her termination, describing her behavior as "not very professional[,]" Doc. No. 52 at PageID 1031, and "completely atrocious[,]"  Doc. No. 52-64 at PageID 1596, 1617, further cementing that there is no genuine dispute that she acted unprofessionally.  *See also* Doc. No. 52 at PageID 1158; Doc. No. 52-58 at PageID 1480.

The decision to terminate her for this behavior satisfied the minimal due process required for academic dismissals.  Throughout her tumultuous time at Boonshoft, Dr. Mares was repeatedly warned of her unprofessional behavior and the consequences it could have on her professional career.  *See* Doc. No. 52-43; Doc. No. 52-45 at PageID 1350–51; Doc. No. 52-57 at PageID 1478. The record thus reflects Boonshoft's continuous efforts to let Dr. Mares know how she was not meeting the residency program's standards.  *See, e.g.*, Doc. No. 50 at PageID 1012, 1019; Doc. No. 52-55; Doc. No. 52-57.  Boonshoft not only strictly adhered to Item 504 by allowing Dr. Mares to have a hearing, numerous appeals, and several opportunities to argue her position, but it imposed

every Accreditation Council standard, including giving Dr. Mares an individual remediation plan. *See* Doc. No. 52-43 at PageID 1347. Those efforts ensured that Dr. Mares was "fully informed of [Boonshoft's] dissatisfaction" with her performance before its "careful and deliberate" decision to dismiss her. *Ku*, 322 F.3d at 436; *see also, e.g.*, *Peavey v. Univ. of Louisville*, 834 F. Supp. 2d 620, 627–28 (W.D. Ky. 2011) (granting summary judgment as to medical resident's procedural due process claim because she was dismissed for unprofessional behavior and received a grievance hearing "[a]lthough [the medical school] was not required to do so"); *Shah v. Univ. of Tex. Southwestern Med. Sch.*, 54 F. Supp. 3d 681, 694–95 (N.D. Tex. 2014) (medical resident not denied due process when dismissed for unprofessionalism because he received weeks of negative feedback and could appeal his dismissal).

Even assuming, *arguendo*, that Dr. Mares was entitled to more due process than that owed to students faced with academic dismissal, the record makes clear that she received constitutionally required due process. Crediting Dr. Mares's claim that her dismissal affected her liberty interest in her livelihood, *see Johnson v. Morales*, 946 F.3d 911, 937 (6th Cir. 2020), Dr. Mares knew long before her dismissal that she was in danger of being dismissed on professionalism grounds, as discussed above. *See, e.g.*, Doc. No. 50 at PageID 1012, 1019; Doc. No. 52-55; Doc. No. 52-57. Likewise, Boonshoft held a hearing and permitted Dr. Mares to present evidence, call witnesses, and fully argue her case. *See, e.g.*, Doc. No. 52 at PageID 1071–74; Doc. No. 52-51.

In rebuttal, Dr. Mares contends that Dr. Dunn's mention of the patient safety report in her letter to terminate Dr. Mares's residency "served as the basis" for her ultimate decision, so Dr. Mares claims that she had no opportunity to address this concern. *See* Doc. No. 66 at PageID 2771. As is true for her other challenges, even construing the record in her favor, her conclusion lacks evidentiary support. First, Dr. Dunn, in her letter and deposition testimony, referenced Dr.

20

Mares's failure to improve on probation, her insubordination, and her unprofessional conduct to reject the panel's decision, which undercuts any notion that Dr. Dunn's decision solely rested on a patient safety report. Doc. No. 50 at PageID 761; Doc. No. 52-7 at PageID 1266. Second, Dr. Mares had the opportunity to, and did, address the report in her appeal to Provost Edwards. *See* Doc. No. 51-2 at PageID 846–47; *see also, e.g.*, *Morrison v. Warren*, 375 F.3d 468, 474–76 (6th Cir. 2004) (sheriff's deputy who received oral notice after discharge hearing of alternative ground for discharge was not deprived of due process). Thus, the record establishes that Dr. Mares "had an opportunity to respond, explain, and defend" against any possible reason motivating her dismissal. *Doe*, 872 F.3d at 400 (internal quotation marks omitted) (quoting *Cummins*, 662 F. App'x at 446).

In sum, Dr. Mares received notice of why she was being considered for dismissal, why she was dismissed, how she could fully appeal that dismissal, and had a full opportunity to be heard. Therefore, the Wright State Defendants are entitled to summary judgment.[10]

### 2. Substantive Due Process

Parallel to procedural due process is substantive due process, which prevents the

---

[10] As an alternative ground for summary judgment, the Wright State Defendants fully complied with their obligations set forth in Boonshoft's manual. "[A] nontenured employee's property interest in continued employment is created and defined by the employee's contract." *Ramsey v. Bd. of Educ. of Whitley Cnty.*, 844 F.2d 1268, 1273 (6th Cir. 1988); *see also Waters v. Drake*, 105 F. Supp. 3d 780, 791 (S.D. Ohio 2015) ("Under Ohio law, "[t]he interests created by contracts are . . . property interests" (quoting *EJS Props., LLC*, 698 F.3d at 857) (citing *Leary v. Daeschner*, 228 F.3d 729, 741 (6th Cir. 2000))). Boonshoft's manual, which functions as a contract between Dr. Mares and the Wright State Defendants, permits Boonshoft to dismiss a student who does not satisfy the school's professionalism standards, provided that their actions satisfy Item 504. Doc. No. 54-23 at PageID 2056. Because the Wright State Defendants followed Item 504 in dismissing Dr. Mares, they afforded her all the due process that she was owed under the manual. *Id.*; *see, e.g.*, *Blazy v. Jefferson Cnty. Reg'l Plan. Comm'n*, 438 F. App'x 408, 413–15 (6th Cir. 2011) (employee's due process rights were not violated where he was not rehired after his contract expired under its express terms). Moreover, although Dr. Mares abandoned her breach of contract claims against the Wright State Defendants, *see* Doc. No. 29 at PageID 219, she could not maintain those claims for this reason because no breach of any relevant contract occurred, as Boonshoft was entitled to dismiss her from the program for her unprofessionalism. *See infra* Part III(B).

government from depriving "individuals of certain rights, regardless of the procedures used." *Siefert v. Hamilton County*, 951 F.3d 753, 765 (6th Cir. 2020) (citing *Guertin v. State*, 912 F.3d 907, 918 (6th Cir. 2019)). "It protects a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.'" *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–50 (6th Cir. 2003)); *see also In re City of Detroit*, 841 F.3d 684, 699 (6th Cir. 2016) (describing the list of substantive due process rights as "short" and "seldom-expanded").

Dr. Mares gives two reasons why she was deprived of substantive due process. Neither succeeds. First, she claims she was denied procedural due process, which contravened her substantive due process rights. Doc. No. 66 at PageID 2776. However, for the reasons previously stated, she received ample procedural due process before, during, and after her dismissal. *See supra* Part III(A). Second, she claims that the "illusory" nature of the panel hearing rendered the proceedings conscience-shocking—again claiming that she was dismissed solely because she entered incorrect information in a safety report. Doc. No. 66 at PageID 2776. This does not follow because the record establishes beyond dispute that she was dismissed for, *inter alia*, unprofessional conduct. *See* Doc. No. 50 at PageID 761, 799, 804–05; Doc. No. 51-2 at PageID 846–47; Doc. No. 52-7 at PageID 1266.

Taking as true Dr. Mares's unsupported assertions, she has not described "conscience-shocking" behavior. Government actions shock the conscience when they are "so 'brutal' and 'offensive' that they do not comport with traditional ideas of fair play and decency." *Range*, 763 F.3d at 589–90 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998)). Naturally, this is a weighty threshold—one that Dr. Mares's dismissal, even accepting her allegations as true,

does not meet. *Cf. id.* at 589–92 (finding no conscience-shocking behavior in the failure to terminate a forensic officer after he sexually abused murder victims' bodies while he was intoxicated); *Puckett v. Lexington-Fayette Urban Cnty. Gov't*, 566 F. App'x 462, 472 (6th Cir. 2014) ("Generally, the 'shocks the conscience' strain of successful substantive due process claims is recognized in the exclusive context of cases involving physical abuse" (internal quotation marks and citations omitted)); *Peavey*, 834 F. Supp. 2d at 628.[11]  For these reasons, the Court grants summary judgment to the Wright State Defendants on this claim.

### 3.  Equal Protection Claim

"The Equal Protection Clause 'is 'essentially a direction that all persons similarly situated should be treated alike.'"  *Andrews v. City of Mentor*, 11 F.4th 462, 473 (6th Cir. 2021) (quoting *EJS Props., LLC*, 698 F.3d at 864). "[A] 'class-of-one' may bring an equal protection claim where the plaintiff alleges that: (1) he or 'she has been intentionally treated differently from others similarly situated'; and (2) 'there is no rational basis for the difference in treatment.'"  *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  "The 'rational basis' test means that courts will not overturn government action 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the

---

[11] Dr. Mares, without elaboration, pivots to alleging that the Wright State Defendants' actions were "arbitrary and capricious," Doc. No. 66 at PageID 2776, because they rejected the panel's decision.  But that does not follow from the record.  Rather, the Wright State Defendants dismissed her, after affording ample notice and a window to respond, because they felt that she did not hold herself to the high professional standards for doctors.  *See, e.g.*, *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–52 (6th Cir. 2003) (rejecting medical student's due process claim for being dismissed from school for academic reasons); *Barsoumian v. Williams*, 29 F. Supp. 3d 303, 315–16 (W.D.N.Y. 2014) (rejecting medical resident's due process claims for being terminated from residency with adequate notice).  Assuming, *arguendo*, that arbitrary and capricious conduct could give rise to constitutional liability, *see Wayne Watson Ents., LLC v. City of Cambridge*, 243 F. Supp. 908, 924 (S.D. Ohio 2017), the Court cannot say that the Wright State Defendants' decision to terminate Dr. Mares was "willful and unreason[ed], without consideration and in disregard of the facts and circumstances[.]" *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221–22 (6th Cir. 1992) (quoting *Greenhill v. Bailey*, 519 F.2d 5, 10 n.12 (8th Cir. 1975)).

23

[government's] actions were irrational.'" *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005) (alterations in original) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 68 (2000)). "A 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negativing every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Johnson*, 946 F.3d at 939 (quoting *Warren*, 411 F.3d at 711).

Dr. Mares contends that the Wright State Defendants treated her differently than other medical residents without a rational basis. Doc. No. 66 at PageID 2777–78. However, that is incorrect for several reasons. First, Dr. Mares admits that she cannot point to evidentiary support in the record showing that similarly situated residents were treated better than her. *Id.* at PageID 2778. That is fatal to her claim. *See, e.g.*, *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 575 (6th Cir. 2008); *Schellenberg v. Township of Bingham*, 436 F. App'x 587, 592 (6th Cir. 2011) ("[P]laintiffs cannot establish a cognizable 'class of one' equal protection claim merely by relying upon the unsupported assertion that 'all applicants' are similarly situated"). Second, assuming, *arguendo*, she could show this necessary element, the Wright State Defendants' decision to dismiss Dr. Mares was rationally related to the "legitimate purpose" of keeping Boonshoft's high professional standards. *Warren*, 411 F.3d at 710; *see, e.g.*, *Benjamin v. Schuller*, 400 F. Supp. 2d 1055, 1080 (S.D. Ohio 2005) (doctor's class-of-one claim failed because hospital had a rational basis to revoke his privileges based on his failure to meet professional medical standards). The record, when considered through this deferential lens, supports this conclusion. *See, e.g.*, Doc. No. 50 at PageID 761; Doc. No. 52-64 at PageID 1517–18; Doc. No. 54-23 at PageID 2077; *cf. Tiwari v. Friedlander*, 26 F.4th 355, 361 (6th Cir. 2022) ("Right or wrong, rational-basis review epitomizes a light judicial touch" (first citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–

24

14 (1993); and then citing *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–88 (1955))). That very same evidence severely undercuts Dr. Mares's conclusory allegation that she was dismissed because of animus, considering it is undisputed that—on numerous occasions—the Wright State Defendants repeatedly informed her that she was not meeting their professional standards and repeatedly gave her opportunities to improve her treatment of colleagues and patients. Doc. No. 52 at PageID 1010, 1019; Doc. No. 52-28; Doc. No. 52-41; Doc. No. 52-45.

Thus, the Wright State Defendants are entitled to summary judgment on Dr. Mares's federal Equal Protection claim.

### 4. Federal Claims Against MVH and Premier Health

MVH and Premier Health allege that their actions are not fairly attributable to the state—precluding § 1983 liability—but the Court need not reach that issue. Dr. Mares's claims against MVH and Premier Health are identical to her claims against the Wright State Defendants, *see, e.g.*, Doc. No. 66, and Dr. Mares did not suffer any violation of her constitutional rights through her termination—regardless of MVH or Premier Health's role—so the aforementioned reasons why her claims are insufficient as a matter of law apply with equal force here. *See* Part III(A)(1)–(3). Accordingly, MVH and Premier Health are entitled to summary judgment as to Dr. Mares's federal claims.

### B. Breach of Contract Claims Against MVH and Premier Health

Breach of contract, under Ohio law, "requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach."[12] *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d

---

[12] Because Defendants are entitled to summary judgment on Dr. Mares's federal law claims, only her state law claims remain. *See supra* Part III(A), (B). Because these claims implicate diversity jurisdiction, the Court applies "the choice of law rules and substantive law of [Ohio,] the forum state." *Smith v. Gen. Motors, LLC*, 988 F.3d 873, 879 (6th Cir. 2021) (quoting *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008)).

458, 469 (Ohio 2018).  "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined."  *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 686 (Ohio 1995) (quoting *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.*, 474 N.E.2d 271, 272 (Ohio 1984)); *see also Beverage Holdings, LLC v. 5701 Lomardo, LLC*, 150 N.E.3d 28, 28 (Ohio 2019).  Relatedly, "[t]here is no independent cause of action for breach of the implied duty of good faith and fair dealing apart from a breach of the underlying contract."  *Lucarell*, 97 N.E.3d at 469 (citations omitted).

Dr. Mares claims that MVH and Premier Health breached the terms of its Resident-Fellow Agreement with her.  Doc. No. 66 at PageID 2781.  That tacit recognition is prescient here because "a contract is binding only upon parties to a contract and those in privity with them[,]" so her claim for breach of the enrollment contract—of which neither MVH nor Premier Health is a party—fails as a matter of law.  *Samadder v. DMF of Ohio, Inc.*, 798 N.E.2d 1141, 1147 (Ohio Ct. App. 2003) (citing *Am. Rock Mechs., Inc. v. Thermex Energy Corp.*, 608 N.E.2d 830 (Ohio Ct. App. 1992)).  All that remains are Dr. Mares's two allegations that MVH and Premier Health breached the Resident-Fellow Agreement by: (1) not following the contract's due process procedure, *i.e.*, Item 504; and (2) violating the duty of good faith and fair dealing by breaching the contract.  *Id.*  Careful review of the record and agreement, however, reveals no breach.

MVH and Premier Health could terminate the agreement if Dr. Mares was "terminated by the [p]rogram."  Doc. No. 54-1 at PageID 1828.  There is no ambiguity as to the meaning of this provision, so MVH and Premier Health did not breach the contract.  *See, e.g., Sekerak v. Nat'l City Bank*, 342 F. Supp. 2d 701, 706 (N.D. Ohio 2004) (applying Ohio law) ("If a contract's terms are clear and unambiguous, a court may grant summary judgment since contract interpretation is a matter of law" (citations omitted)).  MVH and PHP terminated the agreement after Boonshoft

26

terminated Dr. Mares from the program.  *See supra* Part I(B).  Likewise, the Court has already found that, beyond any genuine dispute of material fact, all Defendants followed the due process procedure in Item 504.  *See supra* Part III(A)(1).  Given that no breach of the agreement occurred, the Court will not entertain Dr. Mares's "free-standing" good faith claim.  *Patrick v. CitiMortgage, Inc.*, 676 F. App'x 573, 577 (6th Cir. 2017) (collecting cases).  Thus, MVH and Premier Health are entitled to summary judgment on these claims.

<h3 style="text-align:center">IV. Conclusion</h3>

For the reasons stated, Defendants' motions for summary judgment are **GRANTED**.  Doc. Nos. 49, 57.  This case is **TERMINATED** on the docket.

**IT IS SO ORDERED.**

  May 2, 2023                                 s/Michael J. Newman
                                                       Hon. Michael J. Newman
                                                     United States District Judge